1  Lawrence P. Riff (State Bar No. 104826)
   *lriff@steptoe.com*
2  Jason Levin (State Bar No. 161807)
3  *jlevin@steptoe.com*
   Howard H. Stahl (Pro Hac Vice App. Pending)
4  *hstahl@steptoe.com*
   Karl M. Tilleman (Pro Hac Vice App. Pending)
5  *ktilleman@steptoe.com*
6  **STEPTOE & JOHNSON** LLP
7  633 West Fifth Street, Suite 700
   Los Angeles, California 90071
8  Telephone: (213) 439-9400
9  Facsimile: (213) 439-9599
   Attorneys for Plaintiffs
10

FILED
CLERK, U.S. DISTRICT COURT
SEP - 4 2007
10:18
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

11              **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13  University of Southern California, a non-     Case No.:  LV07-05737 ER (AJWx)
    profit corporation and private university;
14  University Gateway Development, LLC,          **COMPLAINT FOR:**
    a Delaware limited liability company; and    1.  **MONOPOLIZATION IN**
15  Urban Partners, LLC, a California limited         **VIOLATION OF SECTION 2**
    liability company,                               **OF THE SHERMAN ACT**
16
17              Plaintiffs,                       2.  **ATTEMPTED MONOPOLIZATION**
                                                      **IN VIOLATION OF SECTION 2**
18       vs.                                          **OF THE SHERMAN ACT**
19
    Conquest Student Housing, LLC, a             3.  **CONSPIRACY TO MONOPOLIZE**
20  California limited liability company;            **IN VIOLATION OF SECTION 2**
    Brian Chen, also known as Chien-Chih            **OF THE SHERMAN ACT**
21  Chen, an individual; Alan Smolinisky, an
    individual; Casey Smith, an individual;      4.  **VIOLATION OF THE RACKETEER**
22  Mariano Baez, an individual; Julio               **INFLUENCED AND CORRUPT**
    Orellano, an individual; and DOES 1              **ORGANIZATIONS ACT**
23  through 10, inclusive,
24                                               5.  **CONSPIRACY TO VIOLATE THE**
                Defendants.                          **RACKETEER INFLUENCED AND**
25                                                   **CORRUPT ORGANIZATIONS ACT**
26                                               6.  **INTERFERENCE WITH**
                                                     **ECONOMIC RELATIONS**
27
                                                 7.  **INTERFERENCE WITH**
28                                                   **PROSPECTIVE ECONOMIC**
                                                     **ADVANTAGE**

                                                 8.  **UNFAIR COMPETITION**

                                                 9.  **ABUSE OF PROCESS**
                                                 **AND DEMAND FOR JURY TRIAL**

DOCKETED ON CM
SEP - 7 2007

COMPLAINT

1  Plaintiffs, the University of Southern California ("USC"), Urban Partners, LLC

2  ("Urban"), and University Gateway Development, LLC ("Gateway") allege as

3  follows:

### Jurisdiction and Venue

5  1.    This Court has jurisdiction over the subject matter of this action

6  pursuant to 28 U.S.C. § 1331 and § 1337.  This action arises under the Clayton

7  Act, 15 U.S.C. §§ 15, 26, to obtain injunctive relief and damages for violations of

8  section 2 of the Sherman Act, 15 U.S.C. § 2, and the federal Racketeer Influenced

9  and Corrupt Organizations statute, 18 U.S.C. § 1961 *et seq.*

10  2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1367 over the state

11  law causes of actions because those causes of action are related to the federal law

12  causes of action and form part of the same case and controversy under Article III of

13  the United States Constitution.

14  3.    The conduct alleged in this Complaint occurred in interstate

15  commerce and has affected and will continue to substantially and directly affect

16  interstate commerce.

17  4.    Venue is proper in the Central District of California because (a) all

18  Defendants reside in the State of California and at least one of the Defendants

19  resides in this District, and (b) substantial parts of the events or omissions giving rise

20  to the claims occurred in this District.

### Introduction

22  5.    The Conquest Defendants — the self-proclaimed "Al-Qaeda" of the

23  USC student housing market — have conspired to dominate, monopolize, and

24  control the student housing market around USC through a pattern of racketeering

25  activities, abusive litigation, extortion, fraud, and intimidation, even going so far as

26  to state that they have the ability to financially "bomb" competitive development

27  projects.

28

6.      The Conquest Defendants have engaged in these illegal, abusive, and unfair business practices with the brazenly open intent of monopolizing and dominating the student housing market within walking distance of the USC campus. The Conquest Defendants literally have characterized the acquisition of property for USC student housing as akin to playing a game of "Monopoly."

7.      The Conquest Defendants currently own and operate at least 19 apartment complexes within walking distance of USC, which house more than 1,400 USC students.  In early 2007, the Conquest Defendants told USC officials, at a meeting at Conquest's offices, that the Conquest Defendants' mastery over the pricing of the USC student housing market is so complete that they know "by the hour" how they can manipulate rental rates.  The Conquest Defendants maintain in their offices parcel-by-parcel, floor-to-ceiling maps of the USC area that they constantly update to track their monopolistic control over this market.

8.      Plaintiff Urban is a respected and successful real estate planning, investment, development, and management firm based in downtown Los Angeles with a distinguished reputation for its expertise in obtaining urban entitlements and in handling urban development, restoration, and redevelopment projects.

9.      In 2005, Urban completed ground lease and sublease transactions with The Shammas Group and USC to develop 421 apartments for USC students, parking garages, and ground floor retail space on a site adjacent to the USC campus owned by The Shammas Group (the "University Gateway Project").

10.     Soon after, the Conquest Defendants began attacking the University Gateway Project.  The Conquest Defendants initiated a misinformation campaign to distort the project, scare community residents, and artificially incite community opposition by, among other things, creating a website, posting billboards, and circulating flyers that all contained false and misleading information about the size and scope of the project.

- 3 -
**COMPLAINT**

11.     The Conquest Defendants also initiated numerous abusive challenges to the environmental impact report ("EIR") and entitlements granted by the City of Los Angeles and the Community Redevelopment Agency ("CRA") for the University Gateway Project, inappropriately challenging the EIR and entitlements granted by the City primarily, if not solely, to further the Conquest Defendants' own illegal goals.   After the City and the CRA rejected the Conquest Defendants' challenges to the EIR and entitlements, the Conquest Defendants filed another round of abusive appeals with the courts, seeking to delay the University Gateway Project for years.   The Conquest Defendants' abusive litigation tactics have delayed the University Gateway Project, which has resulted in a substantial loss of capital, time and resources for Urban, and has also delayed the introduction of new student housing for more than 1,600 USC students, to the detriment of USC and its students.

12.     In retaliation for Urban's attempt to enter the USC student housing market, the Conquest Defendants have interfered with Urban's development projects outside of the USC area, some as far away as the State of Washington, where the Conquest Defendants have no interests or business activities whatsoever.   The Conquest Defendants have done so, in part, by filing a series of bad faith, anticompetitive, lawsuits against Urban that frivolously challenge the entitlements to Urban's projects.   The Conquest Defendants also have attempted in some cases even to bribe local residents to oppose Urban's projects.

13.     The Conquest Defendants have openly told USC officials and others that they will do whatever it takes to prevent construction of the University Gateway Project, and that they will not stop their anticompetitive and illegal actions until Urban abandons the University Gateway Project.   The Conquest Defendants also have threatened to block or delay any of USC's own future development plans if those plans include any new student housing developments.

14.     The Conquest Defendants also have made blatant anti-competitive threats against other businesses with plans to develop in the USC student housing

- 4 -
**COMPLAINT**

market.  When The Martin Group, another real estate development firm, began to explore the acquisition and development of a student housing project near USC, the Conquest Defendants threatened The Martin Group that they would tie up any proposed project in environmental litigation for years.  The Conquest Defendants specifically told The Martin Group that they should be thought of as "Al-Qaeda" and stated they know how to "bomb" competitive development projects through litigation under the California Environmental Quality Act (CEQA).  The Conquest Defendants brazenly bragged to The Martin Group that their CEQA litigation tactics had successfully delayed the University Gateway Project, and that they had "chased" Urban all the way to Washington to get Urban to drop the University Gateway Project.

15.    The Conquest Defendants' anti-competitive and abusive conduct has not only harmed Urban, Gateway, and USC, it has also wasted the time and resources of public agencies and the courts.  The President of the City of Los Angeles Planning Commission on the record described the Conquest Defendants' tactics as "distasteful," and a member of the Los Angeles City Council described their tactics as "disgraceful" and hoped the matter would be referred to the City Attorney's Office for a criminal investigation.

16.    The Conquest Defendants will stop at nothing to prevent development of the University Gateway Project, to prevent the development of other Urban projects, to prevent appropriate competition in the student housing projects around USC, and to ensure that they maintain monopoly control of the student-housing market near USC.  In the process, the Conquest Defendants have violated the Racketeer Influenced and Corrupt Organizations Act, the Sherman Act, the California Unfair Competition laws, and other federal and state laws.  The Conquest Defendants have also repeatedly abused the litigation process by filing numerous frivolous lawsuits and appeals.

## The Parties

17.     Plaintiff USC is a non-profit corporation and California's oldest private research university located in Los Angeles, California.

18.     Plaintiff Urban is a California limited liability company authorized to do business in Los Angeles County, California.  Urban is a real estate planning, investment, development, and management firm that also provides fee-based project consulting to private, nonprofit, and government clients.  Urban conducts business throughout the United States, and its investors live in various parts of the country.  Urban is currently developing several projects in various California counties and four projects in the State of Washington.

19.     Plaintiff Gateway is a Delaware limited liability company authorized to do business and doing business in Los Angeles County, California.  Gateway is a development company created by Urban to entitle, develop, and construct the University Gateway Project.

20.     Defendant Conquest Student Housing, LLC ("Conquest") is a California limited liability company with its principal place of business in Los Angeles County, California.  At all relevant times, Conquest developed, owned, and operated various apartment complexes near USC.

21.     Defendant Brian Chen, also known as Chien-Chih Chen ("Chen") is, and at all relevant times was, an individual residing in the State of California.

22.     Defendant Alan Smolinisky ("Smolinisky") is, and at all relevant times was, an individual residing in the State of California.

23.     Defendant Casey Smith ("Smith") is, and at all relevant times was, an individual residing in the State of California.

24.     Conquest, on the one hand, and Chen, Smolinisky and Smith, on the other hand, are "alter egos" of each other.  There is such a unity of interest and ownership between Conquest, on the one hand, and Chen, Smolinisky and Smith, on the other hand, that their separate identities have ceased to exist, and to adhere to the

1   separateness of Conquest from Chen, Smolinisky and Smith would promote and
2   sanction an injustice.  Conquest, Chen, Smolinisky, and Smith will be referred to,
3   collectively, as the "Conquest Defendants."

4        25.     Defendant Mariano Baez ("Baez") is, and at all relevant times was, an
5   individual residing in the State of California.

6        26.     Defendant Julio Orellano ("Orellano") is, and at all relevant times
7   was, an individual residing in the State of California.  The Conquest Defendants,
8   Baez, and Orellano will be referred to, collectively, as the "Defendants."

9        27.     Defendants were at all relevant times the agents, principals, partners,
10  co-conspirators and/or co-venturers of each other, and each of them acted within the
11  course, scope, and authority of those relationships.  As a result, Defendants are
12  jointly and severally liable for the acts alleged in this Complaint.

13                              **Factual Allegations**

14  **1.   Conquest Has Monopolized The Available Student Housing Near USC.**

15       28.     USC is located in an area near downtown Los Angeles with a limited
16  number of apartments within walking distance of the campus.  For years, there has
17  been a limited amount of suitable student housing near USC.  Roughly 46 percent of
18  USC's students are from out-of-state, including international students, and they look
19  to USC for guidance regarding the availability of suitable, appropriate housing.
20  However, due to the limited amount of suitable student housing on or near the
21  campus, USC cannot guarantee housing to the majority of its students.

22       29.     To take financial advantage of the demand for student housing within
23  walking distance of USC, Conquest has for several years purchased apartment
24  buildings near USC, made superficial improvements, and then significantly
25  increased the rent — sometimes as much as 200 percent above what residents had
26  previously paid for the same apartment.

27       30.     Conquest is currently the dominant provider of off-campus student
28  housing near USC.  Conquest owns a significant share of, and dominates the market

1   for, non-USC student housing within walking distance of the USC campus, which
2   Conquest itself has defined as "Adams Street on the north, Figueroa on the east, and
3   Vermont on the west." Indeed, Conquest promotes itself as the "premier provider of
4   non-university" student housing in that area — which Conquest refers to as "the
5   USC neighborhood." Conquest owns and/or operates at least 19 apartment
6   complexes within that area, which house more than 1,400 students.

7   **2.   The Conquest Defendants Openly Intend To Terrorize Any Project That**
8   **Interferes With Their Monopolistic Design For The USC Housing**
9   **Market.**

10   31.   Conquest has made it clear that it will do whatever it takes to stop
11   student housing developments by competitors in the USC student housing market.

12   32.   The Martin Group ("TMG") is a real estate development and
13   management company based in Santa Monica, California, that recently began
14   exploring the acquisition and development of a property for student housing located at
15   3800 South Figueroa Street near USC.

16   33.   On May 9, 2007, at Defendant Smolinisky's request, Lee Wagman
17   (TMG's Chief Executive Officer) and Howard Kozloff (TMG's Development
18   Manager) met with Defendant Smolinisky and Defendant Chen at TMG's offices in
19   Santa Monica.

20   34.   During that meeting, Defendant Smolinisky warned TMG that it
21   should not enter the student housing market near USC. (Dec. of Howard J. Kozloff
22   (Ex. 1) at ¶¶ 3-4; Dec. of Lee H. Wagman (Ex. 2) at ¶¶ 3-4) Defendant Smolinisky
23   threatened to sue any TMG project at 3800 South Figueroa using CEQA litigation.
24   (*Id.*)

25   35.   Defendant Smolinisky said that there was no market depth for student
26   housing near USC, that TMG would be making a huge mistake by developing
27   student housing near USC, and that any TMG student housing project near USC
28   would not reach functional occupancy levels. (*Id.* at ¶ 4) Defendant Smolinisky

warned that, if TMG decided to proceed with a student housing project, Conquest would prolong TMG's entitlement process to the maximum extent possible by opposing those entitlements and by suing to delay any project approvals under the CEQA. (*Id.*) Defendant Smolinisky told TMG that those delays would make TMG's purchase of the site economically infeasible. (*Id.*) Defendant Smolinisky said that he knew exactly what it would cost Conquest to slow down a project like TMG's, that he would spend between $1.3 and $1.6 million to prevent the TMG project, and that he could delay the TMG project by six or more years using CEQA litigation. (*Id.*)

36.    Defendant Smolinisky said that TMG should think of him and Conquest like "Al Qaeda," that it does not cost a lot to "bomb" a development project, and that it only takes a single person to cause serious harm to real estate projects using CEQA litigation. (*Id.*)

37.    Defendant Smolinisky also bragged that Conquest's CEQA litigation tactics had successfully delayed the University Gateway Project. (*Id.* at ¶ 5) Defendant Smolinisky said that his lawsuits opposing the University Gateway Project had delayed that project's groundbreaking, and he boasted that he is using CEQA to oppose other projects involving Urban. (*Id.*) Defendant Smolinisky stated that he had delayed Urban's projects in downtown Los Angeles, that he had delayed Urban's project in Sun Valley, and that he "chased" Urban all the way to Seattle to oppose Urban's project in that city. (*Id.*)

38.    Defendant Smolinisky also said that he planned to meet with the Blackstone Group, one of the investors in the University Gateway Project, to threaten them about their involvement in that project. (*Id.*)

39.    Defendant Smolinisky said that he had successfully made Urban and the Shammas family a "victim" for proceeding with the University Gateway Project. (*Id.*)

40.     Defendant Smolinisky told Mr. Wagman and Mr. Kozloff that he viewed CEQA as a powerful tool to delay real estate projects, claimed to have highly effective legal counsel, and falsely claimed that nothing could be done to prevent him from attacking development projects with abusive litigation tactics. (*Id.*)

41.     Defendant Smolinisky said that he knew about TMG's other projects in downtown Los Angeles, Agoura Hills, and on La Brea Boulevard, and noted that the La Brea project had already experienced some delay. (*Id.*)

42.     Within a day or so after the May 9, 2007 meeting, TMG received notice that Conquest had filed California Public Records Act requests for documents concerning TMG's development projects in Agoura Hills and on La Brea Boulevard. (*Id.* at ¶ 7)

43.     On May 16, 2007, Defendants Smolinisky and Chen sent a letter to TMG renewing the threat that Conquest intended to initiate litigation and draw out appeals if TMG developed the 3800 South Figueroa Street property.  (Letter dated May 16, 2007 (Ex. 3))   That letter set forth Conquest's projected development timeline for a TMG project at 3800 South Figueroa Street and stated that "we have assumed that a consortium of existing tenants and neighbors object to the project" and that litigation involving such a project would delay construction until "mid-2013."   (*Id.* at 2)   The letter also stated that "If you were to construct the improvements, we are unable to envision any reality in which you would be able to generate sufficient income to break even." (*Id.* at 3)

44.     On May 17, 2007, TMG sent a letter to Defendant Smolinisky outlining the threats that Defendant Smolinisky and Conquest had made to TMG. (Letter dated May 17, 2007 (Ex. 4))   As a result of Smolinisky's and Chen's extortionate threats, TMG abandoned its plan to enter the student housing market near USC.

///

**3.     The Conquest Defendants Attack The University Gateway Project.**

45.     Conquest has engaged in the same illegal, improper, and anticompetitive conduct in an attempt to destroy the University Gateway Project. To inform the public and investors of new ventures, Urban lists information about its current projects on its website. In early 2005, Urban announced on its website, among other places, that (a) Gateway had completed ground lease and sublease transactions with The Shammas Group and USC and formed a joint venture with an investor to develop 421 rental housing units for USC students and faculty, parking garages, and ground floor retail space for retailers on a site adjacent to the USC campus owned by The Shammas Group, and (b) Clark Construction had been selected as the contractor. The University Gateway Project is the first student housing project that Urban has attempted to develop to address the limited amount of student housing near USC.

46.     USC owns approximately 7% of the property that is being leased for development of the University Gateway Project. USC also is the ground lessee for the Project. USC has contracted to lease approximately 70,000 of the 83,000 square feet of the ground floor commercial space in the University Gateway Project, which will include a fitness center and a USC book store facility that would significantly expand the capacity, and enhance the quality, of USC's current book store facilities.

47.     USC has a compelling interest to encourage the private sector to develop suitable, accessible off-campus student housing, especially as USC transitions from a commuter to a residential university. Additional private-sector student-housing projects, which provide suitable, accessible off-campus student housing, will allow USC to focus its resources and energy on its educational and research goals. Such student-housing projects are essential to USC, especially given the current limited amount of suitable, accessible student housing.

48.     The University Gateway Project is intended to provide housing to over 1,600 USC students; to provide quality fitness, restaurant, bookstore and other

**COMPLAINT**

1   services to USC students; and to increase significantly the supply of student housing
2   units available in the USC off-campus student housing market.   This increased
3   housing supply and related services would also create a more competitive market for
4   student housing — reducing Conquest's ability to inappropriately inflate prices for
5   seriously sub-par student housing.

6        49.     Intending to monopolize the USC off-campus student housing market,
7   the Conquest Defendants immediately initiated a scheme through the use of the U.S.
8   mail and internet, of false and misleading factual representations about the size and
9   scope of the University Gateway Project, intending to delay and ultimately prevent
10  construction of the University Gateway Project.

11       50.     The Conquest Defendants created, funded and controlled as their alter
12  ego an organization called the "University Park Community Association" and
13  created a website on the internet at www.stopuniversitygateway.com.  The Conquest
14  Defendants used this website for fraudulent, anticompetitive, and monopolistic
15  purposes — to make or cause to be made factual representations that the Conquest
16  Defendants knew or should have known were false and misleading regarding the
17  scope and size of the University Gateway Project to incite artificial concern within
18  the community.   The false and misleading representations included, but were not
19  limited to:

20            a.     The  Conquest  Defendants  represented  that  the  University
21  Gateway Project was only the first phase in a series of projects that would take place
22  in the USC off-campus student housing market, when in fact the University Gateway
23  Project is a single stand-alone development with no additional phases.

24            b.     The Conquest Defendants falsely stated that the parking plan for
25  the University Gateway Project would result in a 702 parking space deficit.

26            c.     The Conquest Defendants represented that Urban planned to
27  work with the City of Los Angeles to take the homes of nearby residents through
28  eminent domain to build the University Gateway Project, when in fact the Project

1   would be developed completely on land owned by The Shammas Group without
2   displacing any homes.

3            d.      The Conquest Defendants represented that the University
4   Gateway Project would not provide any living wage permanent jobs, when in fact
5   the Project proposed nearly 700 jobs, almost 200 of which would be full-time
6   permanent jobs that provide a living wage.

7        51.     The Conquest Defendants used www.stopuniversitygateway.com to
8   disseminate the foregoing fraudulent misrepresentations throughout the country, and
9   internationally.  In furtherance of the Conquest Defendants' scheme to defraud, in
10  January, 2006, the Conquest Defendants caused brochures containing these and
11  other false and misleading statements about Urban and the University Gateway
12  Project to be mailed to USC students and the general public, including potential
13  customers of Urban, with the specific intent to delay and ultimately to prevent
14  construction of the University Gateway Project.  (Ex. 5)  The Conquest Defendants
15  also launched a billboard advertising and flyer campaign that misrepresented the size
16  and scope of the University Gateway Project.

17       52.     Conquest was put on notice as early as 2005 that there were no
18  additional phases planned for the University Gateway Project.  In public hearings
19  and otherwise, Urban and its representatives clarified that plans for a phased project
20  had been dropped, and that no future phases were planned.  This clarification was
21  widely publicized and made clear to Conquest.  The University Gateway EIR itself
22  documents that no future phases were intended.  Conquest, through its counsel,
23  acknowledged that fact at page 4 of its opposition letter to the draft EIR.
24  Nevertheless, Conquest continued to misrepresent to the public that University
25  Gateway Project was a phased project with the current plans being only the first of
26  several phases.

27       53.     The Conquest Defendants also improperly copied from Urban's
28  website the conceptual plans prepared in 2002 by Urban's architect without

permission.  The conceptual plans were outdated and substantially superseded and did not represent the actual size or scope of the University Gateway Project.  Even though they knew that the conceptual plans did not accurately portray the University Gateway Project, the Conquest Defendants posted copies of the outdated and erroneous conceptual plans on www.stopuniversitygateway.com and sent agents (including defendant Smith) to falsely misrepresent to the public at hearings that the conceptual drawings constituted the "real" University Gateway Project.  The Conquest Defendants thereby attempted inappropriately to incite local residents and business owners to protest against the University Gateway Project.

54.    The Conquest Defendants also obtained a copy of Urban's Confidential Offering Memorandum without Urban's consent.  The Confidential Offering Memorandum was created by Urban and released only to a few select investors.  Indeed, the Confidential Offering Memorandum expressly states on its face that it "is the confidential and proprietary information of Urban Partners, LLC and is being submitted to you for your confidential use with the express understanding that, without the prior written permission of Urban Partners, LLC, you will not release or discuss the information contained herein or make reproductions of or use this preliminary material for any purpose other than for evaluating an interest in receiving the offering materials with respect to the investment opportunity which is described."

55.    Urban never released the Confidential Offering Memorandum to the public, or authorized it to be used or possessed by the Conquest Defendants.

56.    The Conquest Defendants misappropriated and copied Urban's Confidential Offering Memorandum and filed a copy of the Memorandum with the City of Los Angeles, thereby making Urban's Confidential Offering Memorandum a matter of public record.

57.    Urban did not license or authorize the Conquest Defendants to use Urban's confidential conceptual drawings or Confidential Offering Memorandum.

The Conquest Defendants therefore improperly reproduced, displayed, distributed, and publicized Urban's conceptual drawings and Confidential Offering Memorandum.

**4.     The Conquest Defendants Have Abused the Administrative and Legal Process In Attempting to Block the University Gateway Project.**

58.     In March 2007, Defendant Smolinisky told USC officials that Conquest had done, and would do, whatever is necessary to prevent the construction of the University Gateway Project.  Defendant Smolinisky said that the market for student housing near USC is not very deep and the number of beds that would be added by the University Gateway Project would effectively destroy Conquest's pricing power.

59.     Indeed, in an attempt to force Urban to abandon the University Gateway Project, the Conquest Defendants have abused the administrative and legal process through the filing of numerous inappropriate challenges and appeals to the University Gateway Project.

60.     The Conquest Defendants first sought to delay the University Gateway Project when the University Gateway Project was before the Community Redevelopment Agency ("CRA") by making abusive challenges to the proposed mitigated negative declaration (MND) and the EIR for the University Gateway Project.  During the course of the proceedings before the CRA, the Conquest Defendants submitted, among other things, a 41-page letter, a 107-page letter, and a banker's box full of documents to the CRA to prolong the approval process and incite nearby business owners and residents to submit similar complaints about the EIR.

61.     The Conquest Defendants knew that their improper challenge to the EIR would substantially delay the University Gateway Project.  The Conquest Defendants knew that under CEQA, the CRA (as the "lead agency") would be forced to address and respond to each and every comment — no matter how

1    frivolous or meritless — made by any person regarding the EIR. Indeed, the final
2    approval and certification of the EIR was substantially delayed as a result of the
3    Conquest Defendants' abusive challenges.

4        62.    One of the Conquest Defendants' primary objections to the EIR was
5    that the parking ratio (the number of parking spaces being provided for each dwelling
6    unit) for the University Gateway Project was inadequate. The Conquest Defendants
7    knew their objection regarding the parking ratio, along with many of their other
8    objections, was frivolous and without merit. Indeed, if they were correct, their own
9    Tuscany Project would be illegal. The parking ratio for the University Gateway
10   Project received the proper approvals to comply with the City Code and had the
11   same parking ratio disclosed for the Tuscany project, which is a 120-unit student
12   housing project near USC that the Conquest Defendants developed without an EIR,
13   without any public hearing, without a Site Plan Review, and without a general plan
14   amendment required under the City codes.

15       63.    On July 6, 2006, after much delay, the CRA finally completed
16   responding to all of the submissions made by the Conquest Defendants and approved
17   University Gateway Project's EIR.

18       64.    The Conquest Defendants then appealed the CRA's preliminary
19   approval to the CRA board, again challenging the EIR. The primary, if not sole,
20   purpose for the Conquest Defendants' frivolous appeal was to further delay the
21   University Gateway Project.

22       65.    The CRA board overruled the Conquest Defendants' appeal.

23       66.    The Conquest Defendants did not stop there. The Conquest
24   Defendants then filed an improper Petition for Peremptory Writ of Mandate against
25   Gateway and the CRA styled *Conquest Student Housing, LLC et al v. Community*
26   *Redevelopment Agency of the City of Los Angeles*, California Superior Court, Central
27   District of Los Angeles, Case No. BS 104539, for the primary, if not sole, purpose of
28   further hindering and delaying the University Gateway Project.

67.     The Conquest Defendants continued their pattern of improper challenges by also challenging or appealing the general plan amendment and entitlement proceedings within the City of Los Angeles before the Zoning Administrator, Area Planning Commission, the City Planning Commission, the City Council Planning and Land Use Committee ("PLUM"), and the City Council.

68.     During the City of Los Angeles approval process, the Conquest Defendants argued in their improper challenge that the University Gateway Project violated the City's zoning and general plan because, among other things, (a) the floor area ratio ("FAR") for the University Gateway Project is 3.7:1 instead of 1.5:1, and (b) multi-family residential use is prohibited under the Redevelopment Plan because the Project property is zoned C2.  The Conquest Defendants did so despite the fact that the FAR for Conquest's Tuscany project was 3.0:1 instead of 1.5:1 and Conquest's Tuscany project property was also zoned C2.  Just like the University Gateway Project, Conquest's Tuscany project was developed in an area in close proximity to USC.  Unlike the Tuscany project, which Conquest developed without lawfully amending the City's zoning requirements and general plan (and without any EIR or community input), the University Gateway Project was approved pursuant to a general plan amendment and fully complied with the City's zoning requirements and general plan.

69.     During the approval process that took place before the City of Los Angeles, to hinder, delay, and harm Urban and in furtherance of their improper challenge, the Conquest Defendants also appealed the approval of Urban's entitlements and the general plan amendment to PLUM, a subcommittee of the Los Angeles City Council.  During a March 6, 2007 PLUM hearing on the Conquest Defendants' appeal, Councilmember Jack Weiss referred to Conquest as a "vexatious litigant" and cautioned Conquest that "[t]here are reasons that courts do and courts are well able to look into records and see what individuals are using the legal system and legal processes appropriately and when they are using it

inappropriately, vexatiously and for inappropriate reasons." (Transcript of PLUM Committee meeting on March 6, 2007 (Ex. 6) at 57)   The PLUM Committee unanimously recommended the rejection of Conquest's appeal, and the full City Council subsequently agreed and denied Conquest's appeal.

70.   To further hinder, delay, and harm Urban, Conquest filed an additional abusive Petition for Peremptory Writ of Mandate with the California Superior Court in Los Angeles County styled *Conquest Student Housing, LLC et al v. City of Los Angeles*, California Superior Court, Central District of Los Angeles, Case No. BS 108488, that purports to challenge the Los Angeles City Council's denial of Conquest's appeal.   Conquest's Petition was filed for the primary, if not sole, purpose, of further hindering and delaying the University Gateway Project.

71.   In addition to suing the CRA and the City of Los Angeles under CEQA for approving the University Gateway Project, the Conquest Defendants also recruited several third parties to sue the CRA and the City of Los Angeles, with virtually identical complaints, in order to create the misimpression that there was broader opposition to the University Gateway Project than what actually existed. These abusive challenges and appeals have delayed the University Gateway Project for at least two years.   The Conquest Defendants' abusive litigation tactics have inflicted — and will continue to inflict — millions of dollars in damages on Urban and harm the overall USC student housing market by limiting the availability of acceptable student housing.

**5.   The Conquest Defendants Attacked Urban's Other Projects.**

72.   Urban has refused to give up the University Gateway Project, despite the obstacles and delays caused by the Conquest Defendants' tactics.   In retaliation and in a further attempt to coerce Urban to abandon the University Gateway Project, the Conquest Defendants have embarked on a campaign to interfere with Urban's development projects throughout the United States, even though Conquest has no presence in the cities and areas in which many of Urban's projects are located.

1    Conquest intended that its conduct would  "make an example" out of Urban that
2    would deter any other potential developers from attempting to enter the USC
3    student housing market.

4           73.     In or around May 2006, the Conquest Defendants submitted Public
5    Records Act requests to municipalities across Southern California and the Western
6    United States where Urban was pursuing development projects, and demanded that
7    those municipalities produce, among other things, "any and all documents relating to
8    environmental review," "any and all documents relating to any discretionary
9    approval or contract," and "any and all documents relating in any manner to
10   financing or funding" of any development project which involved Urban in any way
11   including, without limitation, Urban's projects in (a) Burien, Washington, (b),
12   Mount Baker, Washington, (c) Kenmore, Washington, (d) Glendale, California (e)
13   Oxnard, California, (f) Culver City, California, (g) Wilshire Vermont Project, Los
14   Angeles, California, (h) Herald Examiner Project, Los Angeles, California, and (i)
15   Sun Valley, California.  (See, e.g., Ex. 7)  These projects are independent of the
16   University Gateway Project and do not compete with Conquest's projects.

17          74.     The Conquest Defendants made the Public Records Act requests with
18   the improper purpose of interfering with Urban's relationships by harassing and
19   annoying those municipalities from whom Urban has obtained, or was in the process
20   of obtaining, entitlements for its projects and to impede and delay the development
21   projects in those municipalities.

22          75.     For example, the City of Burien compiled and copied voluminous
23   documents responsive to the Conquest Defendants' requests at a cost of $10,000.
24   After the City of Burien compiled the documents, the Conquest Defendants told the
25   City that they no longer wanted the documents.  To protect its relationship with the
26   City of Burien, and to reimburse the City for its loss, Urban paid the City of Burien
27   $10,000 for the costs incurred in complying with the Conquest Defendants'
28   document requests.

76.     The Defendants have also launched a series of frivolous lawsuits and administrative challenges against Urban's other projects spanning across Southern California and the Western United States.

**A.     The Glenoaks Project**

77.     Urban (through its affiliate Urban Ventures Glenoaks II, LLC) and its partner, Cityview Glenoaks, LLC ("Cityview"), are currently developing a project located in Sun Valley, California (the "Glenoaks Project").  The Glenoaks Project is a 51-unit condominium project that will provide workforce housing.

78.     The Glenoaks Project is approximately 21 miles from the nearest Conquest housing development.  Conquest does not own any properties in Sun Valley.  Although the Glenoaks Project does not compete with any of Conquest's projects, the Conquest Defendants sought to delay, hinder, and destroy the Glenoaks Project because Urban is one of the partners involved with the development.

79.     The Conquest Defendants first tried to incite nearby residents to sign a petition objecting to the Glenoaks Project.  On September 4, 2006, Defendant Smith met with various residents of a condominium complex located at 8641 Glenoaks Boulevard, which is directly across the street from the Glenoaks Project, and asked them to sign a petition objecting to the Glenoaks Project.  During this visit, Smith met and spoke with Steve Strouth, the Secretary of the homeowners' association of the condominium complex and asked Mr. Strouth to sign a petition opposing the Glenoaks Project.  Mr. Strouth declined.  (Declaration of Lucinda L. Travis (Ex. 8) at ¶¶ 3-4)

80.     Defendant Smith then met with Steve Inocente, another resident of the condominium complex and the Vice President of the homeowners' association. Defendant Smith asked Mr. Inocente to oppose the Glenoaks Project.  Defendant Smith gave Mr. Inocente his business card and told him to call John Henning, the Conquest Defendants' attorney, if he decided that he would oppose the project. When asked why Conquest was opposing the Glenoaks Project, Defendant Smith

said "there was nothing other than the fact that he and Conquest Student Housing were seeking to keep their eyes on Urban Partners because of what Urban Partners did in downtown." (Declaration of Steve Inocente (Ex. 9) at ¶¶ 3-4)

81.     On or about September 8, 2006, Defendant Smith, acting on behalf of the Conquest Defendants, offered Mr. Strouth $1,500 to oppose the Glenoaks Project. (Travis Dec. (Ex. 8) at ¶¶ 5-6; Inocente Dec. (Ex. 9) at ¶ 5)

82.     In response to comments from the community, Urban substantially revised the plans for the Glenoaks Project. As a result, the Glenoaks Project was approved with strong support from the community and Wendy Greuel, the City Council member representing Sun Valley. The last approval that Urban needed from the City of Sun Valley was a tentative tract map.

83.     Although the Conquest Defendants had never appeared at any public hearings or expressed any objections to the Glenoaks Project prior to the public hearing for the approval of the tentative tract map, the Conquest Defendants suddenly appeared at the hearing and objected to the approval of the tentative tract map, even though Conquest owned no property in Sun Valley or anywhere near the Glenoaks Project.

84.     In September 2006, Conquest's representatives, including Conquest attorney Jack Rubens, told the managing director of Cityview, that Conquest opposed the Glenoaks Project solely because of Urban's involvement with the project, and that Conquest planned to challenge all of Urban's projects in the United States.

85.     The City's Deputy Advisory Agency subsequently rejected Conquest's frivolous objection and approved the tentative tract map for the Glenoaks Project.

86.     Because Conquest does not own any properties in Sun Valley, the Conquest Defendants then conspired with Defendant Orellano to have Orellano join in the Conquest Defendants' frivolous appeal of the Advisory Agency's approval

1  of the tract map for the project.  Although the house in which Defendant Orellano
2  rents a room is on the other side of the I-5 Freeway from the Glenoaks Project, and
3  Defendant Orellano had never attended any public hearings regarding the Glenoaks
4  Project, Defendant Orellano, along with Conquest and Defendant Smolinisky,
5  improperly and frivolously appealed the Deputy Advisory Agency's decision to the
6  City Planning Commission ("CPC").

7       87.    Conquest and Defendant Smolinisky conceded in their appeal that the
8  only interest they had in opposing the Glenoaks Project was to stifle competition.
9  Their appeal stated: "Conquest faces the specter that new competitive projects more
10  proximate to [Conquest's] Rental Properties may be encouraged" and "[s]uch
11  projects would significantly increase the number of units in the market in which
12  Conquest competes for tenants, and would thus likely reduce the economic viability
13  of [Conquest's] Rental Properties."

14       88.    At a public hearing before the CPC on September 28, 2006,
15  Councilmember Greuel stated that Conquest's anticompetitive activity was
16  "disgraceful" and that she was "amazed that the group or the individual that
17  appealed [the project was] not from the community and had no involvement in this
18  project whatsoever."  (Transcript of City of Los Angeles Planning Commission
19  Regular Meeting on September 28, 2006 (Ex. 10) at 17-18)  CPC President Jane
20  Usher noted that Orellano and Smolinisky did not even bother to attend the hearing
21  of their own appeals and described the Conquest Defendants' tactics as "distasteful."
22  (*Id.* at 15-16, 19)  President Usher and Councilmember Greuel went on to admonish
23  Conquest's attorneys for abusing environmental legislation and wasting the
24  Commission's time.

25       89.    Following the public hearing, the CPC unanimously denied
26  Conquest's appeal and adopted detailed findings refuting its claims.

27       90.    Conquest then improperly and frivolously appealed the CPC's
28  decision to approve the tract map for the Glenoaks Project to the City Council.  The

**COMPLAINT**

1    matter was heard before the PLUM Committee of the City Council on December 19,

2    2006. Councilmember Greuel again spoke in strong support of the Glenoaks Project

3    and again condemned Conquest's tactics, calling the appeal "unwarranted,"

4    "cynical," and "without merit." (Transcript of PLUM Commission hearing on

5    December 19, 2006 (Ex. 11) at 6) Councilmember Greuel cited reports that

6    Conquest had paid others to oppose the project and asked that Conquest's conduct

7    be referred to the City Attorney's Office for investigation. (*Id.*)

8        91.    Councilmember Jack Weiss likewise found the representations made

9    by Conquest at the hearing to be "troubling," "internally inconsistent," and

10   "contradictory." (*Id.* at 26) Councilmember Weiss also questioned "whether the

11   matter was brought in good faith to begin with." (*Id.*)

12       92.    The PLUM committee voted unanimously to deny the appeal, approve

13   the project, and adopt the findings of the CPC. On December 20, 2006, the full City

14   Council adopted the PLUM Committee's decision, once again in a unanimous vote.

15       93.    Undeterred, Conquest challenged the decision of the City Council by

16   filing an improper and frivolous Petition for Writ of Mandate with the California

17   Superior Court in Los Angeles County. That action is still pending.

18       94.    Each of these frivolous and abusive appeals has delayed the Glenoaks

19   Project for months, and caused significant financial harm to Urban.

20       95.    Each of these frivolous and abusive appeals were intended by the

21   Conquest Defendants to make Urban abandon the University Gateway Project.

22       **B.**    **The Verdugo Gardens Project**

23       96.    Urban is currently developing a 284-unit mixed use project known as

24   Verdugo Gardens in downtown Glendale, California (the "Verdugo Gardens

25   Project"). The Verdugo Gardens Project is independent of the University Gateway

26   Project and does not compete with any Conquest project.

27       97.    Conquest does not own any properties in Glendale. Although the

28   Verdugo Gardens Project does not compete with any of Conquest's projects, the

Conquest Defendants sought to delay, hinder, and destroy Urban's Verdugo Gardens Project.

98.     In conjunction with Urban's development of the Verdugo Gardens Project, Urban entered into a consulting agreement with 17910 Burbank, LLC. Under the terms of the consulting agreement, Urban was to receive substantial compensation for its services.

99.     In order to hinder and destroy Urban's business, the Conquest Defendants began appearing and objecting to the Verdugo Gardens Project even though they had no interest in the project.  The Conquest Defendants did so by challenging the City of Glendale's Specific Plan, which affected not only the Verdugo Gardens Project but also a much larger area in the City of Glendale and a number of other developments within that area.

100.    The City of Glendale Planning Commission held a public hearing, overruled Conquest's frivolous objection, and approved the Specific Plan.

101.    The Conquest Defendants then improperly and frivolously appealed the decision of the Planning Commission to the Glendale City Council.   On November 7, 2006, the Glendale City Council denied Conquest's frivolous appeal.

102.    The Conquest Defendants were undeterred.  As they did in opposing the Glenoaks project, Conquest and Smolinisky filed an improper, frivolous, and abusive CEQA lawsuit that would further delay the Verdugo Gardens Project.

103.    The City of Glendale subsequently noticed the depositions of Conquest and Smolinisky to find out the bases, if any, for their claim of injuries allegedly arising out of the Specific Plan.  In order to avoid appearing for the depositions, Conquest and Smolinisky admitted and stipulated to the following facts on April 10, 2007:

        a.     Smolinisky has never lived or worked within the City of Glendale.

- 24 -
**COMPLAINT**

b. Smolinisky does not own, lease, or manage any property within the City of Glendale.

c. Smolinisky does not pay any taxes, fees, or assessments to the City of Glendale.

d. Smolinisky has not announced any plans to acquire, own, develop, lease or manage any property within the City of Glendale.

e. Conquest's principal place of business is located in the City of Los Angeles, more than 7 miles south of the City of Glendale.

f. Conquest manages properties for companies which concentrate on student housing around the campuses of USC and the University of California Santa Barbara.

g. Conquest does not operate any business within the City of Glendale.

h. Conquest does not own, lease, or manage any property within the City of Glendale.

i. Conquest does not pay any taxes, fees, or assessments to the City of Glendale.

j. Conquest has not announced any plans to acquire, own, develop, lease, or manage any property within the City of Glendale.

k. The only litigation that Conquest has filed challenging the validity of a project or EIR involves the University Gateway Project, the Glenoaks Project, and the Glendale Specific Plan covering the Verdugo Gardens Project, all of which are being developed by Urban and its partners.

l. Conquest did not challenge the Staples Center expansion project, even though Conquest's business headquarters and student housing managed by Conquest are located between 1 and 3 miles from the Staples Center.

m. Conquest did not challenge the Grand Avenue Redevelopment project even though Conquest's business headquarters and student housing managed

by Conquest are located between 3 and 5 miles from the Grand Avenue Redevelopment project.

104.    The Conquest Defendants' improper and abusive challenges, appeals, and lawsuits caused, and are continuing to cause, unnecessary delays, which have resulted in substantial financial losses to Urban by, among other things, causing the loss of millions of dollars in benefits under Urban's consulting agreement with 17910 Burbank, LLC.

105.    Each of these improper and abusive challenges, appeals, and lawsuits were intended by the Conquest Defendants to make Urban abandon the University Gateway Project

## C.    The Herald Examiner Project

106.    The Hearst Corporation ("Hearst") currently owns three parcels of real property located in downtown Los Angeles, California (the "Herald Examiner Buildings"). Hearst entered into a letter of intent with Urban to form a management agreement, whereby Urban would develop Hearst's Herald Examiner Buildings.

107.    The Conquest Defendants discovered Urban's plan to assist Hearst with the development project and began a series of improper and frivolous challenges to the Herald Examiner Buildings development. The Conquest Defendants conspired with Defendant Baez to bring the challenges with the intent to strain Urban's relationship with Hearst by delaying the development of the Herald Examiner Buildings and to deter and destroy Urban's reputation and business.

108.    The Conquest Defendants opposed and appealed a Zoning Administrator's Interpretation ("ZAI") of the Los Angeles Municipal Code that affected the Herald Examiner Project, even though Conquest had no holdings near the project. On May 10, 2007, the City Planning Commission (CPC) held a hearing to consider Conquest's appeal of the ZAI. During that hearing, a representative from the mayor's office told the CPC that the mayor was "disturbed" by Conquest's appeal and "antagonistic antidevelopment attitude." Councilmember Jan Perry

1  likewise stated on the record that she was "stunned and disappointed and disgusted"
2  by Conquest's challenge to the Hearst project that "was filed to try to prevent the
3  Gateway project from being built and being in the market."   CPC President Jane
4  Usher stated that it was "a waste of time, money, and everyone's resources to be put
5  through appeals" like Conquest's.  After the CPC unanimously approved the Herald
6  Examiner Project, including the ZAI, Conquest appealed the approvals.

7       109.    The Conquest Defendants contacted Hearst and asked questions about
8  Urban's relationship with Hearst on the Herald Examiner Project and whether Urban
9  had any ownership or other interest in the Herald Examiner Project.  The Conquest
10 Defendants, through their counsel Greg Yaris, told Harry O'Brien, counsel for
11 Hearst, that Conquest's opposition to the Herald Examiner Project was due to
12 Urban's involvement as development manager of the project and Conquest's desire
13 to stop the unrelated University Gateway Project.  In early 2007, Mr. O'Brien
14 informed Mr. Yaris that Hearst had ended its relationship with Urban, and inquired
15 whether the Conquest Defendants would end their opposition to the Herald
16 Examiner Project.  Mr. Yaris subsequently contacted Mr. O'Brien, told him that
17 Conquest was not sure Hearst had ended its relationship with Urban, that Conquest
18 believed that of "all the Urban projects" Conquest's challenge to the Herald
19 Examiner Project had the most substance, and that Conquest would "go away" for
20 $1,000,000.

21      110.    As a result of the Conquest Defendants' extortion and opposition to
22 the project, Hearst terminated its relationship with Urban on that project.

23      **D.    The Kenmore Project**

24      111.    Urban is currently developing a project entitled Kenmore Village
25 by the Lake, in Kenmore, Washington (the "Kenmore Project").  The Kenmore
26 Project is independent of the University Gateway Project and does not compete with
27 any Conquest project.

28

112.    Upon information and belief, Conquest does not own any properties and does not conduct any business in Kenmore, Washington.    Although the Kenmore Project does not compete with any of Conquest's projects, the Conquest Defendants sought to delay, hinder, and destroy Urban's Kenmore Project and interfere with Urban's relationship with the City of Kenmore.

113.    To that end, the Conquest Defendants requested confidential documents, including Urban's tax returns, from various agencies in Kenmore connected with the Kenmore Project.

114.    To protect its confidential information, Urban was forced to sue the City of Kenmore to enjoin the disclosure of its confidential documents, including Urban's tax returns.

115.    Conquest then filed a motion to intervene in the lawsuit to compel the City of Kenmore to disclose and produce Urban's confidential documents, including Urban's tax returns, to Conquest.

116.    In or around early February 2007, Urban's counsel noticed the depositions of Defendants Smolinisky and Chen to, among other things, ascertain why Conquest was seeking Urban's confidential documents, including Urban's tax returns, from the City of Kenmore where Conquest conducts no business.    After Defendants Smolinisky and Chen refused to appear for their depositions, Urban filed a motion to compel.    On February 21, 2007, the Washington Superior Court (Hon. Dean S. Lum presiding) granted Urban's motion to compel, ordered Defendants Smolinisky and Chen to appear for depositions, and imposed sanctions in the amount of $500.

117.    Instead of complying with the Court's order and appearing for their depositions, Defendants Smolinisky and Chen filed a motion for protective order to prevent the depositions.

118.    On March 15, 2007, Judge Lum denied Smolinisky's and Chen's motion for protective order, found Smolinisky and Chen in contempt of Court, and

1    imposed additional sanctions in the amount of $250 against Smolinisky and Chen.

2         119.    Defendants Smolinisky and Chen still refused to appear for
3    depositions and instead filed an appeal of Judge Lum's orders.

4         120.    The Court of Appeals in Washington refused to hear the appeal and let
5    Judge Lum's ruling stand.  Instead of facing depositions as Judge Lum had ordered
6    eight weeks earlier, Defendants Smolinisky and Chen dropped the underlying request
7    and the lawsuit.   The Conquest Defendants' improper and abusive challenges,
8    motions, and appeals caused unnecessary delays with the Kenmore Project, and have
9    caused Urban to needlessly incur substantial financial losses.

10        121.    In February 2007, Defendant Smolinisky told USC officials that
11   Conquest's challenges to other Urban projects were part of the strategy to kill the
12   University Gateway Project and explained that it was much easier to tie a project up
13   than to defend one.

14   **7.    Conquest Threatened USC With Similar Abusive and Illegal Tactics.**

15        122.    The neighborhood surrounding the USC campus is a place where
16   diverse people from all socioeconomic backgrounds benefit from the presence of a
17   major research university.

18        123.    USC cares deeply about the surrounding community and has worked
19   for many years to ensure that the area keeps its unique character by engaging the
20   community and seeking to create responsible development projects that will enhance
21   the community.

22        124.    USC is in the midst of a historic change to being a fully residential
23   campus.  As part of that transaction, USC will need to provide student housing for as
24   many as 8,000 students on and nearby campus.  USC wants all students who desire
25   to live near campus to have access to affordable, suitable housing.

26        125.    USC embraced the University Gateway Project as a way to enhance
27   student living options while clustering housing along the Jefferson Boulevard and
28   Figueroa Street corridors.  The University Gateway Project would help protect the

residential portion of the USC neighborhood from haphazard conversion of single family residences to multiple-unit projects, and provide parking and transportation options that would help reduce congestion.

126.   The Conquest Defendants have obstructed USC's ability to secure responsible new housing sources for its students seeking to live nearby campus. The Conquest Defendants' actions and abusive legal challenges to the University Gateway Project have delayed a project that could already be serving more than 1,600 students as well as providing new retail options for the entire USC neighborhood.

127.   On March 9, 2007, and March 27, 2007, Defendant Smolinisky, Defendant Chen, and Greg Yaris (Conquest's attorney) told USC Associate Senior Vice President Kristina Raspe that Conquest's objections to the University Gateway Project were based solely on competition, and not because of any environmental issues or land use impacts.  (Dec. of Kristina Raspe (Ex. 12) at ¶¶ 3-4)  They also told her that Conquest's tactics of "tying-up" Urban's other projects had been a big success, and that Urban had "not broken ground on a project in a year because of the appeals and lawsuits."  (*Id.* at ¶ 4)  Defendant Smolinisky told Ms. Raspe that Conquest would continue this strategy of opposing Urban's projects until Urban abandoned the University Gateway Project.  (*Id.* at ¶ 4)

128.   The Conquest Defendants' statements demonstrate a clear intent to use the administrative appeals processes and court processes, including CEQA litigation, for Conquest's anti-competitive objectives rather than out of any concern over development issues, land use laws, or the environment.

129.   On April 18, 2007, Ms. Raspe discussed USC's Master Plan — a document USC is in the process of preparing to address the university's future development goals — with Yaris.  (*Id.* at ¶ 5)  Yaris, on behalf of the Conquest Defendants, threatened Ms. Raspe that if the Master Plan contained any new housing

1  developments for students, Conquest would oppose the Master Plan and sue to block
2  or delay its approval. (*Id.* at ¶ 6)

3      130.   On April 23, 2007, Defendant Smolinisky, on behalf of Conquest,
4  offered to purchase additional property from USC for development (somewhere
5  between 1,406 – 1,621 new beds) including several single family homes with
6  historic designations, Greek housing, and parking lots.  The prices offered for these
7  parcels were substantially below market.  These actions directly contradict
8  Conquest's claims that there is sufficient student housing for USC students, and that
9  the University Gateway Project should not be approved because of a general parking
10  shortage in and around the USC campus.  USC subsequently informed Conquest that
11  it was not interested in selling the parcels of land proposed by Conquest.

<center>

**FIRST CAUSE OF ACTION**

**(Monopolization in Violation of Section 2 of the Sherman Act by all Plaintiffs**

**Against the Conquest Defendants)**
</center>

15      131.   Paragraphs 1 through 130 are re-alleged and reincorporated herein.

16      132.   The Conquest Defendants possess monopoly power in the market for
17  off-campus student housing within walking distance of the USC campus, which
18  Conquest has defined as "Adams Street on the north, Figueroa on the east, and
19  Vermont on the west."

20      133.   The geographic area within walking distance of the USC campus is
21  the area of effective competition for the providers of non-university student housing
22  due to the high demand and desirability for housing from USC students who wish to
23  live near campus.

24      134.   Students who want to live within walking distance of the USC campus
25  have few choices of alternative housing other than housing owned and/or operated by
26  the Conquest Defendants.

27      135.   Due to the limited amount of student housing provided by USC on
28  campus, most USC students require student housing that is not provided by USC.

<center>

- 31 -

**COMPLAINT**
</center>

1  There are no other goods or services that are reasonably interchangeable with
2  student housing that is located within walking distance of the USC campus.

3          136.    The Conquest Defendants improperly exercise control and monopoly
4  power by engaging in unfair, unlawful, and fraudulent business practices that have
5  excluded and prevented competition from entering or otherwise competing in the
6  market for off-campus student housing within walking distance of the USC campus.

7          137.    The Conquest Defendants have willfully acquired and maintained
8  their monopoly in the market for off-campus student housing within walking
9  distance of the USC campus.  The Conquest Defendants' acts have prevented or
10 suppressed competition, and continue to prevent or suppress competition, by
11 permitting the Conquest Defendants to maintain their dominant and monopolistic
12 market position and price control in violation of Section 2 of the Sherman Act, 15
13 U.S.C. § 2.

14         138.    As a direct and proximate result of the Conquest Defendants' anti-
15 competitive activities in violation of Section 2 of the Sherman Act, Plaintiffs Urban
16 and Gateway have suffered business injuries by, among other things, threats to their
17 projects, loss of goodwill, significant lost profits, a loss of revenue that will impact
18 prices paid by consumers for the Urban projects, and significant cost overruns due
19 to delays in construction of the projects.  Plaintiffs Urban and Gateway have
20 suffered, and will continue to suffer, irreparable harm if the Conquest Defendants
21 are not enjoined from engaging in their anti-competitive conduct.

22         139.    The Conquest Defendants' anti-competitive activities have obstructed
23 USC's ability to secure responsible new housing sources for its students seeking to
24 live nearby campus.  The Conquest Defendants' unlawful conduct has also caused,
25 and continues to cause, among other things, increased prices to USC students due to
26 the lack of meaningful market competition, reduced competition due to the
27 availability of fewer student housing units, and blocked entry or reduced desirability
28 of entry into the relevant market of Plaintiffs and others, including but not limited to

1   TMG, that are or would be competitors of the Conquest Defendants in the market for
2   off-campus student housing within walking distance of the USC campus.

3       140.    As a proximate result of the wrongful acts herein alleged, Plaintiffs
4   have been damaged in an amount to be determined at trial.

5       141.    Plaintiffs are also entitled to recover treble damages, costs of suit, and
6   attorneys' fees.

7                           **SECOND CAUSE OF ACTION**

8   **(Attempted Monopolization in Violation of Section 2 of the Sherman Act by All**
9                   **Plaintiffs Against the Conquest Defendants)**

10      142.    Paragraphs 1 through 141 are re-alleged and reincorporated herein.

11      143.    Plaintiff Urban and others, including TMG, compete or have
12   attempted to compete against the Conquest Defendants in the market for off-campus
13   student housing within walking distance of the USC campus.

14      144.    The Conquest Defendants have a dominant share in the market for off-
15   campus student housing within walking distance of the USC campus.

16      145.    By virtue of the Conquest Defendants' threats, statements, behavior,
17   conduct, acts, and omissions to prevent Plaintiffs' entry into the market, the
18   Conquest Defendants have a specific intent to control prices and destroy competition
19   in the market for off-campus student housing within walking distance of the USC
20   campus by the conduct described in this Complaint.  The Conquest Defendants'
21   statements, behavior, conduct, acts, and omissions, affirmatively demonstrate their
22   specific intent to control prices and destroy competition in the market for off-
23   campus student housing within walking distance of the USC campus.

24      146.    The  Conquest  Defendants  have  engaged  in  predatory  or
25   anticompetitive conduct with the objective of obtaining a monopoly by controlling
26   prices and/or destroying competition in the market for off-campus student housing
27   within walking distance of the USC campus, and to maintain their dominant market
28   position.

147.   The Conquest Defendants' intent, power, and resources create a dangerous probability that they will succeed in monopolizing the market for off-campus student housing within walking distance of the USC campus.

148.   The Conquest Defendants have violated, and continue to violate, Section 2 of the Sherman Act, 15 U.S.C. § 2.

149.   As a direct and proximate result of the Conquest Defendants' anticompetitive activities in violation of Section 2 of the Sherman Act, Plaintiffs Urban and Gateway have suffered business injuries by, among other things, threats to their projects, loss of goodwill, significant lost profits, a loss of revenue that will impact prices paid by consumers for the Urban projects, and significant cost overruns due to delays in construction of the projects.   Plaintiffs Urban and Gateway have suffered, and will continue to suffer, irreparable harm if the Conquest Defendants are not enjoined from engaging in their anti-competitive conduct.

150.   The Conquest Defendants' anti-competitive activities have obstructed USC's ability to secure responsible new housing sources for its students seeking to live nearby campus.  The Conquest Defendants' unlawful conduct has also caused, and continues to cause, among other things, a loss of revenue due to unlawful delays that will impact prices paid by consumers for the Urban projects, increased prices to USC students due to the lack of meaningful market competition, reduced competition due to the availability of fewer student housing units, and blocked entry or reduced desirability of entry into the relevant market of Plaintiffs and others, including but not limited to TMG, that are or would be competitors of the Conquest Defendants in the market for off-campus student housing within walking distance of the USC campus.

151.   As a proximate result of the wrongful acts herein alleged, Plaintiffs have been damaged in an amount to be determined at trial.

152.   Plaintiffs are entitled to recover treble damages, costs of suit, and attorneys' fees.

## THIRD CAUSE OF ACTION

### (Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act by All Plaintiffs Against All Defendants)

153.   Paragraphs 1 through 152 are re-alleged and reincorporated herein.

154.   Defendants knowingly and willfully conspired among themselves and others to monopolize the market for off-campus student housing within walking distance of the USC campus.

155.   Defendants committed overt acts and engaged in other conduct pursuant to, and in furtherance of, the conspiracy.  Defendants have engaged in predatory conduct and anti-competitive conduct directed toward achieving the objective of controlling prices and destroying competition in the market for off-campus student housing within walking distance of the USC campus.

156.   Defendants did the acts and things alleged in this Complaint pursuant to, and in furtherance of, the conspiracy.  By virtue of Defendants' statements, behavior, conduct, overt acts, and omissions to prevent or substantially delay Plaintiffs' entry into the market, Defendants have the specific intent to control prices and monopolize the market for off-campus student housing within walking distance of the USC campus.

157.   Recent overt acts in pursuit of the above-described conspiracy occurred when the Conquest Defendants, through counsel, recently communicated to USC that Conquest would oppose any Master Plan that included student housing, which would threaten Conquest's monopoly, and Conquest's attack on The Martin Group in May of 2007, which resulted in The Martin Group abandoning its off-campus USC student-housing project.  Defendants' conspiracy is ongoing, and includes recent retaliatory legal and other actions taken against Urban development projects for the primary, if not sole, purpose of improperly making Urban abandon the University Gateway Project.

**COMPLAINT**

158.    As a direct and proximate result of Defendants' anti-competitive activities in violation of Section 2 of the Sherman Act, Plaintiffs Urban and Gateway have suffered business injuries by, among other things, threats to their projects, loss of goodwill, significant lost profits, a loss of revenue that will impact prices paid by consumers for the Urban projects, and significant cost overruns due to delays in construction of the projects.   Plaintiffs Urban and Gateway have suffered, and will continue to suffer, irreparable harm if Defendants are not enjoined from engaging in their anti-competitive conduct.

159.    Defendants' anti-competitive activities have obstructed USC's ability to secure responsible new housing sources for its students seeking to live nearby campus.   Defendants' unlawful conduct has also caused, and continues to cause, among other things, a loss of revenue due to unlawful delays that will impact prices paid by consumers for the Urban projects, increased prices to USC students due to the lack of meaningful market competition, reduced competition due to the availability of fewer student housing units, and blocked entry or reduced desirability of entry into the relevant market of Plaintiffs and others, including but not limited to TMG, that are or would be competitors of the Conquest Defendants in the market for off-campus student housing within walking distance of the USC campus.

160.    As a proximate result of the wrongful acts herein alleged, Plaintiffs have been damaged in an amount to be determined at trial.

161.    Plaintiffs are entitled to recover treble damages, costs of suit, and attorneys' fees.

## FOURTH CAUSE OF ACTION

## (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), by Plaintiffs Urban and Gateway Against All Defendants)

162.    Paragraphs 1 through 161 are re-alleged and reincorporated herein.

163.    At all relevant times, Conquest constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that it was a corporation.

**COMPLAINT**

164.    At all relevant times, Chen, Smolinisky, Smith, Orellano, and Baez were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with Conquest.

165.    From January 1, 2005 until the present, Chen, Smolinisky, Smith, Orellano, and Baez conducted, participated in, engaged in, conspired to engage in, or aided and abetted the conduct of the affairs of Conquest through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). The predicate acts constituting the pattern of unlawful activity engaged in by the Conquest Defendants, as described herein, constitute:

        a.    Extortion, as defined in 18 U.S.C. § 1961(1)(B);

        d.    Mail fraud, as defined in 18 U.S.C. § 1961(1)(B); and

        c.    Wire fraud, as defined in 18 U.S.C. § 1961(1)(B).

166.    These acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

167.    All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the Defendants engaged in the predicate acts over a substantial period of time and such predicate acts have become the Defendants' regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained by this Court.

168.    As a direct and proximate result of, and by reason of the activities of Chen, Smolinisky, Smith, Orellano and Baez, and their conduct in violation of 18 U.S.C. §1962(c), Plaintiffs Urban and Gateway have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c). The afore-described distortion and misrepresentation of Urban's projects in order to scare residents and orchestrate artificial community opposition through extortion, and mail and wire fraud were done to deter Urban and Conquest from entering the relevant off-campus USC student housing market and for the Conquest Defendants to maintain their monopoly.

169.    As a result of these actions, Urban and Gateway have been injured in their business, having suffered, among other things, threats to their projects, significant lost profits, lost goodwill, and significant cost overruns due to delays in construction of the projects based on, among other things, inflation, routine price increases, and other market conditions.

170.    Plaintiffs Urban and Gateway are entitled to recover treble the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## FIFTH CAUSE OF ACTION

### (Racketeer Influenced and Corrupt Organizations Act; 18 U.S.C. § 1962(c), by Plaintiffs Urban and Gateway Against All the Defendants)

171.    Paragraphs 1 through 170 are reincorporated herein by this reference.

172.    At all relevant times, Defendants are and were an "association-in-fact enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that they formed an informal entity with the common goal of monopolizing the market for off-campus student housing within walking distance of the USC campus through improper means, including extortion, and mail and wire fraud, done solely to deter Urban, USC and others, from entering the market for off-campus student housing within walking distance of the USC campus, and for the Conquest Defendants to maintain their monopoly, using the existing corporate structure for controlling and directing the affairs of the association-in-fact enterprise on an ongoing basis.

173.    At all relevant times, Chen, Smolinisky, Smith, Orellano, Baez and Conquest are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with one another.

174.    From January 1, 2005 until the present, the Defendants conducted, participated in, engaged in, conspired to engage in, or aided and abetted the conduct of the affairs of the association-in-fact enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).  The

predicate acts constituting the pattern of unlawful activity engaged in by the Defendants, as described herein, constitute:

      a.    Extortion, as defined in 18 U.S.C. § 1961(1)(B);

      b.    Mail fraud, as defined in 18 U.S.C. § 1961(1)(B); and

      c.    Wire fraud, as defined in 18 U.S.C. § 1961(1)(B).

175.    These acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

176.    All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the Defendants engaged in the predicate acts over a substantial period of time and such predicate acts have become the Defendants' regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained by this Court.

177.    As a direct and proximate result of, and by reason of the activities of Chen, Smolinsky, Smith, Orellano, Baez, and Conquest, and their conduct in violation of 18 U.S.C. §1962(c), Plaintiffs Urban and Gateway have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).  The afore-described distortion and misrepresentation of Urban's projects in order to scare residents and orchestrate artificial community opposition through extortion, and mail and wire fraud were done to deter Urban and Gateway from entering the off-campus USC student housing market and for the Conquest Defendants to maintain their monopoly.

178.    As a result of these actions, Urban and Gateway have been injured in their business, having suffered, among other things, threats to their projects, significant lost profits, lost goodwill, and significant cost overruns due to delays in construction of the projects based on, among other things, inflation, routine price increases, and other market conditions.

179.    Urban and Gateway are entitled to recover treble the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## SIXTH CAUSE OF ACTION

### (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), by Plaintiffs Urban and Gateway Against All the Defendants)

180.    Paragraphs 1 through 179 are re-alleged and reincorporated herein.

181.    At all relevant times, University Park Community Association constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that it was and is an association.

182.    At all relevant times, Chen, Smolinisky, Smith, Orellano, Baez, and Conquest were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with University Park Community Association.

183.    From January 1, 2005 until the present, Chen, Smolinisky, Smith, Orellano, Baez, and Conquest conducted, participated in, engaged in, conspired to engage in, or aided and abetted the conduct of the affairs of University Park Community Association through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).   The predicate acts constituting the pattern of unlawful activity engaged in by the Conquest Defendants, as described herein, constitute:

        a.    Extortion, as defined in 18 U.S.C. § 1961(1)(B);

        b.    Mail fraud, as defined in 18 U.S.C. § 1961(1)(B); and

        c.    Wire fraud, as defined in 18 U.S.C. § 1961(1)(B).

184.    These acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

185.    All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the Defendants engaged in the predicate acts over a substantial period of time and such predicate acts have become

1  the Defendants' regular way of conducting business, and these business practices

2  will continue indefinitely into the future unless restrained by this Court.

3       186.    As a direct and proximate result of, and by reason of the activities of

4  Chen, Smolinsky, Smith, Orellano, Baez, and Conquest and their conduct in

5  violation of 18 U.S.C. §1962(c), Defendants Gateway and Urban have been injured

6  in their business or property within the meaning of 18 U.S.C. § 1964(c).  The afore-

7  described distortion and misrepresentation of Urban's projects in order to scare

8  residents and orchestrate artificial community opposition through extortion, and mail

9  and wire fraud were done to deter Urban and Gateway from entering the market for

10  off-campus student housing within walking distance of the USC campus and for the

11  Conquest Defendants to maintain their monopoly.

12       187.    As a result of these actions, Urban and Gateway have been injured in

13  their business, having suffered, among other things, threats to their projects,

14  significant lost profits, lost goodwill, and significant cost overruns due to delays in

15  construction of the projects based on, among other things, inflation, routine price

16  increases, and other market conditions.

17       188.    Gateway and Urban are entitled to recover treble the damages they

18  have sustained together with the cost of the suit, including reasonable attorneys' and

19  experts' fees.

20  ## SEVENTH CAUSE OF ACTION

21  **(Conspiracy To Violate the Racketeer Influenced and Corrupt Organizations**

22  **Act, 18 U.S.C. § 1962 (d), by Plaintiffs Urban and Gateway Against All**

23  **Defendants)**

24       189.    Paragraphs 1 through 188 are re-alleged and reincorporated herein.

25       190.    The Defendants and others knowingly and willfully agreed and

26  conspired to violate 18 U.S.C. § 1962(c) as described above.  The Defendants knew

27  that their predicate acts were part of a pattern of racketeering activity and agreed to

28  the commission of those acts to ensure the results described above.

**COMPLAINT**

191.    Defendants' conspiracy is ongoing, and includes recent retaliatory legal and other actions taken against Urban development projects for the primary, if not sole, purpose of improperly making Urban abandon the University Gateway Project.

192.    As a direct and proximate result of, and by reason of the activities of Chen, Smolinisky, Smith, Smith, Orellano, Baez, and Conquest, and their conduct in violation of 18 U.S.C. §1962(c), Gateway and Urban have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).   The afore-described distortion and misrepresentation of Urban's projects in order to scare residents and orchestrate artificial community opposition through extortion, and mail and wire fraud were done to deter Urban from entering the market for off-campus student housing within walking distance of the USC campus and for the Conquest Defendants to maintain their monopoly.

193.    As a result of these actions, Urban and Gateway have been injured in their business, having suffered, among other things, threats to their projects, significant lost profits, lost goodwill, and significant cost overruns due to delays in construction of the projects based on, among other things, inflation, routine price increases, and other market conditions.

194.    Urban and Gateway are entitled to recover treble the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## EIGHTH CAUSE OF ACTION

### (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), by Plaintiff USC Against the Conquest Defendants)

195.    Paragraphs 1 through 194 are re-alleged and reincorporated herein.

196.    At all relevant times, Conquest constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that it was a corporation.

**COMPLAINT**

197.   At all relevant times, Chen, Smolinisky, and Smith were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with Conquest.

198.   From January 1, 2005 until the present, Chen, Smolinisky, and Smith conducted, participated in, engaged in, conspired to engage in, or aided and abetted the conduct of the affairs of Conquest through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).  The predicate acts constituting the pattern of unlawful activity engaged in by the Conquest Defendants, as described herein, constitute:

   a.   Extortion, as defined in 18 U.S.C. § 1961(1)(B);

   b.   Mail fraud, as defined in 18 U.S.C. § 1961(1)(B); and

   c.   Wire fraud, as defined in 18 U.S.C. § 1961(1)(B).

199.   These acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

200.   All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the Conquest Defendants engaged in the predicate acts over a substantial period of time and such predicate acts have become the Conquest Defendants' regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained by this Court.

201.   As a direct and proximate result of, and by reason of the activities of Chen, Smolinisky, and Smith, and their conduct in violation of 18 U.S.C. §1962(c), USC has been injured in its business or property within the meaning of 18 U.S.C. § 1964(c).  The afore-described distortion and misrepresentation of Plaintiff Urban's projects in order to scare residents and orchestrate artificial community opposition through extortion, and mail and wire fraud were done to deter any competitors from entering the relevant off-campus USC student housing market, including Urban and USC, and for the Conquest Defendants to maintain their monopoly.

**COMPLAINT**

202.    As a result of these actions, USC has been injured in its business, having suffered, among other things, significant lost profits due to the delay in opening its bookstore, lost goodwill, increased rental prices, substandard housing, and lack of competition in a free market.

203.    USC is entitled to recover treble the damages it has sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## NINTH CAUSE OF ACTION

### (Racketeer Influenced and Corrupt Organizations Act; 18 U.S.C. § 1962(c), by Plaintiff USC Against the Conquest Defendants)

204.    Paragraphs 1 through 203 are re-alleged and reincorporated herein.

205.    At all relevant times, the Conquest Defendants are and were an "association-in-fact enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that they formed an informal entity with the common goal of monopolizing the market for off-campus student housing within walking distance of the USC campus through improper means, including extortion, and mail and wire fraud, done solely to deter Urban, USC and others, from entering the market for off-campus student housing within walking distance of the USC campus, and for the Conquest Defendants to maintain their monopoly, using the existing corporate structure for controlling and directing the affairs of the association-in-fact enterprise on an ongoing basis.

206.    At all relevant times, Conquest, Chen, Smolinisky, and Smith were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with one another.    From January 1, 2005 until the present, Conquest, Chen, Smolinisky, and Smith conducted, participated in, engaged in, conspired to engage in, or aided and abetted the conduct of the affairs of the association-in-fact enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).    The predicate acts constituting the pattern of

**COMPLAINT**

unlawful activity engaged in by the Conquest Defendants, as described herein, constitute:

        a.    Extortion, as defined in 18 U.S.C. § 1961(1)(B);

        b.    Mail fraud, as defined in 18 U.S.C. § 1961(1)(B); and

        c.    Wire fraud, as defined in 18 U.S.C. § 1961(1)(B).

207.    These acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

208.    All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the Conquest Defendants engaged in the predicate acts over a substantial period of time and such predicate acts have become the Conquest Defendants' regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained by this Court.

209.    As a direct and proximate result of, and by reason of the activities of Conquest, Chen, Smolinisky, and Smith, and their conduct in violation of 18 U.S.C. §1962(c), USC has been injured in its business or property within the meaning of 18 U.S.C. § 1964(c). The afore-described distortion and misrepresentation of Plaintiff Urban's projects in order to scare residents and orchestrate artificial community opposition through extortion, and mail and wire fraud were done to deter any competitors from entering the relevant off-campus USC student housing market, including Urban and USC, and for the Conquest Defendants to maintain their monopoly.

210.    As a result of these actions, USC has been injured in its business, having suffered, among other things, significant lost profits due to the delay in opening its bookstore, lost goodwill, increased rental prices, substandard housing, and lack of competition in a free market.

211.    USC is entitled to recover treble the damages it has sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

# TENTH CAUSE OF ACTION

## (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), by Plaintiff USC Against the Conquest Defendants)

212.    Paragraphs 1 through 211 are re-alleged and reincorporated herein.

213.    At all relevant times, University Park Community Association constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that it was and is an association.

214.    At all relevant times, Conquest, Chen, Smolinisky, and Smith were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with University Park Community Association.

215.    From January 1, 2005 until the present, Conquest, Chen, Smolinisky, and Smith conducted, participated in, engaged in, conspired to engage in, or aided and abetted the conduct of the affairs of University Park Community Association through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).   The predicate acts constituting the pattern of unlawful activity engaged in by the Conquest Defendants, as described herein, constitute:

      a.    Extortion, as defined in 18 U.S.C. § 1961(1)(B);

      b.    Mail fraud, as defined in 18 U.S.C. § 1961(1)(B); and

      c.    Wire fraud, as defined in 18 U.S.C. § 1961(1)(B).

216.    These acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

217.    All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the Conquest Defendants engaged in the predicate acts over a substantial period of time and such predicate acts have become the Conquest Defendants' regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained by this Court.

218.    As a direct and proximate result of, and by reason of the activities of Conquest, Chen, Smolinisky, and Smith, and their conduct in violation of 18 U.S.C. §1962(c), USC has been injured in its business or property within the meaning of 18 U.S.C. § 1964(c).  The afore-described distortion and misrepresentation of Plaintiff Urban's projects in order to scare residents and orchestrate artificial community opposition through extortion, and mail and wire fraud were done to deter any competitors from entering the relevant off-campus USC student housing market, including Urban and USC, and for the Conquest Defendants to maintain their monopoly.

219.    As a result of these actions, USC has been injured in its business, having suffered, among other things, significant lost profits due to the delay in opening its bookstore, lost goodwill, increased rental prices, substandard housing, and lack of competition in a free market.

220.    USC is entitled to recover treble the damages it has sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## ELEVENTH CAUSE OF ACTION

### (Conspiracy To Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (d), by Plaintiff USC Against Conquest Defendants)

221.    Paragraphs 1 through 220 are reincorporated and re-alleged herein.

222.    The Conquest Defendants and others knowingly and willfully agreed and conspired to violate 18 U.S.C. § 1962(c) as described above.  The Conquest Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to ensure the results described above.

223.    Recent overt acts in pursuit of the above-described conspiracy occurred when the Conquest Defendants, through counsel, recently communicated to USC that Conquest would oppose any Master Plan that included student housing, which would threaten Conquest's monopoly, and Conquest's attack on The Martin Group in May of

**COMPLAINT**

1  2007, which resulted in The Martin Group abandoning its off-campus USC student-

2  housing project.

3       224.   As a direct and proximate result of, and by reason of the activities of

4  Conquest, Chen, Smolinisky, and Smith, and their conduct in violation of 18 U.S.C.

5  §1962(c), USC has been injured in its business or property within the meaning of 18

6  U.S.C. § 1964(c).  The afore-described distortion and misrepresentation of Plaintiff

7  Urban's projects in order to scare residents and orchestrate artificial community

8  opposition through extortion, copyright infringement, and mail and wire fraud were

9  done to deter any competitors from entering the relevant off-campus USC student

10 housing market, including Urban and USC, and for the Conquest Defendants to

11 maintain their monopoly.

12      225.   As a result of these actions, USC has been injured in its business,

13 having suffered, among other things, significant lost profits due to the delay in

14 opening its bookstore, lost goodwill, increased rental prices, substandard housing,

15 and lack of competition in a free market.

16      226.   USC is entitled to recover treble the damages it has sustained together

17 with the cost of the suit, including reasonable attorneys' and experts' fees.

## TWELFTH CAUSE OF ACTION

### (Unfair Competition, Cal. Bus. & Prof. Code § 17200, By All Plaintiffs Against The Conquest Defendants)

21      227.   Paragraphs 1 through 226 are re-alleged and reincorporated herein.

22      228.   The Conquest Defendants have engaged in unfair competition by

23 committing acts that are unlawful, unfair, and fraudulent business practices or acts as

24 defined by the California Business and Professions Code sections 17200, *et seq.* by,

25 among other things, engaging in the acts described above, including but not limited

26 to:

27       a.    Conduct that constitutes or threatens violation of the Sherman

28 and Clayton Acts, 15 U.S.C. § 2, *et seq.*, and/or violates the policy and spirit of these

laws by significantly threatening or actually harming lawful competition, including these Defendants' threats that they would retaliate against USC if its Master Plan contained student housing plans.

        b.    Conduct that violates the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1960, *et seq.*, including these Defendants' threats that they would retaliate against USC if its Master Plan contained student housing plans.

        c.    Misappropriating Urban's confidential information, including the Confidential Offering Memorandum and the conceptual drawings.

        d.    Intentionally and improperly interfering with Urban's contracts with Clark Construction, 17910 Burbank LLC, and with its other partners, investors, joint venturers.

        e.    Intentionally and improperly interfering with Urban's business relationship with Hearst and thereby causing the breach or termination of the business relationships and/or lawful business expectancies Urban had with Hearst.

        f.    Violating California Business and Professions Code sections 17500, *et seq.*

        g.    Offering compensation or other financial incentives to members of the public and private entities that did not otherwise intend to appear at events and hearings related to Urban's projects to induce them to appear and object to Urban's projects for the sole purpose of halting or delaying completion of those projects.

        h.    Initiating and maintaining frivolous sham inquiries or objections to Urban projects in (a) Burien, Washington, (b) Washington National Station, Washington, (c) Mount Baker, Washington, (d) Seattle, Washington, (e) Glendale, California (f) Oxnard, California, (g) Culver City, California, (h) Wilshire Vermont Project, Los Angeles, California, (i) Herald Examiner Project, Los Angeles, California, and (h) Sun Valley, California, with the sole purpose of halting or delaying completion of the University Gateway Project.

229.   The Conquest Defendants have engaged in unfair competition by committing acts that are unfair, deceptive, untrue, and misleading advertising, as defined by the California Business and Professions Code sections 17200, *et seq.* by, among other things, engaging in the acts described above, including but not limited to:

a.   These Defendants made unfair, deceptive, untrue, and/or misleading representations to the public by direct and indirect commercial advertising regarding the nature and scope of the University Gateway Project over the Internet, in flyers, on billboards, in person, and, on information and belief, by other means.

b.   These Defendants made the unfair, deceptive, untrue, and/or misleading representations to the public in order to provide new housing and/or continue to provide the same housing to USC students and other members of the public by eliminating the competition that would be present if the University Gateway Project were completed.

c.   As evidenced by the factual allegations set forth above, these Defendants' misrepresentations were likely to cause, and did in fact cause, members of the public to be deceived about the nature and scope of the University Gateway Project.

d.   As a result of these misrepresentations, many individuals and entities initially opposed the University Gateway Project based on the unfair, deceptive, untrue, and/or misleading information provided by one or more of the Defendants, and when the true facts came to light most of those who opposed the project dropped their opposition to it.

e.   Once Plaintiffs and/or others provided these individuals and entities that initially opposed the University Gateway Project with true and correct information regarding the nature and scope of the Gateway Project, many of these

COMPLAINT

individuals and entities affirmatively supported the Gateway Project, including but not limited to the Shrine Auditorium.

230.    The acts described in this Complaint constitute numerous individual and combined unfair acts or practices within the meaning of Business and Professions Code sections 17200, *et seq*.   The totality of these Defendants' conduct has enabled Conquest to force competition, including but not limited to TMG, out of the off-campus USC student housing market.   These Defendants' conduct also harmed the local community by restricting the availability of student housing in the USC student housing market and affordable housing in other communities.

231.    These Defendants' unfair and unlawful business practices are likely to continue to harm the public by forcing the public to pay higher rents due to the limited availability of housing in the market for off-campus student housing within walking distance of the USC campus and affordable housing in other communities.   As such, these Defendants' conduct presents a continuing threat to the public.

232.    As a direct and proximate result of these Defendants' conduct, Conquest has received and continues to receive inflated profits and economic advantages that rightfully belong to the residents and students living in the off-campus USC student housing who have been adversely affected by the Conquest Defendants' conduct, as well as to Urban by virtue of Urban's loss of revenues and business relationships, increases in expenses and carrying costs caused by the delays inflicted by these Defendants, and costs of pursuing this action and pursuing and defending other actions described herein.

## THIRTEENTH CAUSE OF ACTION

### (Unfair Competition, Cal. Bus. & Prof. Code § 17500, By All Plaintiffs Against The Conquest Defendants)

233.    Paragraphs 1 through 232 are reincorporated and re-alleged herein.

234.    The Conquest Defendants have engaged in unfair competition by committing acts that constitute misleading advertising under California Business and

1  Professions Code section 17500, as defined by the California Business and

2  Professions Code sections 17200, *et seq.*, by, among other things, engaging in the

3  acts described above, including but not limited to:

4          a.  These Defendants, as individuals and/or as agents for Conquest,

5  made unfair, deceptive, untrue, and/or misleading representations to the public by

6  direct and indirect commercial advertising regarding the nature and scope of the

7  Gateway Project over the Internet, in flyers, on billboards, in person, and, on

8  information and belief, by other means;

9          b.  These Defendants, as individuals and/or as agents for Conquest,

10  made the unfair, deceptive, untrue, and/or misleading representations to the public in

11  order to allow Conquest to provide new housing and/or continue to provide the same

12  housing to USC students and other members of the public by eliminating the

13  competition that would be present if the University Gateway Project or additional

14  USC housing projects were completed;

15          c.  These Defendants knew or had reason to know that the

16  misrepresentations they were making were unfair, deceptive, untrue, and/or

17  misleading;

18          d.  As evidenced by the factual allegations set forth above, these

19  Defendants' misrepresentations were likely to cause, and did in fact cause, members

20  of the public to be deceived about the nature and scope of the University Gateway

21  Project;

22          e.  As a result of these misrepresentations, many individuals and

23  entities initially opposed the University Gateway Project based on the unfair,

24  deceptive, untrue, and/or misleading information provided by one or more of these

25  Defendants.

26          f.  Once Plaintiffs and/or others provided these individuals and

27  entities that initially opposed the University Gateway Project with true and correct

28  information regarding the nature and scope of the University Gateway Project, many

**COMPLAINT**

1  of these individuals and entities affirmatively supported the Gateway Project,

2  including but not limited to the Shrine Auditorium.

3  235.   The totality of these Defendants' conduct has enabled Conquest to

4  force competition, including but not limited to TMG, out of the off-campus USC

5  student housing market.   These Defendants' conduct also harmed the local

6  community by restricting the availability of off-campus USC student housing.

7  236.   Each of these enumerated acts constitutes an unlawful business

8  practice within the meaning of Business and Professions Code sections 17500, *et*

9  *seq.*

10  237.   These Defendants' unfair and unlawful business practices are likely to

11  continue to harm the public by forcing the public to pay higher rents due to the limited

12  availability of housing in the market for off-campus student housing within walking

13  distance of the USC campus and affordable housing in other communities.   As such,

14  Conquest Defendants' conduct presents a continuing threat to the public.

15  238.   As a direct and proximate result of the Conquest Defendants' conduct,

16  Conquest has received and continues to receive inflated profits and economic

17  advantages that rightfully belong to the residents and students living in off-campus

18  USC student housing who have been adversely affected by the Defendants' conduct,

19  as well as to Urban by virtue of Urban's loss of revenues and business relationships,

20  increases in expenses and carrying costs caused by the delays inflicted by the

21  Defendants, and costs of pursuing this action and pursuing and defending other

22  actions described herein.

### FOURTEENTH CAUSE OF ACTION

### (Abuse of Process By Plaintiff Urban Against All Defendants)

25  239.   Paragraphs 1 through 238 are reincorporated and re-alleged herein.

26  240.   Defendants have used legal process against Plaintiff Urban for an

27  ulterior purpose not proper in the regular conduct of the proceedings.   Defendants'

28  conduct was part of an illegal and anticompetitive plan to use administrative appeals

**COMPLAINT**

1    and CEQA lawsuits with an ulterior purpose of forcing Urban to abandon the
2    University Gateway Project.

3         241.    Specifically, Defendants filed writs of mandate on the University
4    Gateway Project's EIR, the University Gateway Project's City entitlement process,
5    and the Verdugo Gardens, Glenoaks and Herald Examiner project appeals for the
6    primary improper purposes of illegally restricting competition, harassing Urban, and
7    interfering with the lawful competitive relationships Urban has with customers,
8    investors and the marketplace.

9         242.    Defendants have engaged in the misuse of process and imprudent use
10   of the administrative process and the court system, including but not limited to the
11   filing of improper motions, for an end other than that which it was designed to
12   accomplish.  The ulterior collateral purposes of Defendants were designed to punish
13   Urban and to subject Urban to excessive litigation expenses, harassment, oppression,
14   and abuse, and Defendants' use of various legal processes was not for legitimate or
15   reasonably justifiable purposes.

16        243.    As a proximate result of the above-mentioned abusive, oppressive,
17   and wrongful conduct of Defendants in the misuse of process, Plaintiff Urban has
18   suffered damages in an amount to be proven at trial.

19        244.    Defendants' conduct was done willfully, oppressively, maliciously,
20   deceptively, with conscious disregard of the rights and interests of Plaintiffs, and
21   with the intent to harm or injure Plaintiffs such that there should be an assessment of
22   punitive damages against each Defendant, in an amount appropriate to punish and
23   set an example of the Defendants.

## FIFTEENTH CAUSE OF ACTION

**(Interference With Economic Relations By Plaintiff Urban Against The**

**Conquest Defendants)**

27        245.    Paragraphs 1 through 244 are re-alleged and reincorporated herein.
28        246.    Urban had a valid contract with Clark Construction.

247.    The Conquest Defendants knew of the contractual relationship between Urban and Clark Construction.

248.    The Conquest Defendants intentionally and improperly interfered with Urban's contract with Clark Construction.

249.    The Conquest Defendants' misconduct and that of their agents was intentional and outrageous and committed with the purpose of causing injury, or in reckless disregard of harm, to Urban to serve the Conquest Defendants' own interests.

250.    As a direct and proximate cause of the Conquest Defendants' interference, Urban has experienced an actual disruption of its relationship with Clark such that cost of constructing the University Gateway Project has increased tens of millions of dollars; Clark has been forced to delay performance, causing a substantial increase in the fees owed to Clark or any other competent and reputable contractor who would construct the project; Urban has experienced an actual disruption of its relationship with its partners, investors, and joint venturers because the investors, joint venturers, and partners are and will be reluctant to invest in, partner, or joint venture with Urban in any future development projects for fear that such projects will be challenged and delayed by the Conquest Defendants.

251.    Urban has been damaged in an amount to be proven at trial as a result of the intentional interference.

252.    The Conquest Defendants' misconduct and that of their agents was intentional and outrageous and committed with the purpose of causing injury to, or in reckless disregard of harm, to Urban in order to serve the Conquest Defendants' own interests.

## SIXTEENTH CAUSE OF ACTION

### (Interference With Economic Relations By Plaintiff Urban Against The Conquest Defendants and Defendant Orellano)

253.    Paragraphs 1 through 252 are re-alleged and reincorporated herein.

**COMPLAINT**

254.     Urban had a valid contract with 17910 Burbank, LLC, and its investors, joint venturers and partners.

255.     The Conquest Defendants and Defendant Orellano knew of the contractual relationship between Urban and 17910 Burbank, LLC, and its investors, joint venturers and partners.

256.     These Defendants intentionally and improperly interfered with Urban's contract with 17910 Burbank, LLC, and its investors, joint venturers and partners.

257.     These Defendants misconduct, and that of their agents, was intentional and outrageous and committed with the purpose of causing injury, or in reckless disregard of harm, to Urban in order to serve these Defendants' own interests.

258.     As a direct and proximate cause of these Defendants' interference, Urban has experienced an actual disruption of its relationship with 17910 Burbank by causing unnecessary delays and causing the loss of millions of dollars in benefits under Urban's consulting agreement with 17910 Burbank; Urban has experienced an actual disruption of its relationship with its partners, investors, and joint venturers because the investors, joint venturers, and partners are and will be reluctant to invest in, partner, or joint venture with Urban in any future development projects for fear that such projects will be challenged and delayed by these Defendants.

259.     Urban has been damaged in an amount to be proven at trial as a result of the intentional interference.

260.     These Defendants' misconduct and that of their agents was intentional and outrageous and committed with the purpose of causing injury to, or in reckless disregard of harm, to Urban in order to serve these Defendants' own interests.

///

///

///

## SEVENTEENTH CAUSE OF ACTION

### (Interference With Prospective Economic Advantage By Plaintiff Urban Against The Conquest Defendants and Defendant Baez)

261.    Paragraphs 1 through 260 are reincorporated and re-alleged herein.

262.    Urban had a valid and existing business relationship with Hearst.

263.    The Conquest Defendants and Defendant Baez knew of the business relationship and business expectancy between Urban and Hearst.

264.    These Defendants intentionally interfered with Urban's prospective economic benefit with Hearst, causing the breach or termination of expectancies by questioning Hearst about the Herald Examiner Project, resulting in Hearst's decision not to renew its contract with Urban in February, 2007.

265.    These Defendants' misconduct, and that of their agents, was intentional and outrageous and committed with the purpose of causing injury to or in reckless disregard of harm to Urban in order to serve these Defendants' own interests.

266.    As a direct and proximate result of these Defendants' actions, Urban has been damaged in an amount to be proven at trial.

These Defendants' misconduct was of such a degree as to entitle Urban to punitive or exemplary damages from these Defendants.

**WHEREFORE,** Plaintiffs request judgment against Defendants, and each of them, for the following:

## ON THE FIRST, SECOND AND THIRD CAUSES OF ACTION

1.    The Conquest Defendants and their agents be enjoined during this litigation, and permanently thereafter, from ongoing and future acts constituting violations of Federal antitrust laws to maintain or secure a monopoly, as provided for by 15 U.S.C. § 26;

2.    Treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15,

- 57 -

COMPLAINT

1  arising from harm the Plaintiffs have sustained as a result of the Conquest
2  Defendants' violation of section 2 of the Sherman Act, 15 U.S.C. § 2;

3      3.    Prejudgment interest;

4      4.    Costs of suit incurred;

5      5.    All costs, expenses and attorneys' fees; and

6      6.    Such other and further relief as the court deems just and proper.

7  **ON THE FOURTH, FIFTH, SIXTH AND SEVENTH CAUSES OF**
8  **ACTION**

9      1.    Issue a permanent injunction restraining the Defendants, their officers,
10 employees, agents, affiliates, parents, subsidiaries and all other persons who act in
11 concert with them from making false, misleading or deceptive statements or
12 representations about Urban, Gateway, or the Gateway Project.

13     2.    Issue a permanent injunction restraining the Defendants, their officers,
14 employees, agents, affiliates, parents, subsidiaries and all other persons who act in
15 concert with them from extorting Urban or Gateway.

16     3.    Award damages against the Defendants, jointly and severally, for a sum
17 of money equal to the amount of damages Urban has sustained or will sustain, said
18 amount to be trebled pursuant to 18 U.S.C. § 1964(c).

19     4.    Award prejudgment interest on the amount of damages that Urban and
20 Gateway has sustained;

21     5.    Award all costs of litigation incurred by Urban and Gateway, including
22 its reasonable attorneys' fees and expert witnesses fees, pursuant to 18 U.S.C. §
23 1964(c);

24     6.    Award punitive damages; and

25     7.    Award such other further relief as the Court deems just and equitable.

26 **ON THE EIGHTH, NINTH, TENTH AND ELEVENTH CAUSES OF**
27 **ACTION**

28

**COMPLAINT**

1.     Issue a permanent injunction restraining the Conquest Defendants, their officers, employees, agents, affiliates, parents, subsidiaries and all other persons who act in concert with them from making false, misleading or deceptive statements or representations about the University Gateway Project and USC.

2.     Issue a permanent injunction restraining the Conquest Defendants, their officers, employees, agents, affiliates, parents, subsidiaries and all other persons who act in concert with them from extorting USC.

4.     Award damages against the Conquest Defendants, jointly and severally, for a sum of money equal to the amount of damages USC sustained or will sustain, said amount to be trebled pursuant to 18 U.S.C. § 1964(c).

5.     Award prejudgment interest on the amount of damages that USC has sustained;

6.     Award all costs of litigation incurred by USC, including its reasonable attorneys' fees and expert witnesses fees, pursuant to 18 U.S.C. § 1964(c);

7.     Award punitive damages; and

8.     Award such other further relief as the Court deems just and equitable.

**ON THE TWELFTH AND THIRTEENTH CAUSES OF ACTION**

1.     A permanent injunction pursuant to Business and Professions Code section 17203, restraining and enjoining Conquest Defendants from continuing the acts of unfair competition set forth above;

2.     During this action, a preliminary injunction pursuant to Business and Professions Code section 17203 to enjoin and restrain the Conquest Defendants from the acts of unfair competition set forth above;

3.     The Conquest Defendants be ordered to restore to the public all funds acquired by the acts of unfair competition set forth above pursuant to Business and Professions Code section 17203;

4.     For all costs, expenses and attorney's fees of suit pursuant to 17 U.S.C. §§ 503-05; and

**COMPLAINT**

5.      Any other and further relief as the court deems just and equitable.

**ON   THE   FOURTEENTH,   FIFTEENTH,   SIXTEENTH,   AND SEVENTEENTH CAUSES OF ACTION**

1.      Compensatory damages;

2.      Punitive damages;

3.      All costs of suit; and

4.      Such other and further relief as the court considers proper.

## Jury Demand

Plaintiffs demand a trial by jury.

DATED this ___4th___ day of September 2007.

STEPTOE & JOHNSON LLP

By: _____

Lawrence P. Riff
Jason Levin
Howard H. Stahl
Karl M. Tilleman
633 West Fifth Street, Suite 700
Los Angeles, California 90071

Attorneys for Plaintiffs

- 60 -
COMPLAINT

## DECLARATION OF HOWARD J. KOZLOFF

I, Howard J. Kozloff, declare as follows:

1.        I am currently the Development Manager of The Martin Group ("TMG"). I have held this position since 2006.  In my role at TMG, I have had the opportunity to interact with Mssrs. Alan Smolinisky and Brian Chien-Chih Chen of Conquest Student Housing, LLC ("Conquest").  I have firsthand personal knowledge of the facts set forth below, and if called upon to do so, I could and would testify competently thereto under oath.

2.        TMG is a real estate development and management company that was founded in 1984.  TMG's headquarters is located in Santa Monica, California.  TMG recently became involved in the potential acquisition and development of a property located at 3800 S. Figueroa St., in the University Park area of South Los Angeles, near the University of Southern California ("USC").

3.        On May 9, 2007, Mr. Lee Wagman (TMG's Chief Executive Officer), and I met with Conquest representatives, Alan Smolinisky and Brian Chien-Chih Chen, at TMG's offices in Santa Monica.  Mr. Smolinisky had previously requested this meeting, and TMG agreed to host it. Prior to that meeting, I had never met or had any relationship with either of these individuals.

4.        During the May 9 meeting, Mr. Smolinisky tried to convince us that TMG should not proceed with a development project at 3800 S. Figueroa and then threatened to sue any TMG project at that location using the California Environmental Quality Act ("CEQA"). Mr. Smolinisky stated that there is no market depth for student housing near USC, that TMG would be making a huge mistake by developing student housing near USC, and that any TMG student housing project near USC would not reach functional occupancy levels.  Mr. Smolinisky also said that if TMG decides to proceed with a student housing project at 3800 S. Figueroa, that Conquest would prolong TMG's entitlement process to the maximum extent possible by opposing those entitlements and by suing to try to delay any project approvals under CEQA.  Mr. Smolinisky said that those delays would make our purchase of this site economically infeasible. He also said that he knows exactly what it would cost Conquest to slow down a project like

1

DECLARATION OF HOWARD J. KOZLOFF RE CONQUEST
STUDENT HOUSING, LLC

1   TMG's, that he would spend between $1.3 and $1.6 million to prevent the TMG project, and that

2   he could delay the TMG project by six or more years using CEQA litigation.  Mr. Smolinisky

3   also stated that we should think of him and Conquest like "Al Qaeda," adding that it does not

4   cost a lot to build a "bomb" and cause extensive damage to a development project, and that it

5   only takes a single person to cause serious harm to real estate projects using CEQA.

6          5.          During the May 9 meeting, Mr. Smolinisky also discussed how his CEQA

7   litigation tactics have successfully delayed the University Gateway Project near USC.  Mr.

8   Smolinisky said that his lawsuits opposing the University Gateway Project have delayed that

9   project's groundbreaking, and he boasted that he is using CEQA to oppose other projects

10  involving Urban Partners, one of the developers involved in the University Gateway Project.

11  Mr. Smolinisky said that he has delayed Urban Partners' project downtown, that he has delayed

12  Urban Partners' project in Sun Valley, and that he has "chased" Urban Partners to Seattle to

13  oppose Urban's project in that city.  Mr. Smolinisky also said that he is meeting with the

14  Blackstone Group, one of the investors in the University Gateway Project, to threaten them about

15  their involvement in that project.  Mr. Smolinisky said that he has successfully made Urban

16  Partners and the Shammas family the "victim" for proceeding with the University Gateway

17  Project.  Mr. Smolinisky told us that he views CEQA as a powerful tool to delay real estate

18  projects, that he has highly effective legal counsel, and that his tactics are protected by the First

19  Amendment and the "anti-SLAP lawsuit" rules .  Mr. Smolinisky also explained that he knows

20  about TMG's projects in Downtown Los Angeles, Agoura Hills and on La Brea Blvd, and that he

21  knows the La Brea project already has experienced some delay.

22          6.          During the May 9 meeting, Mr. Smolinisky also said that he is aware of a

23  personal legal issue that involves Mr. Wagman, and that as an inducement for TMG not to

24  proceed with the 3800 S. Figueroa project he could  arrange to call off the opposition in that

25  personal matter because the attorney involved, John Henning, works for him in some capacity.

26          7.          Within a day or so of the May 9 meeting, we received notice that

27  Conquest had filed requests for documents concerning TMG's development projects in Agoura

28  Hills and on La Brea through California's Public Records Act.

2

1

62

8.        On May 16, 2007, Mr. Wagman received a letter from Mssrs. Smolinisky and Chen that renewed the threat that Conquest intends to initiate litigation and draw out appeals if TMG develops the 3800 S. Figueroa property.  A true and correct copy of that letter is attached hereto as Exhibit A.  That letter sets forth Conquest's projected development timeline for a TMG project at 3800 S. Figueroa, and states that "we have assumed that a consortium of existing tenants and neighbors object to the project," and that a litigation involving such a project would delay construction until "mid-2013."  The letter also states that "If you were to construct the improvements, we are unable to envision any reality in which you would be able to generate sufficient income to break even."

9.        On May 17, 2007, Mr. Wagman sent a letter to Mr. Smolinisky explaining that TMG believes Mr. Smolinisky is trying to harass TMG, and that TMG believes his tactics and motives are anticompetitive.  A true and correct copy of this letter is attached hereto as Exhibit B.

10.        Based on the conduct of Mr. Smolinisky and Mr. Chen, I believe that these individuals are trying to threaten and harass TMG to keep our company from entering the student housing market near USC, and that these individuals have used similar tactics against other potential competitors to prevent them from entering this market.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 11 th day of June, 2007 in Los Angeles, California.

Howard J. Kozloff

DECLARATION OF HOWARD J. KOZLOFF RE CONQUEST
STUDENT HOUSING, LLC

# EXHIBIT A



### STUDENT HOUSING

May 16, 2007

Mr. Lee Wagman
The Martin Group of Companies, LLC
100 Wilshire Blvd.
Suite 1845
Santa Monica, CA 90401

      Re:    <u>3800 S. Figueroa Street Development</u>

Dear Mr. Wagman:

      We are disappointed that you have elected not to avail yourself of the further opportunity to meet with us at our office and hear further our issues and concerns regarding your company's potential acquisition and development of the 3800 S. Figueroa property. Other than the actual tenants of the property, we are your closest neighbor, and as the owners of 18 other buildings in the general vicinity, will be most affected by your development.

      We have been developing ground up construction properties in this area for the past 6 years. Our offices are located here as well. We have more knowledge of this area than anyone else. At the meeting we had hoped to have, we intended to show you property by property our actual income and expenses based on Federal tax returns (the numbers for Tuscany are based on monthly rent rolls since the property has not been in operation for an entire year yet). With this information in hand, we had hoped to help you ascertain the following: (i) the per square foot sales price you would need in order to break even, assuming that you sold the property after entitlements, and (ii) your total cost of development, assuming that you built the improvements and maintained ownership.

      We believe that it is so important that you receive this information that even though you would not meet, we have taken the liberty of compiling the relevant information for you anyway. For now, you will have to take our word that all of the financial information is taken directly off of our tax returns. Of course, after you have reviewed this information, if you would like to meet at our office, we would be happy to walk you through all of the backup documentation.

3770 South Figueroa Street, Los Angeles, California 90007
Tel: (213) 746-7121    Fax: (213) 748-9722
www.ConquestHousing.com

The attached pages contain the following information:

1.      Rents.

These are our actual rent figures on a cumulative basis, property by property.  For Tuscany, we have provided monthly figures because the property has not been operational for an entire year yet.  Rents are "gross", that is, all Conquest apartments include parking, Ethernet, DISH Network television and trash pickup for no additional charge.

2.      Operating Expenses.

Even with our ability to manage expenses across a platform of properties, student housing is still a very labor intensive, high expense business.  As you can see, our expenses per property run between 35% and 52%.  We do not yet have Tuscany's year based expenses, but we expect these expenses to run towards the higher end of the expense range because of the additional services offered at Tuscany free of charge, including concierge, yoga classes, movie night, gym, pool, spas, steam and saunas.

3.      Development Timeline.

We have created the type of timeline we would use assuming we were developing the property and we intended to build a project with the same uses and development intensity as Tuscany (that is, we have assumed that you will need certain discretionary approvals from the City of Los Angeles, but we have not assumed that you intend to construct a fifty story tower).  We have also assumed that you have a team of consultants ready to go immediately upon acquisition of the land.  Finally, we have assumed that a consortium of existing tenants and neighbors object to the project, and that therefore you must be successful in obtaining all governmental entitlements notwithstanding the opposition from tenants and affected neighbors, and then after that you must win both at trial court and on appeal before you can either sell the property with entitlements or break ground.

Based on these assumptions, and assuming that neither the trial court nor appeals court invalidates any of your entitlements or requires you to redo any of your reports or studies, we believe that you would be in position to either sell the property or commence construction mid-2013.  Assuming it takes approximately 24 months to construct the improvements, if you were to do so, the improvements would be completed summer 2015.  That means that you would be open for students for the 2015-2016 school year.

4.      Development and Construction Costs.

3770 South Figueroa Street, Los Angeles, California  90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

We have attempted to ballpark your cost of carrying the land through the entitlement process. We have assumed a land carrying cost of 5.5% per annum. This is either a very optimistic figure if you are using third party financing of any kind, or a reasonable missed return on investment if you were to be utilizing equity only. We have added anticipated annual real property tax payments based on your purchase price, as well as liability insurance for the property.

Our conclusion is that as of mid-2013, your cost in the project, exclusive of entitlement cost, would be approximately **$29,500,000**, which translates into **$422** per foot for the land. If you add **$6,000,000** for the cost of entitlements through appeal court, including all consultants and attorneys, your cost is approximately **$35,500,000**, which translates into **$500** per square foot for the land. Assuming 3% brokerage and closing costs, you would need to realize **$520** per foot for the land just to break even.

Finally, assuming that you were to build a project of the same size as Tuscany, we believe that your construction costs would be at least **$50,000,000**. We have assumed that you would obtain a construction loan for the improvements. We have assumed interest on the construction loan of 7%, inclusive of fees and costs. We have therefore concluded that upon completion, between equity, deemed return on equity and construction, your cost in the project would be at least **$85,000,000**. As a comparison, it cost us less than half of that to buy the land and build Tuscany.

Obviously there are a variety of unknowns which could greatly affect the numbers. Interest rates and construction costs could be higher or lower. USC could greatly increase or decrease the size of its freshman class, thereby altering demand. Supply of units will certainly increase based on downtown LA construction as well as the proposed redevelopment by USC of University Village.

Notwithstanding the foregoing, we believe that it is clear that barring something quite extraordinary, if you were to sell the property post-entitlement pre-construction, you would need to receive a land price not seen anywhere but in Beverly Hills just to break even. If you were to construct the improvements, we are unable to envision any reality in which you would be able to generate sufficient income to break even.

We would be happy to go over this analysis and the backup information on which it was based if you elect to meet with us in our office.

Very truly yours,


Alan Smolinisky/Brian Chen


3770 South Figueroa Street, Los Angeles, California 90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

# Conquest Student Housing Rents

## TUSCANY

|  | 2006 Monthly Rent |
|---|---|
| TUSCANY Monthly Rent: | $ 401,335 |
| Monthly Rent Per Bed: | $ 784 |

## OTHER PROPERTIES

|  | Number of Beds | 2006 Annual Rent | 2006 Annual Rent Per Bed |
|---|---|---|---|
| Chez Ronnee & The Bungalows | 148 | $ 1,101,950 | $ 7,445.61 |
| Hablat Soo Zee | 96 | $ 673,917 | $ 7,019.97 |
| The Pad | 37 | $ 230,177 | $ 6,221.00 |
| Abbey Road/The Palazzo | 48 | $ 395,395 | $ 8,237.40 |
| Providence | 97 | $ 627,693 | $ 6,471.06 |
| Palisades I & II | 136 | $ 930,916 | $ 6,844.97 |

Notes:
The figures above for "Other Properties" were taken directly from IRS Form 8825 of each respective 2006 LLC tax return.
The 2006 Monthly rent for Tuscany is the actual monthly rent collection since we have no tax returns for a full year of operation.
The above properties do not include graduate buildings that consist of studio and 1BR units only.
All Conquest apartments include parking, Ethernet, Dish Network televison and trash pick up included in rent.

1
68

The figures below were taken directly from IRS Form 8825 of each respective 2006 LLC tax return

| Building Name | Owner (LLC) | # of units | # of beds | 2006 Revenue | 2006 Operating Expenses (w/out interest, depreciation, and amortization) | % Expenses | NOI | % NOI |
|---|---|---|---|---|---|---|---|---|
| Chez Ronnee & The Bungalows | Chez Investments, LLC | 42 | 148 | $ 1,101,950.00 | $ 390,325.00 | 35.44% | $ 711,625.00 | 64.56% |
| Habitat See Zee | Habitat See Zee, LLC | 24 | 96 | $ 673,617.00 | $ 267,702.00 | 39.74% | $ 406,216.00 | 60.26% |
| The Pad | The Pad on 30th Street, LLC | 14 | 37 | $ 230,177.00 | $ 118,743.00 | 51.59% | $ 111,434.00 | 48.41% |
| Abbey Road/The Palazzo | Sgt. Pepper Housing, LLC | 12 | 45 | $ 395,385.00 | $ 173,030.00 | 43.76% | $ 222,365.00 | 56.24% |
| Providence | Providence Apartments on Maple, LLC | 20 | 97 | $ 627,693.00 | $ 295,261.00 | 47.04% | $ 332,432.00 | 52.96% |
| Palisades I & II | Polymer Housing, LLC | 24 | 136 | $ 930,916.00 | $ 389,586.00 | 41.85% | $ 541,330.00 | 58.15% |

1
69







Purchase Price: $ 21,000,000
Square Footage: 70,130
Price per foot: $ 299.44
2010
2011
2012
Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Jan Feb Mar Apr May Jun Jul Aug
Acquisition of Land:
Engage Primary Consultants
(architect, surveyor, soil engineer, zoning consultant,
EIR consultant, traffic consultant, historical consultant, community relations):
Prepare Architectural Design and Project Description:
City and CRA Meetings and Community Outreach:
Notice of Preparation and Scoping Meeting (30 days):
Preparation of Draft EIR including all technical reports:
Public Comment Period for Draft EIR (45 days):
Preparation of Responses to Draft EIR Comments, and Preparation of Final EIR:
CRA Board Hearing (Certify Final ERI and Approves Variations):
Lawsuit Challenging Final EIR and Board Approvals:
File Applications for City Entitlements:
Hearing by CPC Hearing Officer:
CPC Hearing
Issuance of CPC determination
Appeal CPC Determination and Processing by City:
Submit Building Permit Application:
PLUM Committee Hearing:
City Council Approval of Project:
City Entitlements Complete:
Lawsuit Challenging Final EIR and City Approvals
Appeal of CRA and City Lawsuit (Court of Appeal):
Best Case to Break Ground:
(assumes complete victory)

*Purchase Price:* $ 21,000,000
*Square Footage:* 70,130
*Price per foot:* $ 299.44

| | | | | | 2013 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| Acquisition of Land: | | | | | | | | | | | | | | | | |
| Engage Primary Consultants *(architect, surveyor, soil engineer, zoning consultant, EIR consultant, traffic consultant, historical consultant, community relations):* | | | | | | | | | | | | | | | | |
| Prepare Architectural Design and Project Description: | | | | | | | | | | | | | | | | |
| City and CRA Meetings and Community Outreach: | | | | | | | | | | | | | | | | |
| Notice of Preparation and Scoping Meeting (30 days): | | | | | | | | | | | | | | | | |
| Preparation of Draft EIR including all technical reports: | | | | | | | | | | | | | | | | |
| Public Comment Period for Draft EIR (45 days): | | | | | | | | | | | | | | | | |
| Preparation of Responses to Draft EIR Comments, and Preparation of Final EIR: | | | | | | | | | | | | | | | | |
| CRA Board Hearing (Certify Final ERI and Approves Variations): | | | | | | | | | | | | | | | | |
| Lawsuit Challenging Final EIR and Board Approvals: | | | | | | | | | | | | | | | | |
| File Applications for City Entitlements: | | | | | | | | | | | | | | | | |
| Hearing by CPC Hearing Officer | | | | | | | | | | | | | | | | |
| CPC Hearing | | | | | | | | | | | | | | | | |
| Issuance of CPC determination | | | | | | | | | | | | | | | | |
| Appeal CPC Determination and Processing by City: | | | | | | | | | | | | | | | | |
| Submit Building Permit Application: | | | | | | | | | | | | | | | | |
| PLUM Committee Hearing: | | | | | | | | | | | | | | | | |
| City Council Approval of Project: | | | | | | | | | | | | | | | | |
| City Entitlements Complete: | | | | | | | | | | | | | | | | |
| Lawsuit Challenging Final EIR and City Approvals | | | | | | | | | | | | | | | | |
| Appeal of CRA and City Lawsuit (Court of Appeal): | | | | | | | | | | | | | | | | |
| Best Case to Break Ground: (assumes complete victory) | | | | | | | | | | | | | | | | |

| | |
|---|---|
| Purchase Price: | $ 21,000,000 |
| Land Square Footage: | 70,000 |
| Price per foot: | 300.00 |
| Property Tax Rate: | 1.14% |
| | |
| Total Land Purchase Carrying Cost: | $ 21,000,000 |

**Ordinary Expenses**

| | |
|---|---|
| Annual Insurance Costs: | 17,500 |
| April 10 Property Tax Payment: | 119,700 |
| December 10 Property Tax Payment: | 119,700 |

| | 8/1/07 - 1/31/08 | 2/08 - 7/31/08 | 8/1/08 - 1/31/09 | 2/1/09 - 7/31/09 | 8/1/09 - 1/31/10 | 2/1/10 - 7/31/10 | 8/1/10 - 1/31/11 | 2/1/11 - 7/31/11 | 8/1/11 - 1/31/12 | 2/1/12 - 7/31/12 | 8/1/12 - 1/31/13 | 2/1/13 - 4/1/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Compounded Carrying Cost | $ 21,000,000 | $ 21,129,450 | $ 21,258,900 | $ 21,385,350 | $ 21,513,800 | $ 21,642,250 | $ 21,770,700 | $ 21,899,150 | $ 22,027,600 | $ 22,156,050 | $ 22,284,500 | $ 22,412,950 |
| Property Taxes (April 10 Payment) | | 119,700 | | 119,700 | | 119,700 | | 119,700 | | 119,700 | | 119,700 |
| Property Taxes (December 10 Payment) | 119,700 | | 119,700 | | 119,700 | | 119,700 | | 119,700 | | 119,700 | |
| Property Insurance | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 9,333 |
| Total Carrying Cost | $ 21,128,450 | $ 21,256,900 | $ 21,385,350 | $ 21,513,800 | $ 21,642,250 | $ 21,770,700 | $ 21,899,150 | $ 22,027,600 | $ 22,156,050 | $ 22,284,500 | $ 22,412,950 | $ 22,536,443 |
| Opportunity Cost Interest Rate | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% |
| Semi-annual Opportunity Cost | $ 581,032 | $ 584,565 | $ 588,097 | $ 591,630 | $ 595,162 | $ 598,694 | $ 602,227 | $ 605,759 | $ 609,291 | $ 612,824 | $ 616,356 | $ 413,206 |
| Compounded Opportunity Cost | $ 581,032 | $ 1,165,597 | $ 1,753,694 | $ 2,345,324 | $ 2,940,486 | $ 3,539,180 | $ 4,141,407 | $ 4,747,166 | $ 5,356,457 | $ 5,969,281 | $ 6,585,637 | $ 6,998,842 |
| TOTAL COST: | $ 21,709,482 | $ 22,422,497 | $ 23,139,044 | $ 23,859,124 | $ 24,582,736 | $ 25,309,880 | $ 26,040,557 | $ 26,774,766 | $ 27,512,507 | $ 28,253,781 | $ 28,998,587 | $ 29,537,226 |

| | |
|---|---|
| TOTAL COST (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING): | $ 29,537,226 |
| TOTAL COST PER FOOT (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING): | 421.96 |

Note:
We have assumed no increase in property taxes, insurance or interest rate.

**EXHIBIT B**

THE MARTIN GROUP

May 17, 2007


Alan Smolinisky
Conquest Student Housing
3770 South Figueroa Street
Los Angeles, CA 90007


Dear Alan,

We've been reluctant to respond to your calls or to answer the letter you sent yesterday in light of the threatening statements you made in our meeting last week and because of the aggressive and, we believe, inappropriate actions you've taken subsequently. In particular, we are concerned by the document requests you immediately filed in communities where we are doing business in which you have absolutely no interest other than to harass us; the introduction of personal, non-business matters to induce us to change course; the letter that you sent that reiterated in bold face type your threats to initiate litigation and draw out appeals; the effort you made to go around one of us with calls to the other simply because your call wasn't returned in 20 hours; the letter that appears to have been carefully crafted by litigation lawyers; and the numerous inquiries you've made about us to third parties.

This all creates an alarming pattern and causes us to regard your motives and tactics as anti-competitive. It also convinces us that we should not consider, let alone rely, on any information that you proffer. Indeed, we prefer not to have any conversation with you in which you don't consent in advance to record, or in which counsel is not present.

Your actions and threats to "tie us up in CEQA litigation for six or more years" are, to my mind, completely inappropriate. You know nothing about our project, the process we intend to follow, or any potential CEQA issues. Your only goal seems to be to convince us to either back away from our purchase or end up "the victim", as you bragged you made out of Urban Partners and the Shammas family. In our meeting, you analogized yourself to Al Qaeda. We are starting to agree.

Instead of this type of dialogue, I would welcome the opportunity to share with you our thoughts about why we think our project will be good for you.

> - Because we are spending so much on the land, we will need to achieve substantial rents which will uplift the entire market and inure the benefit of Tuscany.

The Martin Group
...
...

www.themartingroup.com

1
75

- We build quality projects which improve the neighborhoods in which we locate.
- We will attract more people to the area who will shop and dine at Tuscany and who will walk by and appreciate the building first hand.

We believe that our project will be highly complementary. We encourage your support, not your threats and opposition. We do not wish to be an adversary and warmly welcomed you in our office as a neighbor when you first called.

We simply want to develop a first rate project, one that we believe will be well received by the market, by the University and by the City. Unfairly competing and attempting to create and maintain a market monopoly through the tactics of intimidation are not, as you suggested in person, the protected exercise of any constitutional right.

We hope that what we've said may persuade you to take a different course. But from the impression you've quickly given and your past actions, we doubt it. Please know that we don't consider your threats as idle or dismiss them. As you reminded us several times, you've done this successfully in the past, have all the resources you need to do it again, and know how to use lawsuits as weapons to chill our purchase or damage our project. We hear you, but we'll make our own decisions based on what is right, not on threats.

Sincerely,

The Martin Group

Lee H. Wagman

J. David Martin

1
76

## DECLARATION OF LEE H. WAGMAN

I, Lee H. Wagman, declare as follows:

1.         I am currently the Chief Executive Officer and a Partner of The Martin Group ("TMG"). I have held these positions since 2005. In my role at TMG, I have had the opportunity to interact with Mssrs. Alan Smolinisky and Brian Chien-Chih Chen of Conquest Student Housing, LLC ("Conquest"). I have firsthand personal knowledge of the facts set forth below, and if called upon to do so, I could and would testify competently thereto under oath.

2.         TMG is a real estate development and management company that was founded in 1984. TMG's headquarters is located in Santa Monica, California. TMG recently became involved in the potential acquisition and development of a property located at 3800 S. Figueroa St., in the University Park area of South Los Angeles, near the University of Southern California ("USC").

3.         On May 9, 2007, Mr. Howard Kozloff (TMG's Development Manager) and I met with Conquest representatives, Alan Smolinisky and Brian Chien-Chih Chen, at TMG's offices in Santa Monica. Mr. Smolinisky had previously requested this meeting, and TMG agreed to host it. Prior to that meeting, I had never met or had any relationship with either of these individuals.

4.         During the May 9 meeting, Mr. Smolinisky tried to convince us that TMG should not proceed with a development project at 3800 S. Figueroa and then threatened to sue any TMG project at that location using the California Environmental Quality Act ("CEQA"). Mr. Smolinisky stated that there is no market depth for student housing near USC, that TMG would be making a huge mistake by developing student housing near USC, and that any TMG student housing project near USC would not reach functional occupancy levels. Mr. Smolinisky also said that if TMG decides to proceed with a student housing project at 3800 S. Figueroa, that Conquest would prolong TMG's entitlement process to the maximum extent possible by opposing those entitlements and by suing to try to delay any project approvals under CEQA. Mr. Smolinisky said that those delays would make our purchase of this site economically infeasible. He also said that he knows exactly what it would cost Conquest to slow down a project like

1

1   TMG's, that he would spend between $1.3 and $1.6 million to prevent the TMG project, and that

2   he could delay the TMG project by six or more years using CEQA litigation. Mr. Smolinsky

3   also stated that we should think of him and Conquest like "Al Qaeda," adding that it does not

4   cost a lot to build a "bomb" and cause extensive damage to a development project, and that it

5   only takes a single person to cause serious harm to real estate projects using CEQA.

6          5.          During the May 9 meeting, Mr. Smolinisky also discussed how his CEQA

7   litigation tactics have successfully delayed the University Gateway Project near USC. Mr.

8   Smolinisky said that his lawsuits opposing the University Gateway Project have delayed that

9   project's groundbreaking, and he boasted that he is using CEQA to oppose other projects

10  involving Urban Partners, one of the developers involved in the University Gateway Project.

11  Mr. Smolinisky said that he has delayed Urban Partners' project downtown, that he has delayed

12  Urban Partners' project in Sun Valley, and that he has "chased" Urban Partners to Seattle to

13  oppose Urban's project in that city. Mr. Smolinisky also said that he is meeting with the

14  Blackstone Group, one of the investors in the University Gateway Project, to threaten them about

15  their involvement in that project. Mr. Smolinisky said that he has successfully made Urban

16  Partners and the Shammas family the "victim" for proceeding with the University Gateway

17  Project. Mr. Smolinisky told us that he views CEQA as a powerful tool to delay real estate

18  projects, that he has highly effective legal counsel, and that his tactics are protected by the First

19  Amendment and the "anti-SLAP lawsuit" rules. Mr. Smolinisky also explained that he knows

20  about TMG's projects in Downtown Los Angeles, Agoura Hills and on La Brea Blvd, and that he

21  knows the La Brea project already has experienced some delay.

22         6.          During the May 9 meeting, Mr. Smolinisky also said that he is aware of a

23  personal legal issue that involves me, and that as an inducement for TMG not to proceed with the

24  3800 S. Figueroa project he could arrange to call off the opposition in that personal matter

25  because the attorney involved, John Henning, works for him in some capacity.

26         7.          Within a day or so of the May 9 meeting, we received notice that

27  Conquest had filed requests for documents concerning TMG's development projects in Agoura

28  Hills and on La Brea through California's Public Records Act.

                                        2

1        8.        On May 16, 2007, I received a letter from Mssrs. Smolinisky and Chen

2  that renewed the threat that Conquest intends to initiate litigation and draw out appeals if TMG

3  develops the 3800 S. Figueroa property.  A true and correct copy of that letter is attached hereto

4  as Exhibit A.  That letter sets forth Conquest's projected development timeline for a TMG

5  project at 3800 S. Figueroa, and states that "we have assumed that a consortium of existing

6  tenants and neighbors object to the project," and that a litigation involving such a project would

7  delay construction until **"mid-2013."**  The letter also states that "If you were to construct the

8  improvements, we are unable to envision any reality in which you would be able to generate

9  sufficient income to break even."

10       9.        On May 17, 2007, I sent a letter to Mr. Smolinisky explaining that TMG

11  believes Mr. Smolinisky is trying to harass TMG, and that TMG believes his tactics and motives

12  are anticompetitive.  A true and correct copy of this letter is attached hereto as Exhibit B.

13       10.      Based on the conduct of Mr. Smolinisky and Mr. Chen, I believe that these

14  individuals are trying to threaten and harass TMG to keep our company from entering the student

15  housing market near USC, and that these individuals have used similar tactics against other

16  potential competitors to prevent them from entering this market.

17       I declare under penalty of perjury under the laws of the State of California that the

18  foregoing is true and correct.  Executed this _11_ th day of June, 2007 in Los Angeles, California.

19

20                      Lee H. Wagman

21

22

23

24

25

26

27

28

3

**EXHIBIT A**

2
80



May 16, 2007

Mr. Lee Wagman
The Martin Group of Companies, LLC
100 Wilshire Blvd.
Suite 1845
Santa Monica, CA 90401

Re:     3800 S. Figueroa Street Development

Dear Mr. Wagman:

We are disappointed that you have elected not to avail yourself of the further opportunity to meet with us at our office and hear further our issues and concerns regarding your company's potential acquisition and development of the 3800 S. Figueroa property. Other than the actual tenants of the property, we are your closest neighbor, and as the owners of 18 other buildings in the general vicinity, will be most affected by your development.

We have been developing ground up construction properties in this area for the past 6 years. Our offices are located here as well. We have more knowledge of this area than anyone else. At the meeting we had hoped to have, we intended to show you property by property our actual income and expenses based on Federal tax returns (the numbers for Tuscany are based on monthly rent rolls since the property has not been in operation for an entire year yet). With this information in hand, we had hoped to help you ascertain the following: (i) the per square foot sales price you would need in order to break even, assuming that you sold the property after entitlements, and (ii) your total cost of development, assuming that you built the improvements and maintained ownership.

We believe that it is so important that you receive this information that even though you would not meet, we have taken the liberty of compiling the relevant information for you anyway. For now, you will have to take our word that all of the financial information is taken directly off of our tax returns. Of course, after you have reviewed this information, if you would like to meet at our office, we would be happy to walk you through all of the backup documentation.

3770 South Figueroa Street, Los Angeles, California  90007
Tel: (213) 746-7121    Fax: (213) 748-9722
www.ConquestHousing.com

2
81

The attached pages contain the following information:

1.    Rents.

These are our actual rent figures on a cumulative basis, property by property. For Tuscany, we have provided monthly figures because the property has not been operational for an entire year yet. Rents are "gross", that is, all Conquest apartments include parking, Ethernet, DISH Network television and trash pickup for no additional charge.

2.    Operating Expenses.

Even with our ability to manage expenses across a platform of properties, student housing is still a very labor intensive, high expense business. As you can see, our expenses per property run between 35% and 52%. We do not yet have Tuscany's year based expenses, but we expect these expenses to run towards the higher end of the expense range because of the additional services offered at Tuscany free of charge, including concierge, yoga classes, movie night, gym, pool, spas, steam and saunas.

3.    Development Timeline.

We have created the type of timeline we would use assuming we were developing the property and we intended to build a project with the same uses and development intensity as Tuscany (that is, we have assumed that you will need certain discretionary approvals from the City of Los Angeles, but we have not assumed that you intend to construct a fifty story tower). We have also assumed that you have a team of consultants ready to go immediately upon acquisition of the land. Finally, we have assumed that a consortium of existing tenants and neighbors object to the project, and that therefore you must be successful in obtaining all governmental entitlements notwithstanding the opposition from tenants and affected neighbors, and then after that you must win both at trial court and on appeal before you can either sell the property with entitlements or break ground.

Based on these assumptions, and assuming that neither the trial court nor appeals court invalidates any of your entitlements or requires you to redo any of your reports or studies, we believe that you would be in position to either sell the property or commence construction mid-2013. Assuming it takes approximately 24 months to construct the improvements, if you were to do so, the improvements would be completed summer 2015. That means that you would be open for students for the 2015-2016 school year.

4.    Development and Construction Costs.

We have attempted to ballpark your cost of carrying the land through the entitlement process. We have assumed a land carrying cost of 5.5% per annum. This is either a very optimistic figure if you are using third party financing of any kind, or a reasonable missed return on investment if you were to be utilizing equity only. We have added anticipated annual real property tax payments based on your purchase price, as well as liability insurance for the property.

Our conclusion is that as of mid-2013, your cost in the project, exclusive of entitlement cost, would be approximately $29,500,000, which translates into $422 per foot for the land. If you add $6,000,000 for the cost of entitlements through appeal court, including all consultants and attorneys, your cost is approximately $35,500,000, which translates into $500 per square foot for the land. Assuming 3% brokerage and closing costs, you would need to realize $520 per foot for the land just to break even.

Finally, assuming that you were to build a project of the same size as Tuscany, we believe that your construction costs would be at least $50,000,000. We have assumed that you would obtain a construction loan for the improvements. We have assumed interest on the construction loan of 7%, inclusive of fees and costs. We have therefore concluded that upon completion, between equity, deemed return on equity and construction, your cost in the project would be at least $85,000,000. As a comparison, it cost us less than half of that to buy the land and build Tuscany.

Obviously there are a variety of unknowns which could greatly affect the numbers. Interest rates and construction costs could be higher or lower. USC could greatly increase or decrease the size of its freshman class, thereby altering demand. Supply of units will certainly increase based on downtown LA construction as well as the proposed redevelopment by USC of University Village.

Notwithstanding the foregoing, we believe that it is clear that barring something quite extraordinary, if you were to sell the property post-entitlement pre-construction, you would need to receive a land price not seen anywhere but in Beverly Hills just to break even. If you were to construct the improvements, we are unable to envision any reality in which you would be able to generate sufficient income to break even.

We would be happy to go over this analysis and the backup information on which it was based if you elect to meet with us in our office.

Very truly yours,

Alan Smolinisky/Brian Chen

3770 South Figueroa Street, Los Angeles, California  90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

# Conquest Student Housing Rents

## TUSCANY

| | 2006 Monthly Rent |
|---|---|
| TUSCANY Monthly Rent: | $ 401,335 |
| Monthly Rent Per Bed: | $ 784 |

## OTHER PROPERTIES

| | Number of Beds | 2006 Annual Rent | 2006 Annual Rent Per Bed |
|---|---|---|---|
| Chez Ronnee & The Bungalows | 148 | $ 1,101,950 | $ 7,445.61 |
| Habitat Soo Zee | 96 | $ 673,917 | $ 7,019.97 |
| The Pad | 37 | $ 230,177 | $ 6,221.00 |
| Abbey Road/The Palazzo | 48 | $ 395,395 | $ 8,237.40 |
| Providence | 97 | $ 627,693 | $ 6,471.06 |
| Palisades I & II | 136 | $ 930,916 | $ 6,844.97 |

Notes:
The figures above for "Other Properties" were taken directly from IRS Form 8825 of each respective 2006 LLC tax return.
The 2006 Monthly rent for Tuscany is the actual monthly rent collection since we have no tax returns for a full year of operation.
The above properties do not include graduate buildings that consist of studio and 1BR units only.
All Conquest apartments include parking, Ethernet, Dish Network televison and trash pick up Included in rent.

The figures below were taken directly from IRS Form 8825 of each respective 2006 LLC tax return

| Building Name | Owner (LLC) | # of units | # of beds | 2006 Revenue | 2006 Operating Expenses (w/out interest, depreciation, and amortization) | % Expenses | NOI | % NOI |
|---|---|---|---|---|---|---|---|---|
| Chez Ronnee & The Bungalows | Chen Investment, LLC | 42 | 148 | $ 1,091,950.00 | $ 380,525.00 | 35.44% | $ 711,425.00 | 64.56% |
| Habits Sea Zee | Habits Sea Zee, LLC | 24 | 96 | $ 673,917.00 | $ 267,702.00 | 39.72% | $ 406,215.00 | 60.28% |
| The Pad | The Pad on 30th Street, LLC | 14 | 37 | $ 230,177.00 | $ 118,743.00 | 51.59% | $ 111,434.00 | 48.41% |
| Abbey Road/The Palazza | Sgt. Pepper Housing, LLC | 12 | 48 | $ 395,395.00 | $ 173,030.00 | 43.76% | $ 222,365.00 | 56.24% |
| Providence | Providence Apartments on Mario, LLC | 20 | 97 | $ 627,693.00 | $ 295,261.00 | 47.04% | $ 332,432.00 | 52.96% |
| Palisades I & II | Palmer Housing, LLC | 28 | 106 | $ 930,816.00 | $ 389,396.00 | 41.85% | $ 541,320.00 | 58.15% |

2
85





Purchase Price:      $      21,000,000
Square Footage:             70,130
Price per foot:      $         299.44



| | 2013 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |

Acquisition of Land
Employ Primary Consultants
(architect, surveyor, civil engineer, zoning consultant,
EIR consultant, traffic consultant, approval consultant, community relations)
Prepare Architectural Design and Project Description
City and CRA Meetings and Community Outreach
Notice of Preparation and Scoping Meeting (30 days)
Preparation of Draft EIR including all technical reports
Public Comment Period for Draft EIR (45 days)
Preparation of Responses to Draft EIR Comments, and Preparation of Final EIR
CRA Board Hearing (Certify Final EIR and Approve Variations)
Lawsuit Challenging Final EIR and Board Approval
File Applications for City Entitlements
Hearing by CPC Hearing Officer
CPC Hearing
Issuance of CPC Determination
Appeal CPC Determination and Processing by City
Submit Building Permit Application
PLUM Committee Hearing
City Council Approval of Project
City Entitlements Complete
Lawsuit Challenging Final EIR and City Approvals
Appeal of CRA and City Lawsuit (Court of Appeal)
Both Cases to Brief, Argued,
(assuming complete victory)

| | |
|---|---|
| Purchase Price | $ 21,000,000 |
| Land Square Footage | 70,000 |
| Price per Foot | $ 300.00 |
| Property Tax Rate | 1.14% |
| Total Land Purchase Carrying Cost | $ 21,000,000 |
| **Carrying Expenses:** | |
| Annual Insurance Cost | $ 17,500 |
| April 10 Property Tax Payment | $ 119,700 |
| December 10 Property Tax Payment | $ 119,700 |

| | 8/1/07 - 1/31/08 | 2/1/08 - 7/31/08 | 8/1/08 - 1/31/09 | 2/1/09 - 7/31/09 | 8/1/09 - 1/31/10 | 2/1/10 - 7/31/10 | 8/1/10 - 1/31/11 | 2/1/11 - 7/31/11 | 8/1/11 - 1/31/12 | 2/1/12 - 7/31/12 | 8/1/12 - 1/31/13 | 2/1/13 - 7/31/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Compounded Carrying Cost | $ 21,000,000 | $ 21,128,450 | $ 21,256,900 | $ 21,385,350 | $ 21,513,800 | $ 21,642,250 | $ 21,770,700 | $ 21,899,150 | $ 22,027,600 | $ 22,156,050 | $ 22,284,500 | $ 22,412,950 |
| Property Taxes (April 10 Payment) | | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 |
| Property Taxes (December 10 Payment) | 119,700 | | | | | | | | | | | |
| Property Insurance | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 5,833 |
| Total Carrying Cost | $ 21,128,450 | $ 21,256,900 | $ 21,385,350 | $ 21,513,800 | $ 21,642,250 | $ 21,770,700 | $ 21,899,150 | $ 22,027,600 | $ 22,156,050 | $ 22,284,500 | $ 22,412,950 | $ 22,534,483 |
| Opportunity Cost Interest Rate | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% |
| Semi-Annual Opportunity Cost | $ 581,032 | $ 584,565 | $ 588,097 | $ 591,630 | $ 595,162 | $ 598,694 | $ 602,227 | $ 605,759 | $ 609,291 | $ 612,824 | $ 616,356 | $ 413,206 |
| Compounded Opportunity Cost | $ 581,032 | $ 1,165,597 | $ 1,753,694 | $ 2,345,324 | $ 2,940,486 | $ 3,539,180 | $ 4,141,407 | $ 4,747,166 | $ 5,356,457 | $ 5,969,281 | $ 6,585,637 | $ 6,938,842 |
| **TOTAL COST** | $ 21,709,482 | $ 22,422,497 | $ 23,139,044 | $ 23,859,124 | $ 24,582,734 | $ 25,309,880 | $ 26,040,557 | $ 26,774,766 | $ 27,512,507 | $ 28,253,781 | $ 28,998,587 | $ 29,371,235 |

| | |
|---|---|
| TOTAL COST (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING) | $ 29,637,328 |
| TOTAL COST PER FOOT (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING) | $ 421.96 |

Note:
We have assumed no increase in property taxes, insurance or interest rate.

2
89

**EXHIBIT B**

- We build quality projects which improve the neighborhoods in which we locate.
- We will attract more people to the area who will shop and dine at Tuscany and who will walk by and appreciate the building first hand.

We believe that our project will be highly complementary. We encourage your support, not your threats and opposition. We do not wish to be an adversary and warmly welcomed you in our office as a neighbor when you first called.

We simply want to develop a first rate project, one that we believe will be well received by the market, by the University and by the City. Unfairly competing and attempting to create and maintain a market monopoly through the tactics of intimidation are not, as you suggested in person, the protected exercise of any constitutional right.

We hope that what we've said may persuade you to take a different course. But from the impression you've quickly given and your past actions, we doubt it. Please know that we don't consider your threats as idle or dismiss them. As you reminded us several times, you've done this successfully in the past, have all the resources you need to do it again, and know how to use lawsuits as weapons to chill our purchase or damage our project. We hear you, but we'll make our own decisions based on what is right, not on threats.

Sincerely,

The Martin Group

Lee H. Wagman

J. David Martin



May 16, 2007

Mr. Lee Wagman
The Martin Group of Companies, LLC
100 Wilshire Blvd.
Suite 1845
Santa Monica, CA 90401

      Re:    3800 S. Figueroa Street Development

Dear Mr. Wagman:

      We are disappointed that you have elected not to avail yourself of the further opportunity to meet with us at our office and hear further our issues and concerns regarding your company's potential acquisition and development of the 3800 S. Figueroa property. Other than the actual tenants of the property, we are your closest neighbor, and as the owners of 18 other buildings in the general vicinity, will be most affected by your development.

      We have been developing ground up construction properties in this area for the past 6 years. Our offices are located here as well. We have more knowledge of this area than anyone else. At the meeting we had hoped to have, we intended to show you property by property our actual income and expenses based on Federal tax returns (the numbers for Tuscany are based on monthly rent rolls since the property has not been in operation for an entire year yet). With this information in hand, we had hoped to help you ascertain the following: (i) the per square foot sales price you would need in order to break even, assuming that you sold the property after entitlements, and (ii) your total cost of development, assuming that you built the improvements and maintained ownership.

      We believe that it is so important that you receive this information that even though you would not meet, we have taken the liberty of compiling the relevant information for you anyway. For now, you will have to take our word that all of the financial information is taken directly off of our tax returns. Of course, after you have reviewed this information, if you would like to meet at our office, we would be happy to walk you through all of the backup documentation.

3770 South Figueroa Street, Los Angeles, California 90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

The attached pages contain the following information:

1.    <u>Rents</u>.

These are our actual rent figures on a cumulative basis, property by property.  For Tuscany, we have provided monthly figures because the property has not been operational for an entire year yet.  Rents are "gross", that is, all Conquest apartments include parking, Ethernet, DISH Network television and trash pickup for no additional charge.

2.    <u>Operating Expenses</u>.

Even with our ability to manage expenses across a platform of properties, student housing is still a very labor intensive, high expense business.  As you can see, our expenses per property run between **35%** and **52%**.  We do not yet have Tuscany's year based expenses, but we expect these expenses to run towards the higher end of the expense range because of the additional services offered at Tuscany free of charge, including concierge, yoga classes, movie night, gym, pool, spas, steam and saunas.

3.    <u>Development Timeline</u>.

We have created the type of timeline we would use assuming we were developing the property and we intended to build a project with the same uses and development intensity as Tuscany (that is, we have assumed that you will need certain discretionary approvals from the City of Los Angeles, but we have not assumed that you intend to construct a fifty story tower).  We have also assumed that you have a team of consultants ready to go immediately upon acquisition of the land.  Finally, we have assumed that a consortium of existing tenants and neighbors object to the project, and that therefore you must be successful in obtaining all governmental entitlements notwithstanding the opposition from tenants and affected neighbors, and then after that you must win both at trial court and on appeal before you can either sell the property with entitlements or break ground.

Based on these assumptions, and assuming that neither the trial court nor appeals court invalidates any of your entitlements or requires you to redo any of your reports or studies, we believe that you would be in position to either sell the property or commence construction **mid-2013**.  Assuming it takes approximately 24 months to construct the improvements, if you were to do so, the improvements would be completed **summer 2015**.  That means that you would be open for students for the **2015-2016** school year.

4.    <u>Development and Construction Costs</u>.

3770 South Figueroa Street, Los Angeles, California  90007
Tel: (213) 746-7121    Fax: (213) 748-9722
www.ConquestHousing.com

3
94

We have attempted to ballpark your cost of carrying the land through the entitlement process. We have assumed a land carrying cost of 5.5% per annum. This is either a very optimistic figure if you are using third party financing of any kind, or a reasonable missed return on investment if you were to be utilizing equity only. We have added anticipated annual real property tax payments based on your purchase price, as well as liability insurance for the property.

Our conclusion is that as of mid-2013, your cost in the project, exclusive of entitlement cost, would be approximately $29,500,000, which translates into $422 per foot for the land. If you add $6,000,000 for the cost of entitlements through appeal court, including all consultants and attorneys, your cost is approximately $35,500,000, which translates into $500 per square foot for the land. Assuming 3% brokerage and closing costs, you would need to realize $520 per foot for the land just to break even.

Finally, assuming that you were to build a project of the same size as Tuscany, we believe that your construction costs would be at least $50,000,000. We have assumed that you would obtain a construction loan for the improvements. We have assumed interest on the construction loan of 7%, inclusive of fees and costs. We have therefore concluded that upon completion, between equity, deemed return on equity and construction, your cost in the project would be at least $85,000,000. As a comparison, it cost us less than half of that to buy the land and build Tuscany.

Obviously there are a variety of unknowns which could greatly affect the numbers. Interest rates and construction costs could be higher or lower. USC could greatly increase or decrease the size of its freshman class, thereby altering demand. Supply of units will certainly increase based on downtown LA construction as well as the proposed redevelopment by USC of University Village.

Notwithstanding the foregoing, we believe that it is clear that barring something quite extraordinary, if you were to sell the property post-entitlement pre-construction, you would need to receive a land price not seen anywhere but in Beverly Hills just to break even. If you were to construct the improvements, we are unable to envision any reality in which you would be able to generate sufficient income to break even.

We would be happy to go over this analysis and the backup information on which it was based if you elect to meet with us in our office.

Very truly yours,

Alan Smolinisky/Brian Chen

3770 South Figueroa Street, Los Angeles, California 90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

# Conquest Student Housing Rents

## TUSCANY

| | 2006 Monthly Rent |
|---|---|
| TUSCANY Monthly Rent: | $ 401,335 |
| Monthly Rent Per Bed: | $ 784 |

## OTHER PROPERTIES

| | Number of Beds | 2006 Annual Rent | 2006 Annual Rent Per Bed |
|---|---|---|---|
| Chez Ronnee & The Bungalows | 148 | $ 1,101,950 | $ 7,445.61 |
| Habitat Soo Zee | 96 | $ 673,917 | $ 7,019.97 |
| The Pad | 37 | $ 230,177 | $ 6,221.00 |
| Abbey Road/The Palazzo | 48 | $ 395,395 | $ 8,237.40 |
| Providence | 97 | $ 627,693 | $ 6,471.06 |
| Palisades I & II | 136 | $ 930,916 | $ 6,844.97 |

Notes:
The figures above for "Other Properties" were taken directly from IRS Form 8825 of each respective 2006 LLC tax return.
The 2006 Monthly rent for Tuscany is the actual monthly rent collection since we have no tax returns for a full year of operation.
The above properties do not include graduate buildings that consist of studio and 1BR units only.
All Conquest apartments include parking, Ethernet, Dish Network televison and trash pick up included in rent.

The figures below were taken directly from IRS Form 8825 of each respective 2006 LLC tax return

| Building Name | Owner (LLC) | # of units | # of beds | 2006 Revenue | 2006 Operating Expenses (without interest, depreciation, and amortization) | % Expenses | NOI | % NOI |
|---|---|---|---|---|---|---|---|---|
| Chez Ronnee & The Bungalows | Chez Investments, LLC | 42 | 148 | $ 1,101,950.00 | $ 390,525.00 | 35.44% | $ 711,426.00 | 64.56% |
| Habitat Boo Zoo | Habitat Boo Zoo, LLC | 24 | 95 | $ 673,917.00 | $ 267,702.00 | 39.72% | $ 406,215.00 | 60.28% |
| The Pad | The Pad on 20th Street, LLC | 14 | 37 | $ 230,177.00 | $ 118,743.00 | 51.69% | $ 111,434.00 | 48.41% |
| Abbey Road/The Palazzo | Sgt. Pepper Housing, LLC | 12 | 48 | $ 395,385.00 | $ 173,020.00 | 43.76% | $ 222,365.00 | 56.24% |
| Providence | Providence Apartments on Menlo, LLC | 20 | 97 | $ 627,693.00 | $ 295,261.00 | 47.04% | $ 332,432.00 | 52.96% |
| Palazzos I & II | Polymer Housing, LLC | 28 | 158 | $ 930,816.00 | $ 389,586.00 | 41.85% | $ 541,230.00 | 58.15% |







*Purchase Price:* $ 21,000,000
*Square Footage:* 70,130
*Price per foot:* $ 299.44

| | | | | | 2013 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| Acquisition of Land: | | | | | | | | | | | | | | | | |
| Engage Primary Consultants *(architect, surveyor, soil engineer, zoning consultant, EIR consultant, traffic consultant, historical consultant, community relations)*: | | | | | | | | | | | | | | | | |
| Prepare Architectural Design and Project Description: | | | | | | | | | | | | | | | | |
| City and CRA Meetings and Community Outreach: | | | | | | | | | | | | | | | | |
| Notice of Preparation and Scoping Meeting (30 days): | | | | | | | | | | | | | | | | |
| Preparation of Draft EIR including all technical reports: | | | | | | | | | | | | | | | | |
| Public Comment Period for Draft EIR (45 days): | | | | | | | | | | | | | | | | |
| Preparation of Responses to Draft EIR Comments, and Preparation of Final EIR: | | | | | | | | | | | | | | | | |
| CRA Board Hearing (Certify Final ERI and Approves Variations) | | | | | | | | | | | | | | | | |
| Lawsuit Challenging Final EIR and Board Approvals: | | | | | | | | | | | | | | | | |
| File Applications for City Entitlements: | | | | | | | | | | | | | | | | |
| Hearing by CPC Hearing Officer | | | | | | | | | | | | | | | | |
| CPC Hearing | | | | | | | | | | | | | | | | |
| Issuance of CPC determination | | | | | | | | | | | | | | | | |
| Appeal CPC Determination and Processing by City: | | | | | | | | | | | | | | | | |
| Submit Building Permit Application: | | | | | | | | | | | | | | | | |
| PLUM Committee Hearing: | | | | | | | | | | | | | | | | |
| City Council Approval of Project: | | | | | | | | | | | | | | | | |
| City Entitlements Complete: | | | | | | | | | | | | | | | | |
| Lawsuit Challenging Final EIR and City Approvals | | | | | | | | | | | | | | | | |
| Appeal of CRA and City Lawsuit (Court of Appeal): | | | | | | | | | | | | | | | | |
| Best Case to Break Ground: (assumes complete victory) | | | | | | | | | | | | | | | | |

| | | |
|---|---|---|
| Purchase Price: | $ | 21,000,000 |
| Land Square Footage: | | 70,000 |
| Price per foot: | | 300.00 |
| Property Tax Rate: | | 1.14% |
| | | |
| Total Land Purchase Carrying Cost: | $ | 21,000,000 |

**Carrying Expenses:**

| | | |
|---|---|---|
| Annual Insurance Costs: | $ | 17,500 |
| April 10 Property Tax Payment: | $ | 119,700 |
| December 10 Property Tax Payment: | $ | 119,700 |

| | 8/1/07 - 1/31/08 | 2/1/08 - 7/31/08 | 8/1/08 - 1/31/09 | 2/1/09 - 7/31/09 | 8/1/09 - 1/31/10 | 2/1/10 - 7/31/10 | 8/1/10 - 1/31/11 | 2/1/11 - 7/31/11 | 8/1/11 - 1/31/12 | 2/1/12 - 7/31/12 | 8/1/12 - 1/31/13 | 2/1/13 - 6/1/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Compounded Carrying Cost | $ 21,000,000 | $ 21,128,400 | $ 21,256,900 | $ 21,385,350 | $ 21,513,800 | $ 21,642,250 | $ 21,770,700 | $ 21,899,150 | $ 22,027,600 | $ 22,156,050 | $ 22,284,500 | $ 22,412,950 |
| Property Taxes (April 10 Payment) | $ 119,700 | | $ 119,700 | | $ 119,700 | | $ 119,700 | | $ 119,700 | | $ 119,700 | $ 119,700 |
| Property Taxes (December 10 Payment) | $ 119,700 | $ 119,700 | | $ 119,700 | | $ 119,700 | | $ 119,700 | | $ 119,700 | | |
| Property Insurance | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 |
| Total Carrying Cost | $ 21,128,450 | $ 21,256,900 | $ 21,385,350 | $ 21,513,800 | $ 21,642,250 | $ 21,770,700 | $ 21,899,150 | $ 22,027,600 | $ 22,156,050 | $ 22,284,500 | $ 22,412,950 | $ 22,538,443 |
| Opportunity Cost Interest Rate | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% |
| Semi-Annual Opportunity Cost | $ 581,032 | $ 584,565 | $ 588,097 | $ 591,630 | $ 595,162 | $ 598,694 | $ 602,227 | $ 605,759 | $ 609,291 | $ 612,824 | $ 616,356 | $ 413,206 |
| Compounded Opportunity Cost | $ 581,032 | $ 1,165,597 | $ 1,753,694 | $ 2,345,324 | $ 2,940,486 | $ 3,539,180 | $ 4,141,407 | $ 4,747,166 | $ 5,356,457 | $ 5,969,281 | $ 6,585,637 | $ 6,998,842 |
| TOTAL COST: | $ 21,709,432 | $ 22,422,497 | $ 23,139,044 | $ 23,859,124 | $ 24,582,736 | $ 25,309,880 | $ 26,040,557 | $ 26,774,766 | $ 27,512,507 | $ 28,253,781 | $ 28,998,587 | $ 29,537,326 |

| | | |
|---|---|---|
| TOTAL COST (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING): | $ | 29,537,326 |
| TOTAL COST PER FOOT (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING): | $ | 421.96 |

Note:
We have assumed no increase in property taxes, insurance or interest rate.

3

# THE MARTIN GROUP
ESTABLISHED 198~

May 17, 2007

Alan Smolinisky
Conquest Student Housing
3770 South Figueroa Street
Los Angeles, CA 90007

Dear Alan,

We've been reluctant to respond to your calls or to answer the letter you sent yesterday in light of the threatening statements you made in our meeting last week and because of the aggressive and, we believe, inappropriate actions you've taken subsequently. In particular, we are concerned by the document requests you immediately filed in communities where we are doing business in which you have absolutely no interest other than to harass us; the introduction of personal, non-business matters to induce us to change course; the letter that you sent that reiterated in bold face type your threats to initiate litigation and draw out appeals; the effort you made to go around one of us with calls to the other simply because your call wasn't returned in 20 hours; the letter that appears to have been carefully crafted by litigation lawyers; and the numerous inquiries you've made about us to third parties.

This all creates an alarming pattern and causes us to regard your motives and tactics as anti-competitive. It also convinces us that we should not consider, let alone rely, on any information that you proffer. Indeed, we prefer not to have any conversation with you in which you don't consent in advance to record, or in which counsel is not present.

Your actions and threats to "tie us up in CEQA litigation for six or more years" are, to my mind, completely inappropriate. You know nothing about our project, the process we intend to follow, or any potential CEQA issues. Your only goal seems to be to convince us to either back away from our purchase or end up "the victim", as you bragged you made out of Urban Partners and the Shammas family. In our meeting, you analogized yourself to Al Qaeda. We are starting to agree.

Instead of this type of dialogue, I would welcome the opportunity to share with you our thoughts about why we think our project will be good for you.

> — Because we are spending so much on the land, we will need to achieve substantial rents which will uplift the entire market and inure the benefit of Tuscany.

The Martin Group
100 Wilshire Blvd., Suite 1845, Santa Monica, CA 90401
310-393-8006 tel   310-393-2401 fax

www.themartingroup.com

- We build quality projects which improve the neighborhoods in which we locate.
- We will attract more people to the area who will shop and dine at Tuscany and who will walk by and appreciate the building first hand.

We believe that our project will be highly complementary. We encourage your support, not your threats and opposition. We do not wish to be an adversary and warmly welcomed you in our office as a neighbor when you first called.

We simply want to develop a first rate project, one that we believe will be well received by the market, by the University and by the City. Unfairly competing and attempting to create and maintain a market monopoly through the tactics of intimidation are not, as you suggested in person, the protected exercise of any constitutional right.

We hope that what we've said may persuade you to take a different course. But from the impression you've quickly given and your past actions, we doubt it. Please know that we don't consider your threats as idle or dismiss them. As you reminded us several times, you've done this successfully in the past, have all the resources you need to do it again, and know how to use lawsuits as weapons to chill our purchase or damage our project. We hear you, but we'll make our own decisions based on what is right, not on threats.

Sincerely,

The Martin Group

Lee H. Wagman

J. David Martin

4
103





# It's Just Too Big

**Phase 1** of University Gateway would dwarf our neighborhood and will be totally incompatible with the surrounding community.

- Eight stories tall, with a total height of 87 feet
- A massive 923,000 square foot building with an 8-story, above-ground parking structure
- 450% bigger (above ground) than the Tuscany student housing project that is currently under construction at Figueroa and Flower
- Dwarfs our small, code-compliant, two- and three-story residential and commercial buildings, as well as a historic single-family home located right across the street from the **Phase 1** project site
- With 421 apartments, almost twice as many residential units as permitted by code in our neighborhood
- All cars will enter and leave the site from 32nd street, a small residential street
- 83,000 square feet of commercial, including a USC bookstore, a USC health and fitness center, and a small amount of student-serving retail and restaurant space – virtually nothing for local residents and families
- Creates more traffic congestion, clogging our streets with cars, including the already gridlocked intersections of Jefferson/Figueroa, Hoover/Jefferson and Figueroa/Adams
- Inevitably leads to Phase 2 and Phase 3 – another 639 apartments
- Allows other developers to come into our neighborhood and build more oversized buildings without creating enough parking – bringing more traffic and crowding to our streets
- The developer is seeking a 93% increase over the maximum residential density, a 145% increase above the the maximum floor area, a 93% increase above the maximum height, a 167% increase in the maximum number of stories, and would use up to 4 acres of scarce land, but is **not providing any community benefit in return**
- The only new residential building in the area with an above ground parking structure
- The project will **not provide any living wage permanent jobs.** All of the jobs created from the USC Bookstore and Health and Fitness Center will be mostly low-paying jobs with the majority of the jobs being filled by USC students

If Phase 1 of University Gateway is allowed to go through – it will mean the end of our neighborhood as we know it.

# www.StopUniversityGateway.com



P.O. Box 18199
Los Angeles, CA 90018

Presorted Std
US Postage
PAID
Victory Mail

Come to the public hearing to stop University Gateway. Thursday, February 2nd at the CRA, 354 S. Spring St 4th floor.

S33 P2**********ECRLOT**C033
OCCUPANT
3245 S FIGUEROA ST
LOS ANGELES CA 90007-3739

5



# The Real Plan

University Gateway is just **Phase 1** of Urban Partners' and the Shammas family's Master Plan.

Ultimately, Urban Partners and the Shammas family intend to build 1,060 student-oriented apartments on about 16 acres of land on both sides of Figueroa Street. How do we know that? We captured the master plan that was on the Urban Partner's website until February 25, 2005 *(shown at right)*.

**Prior to Feb. 25, 2005, the Urban Partners website stated that:**

One of its "completed projects" was the "University Gateway Master Plan" for "the redevelopment of 16 acres of privately owned land on three parcels immediately north of the USC campus" and that the "first phase, involving 400 units of student-oriented, market rate housing, is under development."

Their website also included a detailed graphic rendering of the Master Plan (see above), which included:



Working with a local property owner and the University of Southern California, Urban Partners created a master plan for redevelopment of 16 acres of privately-owned land on three parcels immediately north of the USC campus. The first phase, involving 400 units of student-oriented, market-rate housing, is under development.

— *From the Urban Partner's website on February 25, 2005*

- Two additional phases of development directly across from the site on the east side of Figueroa Street
- 639 additional apartments in **Phase 2 and 3**
- Oversized buildings
- Additional parking deficits

When they realized that they could not sneak this past the community, Urban Partners quickly covered up its intentions by removing this material from its website. But we captured the evidence before they could destroy it!

Then, they convinced the Community Redevelopment Agency (CRA) to unlawfully "split" the project to conceal their true intent, while attempting to avoid the preparation of an Environmental Impact Report (EIR) for the whole project or, for that matter, even the **Phase 1** development.

However, when the community learned the real facts, it rose up and forced the CRA to prepare the EIR that has just been released for public comment. Urban Partners and the Shammas family now insist that there are not any other phases planned.

**WE MUST CONTINUE TO SPEAK WITH ONE VOICE TO PROTECT OUR NEIGHBORHOOD!**



The Real Parking Story

Here are the facts. They are verified by documents and by common sense experience.

## THE PROJECT DOES NOT COME CLOSE TO MEETING RESIDENTIAL PARKING DEMAND.

- Number of students living in University Gateway: 1,656
- Minimum residential parking demand: 1,200 spaces (Estimated by Glenn Togawa, of Togawa & Smith, the project architect)
- Number of onsite residential spaces: 402



Do the Math:
1,200 - 402 = 798
DEFICIT of ONSITE
RESIDENTIAL
PARKING SPACES

## THE PROJECT DOES NOT COME CLOSE TO MEETING CODE REQUIRED ONSITE PARKING EITHER

- Code parking requirement: 1,449 spaces (835 residential + 614 retail)
- Actual onsite parking spaces: 770 spaces (402 residential + 368 retail)
- Number of guest parking spaces for residents: 0
- Offsite parking spaces at UPC: 440 spaces (1,729 walking feet away)

Do the Math:
1,449 - 770 = 679
DEFICIT of CODE
PARKING SPACES
ONSITE

## AND THE PROPOSED OFF-SITE PARKING IS MUCH TOO FAR AWAY

- Code limitation for off-site parking distance: not more than 750 feet away
- Actual walking distance: 1,729 feet away from the residential front door of University Gateway to the entrance of the University Parking Center. The UPC can only be accessed by going through a dark tunnel underneath the Harbor Freeway. The tunnel is unsafe and is frequently used as a homeless encampment.

*WOULD YOU WALK A THIRD OF A MILE THROUGH A DARK TUNNEL UNDER A FREEWAY TO A PARKING STRUCTURE THAT HAS INADEQUATE CAPACITY TO GET TO OR FROM YOUR CAR?*

**FACT:**   University Parking Center capacity: 1,911 spaces

**FACT:**   The UPC and all the other University lots are ALL SOLD OUT.

**FACT:**   The Galen Center, a 10,000-seat event center, already has a legal claim to 1,052 of the UPC spaces through a covenant that was recorded on the property on November 24, 2004.

**FACT:**   Even if there were UPC spaces available and anyone was going to walk 1,729 feet under the freeway, the project would still be 358 residential parking spaces short of the minimum residential parking demand (1,200 spaces).

**FACT:**   Phase 1 will house 1,656 students.



**Phase 1 of University Gateway would have significant traffic impacts on our Neighborhood**



Student housing has more occupants in a unit than normal apartment housing and generates significantly more traffic

- **Phase 1** of University Gateway would have 1,656 occupants
- There would be four students in each two-bedroom apartment and two students in each one-bedroom apartment.
- Most of the students would have their own cars
- The University Gateway architect has stated that four students in a two-bedroom apartment will have at least three vehicles

**In comparison:** The occupants of most non-student, two-bedroom apartments do not have more than two cars. This is why the Los Angeles Municipal Code only requires two parking spaces for such apartments, and why the actual parking demand is higher than what the city code requires for parking. As previously discussed, they do not meet city code parking either.

Many students already cut through our neighborhood on a regular basis because Figueroa Street and the other commercial streets in the area are already so congested. **Phase 1 of University Gateway would add to the gridlock, endanger pedestrians and further erode our quality of life.**

Join your friends, neighbors, fellow students, community groups, and the **Shrine Auditorium** in opposing this project and ask Urban Partners and the Shammas family to be our partners in Responsible Development. This is a low-density community with families, businesses and other students. We welcome code-compliant student housing with adequate parking in our low-rise neighborhood.

If you would like to learn more about Phase 1 of the UNIVERSITY GATEWAY PROJECT or express your concerns or opposition to their plans, please complete the response form below. *Check off or enter all that apply:*

Please let my Government Leaders know that I am most concerned about:

- ☐ Lack of Onsite Parking
- ☐ Too Big for Neighborhood
- ☐ Increased Traffic
- ☐ Neighborhood Safety
- ☐ Serious Violations of City Code
- ☐ Real Intentions of Urban Partners/Shammas Family
- ☐ No community benefits such as low income/affordable housing and living wage permanent jobs
- ☐ Other Concerns _____
  _____

Please list me as a supporter of Stop University Gateway.
- ☐ Add me to your mailing/emailing list.
- ☐ Please deliver a "Stop Gateway" sign for my lawn
- ☐ Please deliver a "Stop Gateway" sign for my window

NAME: _____

ADDRESS: _____

CITY: _____

STATE: _____ ZIP: _____

PHONE: _____

FAX: _____

EMAIL: _____

COMMENTS: _____
_____



Investment in our neighborhood is vital. However, we want responsible development that conforms to planning and building codes. We want responsible development that provides safety, security, adequate parking, and respect for resident stakeholders. Last year, Urban Partners, LLC and the Shammas family tried to sneak past us **Phase 1** of the massive University Gateway development, without an Environmental Impact Report (EIR) and without any public participation.

However, in response to overwhelming opposition, the Community Redevelopment Agency (CRA) finally agreed with us that an EIR was required. On January 9, 2006, the CRA released the Draft EIR for public comment. We have until February 22, 2006 to submit written comments to the CRA expressing our concerns with the project.

**Here are the real facts about the University Gateway project. Facts that Urban Partners and the Shammas family do NOT want you to have...**

University Gateway Phase 1 Parking Problems:
- Only 402 onsite residential parking spaces for 1,656 students
- Requires at least 440 students to walk 1,729 feet through a dark unsafe tunnel underneath the Harbor Freeway to their cars parked at the University Parking Center
- Does not provide nearly enough residential parking for student occupants and no guest parking
- Does not include adequate parking for proposed health and fitness center and the other commercial tenants

How Big is Phase 1?
- 923,000 square feet above ground
- 450% bigger than the nearby Tuscany Project (above ground)
- 378,000 square feet bigger and nearly double the maximum height permitted by code
- Nearly three times number of allowed floors

What will Phase 1 of University Gateway do?
- Swamp our neighborhood with cars, endlessly circling, seeking a place to park
- Create traffic gridlock in an already congested area and take street parking away from existing residents
- Establish a dangerous precedent by permitting development that ignores all major zoning limitations and is wholly incompatible with our low-density neighborhood

---



NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

# BUSINESS REPLY MAIL
FIRST-CLASS MAIL      PERMIT NO. 74365      LOS ANGELES CA

POSTAGE WILL BE PAID BY ADDRESSEE

STOP UNIVERSITY GATEWAY
PO BOX 18199
LOS ANGELES CA 90018-0199

Herald Examiner Hearing.txt

```
 1              LOS ANGELES, CALIFORNIA
 2      PLANNING AND LAND USE MANAGEMENT COMMITTEE
 3
 4    In re:                  )
                              )
 5    South Los Angeles Area  )
      Planning Commission     )
 6    Meeting.                )
      _____)
 7
 8
 9
10
11
12
13
14          REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
16
17            Los Angeles City Hall
18            Los Angeles, California
19            Tuesday, March 6, 2007
20
21
22
23
      Reported by:
24    DEBBI J. ZAMBITO
      CSR No. 6651
25    JOB No. 207692
```

0

2

```
 1              LOS ANGELES, CALIFORNIA
 2      PLANNING AND LAND USE MANAGEMENT COMMITTEE
```

Herald Examiner Hearing.txt

```
 3
 4   In re:                      )
                                 )
 5   South Los Angeles Area      )
     Planning Commission         )
 6   Meeting.                    )
     _____ )
 7
 8
 9
10
11
12  .
13
14          REPORTER'S TRANSCRIPT OF
15   PROCEEDINGS, reported March 6,
16   2007, in Los Angeles, California,
17   by DEBBI J. ZAMBITO, Certified
18   Shorthand Reporter No. 6651.
19
20
21
22
23
24
25
```

☐

3

```
 1   APPEARANCES:
 2
 3       COUNCILMEMBERS PRESENT:
 4           ED P. REYES, Chairman
             JACK WEISS
 5
```

Herald Examiner Hearing.txt

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0

4

1                    Los Angeles, California

2                    Tuesday, March 6, 2007

3                    Los Angeles City Hall

4

5        MS. DIVFENDERFER:  Good afternoon.  Patricia

6   Divfenderfer, staff for the planning department.  The

7   item before you involves a number of requests

8   associated with a project that is a 421-unit student

                              Herald Examiner Hearing.txt
7    Partners projects.

8           But, you know, I do have to add one thing.

9    I know in this hearing and others you have really

10   focused on this point and I think I would like to say

11   for the record that with respect to the University

12   Gateway project Conquest owns or manages numerous

13   apartment buildings within a block or two blocks or

14   three blocks of this site and has raised very

15   legitimate, and I think overwhelmingly compelling,

16   arguments as to why the EIR is inadequate and why a

17   number of the other actions that you're being asked

18   to take are unlawful.  And that to us is the focus of

19   the proceeding here today and the reason that this

20   appeal was filed.

21          COUNCILMEMBER WEISS:  And let me just say for

22   the record, Mr. Rubens, that the reason in a few

23   moments that I will move to deny the appeal is

24   because I don't think the appeal is meritorious.  I

25   think the applicant's positions are meritorious for

D

                                                        57

1    the reasons that have been stated earlier and the

2    reasons that have been stated and worked up by city

3    staff.

4           I will say to you and your client that we

5    don't have a vexatious litigant rule here in the

6    council, but courts do.  There are reasons that

7    courts do and courts are well able to look into

8    records and see what individuals are using the legal

9    system and legal processes appropriately and when

Herald Examiner Hearing.txt

10    they are using it inappropriately, vexatiously and

11    for inappropriate reasons.  I'll leave that at that.

12         Thank you, Mr. Rubens.

13         MR. RUBENS:  Thank you.

14         CHAIRMAN REYES:  Mr. Whitaker.

15         MR. WHITAKER:  The fifth attachment, just so

16    it's in the record and that's -- the fourth one is

17    the California Real Estate Journal article dated

18    September 25, 2006 describing Conquest's actions and

19    tactics.  And the last one is the article to which

20    the USC student referred earlier dated March 1

21    describing the adverse effects of the

22    anti-competition as being created around USC by

23    Conquest in its acquisition -- or dominating the

24    student housing market around USC.  Thank you very

25    much.

0

58

1         CHAIRMAN REYES:  Thank you, Mr. Whitaker.  Thank

2    you, Mr. Rubens.

3         Okay.  Last but not least we have Gabriel

4    Sermino.  I hope you're still in the room.  Thank

5    you, sir.  And this will conclude our public hearing.

6         Thank you for your patience, Mr. Sermino.

7         MR. SERMINO:  Good afternoon, Councilmember

8    Weiss and Chairman Reyes.  My name is Gabriel

9    Sermino.  I represent the mayor's office of housing

10    and economic development and we're here to support

11    the general plan amendment, to change the necessary

12    designations to complete the University Gateway

 

333 South Hope Street | 48th Floor Los Angeles, CA 90071-1448
213-620-1780 office | 213-620-1398 fax | www.sheppardmullin.com

Writer's Direct Line: 213-617-4155
mklima@sheppardmullin.com

Our File Number: 07BK-114213.

May 26, 2006

**BY U.S. MAIL AND FACSIMILE**

Mr. Daniel Martinez
City Clerk
City of Oxnard
305 West Third Street
First Floor, West Wing
Oxnard, California 93030
Facsimile: (805) 385-7806

Re:   RiverPark Apartments Project (RiverPark Master
Planned Community) – Public Records Act Request

Dear Mr. Martinez:

Pursuant to the California Public Records Act, we request copies of all of the documents in the files or possession of the City of Oxnard (the "City") regarding the RiverPark Apartments project consisting of 400 apartments (the "Project"), proposed by an entity involving Urban Partners LLC, located in the RiverPark Master Planned Community and designated as Assessor Parcel Number 132011004, including, but not limited to, all of the following:

1.   Any and all documents relating to environmental review for the Project pursuant to the California Environmental Quality Act, including all technical reports relating thereto.

2.   Any and all documents relating to any discretionary approval or contract relating to the Project.

3.   Any and all project, construction or other schedules relating in any way to the Project.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Mr. Daniel Martinez
May 26, 2006
Page 2

      4.     Any and all project descriptions, plans, renderings, drawings or specifications relating in any manner to the Project.

      5.     Any and all internal memoranda, notes and emails relating in any manner to the Project.

      6.     Any and all documents relating in any manner to financing or funding for the Project.

      7.     Any and all correspondence between the City and any other person or entity relating in any manner to the Project.

      Pursuant to the Public Records Act, we look forward to receiving the requested documents on or before June 6, 2006.  If you let me know when the documents are ready (please call 213-617-4155), I will send someone to your offices to pick them up and pay for them.

      We look forward to your prompt response.

              Very truly yours,

              Mary C. Klima

      for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-LA:1MCK1\70954359.1

7
116



333 South Hope Street | 48th Floor | Los Angeles, CA 90071-1448
213-620-1780 office | 213-620-1398 fax | www.sheppardmullin.com

Writer's Direct Line: 213-617-4155
mldima@sheppardmullin.com

Our File Number: 07BK-114213

May 26, 2006

**BY U.S. MAIL, FACSIMILE AND EMAIL**

Mr. Scott Greenberg
Director
Department of Community Development
City of Burien
415 SW 150th Street
Burien, Washington 98166-1957
Facsimile: (206) 248-5539
Email: scottg@ci.burien.wa.us

        Re:    <u>Burien Town Square Project – Public Records Request</u>

Dear Mr. Greenberg:

        Pursuant to RCW Chapter 42.17, we request copies of all of the documents in the files or possession of the City of Burien Department of Community Development (the "Department") regarding the Burien Town Square mixed-use project (the "Project") proposed by Urban Partners LLC and located in the area bounded by 4th Avenue SW to the east, 6th Avenue SW to the west, SW 150th Street to the north, and SW 152nd Street to the south, including, but not limited to, all of the following:

        1.    Any and all documents relating to environmental review for the Project pursuant to the State Environmental Policy Act, including all technical reports relating thereto.

        2.    Any and all documents relating to any discretionary approval or contract relating to the Project.

        3.    Any and all project, construction or other schedules relating in any way to the Project.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Mr. Scott Greenberg
May 26, 2006
Page 2

     4.     Any and all project descriptions, plans, renderings, drawings or specifications relating in any manner to the Project.

     5.     Any and all internal memoranda, notes and emails relating in any manner to the Project.

     6.     Any and all documents relating in any manner to financing or funding for the Project.

     7.     Any and all correspondence between the Department and any other person or entity relating in any manner to the Project.

     Pursuant to RCW Chapter 42.17, we look to receiving your response to this document request on or before June 5, 2006. When the documents are ready, please let me know the copy costs (my email address and direct line are set forth at the top of page one) and I will send a check to cover those costs. I will also provide your with our Federal Express billing number to facilitate the overnight delivery of the documents to us.

     We look forward to your prompt response.

                     Very truly yours,

                     Mary C. Klima

               for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-LA:1MCK1\70954566.1

7
118

CT 9990

 333 South Hope Street | 48th Floor | Los Angeles, CA 90071-1448
213-620-1780 office | 213-620-1398 fax | www.sheppardmullin.com

Writer's Direct Line: 213-617-4155
mklima@sheppardmullin.com

Our File Number: 07BK-114213

May 26, 2006

**BY U.S. MAIL, EMAIL AND FACSIMILE**

Ms. Diane Wren
Custodian of Records
Community Redevelopment Agency
  of the City of Los Angeles
Records Department
354 South Spring Street, Suite 500
Los Angeles, California 90013
Facsimile: (213) 977-1665
Email: dwren@cra.lacity.org

Re:   Herald Examiner Project – Public Records Act Request

Dear Ms. Wren:

        Pursuant to the California Public Records Act, we request copies of all of the documents in the files or possession of the City of Los Angeles Community Redevelopment Agency (the "Agency") regarding the Herald Examiner project (the "Project") proposed by Urban Partners LLC and commonly known as 1111 S. Broadway, 1108 S. Hill Street and 120 W. 12th Street (the "Project"), including, but not limited to, all of the following:

        1.      Any and all documents relating to environmental review for the Project pursuant to the California Environmental Quality Act, including all technical reports relating thereto.

        2.      Any and all documents relating to any discretionary approval or contract relating to the Project.

        3.      Any and all project, construction or other schedules relating in any way to the Project.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Ms. Diane Wren
May 26, 2006
Page 2

      4.    Any and all project descriptions, plans, renderings, drawings or specifications relating in any manner to the Project.

      5.    Any and all internal memoranda, notes and emails relating in any manner to the Project.

      6.    Any and all documents relating in any manner to financing or funding for the Project.

      7.    Any and all correspondence between the Agency and any other person or entity relating in any manner to the Project.

      Pursuant to the Public Records Act, we look forward to receiving the requested documents on or before June 6, 2006.  If you let me know when the documents are ready (please call 213-617-4155), I will send someone to your offices to pick them up and pay for them.

      We look forward to your prompt response.

      Very truly yours,

      Mary C. Klima

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-WEST:1MCK1\400000263.1

7
120

*W X 9990*



RECEIVED
DEPT.
*07 WP 4:43*

· 333 South Hope Street | 48th Floor | Los Angeles, CA 90071-1445
213-620-1780 *ohru* | 213 620 1398 *fax* | www.sheppardmullin.com

May 26, 2006

Writer's Direct Line: 213-617-4155
mklino@sheppardmullin.com

Our File Number: 07BK-114213

## BY U.S. MAIL, EMAIL AND FACSIMILE

Ms. Diane Wren
Custodian of Records
Community Redevelopment Agency
  of the City of Los Angeles
Records Department
354 South Spring Street, Suite 500
Los Angeles, California 90013
Facsimile: (213) 977-1665
Email: dwren@cra.lacity.org

Action: E. Young
Info:
[handwritten notations]

Re:   Wilshire Vermont Project (Northeast Corner of Wilshire
      Boulevard and Vermont Avenue) -- Public Records Act Request

Dear Mr. Martinez:

        Pursuant to the California Public Records Act, we request copies of all of
the documents in the files or possession of the City of Los Angeles Community
Redevelopment Agency (the "Agency") regarding the Wilshire Vermont mixed-use
project (the "Project") consisting of 71,000 square feet of retail space, a Los Angeles
Unified School District middle school, 358 new housing units and 90 units of affordable
housing, being developed by an entity involving Urban Partners LLC and located
adjacent to the Wilshire/Vermont Metro Red Line station and the Metro bus terminal at
the northeast corner of Wilshire Boulevard and Vermont Avenue, including, but not
limited to, all of the following:

        1.      Any and all documents relating to environmental review for the
Project pursuant to the California Environmental Quality Act, including all technical
reports relating thereto.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Ms. Diane Wren
May 26, 2006
Page 2

      2.    Any and all documents relating to any discretionary approval or contract relating to the Project.

      3.    Any and all project, construction or other schedules relating in any way to the Project.

      4.    Any and all project descriptions, plans, renderings, drawings or specifications relating in any manner to the Project.

      5.    Any and all internal memoranda, notes and emails relating in any manner to the Project.

      6.    Any and all documents relating in any manner to financing or funding for the Project.

      7.    Any and all correspondence between the Agency and any other person or entity relating in any manner to the Project.

      Pursuant to the Public Records Act, we look forward to receiving the requested documents on or before June 6, 2006. If you let me know when the documents are ready (please call 213-617-4155), I will send someone to your offices to pick them up and pay for them.

      We look forward to your prompt response.

                Very truly yours,

                Mary C. Klima

       for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-WEST:1MCK1\400001609.1

## DECLARATION OF LUCINDA L. TRAVIS

I, Lucinda L. Travis, declare as follows:

1.      I reside in a condominium complex located at 8641 Glenoaks Boulevard, Unit 146, Sun Valley, California ("Unit"). I am the owner of the Unit as well as the President of the homeowners' association ("Association") of the condominium complex at the above address. I have personal knowledge of the facts set forth herein and if called and sworn as a witness, I could and would testify competently thereto.

2.      In or around 2003, I was informed that an apartment project ("Project") was being proposed on the vacant lots located at 8612, 8614, and 8616 Glenoaks Boulevard, Sun Valley, California, which are directly across the street from our condominium complex. Initially, I was opposed to the Project because I believed that the apartment Project was not a positive addition to our neighborhood because of the number of units (population density), insufficient parking (apartments do not require the same amount of parking as condos), and the Project would alter the look of Glenoaks by destroying our trees on the Boulevard. Subsequently, the developer of the Project proposed condominiums in lieu of apartment units, which adequately addressed my and the Association's concerns.

3.      Steve Strouth owns the condominium unit located at 8641 Glenoaks Boulevard, Unit 221, Sun Valley, California. Mr. Strouth is also the Secretary of the Association.

4.      While I was in Arizona on Labor Day, September 4, 2006, I received a telephone call from Mr. Strouth stating that a person named Casey Smith with Conquest Student Housing was at Mr. Strouth's unit and was telling him that he wanted to help us with our problem across the street. Mr. Strouth stated that Mr. Smith requested him to sign a petition opposing the Project and asked me whether the Association had any opposition to the Project. I told Mr. Strouth that while he was away for several months in India and Ireland, the Project had changed from apartments to condos, less units were being proposed, more parking was being provided, and that we had attended meetings in support of the revised Project. I asked Mr. Strouth not to sign the petition. Mr. Strouth thanked me for informing him of the changes and said he would not

-1-

1  sign the petition.

2      5.    On or about September 8, 2006, Mr. Strouth advised me that Mr. Smith

3  had subsequently called and offered him $1,500 to sign the petition opposing the Project.  Mr.

4  Strouth told me that he had not accepted the money at that time.  Mr. Strouth asked me what I

5  thought he should do.  I told Mr. Strouth that I thought it was wrong, probably illegal, and

6  immoral and unethical to say the least and told him he should not take the money.

7      6.    A couple of days later, Mr. Strouth told me that he called Mr. Smith and

8  told him that he decided not to get involved.  Mr. Strouth stated that Mr. Smith said he respected

9  Mr. Strouth's integrity.

10

11      I declare under penalty of perjury under the laws of the State of California that the

12  foregoing is true and correct.

13      Executed this   17th   day of September 2006, at San Valley, California.

14

15

16          Lucinda L. Travis

17

18

19

20

21

22

23

24

25

26

27

28

-2-

DECLARATION OF LUCINDA L. TRAVIS

8

124

## DECLARATION OF STEVE INOCENTE

I, Steve Inocente, declare as follows:

1.      I reside in a condominium complex located at 8641 Glenoaks Boulevard, Unit 107, Sun Valley, California ("Unit"). I am the owner of the Unit as well as the Vice President of the homeowners' association ("Association") of the condominium complex at the above address. I have personal knowledge of the facts set forth herein and if called and sworn as a witness, I could and would testify competently thereto.

2.      In or around 2003, I was informed that an apartment project ("Project") was being proposed on the vacant lots located at 8612, 8614, and 8616 Glenoaks Boulevard, Sun Valley, California, which are directly across the street from our condominium complex. Initially, I was opposed to the Project because I believed that the Project contained too many units and did not provide sufficient parking. Subsequently, the developer of the Project reduced the number of units, provided additional parking, and proposed condominiums in lieu of apartment units, which adequately addressed my and the Association's concerns.

3.      Steve Strouth owns the condominium unit located at 8641 Glenoaks Boulevard, Unit 221, Sun Valley, California. Mr. Strouth is also the Secretary of the Association.

4.      On September 4, 2006, a person named Casey Smith with Conquest Student Housing visited Mr. Strouth regarding the Project. After Mr. Smith was done meeting with Mr. Strouth, Mr. Smith came to my Unit asking for support to oppose the Project. I told him I would think about it and asked Mr. Smith for his business card, which he gave me. Mr. Smith told me that if I decided to oppose the Project, I should call the person whose name and telephone number Mr. Smith wrote on the back of his business card. A true and correct copy of the front and back side of the business card which Mr. Smith gave me is attached hereto as Exhibit "A" and incorporated by reference herein. Out of curiosity, I asked Mr. Smith what was in it for him and he told me that there was nothing other than the fact that he and Conquest Student Housing were seeking to keep their eyes on Urban Partners because of what Urban Partners did in downtown.

-1-

5.     On or about September 8, 2006, Mr. Strouth advised me that Mr. Casey Smith of Conquest Student Housing had called and offered him $1,500 to sign a petition opposing the Project.  Mr. Strouth told me that he refused to accept the money or sign the petition because the Association was now supporting the Project.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this __/7__ day of September 2006, at San Valley, California.

_____
Steve Inocente

-2-

DECLARATION OF STEVE INOCENTE

**EXHIBIT  A**

**CON UEST**

STUDENT HOUSING

CASEY SMITH

casey@conquesthousing.com

(213) 746-7121
Fax (213) 232-3719
Cell (213) 305-0144

2343 Scarff Street, Suite A
Los Angeles, CA 90007

9
128

John Henning
(323) 252 - 4650

9
129

CITY OF LOS ANGELES PLANNING COMMISSION

REGULAR MEETING

THURSDAY, SEPTEMBER 28, 2006

VAN NUYS CITY HALL

14410 SYLAN STREET

COUNCIL CHAMBERS, SECOND FLOOR

VAN NUYS, CALIFORNIA 91401

# CERTIFIED COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

IN RE:  AGENDA ITEM NO. 4 ONLY

TENTATIVE TRACT NO. 65528-1A

Reported By:

CAROL LYNN COX,

CSR No. 5128

*Karyn Abbott & Associates, Inc.*

Certified Shorthand Reporters
Transamerica Center
1150 S. Olive Street, Suite GL-29
Los Angeles, California 90015
(213) 749 - 1234

1    doesn't review the design of the project.

2           Well, when a tentative tract map says four

3    stories on it, with an application that says four

4    stories on it, and when the subdivider statement says

5    four stories on it, and the design of your condos is

6    two-story units stacked on top of each other equals --

7    two times two equals four stories -- do you really

8    think that if they go ahead and get an approval from

9    this commission and then go to the Department of

10   Building and Safety and they say, "Well, you can't

11   have a four-story project because of the general plan"

12   that they're not going to be in the court suing the

13   City?

14          You're giving them a discretionary approval

15   for a four-story project.  You cannot paint a

16   different picture.

17          COMMISSION PRESIDENT USHER:  Mr. Henning, thank

18   you.  It's my unhappy task to ask you some tough

19   questions that I hope you will understand it's just my

20   role.  I have to do it.

21          There are allegations regarding the

22   appellant Mr. Orellano, and the allegations go

23   something like this:  That he was compensated to file

24   his appeal, that he was solicited by one of the other

25   appellants, that he was put in contact with you by

14

1   virtue of a business card that was left behind.

2          So, Mr. Henning, I'd like to ask you, how

3   did Mr. Orellano come to be an appellant and how did

4   he come to be your client?

5      MR. HENNING:  Mr. Orellano contacted me to

6   represent him.  Further than that, I will not speak to

7   the relationship that I have with him because it will

8   breach my privilege with that client.

9          So I was approached by Mr. Orellano, as

10  lawyers frequently are, to represent him.  That's

11  really all I can say about the relationship.  I'm not

12  going to confirm or deny things that people throw out

13  at me about it.

14     COMMISSION PRESIDENT USHER:  Do you know whether

15  he was compensated in any way to file?

16     MR. HENNING:  I don't know of anything like that.

17  But if I did, I wouldn't be telling the commission,

18  quite frankly, because to discuss anything would --

19     COMMISSION PRESIDENT USHER:  Well,

20  Mr. Orellano -- it would have been very helpful if the

21  appellants themselves would have been here today

22  because they wouldn't be claiming attorney-client

23  privilege.

24          So really, Mr. Henning, your testimony is

25  deficient in some areas that are of great interest to

1    this commission because we can't understand whether

2    these allegations are true because you won't answer to

3    them.  I can understand why you won't answer to them,

4    but frankly, then, the appellants themselves should

5    have been here today and you indicate they are not.

6         MR. HENNING:  Yes, in fact, they are not.  There

7    are three appellants here, just so I might add.  I

8    might also add that the argument that's being made is

9    really not -- is not -- does not stand and fall on the

10   motivation of a particular appellant.

11            Whatever this commission or the opponents

12   of this particular appellant may characterize, there

13   is -- it's really not relevant to whether this

14   particular project complies with the law.  But I

15   appreciate the question.

16            I'm sure you can understand the limits on

17   what I can talk about.  I was approached to represent

18   this client by this client and I am now his lawyer.

19   COMMISSION PRESIDENT USHER:  Well, let me just

20   suggest to the audience and to staff, if you intend to

21   be an appellant or a party in a case, it would be

22   tremendously important for you yourself to do us the

23   honor of joining us when your case is before us.

24            Okay, Mr. Henning.  Thank you so much.  We

25   do have other speakers on this matter.

16

1            Let me next -- Dale, if you are prepared,

2    I'd like to call Wendy at this time.

3            I am now turning to the speaker cards that

4    I have that are opposed to the appeal, and the first

5    Councilwoman Wendy Greuel.

6            Dale, do you also wish to speak

7    separately?

8        MR. THRUSH:  No.

9        COMMISSION PRESIDENT USHER:  Very good.

10       COUNCILWOMAN GREUEL:  You called me just as I

11   was walking in.

12       COMMISSION PRESIDENT USHER:  Sorry.  Good

13   morning.

14       COUNCILWOMAN GREUEL:  Good morning.

15       COMMISSION PRESIDENT USHER:  Thank you so much

16   for coming.  And please take the time you need.

17       COUNCILWOMAN GREUEL:  I'm out of breath from

18   running up the stairs.  Thank you very much.

19           I wanted to be here this morning because

20   this is a project, as you see here, one that has been

21   worked -- they worked very closely with the community

22   to make some changes I think that were critically

23   important on landscaping, et cetera.

24           One of the reasons I also wanted to be here

25   is that I was somewhat amazed that the group or the

                                                          17

1    individual that appealed this project is not from the

2    community and had no involvement in this project

3    whatsoever.   That's not something that I think is very

4    acceptable in the City of Los Angeles and wanted to be

5    here to say very strongly that when you make a

6    decision, you're making a decision on people who are

7    interested in this community, interested in what's

8    going to happen in the creation of affordable housing

9    and building and particularly this area and bringing

10   up the area.   And for individuals who for whatever

11   reason appeal something just for their fancy I think

12   is really, you know, disgraceful.

13            So that's why I wanted to be here this

14   morning, to ask you to support this project and to let

15   it go forward.   We have worked very closely with Dale

16   Thrush -- I'm out of breath, sorry -- with the

17   developer this morning.

18            So really, I wanted just to say I know you

19   understand the importance of it being a project that

20   is supported by the community and the City Council

21   office who has worked very closely with them.

22            I'll answer any questions that you have.

23       COMMISSION PRESIDENT USHER:  Councilwoman, it

24   means everything to us that you came here this

25   morning.  We really appreciate it.

1       Certainly for the audience, you don't

2   realize it, but we do have a volume of paperwork

3   regarding this case, and the implications about the

4   appellants are very distasteful.

5       You can see that I tried to get some more

6   information, but I was not able to because of the

7   attorney-client privilege, which I do understand and

8   respect, but it does make it quite difficult.

9       COUNCILWOMAN GREUEL:  And I think it's

10  important -- again, that's why I wanted to be here

11  personally -- to send a message to that appellant that

12  it is unacceptable in the City of Los Angeles to go

13  after, for whatever grudge position they have, after a

14  project has been worked on very closely, and I know

15  the Planning Commission today will, as I've heard you

16  say, Jane, the importance of sending a message.

17       This is not a folly.  This is about the

18  creation of some wonderful humans in that community

19  and that we should not be held back based upon this

20  appellant's case.

21      COMMISSION PRESIDENT USHER:  And I'd like all of

22  us to consider the time and resources that are going

23  into this case.

24      COUNCILWOMAN GREUEL:  Yes.

25      COMMISSION PRESIDENT USHER:  You know, I'm

                                                    19

Karyn Abbott & Associates

CITY OF LOS ANGELES

PLANNING AND LAND USE MANAGEMENT COMMISSION

TUESDAY, DECEMBER 19, 2006

2:00 P.M.

CERTIFIED COPY

BOARD OF PUBLIC WORKS

LOS ANGELES CITY HALL

200 NORTH SPRING STREET

ROYBAL HEARING ROOM 350


REPORTER'S TRANSCRIPT OF PROCEEDINGS

AGENDA ITEM NO. 8 ONLY


APPEAL FILED BY CONQUEST STUDENT HOUSING, ET AL.

RE:  TENTATIVE TRACT NO. 65528


Reported By:

CAROL LYNN COX,

CSR No. 5128

*Karyn Abbott & Associates, Inc.*
Certified Shorthand Reporters
Transamerica Center
1150 S. Olive Street, Suite GL-29
Los Angeles, California 90015
(213) 749 - 1234

1    A P P E A R A N C E S :

2

3

4                    CITY OF LOS ANGELES
        PLANNING AND LAND USE MANAGEMENT COMMITTEE:

5

6

7        COUNCILMEMBER ED P. REYES, Chair

8        COUNCILMEMBER JOSE HUIZAR

9        COUNCILMEMBER JACK WEISS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    2

1   Los Angeles, California; Tuesday, December 19, 2006

2                 (Agenda Item No. 8 Only)

3                      2:00 p.m.

4                          *

5                        -o0o-

6                          *

7        COUNCILMEMBER REYES:  We'll move to agenda

8   item No. 8.

9        MR. MEJIA:  This is an appeal by Conquest

10  Student Housing and they are appealing the CPC

11  decision to approve a tract map for 51-unit

12  residential condominiums, CD2.

13       COUNCILMEMBER REYES:  Okay.  Can we start

14  with No. 8?

15       MR. LOGRANDE:  Good morning.  I'm Mike

16  Logrande, Los Angeles City Planning Department.

17            This appeal is before you.  It went to the

18  citywide planning commission where they held at the

19  advisory agency level to deny the appeal.

20            We'll let the applicant speak about the

21  reason for appealing this, but this is a continued

22  discussion at the citywide planning commission.

23            The commission chair has some very good

24  points in terms of the looking at some of the issues

25  as to why they've appealed and justification for the

                                                    3

KARYN ABBOTT & ASSOCIATES

1    appeal.

2         The staff's recommendation is to deny the

3    appeal and sustain the action of the deputy advisory

4    agency of the planning commission.

5         COUNCILMEMEBER REYES:  Any questions?  Seeing

6    none, thank you, sir.

7         Councilwoman Greuel?

8         COUNCILWOMAN GREUEL:  Thank you very much.  I

9    ran, just like I did, actually, to the planning

10   commission to hear me.  I'm breathing heavily a

11   little bit, but it was very, very important for me

12   not only to be at the citywide planning commission

13   but to be here today.

14        I know you all will do the right thing,

15   but I think I wanted to share with you why it's so

16   important that I'm standing here and that we send a

17   clear message.

18        The project before you is a model for the

19   type of planning and development that should be

20   replicated throughout the city.

21        This project started out as a 66-unit

22   apartment complex in Sun Valley.  After opposing the

23   project, the developer engaged in various area

24   outreach and discussions with the stake holders.

25        Through this project, you'll find that it

                                              4

1    evolved into a 51-unit condo project with nearly

2    unanimous support from the community.  They worked on

3    landscaping, they worked on access, all of those

4    things that were critically important.

5            Surrounding residents support this

6    project.  The local businesses support the project.

7    The Sun Valley Neighborhood Council supports this

8    project.  And I support this project.  I support this

9    project because it brings needed quality affordable

10   housing to Sun Valley.

11           Now, the tract map was actually approved

12   September 1 of this year.  The only dissenting voice

13   was from a competitor called Conquest Student

14   Housing, the organization that is orchestrating this

15   appeal.

16           Do you know why Conquest opposes this

17   appeal?  I'm still trying to figure out or purporting

18   to figure out the reason.  I know the council will

19   look at this and find this doesn't have much to do

20   with the issue before us, but I do think it's

21   important to send this message.

22           It's because the developer that we have

23   before you today dared to challenge their projects at

24   USC.  They have been retaliating against the

25   applicant by challenging its projects all over the

5

11
141

1    county, five alone here in the City of Los Angeles.

2          I feel very strongly that this strategy

3    has diminished the city council's ability to do what

4    is right in this instance and in my district.  We

5    have been on appeal for four months.

6          If you could have heard the discussion

7    that occurred at the planning commission, the message

8    was sent not only by me but by the commission that

9    this appeal was unwarranted.  It's cynical, without

10   merit, and it deprives the Sun Valley community of a

11   project that it truly wants and needs.

12         As I mentioned, it has delayed the project

13   by four months.  I hope, and I know you will do this,

14   I hope you will not allowed this charade to continue.

15         There are sort of reports that the

16   appellant in this case has recruited others, paid for

17   by Conquest, and if these reports are true, it really

18   is outrageous to me and I think it's potentially

19   illegal and hope that if possible we refer this

20   matter to the criminal division of the city

21   attorney's office for investigation.

22         So as you can see, I feel pretty strongly

23   about this project.  So I urge you to deny this

24   appeal in the strongest possible terms.

25         We need to send a clear message to

6

1    Conquest Student Housing, and I will point out to

2    them and anyone else who would consider these tactics

3    in the City of Los Angeles that we will not stand

4    idly by while they harm our communities and stop

5    projects that are wanted and needed in our neighbors.

6

7         I hope that you will send the same message

8    to the planning commission that this is unacceptable.

9    It is time, it is money, and I think it diminishes

10   what we are trying to do in the City of Los Angeles.

11        When you see the staff sitting here, the

12   staff that is back here that was at the planning

13   commission, the time that we have had to spend in my

14   office on this appeal and this issue is outrageous

15   when we could be working on creating more affordable

16   housing in the city.

17        I hope you will deny very strongly this

18   appeal.

19        COUNCILMEMBER REYES:  We have a comment.

20        COUNCILMEMBER WEISS:  Explain the following in

21   terms of the criminal issue.  What was the nature of

22   that?

23        COUNCILWOMAN GREUEL:  Maybe my staff who is

24   present here can present it.  The local appellant in

25   the case, the suggestion was they were recruited and

                                                    7

```
 1    response to my question was a few miles away.  That
 2    was your first statement.  Then you got to ten, and
 3    now we're at 20.  You're not disputing that, are you?
 4        MR. HENNING:  I don't know one way or the other.
 5    It might be 21 miles.  It could be or it might not
 6    be.  And I don't deny it.  The addresses will speak
 7    for themselves.  I don't have all the addresses.
 8        COUNCILMEMBER WEISS:  That's enough.  I think
 9    you're done.
10            I think that the record is very clear in
11    terms of the planning record that has been developed
12    in support of Mr. Huizar's motion, and I second
13    Mr. Huizar's motion.
14            I do think that in addition to that, I
15    will just say that there's nothing more important to
16    an advocate in any legal proceeding than credibility.
17    And when an advocate loses his or her credibility, it
18    can cause a decision maker to draw inferences against
19    that client for a variety of reasons.
20            I have found the representations here
21    today by the appellant troubling.  They're certainly
22    internally inconsistent and contradictory, and that
23    leads me to question whether the matter was brought
24    in good faith, to begin with, and I just want to make
25    that part of our records as well.
```

26

## DECLARATION OF KRISTINA RASPE

I, Kristina Raspe, declare as follows:

1.     I am currently the Associate Senior Vice President for Real Estate & Asset Management at the University of Southern California ("USC"). I have held this position since November 13, 2006. In my role at USC, I have had the opportunity to interact with the following principals/representatives of Conquest Student Housing, LLC, which rents numerous off-campus housing units to USC students: Messrs. Alan Smolinsky, Brian Chien-Chih Chen and Greg Yaris. I have firsthand personal knowledge of the facts set forth below, and if called upon to do so, I could and would testify competently thereto under oath.

2.     USC is a nationally recognized private university with its main campus located in the University Park area of South Los Angeles. The current demand for student housing at USC substantially exceeds supply, and USC is only able to provide approximately 6,500 beds for students out of a total student population of approximately 31,000. As a result of this housing shortage, USC is involved in an on-going process of evaluating new on-campus and off-campus housing opportunities for its students.

3.     On March 9, 2007 and March 27, 2007, I met with Conquest representatives, Alan Smolinsky and Brian Chien-Chih Chen, at Conquest's office at 3770 South Figueroa Street, Los Angeles, CA. I had previously met with Mr. Smolinsky and Mr. Chen to discuss off-campus housing issues around USC.

4.     During the both the March 9th and March 27th meetings, Mr. Smolinsky voiced his displeasure over the proposed University Gateway Project at the corner of Figueroa Street and Jefferson Boulevard, across from the USC campus (the "Gateway Project"). Specifically, Mr. Smolinsky said that his and Conquest's objections to the Gateway Project were not based on any environmental issues or land use impacts from that project, but because the Gateway Project would compete directly with Conquest's own projects. Mr. Smolinsky also said that Conquest's tactics of "tying-up" Urban Partners' other development projects have been a big success, and that Urban has "not broken ground on a project in a year because of the appeals and lawsuits." Mr. Smolinsky said that Conquest has "seen what this has done to

1

DECLARATION OF KRISTINA RASPE RE CONQUEST STUDENT HOUSING, LLC

1   [Urban Partners'] bottom line, and can't believe that [Urban Partners] is still making payroll."

2   Mr. Smolinisky stated that Conquest will continue this strategy of opposing Urban Partners'

3   projects until Urban Partners abandons the Gateway Project.

4        5.      On April 18, 2007, I participated in a previously scheduled phone call with

5   a Conquest representative, Mr. Greg Yaris. During this phone call, we discussed USC's Master

6   Plan – a document USC is in the process of preparing to address the university's future

7   development goals.

8        6.      During our April 18 phone conversation, Mr. Yaris told me that if the

9   Master Plan contains any new housing developments for students, then Conquest will oppose the

10   Master Plan and/or will sue to block or delay its approval.

11        7.      Based on the statements of Conquest's representatives, I believe that

12   Conquest is trying to prevent any company, including USC, from building any new student

13   housing developments near the USC campus.

14          I declare under penalty of perjury under the laws of the State of California that the

15   foregoing is true and correct. Executed this 12th day of August, 2007 in Los Angeles,

16   California.

17

18   _____
    Kristina Raspe

19

20

21

22

23

24

25

26

27

28

LA\1756832.2

DECLARATION OF KRISTINA RASPE RE CONQUEST STUDENT
HOUSING, LLC