1    Lawrence P. Riff (State Bar No. 104826)
    lriff@steptoe.com
2    Jason Levin (State Bar No. 161807)
    jlevin@steptoe.com
3    **Steptoe & Johnson LLP**
    633 West Fifth Street, Suite 700
4    Los Angeles, California 90071
    Telephone: (213) 439-9400
5    Facsimile: (213) 439-9599

6    Howard H. Stahl (Admitted Pro Hac Vice)
    hstahl@steptoe.com
7    **Steptoe & Johnson LLP**
    1330 Connecticut Avenue, NW
8    Washington, DC 20036

9    Karl M. Tilleman (Admitted Pro Hac Vice)
    ktilleman@steptoe.com
    **Steptoe & Johnson LLP**
10   Collier Center
    201 East Washington Street, 16th Floor
11   Phoenix, AZ 85004

12   Attorneys for Plaintiffs



13           **UNITED STATES DISTRICT COURT**

14          **CENTRAL DISTRICT OF CALIFORNIA**

15   University of Southern California, a    **Case No.: CV 07-05737 ODW (AJWx)**
    non-profit corporation and private
16   university; University Gateway        **SECOND AMENDED COMPLAINT FOR:**
    Development, LLC, a Delaware
17   limited liability company; and Urban    **1. MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
    Partners, LLC, a California limited
18   liability company,

                     **2. ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
19          Plaintiffs,

20          vs.                 **3. CONSPIRACY TO MONOPOLIZE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**

21   Conquest Student Housing, LLC, a
    California limited liability company;   **4. VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
22   Brian Chen, also known as Chien-Chih
    Chen, an individual; Alan Smolinisky,
23   an individual; Casey Smith, an      **5. CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
    individual; Mariano Baez, an
24   individual; Julio Orellano, an
    individual; and DOES 1 through 10,   **6. INTERFERENCE WITH ECONOMIC RELATIONS**
25   inclusive,

26          Defendants.        **7. INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

27                      **8. UNFAIR COMPETITION**

28                      **9. COPYRIGHT INFRINGEMENT**

                     **AND DEMAND FOR JURY TRIAL**

FILED
CLERK, U.S. DISTRICT COURT
OCT 18 2007
CENTRAL DISTRICT OF CALIFORNIA
BY        DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
OCT 17 2007
4:46
CENTRAL DISTRICT OF CALIFORNIA
BY        DEPUTY

DOCKETED ON CM
OCT 19 2007
BY        210

                   **SECOND AMENDED COMPLAINT**

Plaintiffs, the University of Southern California ("USC"), Urban Partners, LLC ("Urban"), and University Gateway Development, LLC ("Gateway") allege as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 1337.  This action arises under the Clayton Act, 15 U.S.C. §§ 15, 26, to obtain injunctive relief and damages for violations of section 2 of the Sherman Act, 15 U.S.C. § 2, the federal Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. § 1961 *et seq.*, and for Copyright Infringement, 17 U.S.C. § 501, *et seq.*

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1367 over the state law causes of actions because those causes of action are related to the federal law causes of action and form part of the same case and controversy under Article III of the United States Constitution.

3.      The conduct alleged in this Second Amended Complaint occurred in interstate commerce and has affected and will continue to substantially and directly affect interstate commerce.

4.      The Court has personal jurisdiction over the Defendants and venue is proper in the Central District of California because (a) all Defendants reside in the State of California and at least one of the Defendants resides in this District, and (b) substantial parts of the events or omissions giving rise to the claims occurred in this District.

## Introduction

5.      The Conquest Defendants — the self-proclaimed "Al-Qaeda" of the USC student housing market — have conspired to dominate, monopolize, and control the private sector student housing market around USC through a pattern of racketeering activities, abusive litigation, extortion, fraud, and intimidation, even

SECOND AMENDED COMPLAINT

going so far as to state that they have the ability to financially "bomb" competitive development projects.

6.     The Conquest Defendants have engaged in these illegal, abusive, and unfair business practices with the brazenly open intent of monopolizing and dominating the private sector student housing market within walking distance of the USC campus.  The Conquest Defendants literally have characterized the acquisition of property for USC student housing as akin to playing a game of "Monopoly."

7.     The Conquest Defendants currently own and operate at least 19 apartment complexes within walking distance of USC, which house nearly 1,500 USC students.  In early 2007, the Conquest Defendants told USC officials, at a meeting at Conquest's offices, that the Conquest Defendants' mastery over the pricing of the private sector student housing market around USC is so complete that they know "by the hour" how they can manipulate rental rates.  The Conquest Defendants maintain in their offices parcel-by-parcel, floor-to-ceiling maps of the USC area that they constantly update to track their monopolistic control over this market.

8.     Plaintiff Urban is a respected and successful real estate planning, investment, development, and management firm based in downtown Los Angeles with a distinguished reputation for its expertise in obtaining urban entitlements and in handling urban development, restoration, and redevelopment projects.

9.     In 2005, Urban completed ground lease and sublease transactions with The Shammas Group and USC to develop 421 apartments for USC students, parking garages, and ground floor retail space on a site adjacent to the USC campus owned by The Shammas Group (the "University Gateway Project").

10.     Soon after, the Conquest Defendants began attacking the University Gateway Project.  The Conquest Defendants initiated a misinformation campaign to distort the project, scare community residents, and artificially incite community opposition by, among other things, creating a website, posting billboards, and

1  circulating flyers through the US mails that all contained false and misleading
2  information about the size and scope of the project.

3       11.     The Conquest Defendants also initiated numerous abusive challenges
4  to the environmental impact report ("EIR") and entitlements granted by the City of
5  Los Angeles and the Community Redevelopment Agency ("CRA") for the
6  University Gateway Project, inappropriately challenging the EIR and entitlements
7  granted by the City primarily, if not solely, to further the Conquest Defendants' own
8  illegal goals.   After the City and the CRA rejected the Conquest Defendants'
9  challenges to the EIR and entitlements, the Conquest Defendants filed another round
10  of abusive appeals with the courts, seeking to delay the University Gateway Project
11  for years.   The Conquest Defendants' abusive litigation tactics have delayed the
12  University Gateway Project, which has resulted in a substantial loss of capital, time
13  and resources for Urban, and has also delayed the introduction of new student
14  housing for more than 1,600 USC students, to the detriment of USC and its students.

15       12.     In retaliation for Urban's attempt to enter the USC student housing
16  market, the Conquest Defendants have interfered with Urban's development projects
17  outside of the USC area, some as far away as the State of Washington, where the
18  Conquest Defendants have no interests or business activities whatsoever.   The
19  Conquest Defendants have done so, in part, by filing a series of bad faith, anti-
20  competitive lawsuits against Urban that frivolously challenge the entitlements to
21  Urban's projects.   The Conquest Defendants also have attempted in some cases even
22  to bribe local residents to oppose Urban's projects.

23       13.     The Conquest Defendants have openly told USC officials and others
24  that they will do whatever it takes to prevent construction of the University Gateway
25  Project, and that they will not stop their anti-competitive and illegal actions until
26  Urban abandons the University Gateway Project.   The Conquest Defendants also
27  have threatened to block or delay any of USC's own future development plans if
28  those plans include any new student housing developments.

SECOND AMENDED COMPLAINT

14. The Conquest Defendants also have made blatant anti-competitive threats against other businesses with plans to develop in the USC student housing market. When The Martin Group, another real estate development firm, began to explore the acquisition and development of a private sector student housing project near USC, the Conquest Defendants threatened The Martin Group that they would tie up any proposed project in environmental litigation for years. The Conquest Defendants specifically told The Martin Group that they should be thought of as "Al-Qaeda" and stated they know how to "bomb" competitive development projects through litigation under the California Environmental Quality Act (CEQA). The Conquest Defendants brazenly bragged to The Martin Group that their CEQA litigation tactics had successfully delayed the University Gateway Project, and that they had "chased" Urban all the way to Washington to get Urban to drop the University Gateway Project.

15. Forward Progress Management, Inc., a third real estate development firm, also began to explore development of a private sector student housing project near USC. When the Conquest Defendants learned of the proposed acquisition of property, they contacted Forward Progress Management Real Estate, Inc., and asked to meet with its representatives on August 7, 2007. During that meeting, Defendant Smolinisky stated the Conquest Defendants "dominate and control" the student housing market around USC and threatened Forward Progress Management Real Estate, Inc., that the Conquest Defendants would block any proposed Forward Progress Management student housing project using CEQA litigation. Defendant Smolinisky stated that FPM should keep the property as a gas station because the Conquest Defendants would make it impossible for FPM to develop student housing on the property. The Conquest Defendants identified Urban Partners' University Gateway Project as evidence of the Conquest Defendants' ability to block much larger developments.

SECOND AMENDED COMPLAINT

16.     The Conquest Defendants' anti-competitive and abusive conduct has not only harmed Urban, Gateway, and USC, it has also wasted the time and resources of public agencies and the courts.  The President of the City of Los Angeles Planning Commission on the record described the Conquest Defendants' tactics as "distasteful," and a member of the Los Angeles City Council described their tactics as "disgraceful" and hoped the matter would be referred to the City Attorney's Office for a criminal investigation.

17.     The Conquest Defendants will stop at nothing to prevent development of the University Gateway Project, to prevent the development of other Urban projects, to prevent appropriate competition in the private sector student housing market around USC, and to ensure that they maintain monopoly control of the private sector student-housing market near USC.  In the process, the Conquest Defendants have violated the Racketeer Influenced and Corrupt Organizations Act, the Sherman Act, the California Unfair Competition laws, and other federal and state laws.  The Conquest Defendants have also repeatedly abused the litigation process by filing numerous frivolous lawsuits and appeals.

## The Parties

18.     Plaintiff USC is a non-profit corporation and California's oldest private research university located in Los Angeles, California.

19.     Plaintiff Urban is a California limited liability company authorized to do business in Los Angeles County, California and whose principal place of business is in Los Angeles, California.  Urban is a real estate planning, investment, development, and management firm that also provides fee-based project consulting to private, nonprofit, and government clients.  Urban conducts business throughout the United States, and its investors live in various parts of the country.  Urban is currently developing several projects in various California counties and four projects in the State of Washington.

20.     Plaintiff Gateway is a Delaware limited liability company authorized to do business and doing business in Los Angeles County, California.  Gateway is a development company created by Urban to entitle, develop, and construct the University Gateway Project.

21.     Defendant Conquest Student Housing, LLC ("Conquest") is a California limited liability company with its principal place of business in Los Angeles County, California.  At all relevant times, Conquest developed, owned, and operated various apartment complexes near USC.

22.     Defendant Brian Chen, also known as Chien-Chih Chen ("Chen") is, and at all relevant times was, an individual residing in the State of California.

23.     Defendant Alan Smolinisky ("Smolinisky") is, and at all relevant times was, an individual residing in the State of California.

24.     Defendant Casey Smith ("Smith") is, and at all relevant times was, an individual residing in the State of California.

25.     Conquest, on the one hand, and Chen, Smolinisky and Smith, on the other hand, are "alter egos" of each other.  There is such a unity of interest and ownership between Conquest, on the one hand, and Chen, Smolinisky and Smith, on the other hand, that their separate identities have ceased to exist, and to adhere to the separateness of Conquest from Chen, Smolinisky and Smith would promote and sanction an injustice.  Conquest, Chen, Smolinisky, and Smith will be referred to, collectively, as the "Conquest Defendants."

26.     Defendant Mariano Baez ("Baez") is, and at all relevant times was, an individual residing in the State of California.

27.     Defendant Julio Orellano ("Orellano") is, and at all relevant times was, an individual residing in the State of California.  The Conquest Defendants, Baez, and Orellano will be referred to, collectively, as the "Defendants."

28.     Defendants were at all relevant times the agents, principals, partners, co-conspirators and/or co-venturers of each other, and each of them acted within the

course, scope, and authority of those relationships.   As a result, Defendants are jointly and severally liable for the acts alleged in this Second Amended Complaint.

<div align="center">**Factual Allegations**</div>

**1.    Conquest Has Monopolized The Available Student Housing Near USC.**

29.    USC is located in an area near downtown Los Angeles with a limited amount of suitable student housing within walking distance of campus.  For years, there has been a limited amount of suitable private sector student housing near USC. Roughly 46 percent of USC's students are from out-of-state, including international students, and they look to USC for guidance regarding the availability of suitable, appropriate housing.

30.    The overwhelming majority of USC students desire to live on campus or in the areas adjacent to campus.  Due to the limited amount of suitable student housing owned and/or operated by USC on or near the campus, USC cannot guarantee housing to the majority of its students.

31.    USC guarantees student housing for its incoming freshmen and returning resident sophomores.   Nearly all freshmen and a large majority of sophomores accept student housing guaranteed by USC.  The remaining available student housing owned and/or operated by USC is made available to juniors, seniors, and graduate students by way of a computerized lottery system.   Students not guaranteed housing or who lose the lottery are unable to obtain USC owned and/or operated student housing.  There are many more students seeking student housing than USC is able to provide.

32.    USC owned and/or operated student housing has operated for many years at full capacity.  Those students not able to obtain USC owned or operated student housing through USC's housing guarantees or the lottery system must look for housing in the private sector student housing market.

33.    USC does not make its housing available in the private sector student housing market, but allocates its housing based on guarantees and a lottery.  USC

owns and operates its student housing with the goal of operating at or as near zero net profit as possible and prices its student housing accordingly.  Evidence that USC offers its student housing at below-market prices includes but is not limited to the fact that nearly all freshman accept USC's guarantee of student housing and any housing remaining after all USC guarantees are met is allocated by lottery.

34.    USC offers various amenities, services, support, and other programmatic elements that distinguish its student housing from any student housing available in the private sector.  In addition, USC offers its student housing at below-market rates, when adjusted for the quality of the housing itself and the other amenities and programmatic elements.

35.    To take financial advantage of the demand for private sector student housing within walking distance of USC, Conquest has for several years purchased apartment buildings near USC, made superficial improvements, and then significantly increased the rent — sometimes as much as 200 percent above what residents had previously paid for the same apartment.

36.    Conquest is currently the dominant provider of private sector student housing near USC.  Conquest owns a significant share of, and dominates the market for, private sector student housing within walking distance of the USC campus, which Conquest itself has defined as "Adams Street on the north, Figueroa on the east, and Vermont on the west."  Indeed, Conquest promotes itself as the "premier provider of non-university" student housing in that area — which Conquest refers to as "the USC neighborhood."  Conquest owns and/or operates at least 19 apartment complexes within that area, which house nearly 1,500 students.

**2.    The Conquest Defendants Openly Intend To Terrorize Any Project That Interferes With Their Monopolistic Design For The USC Private Sector Student Housing Market.**

37.    Conquest has made it clear that it will do whatever it takes to stop student housing developments by competitors and destroy competition in the USC private sector student housing market within walking distance of USC.

### A.    Conquest's Attack on The Martin Group and Its Proposed Project

38.    The Martin Group ("TMG") is a real estate development and management company based in Santa Monica, California, that recently began exploring the acquisition and development of a property for student housing located at 3800 South Figueroa Street near USC.

39.    On May 9, 2007, at Defendant Smolinisky's request, Lee Wagman (TMG's Chief Executive Officer) and Howard Kozloff (TMG's Development Manager) met with Defendant Smolinisky and Defendant Chen at TMG's offices in Santa Monica.

40.    During that meeting, Defendant Smolinisky warned TMG that it should not enter the student housing market near USC. (Dec. of Howard J. Kozloff (Ex. 1) at ¶¶ 3-4; Dec. of Lee H. Wagman (Ex. 2) at ¶¶ 3-4)  Defendant Smolinisky threatened to sue any TMG project at 3800 South Figueroa using CEQA litigation. (*Id.*)

41.    Defendant Smolinisky said that there was no market depth for student housing near USC, that TMG would be making a huge mistake by developing student housing near USC, and that any TMG student housing project near USC would not reach functional occupancy levels. (*Id.* at ¶ 4)  Defendant Smolinisky warned that, if TMG decided to proceed with a student housing project, Conquest would prolong TMG's entitlement process to the maximum extent possible by opposing those entitlements and by suing to delay any project approvals under the CEQA. (*Id.*)  Defendant Smolinisky told TMG that those delays would make TMG's purchase of the site economically infeasible. (*Id.*)  Defendant Smolinisky said that he knew exactly what it would cost Conquest to slow down a project like TMG's, that he would spend between $1.3 and $1.6 million to prevent the TMG project, and that he could delay the TMG project by six or more years using CEQA litigation. (*Id.*)

SECOND AMENDED COMPLAINT

42.     Defendant Smolinisky said that TMG should think of him and Conquest like "Al Qaeda," that it does not cost a lot to "bomb" a development project, and that it only takes a single person to cause serious harm to real estate projects using CEQA litigation. (*Id.*)

43.     Defendant Smolinisky also bragged that Conquest's CEQA litigation tactics had successfully delayed the University Gateway Project. (*Id.* at ¶ 5) Defendant Smolinisky said that his lawsuits opposing the University Gateway Project had delayed that project's groundbreaking, and he boasted that he is using CEQA to oppose other projects involving Urban. (*Id.*)  Defendant Smolinisky stated that he had delayed Urban's projects in downtown Los Angeles, that he had delayed Urban's project in Sun Valley, and that he "chased" Urban all the way to Seattle to oppose Urban's project in that city. (*Id.*)

44.     Defendant Smolinisky also said that he planned to meet with the Blackstone Group, one of the investors in the University Gateway Project, to threaten them about their involvement in that project. (*Id.*)

45.     Defendant Smolinisky said that he had successfully made Urban and the Shammas family a "victim" for proceeding with the University Gateway Project. (*Id.*)

46.     Defendant Smolinisky told Mr. Wagman and Mr. Kozloff that he viewed CEQA as a powerful tool to delay real estate projects, claimed to have highly effective legal counsel, and falsely claimed that nothing could be done to prevent him from attacking development projects with abusive litigation tactics. (*Id.*)

47.     Defendant Smolinisky said that he knew about TMG's other projects in downtown Los Angeles, Agoura Hills, and on La Brea Boulevard, and noted that the La Brea project had already experienced some delay. (*Id.*)

48.     Within a day or so after the May 9, 2007 meeting, TMG received notice that Conquest had filed California Public Records Act requests for documents

1  concerning TMG's development projects in Agoura Hills and on La Brea Boulevard.
2  (*Id.* at ¶ 7)

3      49.    On May 16, 2007, Defendants Smolinsky and Chen sent a letter to
4  TMG renewing the threat that Conquest intended to initiate litigation and draw out
5  appeals if TMG developed the 3800 South Figueroa Street property.  (Letter dated
6  May 16, 2007 (Ex. 3))   That letter set forth Conquest's projected development
7  timeline for a TMG project at 3800 South Figueroa Street and stated that "we have
8  assumed that a consortium of existing tenants and neighbors object to the project"
9  and that litigation involving such a project would delay construction until "mid-
10  2013."  (*Id.* at 2)   The letter also stated that "If you were to construct the
11  improvements, we are unable to envision any reality in which you would be able to
12  generate sufficient income to break even." (*Id.* at 3)

13      50.    On May 17, 2007, TMG sent a letter to Defendant Smolinsky
14  outlining the threats that Defendant Smolinsky and Conquest had made to TMG.
15  (Letter dated May 17, 2007 (Ex. 4))   As a result of Smolinsky's and Chen's
16  extortionate threats, TMG abandoned its plan to enter the student housing market
17  near USC.

18      **B.    Conquest's Attack on FPM and Its Student Housing Project**

19      51.    Forward Progress Management, Inc. ("FPM") is a real estate
20  investment and management company located in Beverly Hills, California, that also
21  recently began exploring the acquisition and development of property for private sector
22  student housing near USC.

23      52.    In mid-July, 2007, Defendant Smolinsky contacted Billy Ruvelson of
24  FPM on his cellular phone and asked to meet with him at Conquest's Tuscany
25  Project, which Mr. Ruvelson agreed to do.  (Decl. of William "Billy" Ruvelson, Ex.
26  5 at ¶ 3)

27      53.    On August 7, 2007, Defendants Smolinsky and Chen met with Mr.
28  Ruvelson at the Tuscany Project.  (*Id.* at ¶ 4)  The meeting began in a conference

room where the Conquest Defendants maintain a large color coded map of the area around USC that includes all buildings and owners of sites surrounding USC. (*Id.* at 5) Defendant Smolinisky stated that Conquest knows who owns every site and building on the map and monitors every development. (*Id.* at ¶ 5)

54.   During the meeting, Defendant Smolinisky "boasted about how powerful Conquest is and that it dominates and controls the student housing market near USC." (*Id.* at ¶ 6) When Mr. Ruvelson indicated he believed there were positive prospects for development around USC, Defendant Chen disagreed and his demeanor became hostile. (*Id.* at ¶ 7) Defendant Smolinisky told Mr. Ruvelson that it would not be wise for him to get out of his "comfort zone" of owning and managing smaller apartment buildings and compete against Conquest because the Conquest Defendants had been successful in blocking "much larger developments." (*Id.* at ¶ 8) Defendant Smolinisky specifically identified Urban Partners' University Gateway Project as one of the developments that Conquest had successfully blocked. (*Id.*)

55.   Defendant Smolinisky told Mr. Ruvelson that he knew that FPM planned to build a 50 unit development in the Figueroa Corridor, just North of Conquest's Tuscany Project. (*Id.* at ¶ 9) Defendant Smolinisky falsely stated to Mr. Ruvelson that the City of Los Angeles' general plan provides for a floor area ratio ("FAR") of no more than 1.5 to 1 when, in fact, a plan amendment allows for a 4.5 to 1 FAR for a mixed use project that includes student housing above the retail space. (*Id.*) Defendant Smolinisky also stated that FPM was limited to building only 17 units at its proposed development site. (*Id.* at ¶ 10) Mr. Ruvelson stated that, if FPM was limited to only 17 units, he did not understand why such a small project would concern Conquest. (*Id.* at ¶ 12)

56.   Defendant Smolinisky stated something to the effect of "whatever you do, you better keep the property as a gas station. We will make it impossible for you to develop student housing on the property." (*Id.* at ¶ 9) Defendant Smolinisky also

- 12 -

1    stated something to the effect of, "you are sadly mistaken if you think that you will

2    be able to come in and develop a project next to our flagship project." (*Id.*)

3    　　　57.　　Near the conclusion of the meeting, Defendant Smolinisky informed

4    Mr. Ruvelson that because the Conquest Defendants had informed FPM of their

5    intent to block FPM's proposed project using litigation, Mr. Ruvelson now had an

6    obligation to disclose that fact to his investors. (*Id.* at ¶ 11) Defendant Smolinisky

7    further stated that due to Conquest's litigation, Mr. Ruvelson's project would not be

8    completed until 2013. (*Id.*)　Defendant Smolinisky then showed Mr. Ruvelson a

9    project cost document relating to his potential development, including a breakdown

10   of over three years of litigation. (*Id.*)　Mr. Ruvelson viewed this as a direct threat.

11   (*Id.*)

12   　　　58.　　Defendants Smolinisky and Chen made all of the foregoing statements

13   even though Mr. Ruvelson stated that he had no definitive plans for the property.

14   (*Id.* at ¶ 10)

15   　　　59.　　Later in the day on August 7, 2007, Defendant Smolinisky, on behalf

16   of the Conquest Defendants, sent an e-mail to Mr. Ruvelson of FPM with three

17   attachments.　(*Id.* at ¶ 14) The first attachment was a document entitled "FAR

18   Calculation and Cost for Lot," which articulated that without the Plan Amendment,

19   Mr. Ruvelson would be able to develop only 17 units. (*Id.*)　The second attachment

20   was a document entitled "Entitlement Information and Costs," which listed

21   anticipated management costs and included over three years of litigation from

22   Conquest that projected a best case scenario for FPM to break ground, assuming

23   complete victory, of October 2013.　(*Id.*)　The third attachment was a copy of

24   Conquest's CEQA litigation against the City of Los Angeles.　(*Id.*)　Defendant

25   Smolinisky again told Mr. Ruvelson that he should "feel free" to disclose the

26   information contained in the e-mail to his investors. (*Id.*)

27   　　　60.　　Following the threatening statements made by Defendants Chen and

28   Smolinisky during the August 7, 2007 meeting, and in Defendant Smolinisky's e-

mail, FPM partner Eran Fields noted that Smolinisky's e-mail confirmed Conquest's threats. (*Id.* at ¶ 15) Mr. Fields considered their actions to be blackmail. (*Id.*) Mr. Ruvelson noted, "they told me that they would sue me if I tried to build any student housing at the location due to the fact that since they are the largest provider of student housing for USC that they didn't want outsiders encroaching on their business." (*Id.* at ¶ 16)

**3.     The Conquest Defendants Attack The University Gateway Project.**

61.     Conquest has engaged in the same illegal, improper, and anti-competitive conduct in an attempt to destroy the University Gateway Project. To inform the public and investors of new ventures, Urban lists information about its current projects on its website. In early 2005, Urban announced on its website, among other places, that (a) Gateway had completed ground lease and sublease transactions with The Shammas Group and USC and formed a joint venture with an investor to develop 421 rental housing units for USC students and faculty, parking garages, and ground floor retail space for retailers on a site adjacent to the USC campus owned by The Shammas Group, and (b) Clark Construction had been selected as the contractor. The University Gateway Project is the first student housing project that Urban has attempted to develop to address the limited amount of private sector student housing near USC.

62.     USC owns approximately 7% of the property that is being leased for development of the University Gateway Project. USC also is the ground lessee for the Project. USC has contracted to lease approximately 70,000 of the 83,000 square feet of the ground floor commercial space in the University Gateway Project, which will include a fitness center and a USC book store facility that would significantly expand the capacity, and enhance the quality, of USC's current book store facilities.

63.     USC has a compelling interest to encourage the private sector to develop suitable student housing within walking distance of USC, especially as USC transitions from a commuter to a residential university. Additional private sector

student housing projects, which provide suitable, accessible student housing, will allow USC to focus its resources and energy on its educational and research goals. Such student housing projects are essential to USC, especially given the current limited amount of suitable, accessible student housing.

64.     The University Gateway Project is intended to provide housing to over 1,600 USC students; to provide quality fitness, restaurant, bookstore and other services to USC students; and to increase significantly the supply of student housing units available in the private sector student housing market within walking distance of USC.  This increased housing supply and related services would also create a more competitive market for private sector student housing — reducing Conquest's ability to inappropriately inflate prices for seriously sub-par student housing.

65.     Intending to monopolize the private sector student housing market within walking distance of USC, the Conquest Defendants immediately initiated a scheme through the use of the U.S. mail and internet, of false and misleading factual representations about the size and scope of the University Gateway Project, intending to delay and ultimately prevent construction of the University Gateway Project.

66.     In or around August of 2005, the Conquest Defendants created, funded and controlled as their alter ego an organization called the "University Park Community Association" and created a website on the internet at www.stopuniversitygateway.com.   The true identity of the University Park Community Association is disguised and wholly within the control of the Conquest Defendants – their literature fails to identify any individuals as members, lists only a P.O. Box as an address, and the group is not registered in either the City of Los Angeles or the State of California.  The Conquest Defendants used this website for fraudulent, anti-competitive, and monopolistic purposes — to make or cause to be made factual representations that the Conquest Defendants knew or should have known were false and misleading regarding the scope and size of the University

SECOND AMENDED COMPLAINT

Gateway Project to incite artificial concern within the community.  The false and misleading representations included, but were not limited to:

   a.   The Conquest Defendants represented that the University Gateway Project was only the first phase in a series of projects that would take place in the private sector student housing market near USC, when in fact the University Gateway Project is a single stand-alone development with no additional phases.

   b.   The Conquest Defendants falsely stated that the parking plan for the University Gateway Project would result in a 702 parking space deficit.

   c.   The Conquest Defendants represented that Urban planned to work with the City of Los Angeles to take the homes of nearby residents through eminent domain to build the University Gateway Project, when in fact the Project would be developed completely on land owned by The Shammas Group without displacing any homes.

   d.   The Conquest Defendants represented that the University Gateway Project would not provide any living wage permanent jobs, when in fact the Project proposed nearly 700 jobs, almost 200 of which would be full-time permanent jobs that provide a living wage.

   67.   The Conquest Defendants used www.stopuniversitygateway.com to disseminate the foregoing fraudulent misrepresentations throughout the country, and internationally.  In furtherance of the Conquest Defendants' scheme to defraud, in January, 2006, the Conquest Defendants caused brochures containing these and other false and misleading statements about Urban and the University Gateway Project to be mailed to Urban, USC students and the general public, including potential customers of Urban, with the specific intent to delay and ultimately to prevent construction of the University Gateway Project.  (Ex. 6)  The Conquest Defendants also launched a billboard advertising and flyer campaign that misrepresented the size and scope of the University Gateway Project.

68.     Conquest was put on notice as early as 2005 that there were no additional phases planned for the University Gateway Project.  In public hearings and otherwise, Urban and its representatives clarified that plans for a phased project had been dropped, and that no future phases were planned.  This clarification was widely publicized and made clear to Conquest.  The University Gateway EIR itself documents that no future phases were intended.  Conquest, through its counsel, acknowledged that fact at page 4 of its opposition letter to the draft EIR.  Nevertheless, Conquest continued to misrepresent to the public that University Gateway Project was a phased project with the current plans being only the first of several phases.

69.     The Conquest Defendants also improperly copied from Urban's website the conceptual plans prepared in 2002 by Urban's architect without permission.  The conceptual plans were outdated and substantially superseded and did not represent the actual size or scope of the University Gateway Project.  Even though they knew that the conceptual plans did not accurately portray the University Gateway Project, the Conquest Defendants posted copies of the outdated and erroneous conceptual plans on www.stopuniversitygateway.com and sent agents (including defendant Smith) to falsely misrepresent to the public at hearings that the conceptual drawings constituted the "real" University Gateway Project.   The Conquest Defendants thereby attempted inappropriately to incite local residents and business owners to protest against the University Gateway Project.

70.     The Conquest Defendants also obtained a copy of Urban's Confidential Offering Memorandum without Urban's consent.   The Confidential Offering Memorandum was created by Urban and released only to a few select investors.  Indeed, the Confidential Offering Memorandum expressly states on its face that it "is the confidential and proprietary information of Urban Partners, LLC and is being submitted to you for your confidential use with the express understanding that, without the prior written permission of Urban Partners, LLC, you

1   will not release or discuss the information contained herein or make reproductions of
2   or use this preliminary material for any purpose other than for evaluating an interest
3   in receiving the offering materials with respect to the investment opportunity which
4   is described." The Confidential Offering Memorandum was copyright protected and
5   has been registered with the Office of Copyright. The Registration Number is
6   TXU1568914.

7       71.     Urban never released the Confidential Offering Memorandum to the
8   public, or authorized it to be used or possessed by the Conquest Defendants.

9       72.     The Conquest Defendants misappropriated and copied Urban's
10   Confidential Offering Memorandum and filed a copy of the Memorandum with the
11   City of Los Angeles, thereby making Urban's Confidential Offering Memorandum a
12   matter of public record.

13       73.     Urban did not license or authorize the Conquest Defendants to use
14   Urban's confidential conceptual drawings or Confidential Offering Memorandum.
15   The Conquest Defendants therefore improperly reproduced, displayed, distributed,
16   and publicized Urban's conceptual drawings and Confidential Offering
17   Memorandum.

18   **4.    The Conquest Defendants Have Abused the Administrative and Legal
         Process In Attempting to Block the University Gateway Project.**
19

20       74.     In March 2007, Defendant Smolinisky told USC officials that
21   Conquest had done, and would do, whatever is necessary to prevent the construction
22   of the University Gateway Project. Defendant Smolinisky said that the market for
23   student housing near USC is not very deep and the number of beds that would be
24   added by the University Gateway Project would effectively destroy Conquest's
25   pricing power.

26       75.     In an attempt to force Urban to abandon the University Gateway
27   Project, the Conquest Defendants have abused the administrative and legal process

28

1    through the filing of numerous inappropriate challenges and appeals to the
2    University Gateway Project.

3        76.    The Conquest Defendants first sought to delay the University
4    Gateway Project when the University Gateway Project was before the Community
5    Redevelopment Agency ("CRA") by making abusive challenges to the proposed
6    mitigated negative declaration (MND) and the EIR for the University Gateway
7    Project.  During the course of the proceedings before the CRA, the Conquest
8    Defendants submitted, among other things, a 41-page letter, a 107-page letter, and a
9    banker's box full of documents to the CRA to prolong the approval process and
10   incite nearby business owners and residents to submit similar complaints about the
11   EIR.

12       77.    During the comment period on the Draft EIR for the University
13   Gateway Project, comments were received from members of the public.  An
14   overwhelming majority of them, originated from sources with direct connections to,
15   or a personal or business interest in, Conquest and its business activities.  Upon
16   information and belief, the comments were submitted not as a result of the
17   commentators' desire to petition the government, but at the request of the Conquest
18   Defendants as part of the Conquest Defendants' improper and anti-competitive
19   actions.  For example, but not by way of limitation, commentors John Delong,
20   Robert Kircher, and Ronald Knoll all possess a property interest in Habitat Soo Zee,
21   a Conquest property.  Commentors Norm Salter, Craig Sheranian, and Phillip Ram
22   are officers or employees of Salter Construction, Inc. and/or West Millennium
23   Group, companies that designed and/or built, among other Conquest properties,
24   Abbey Road and the Pallazo, and who identify themselves on their website as
25   having a "strong business association" with Conquest.  Commentors Keith Dover
26   and William G. Clark are employees or principals of Clark & Hedricks Architects,
27   the architectural firm that designed Conquest's Tuscany Project.  Commentors
28   Roderick Dion Lemon, Brian Chen, Jo Anne Barce, Sam Szeto, Ronald Zia, Keity

SECOND AMENDED COMPLAINT

1    Park, Fernando Cervantes, Juan Cortez, and Alan Smolinisky are principals or

2    employees of Conquest.   Commentors Justin Wong, Laura Davis, and Joshua

3    Lineham were all USC students living in Conquest student housing, respectively,

4    Chez Ronnee, Chateau Sera, and The Pad.

5        78.    The Conquest Defendants knew that their improper challenge to the

6    EIR would substantially delay the University Gateway Project.   The Conquest

7    Defendants knew that under CEQA, the CRA (as the "lead agency") would be

8    forced to address and respond to each and every comment — no matter how

9    frivolous or meritless — made by any person regarding the EIR.   Indeed, the final

10   approval and certification of the EIR was substantially delayed as a result of the

11   Conquest Defendants' abusive challenges.

12       79.    One of the Conquest Defendants' primary objections to the EIR was

13   that the parking ratio (the number of parking spaces being provided for each dwelling

14   unit) for the University Gateway Project was inadequate. The Conquest Defendants

15   knew their objection regarding the parking ratio, along with many of their other

16   objections, was frivolous and without merit.   Indeed, if they were correct, their own

17   Tuscany Project would be illegal.   The parking ratio for the University Gateway

18   Project received the proper approvals to comply with the City Code and had the

19   same parking ratio disclosed for the Tuscany project, which is a 120-unit student

20   housing project near USC that the Conquest Defendants developed without an EIR,

21   without any public hearing, without a Site Plan Review, and without a general plan

22   amendment required under the City codes.

23       80.    On July 6, 2006, after much delay, the CRA finally completed

24   responding to all of the submissions made by the Conquest Defendants and approved

25   University Gateway Project's EIR.

26       81.    The Conquest Defendants then appealed the CRA's preliminary

27   approval to the CRA board, again challenging the EIR.   The primary, if not sole,

28

SECOND AMENDED COMPLAINT

purpose for the Conquest Defendants' frivolous appeal was to further delay the University Gateway Project.

82. The CRA board overruled the Conquest Defendants' appeal.

83. The Conquest Defendants did not stop there. The Conquest Defendants then filed an improper Petition for Peremptory Writ of Mandate against Gateway and the CRA styled *Conquest Student Housing, LLC et al v. Community Redevelopment Agency of the City of Los Angeles*, California Superior Court, Central District of Los Angeles, Case No. BS 104539, for the primary, if not sole, purpose of further hindering and delaying the University Gateway Project.

84. The Conquest Defendants continued their pattern of improper challenges by also challenging or appealing the general plan amendment and entitlement proceedings within the City of Los Angeles before the Zoning Administrator, Area Planning Commission, the City Planning Commission, the City Council Planning and Land Use Committee ("PLUM"), and the City Council.

85. During the City of Los Angeles approval process, the Conquest Defendants argued in their improper challenge that the University Gateway Project violated the City's zoning and general plan because, among other things, (a) the floor area ratio ("FAR") for the University Gateway Project is 3.7:1 instead of 1.5:1, and (b) multi-family residential use is prohibited under the Redevelopment Plan because the Project property is zoned C2. The Conquest Defendants did so despite the fact that the FAR for Conquest's Tuscany project was 3.0:1 instead of 1.5:1 and Conquest's Tuscany project property was also zoned C2. Just like the University Gateway Project, Conquest's Tuscany project was developed in an area in close proximity to USC. Unlike the Tuscany project, which Conquest developed without lawfully amending the City's zoning requirements and general plan (and without any EIR or community input), the University Gateway Project was approved pursuant to a general plan amendment and fully complied with the City's zoning requirements and general plan.

SECOND AMENDED COMPLAINT

86.     During the approval process that took place before the City of Los Angeles, to further hinder, delay, and harm Urban and in furtherance of their improper challenge, the Conquest Defendants also appealed the approval of Urban's entitlements and the general plan amendment to PLUM, a subcommittee of the Los Angeles City Council.  During a March 6, 2007 PLUM hearing on the Conquest Defendants' appeal, Councilmember Jack Weiss referred to Conquest as a "vexatious litigant" and cautioned Conquest that "[t]here are reasons that courts do and courts are well able to look into records and see what individuals are using the legal system and legal processes appropriately and when they are using it inappropriately, vexatiously and for inappropriate reasons."  (Transcript of PLUM Committee meeting on March 6, 2007 (Ex. 7) at 57)   The PLUM Committee unanimously recommended the rejection of Conquest's appeal, and the full City Council subsequently agreed and denied Conquest's appeal.

87.     To further hinder, delay, and harm Urban, Conquest filed an additional abusive Petition for Peremptory Writ of Mandate with the California Superior Court in Los Angeles County styled *Conquest Student Housing, LLC et al v. City of Los Angeles*, California Superior Court, Central District of Los Angeles, Case No. BS 108488, that purports to challenge the Los Angeles City Council's denial of Conquest's appeal.  Conquest's Petition was filed for the primary, if not sole, purpose of further hindering and delaying the University Gateway Project.

88.     In addition to suing the CRA and the City of Los Angeles under CEQA for approving the University Gateway Project, the Conquest Defendants also recruited several third parties to sue the CRA and the City of Los Angeles, with virtually identical complaints, in order to create the misimpression that there was broader opposition to the University Gateway Project than what actually existed. These abusive challenges and appeals have delayed the University Gateway Project for at least two years.  The Conquest Defendants' abusive litigation tactics have inflicted — and will continue to inflict — millions of dollars in damages on Urban

1   and harm the overall private sector student housing market near USC by limiting

2   the availability of suitable student housing.

3   **5.      The Conquest Defendants Attacked Urban's Other Projects.**

4          89.      Urban has refused to give up the University Gateway Project, despite

5   the obstacles and delays caused by the Conquest Defendants' tactics.  In retaliation

6   and in a further attempt to coerce Urban to abandon the University Gateway Project,

7   the Conquest Defendants have embarked on a campaign to interfere with Urban's

8   development projects throughout the United States, even though Conquest has no

9   presence in the cities and areas in which many of Urban's projects are located.

10  Conquest also intended that its conduct would "make an example" out of Urban that

11  would deter any other potential developers from attempting to enter the USC

12  student housing market.

13          90.      In or around May 2006, the Conquest Defendants submitted Public

14  Records Act requests to municipalities across Southern California and the Western

15  United States where Urban was pursuing development projects, and demanded that

16  those municipalities produce, among other things, "any and all documents relating to

17  environmental review," "any and all documents relating to any discretionary

18  approval or contract," and "any and all documents relating in any manner to

19  financing or funding" of any development project which involved Urban in any way

20  including, without limitation, Urban's projects in (a) Burien, Washington, (b),

21  Mount Baker, Washington, (c) Kenmore, Washington, (d) Glendale, California (e)

22  Oxnard, California, (f) Culver City, California, (g) Wilshire Vermont Project, Los

23  Angeles, California, (h) Herald Examiner Project, Los Angeles, California, and (i)

24  Sun Valley, California.  (*See, e.g.,* Ex. 8)  These projects are independent of the

25  University Gateway Project and do not compete with Conquest's projects.

26          91.      The Conquest Defendants made the Public Records Act requests with

27  the improper purpose of interfering with Urban's relationships by harassing and

28  annoying those municipalities from whom Urban has obtained, or was in the process

- 23 -

SECOND AMENDED COMPLAINT

1  of obtaining, entitlements for its projects and to impede and delay the development

2  projects in those municipalities.

3      92.    For example, the City of Burien compiled and copied voluminous

4  documents responsive to the Conquest Defendants' requests at a cost of $10,000.

5  After the City of Burien compiled the documents, the Conquest Defendants told the

6  City that they no longer wanted the documents.  To protect its relationship with the

7  City of Burien, and to reimburse the City for its loss, Urban paid the City of Burien

8  $10,000 for the costs incurred in complying with the Conquest Defendants'

9  document requests.

10     93.    The Defendants have also launched a series of frivolous lawsuits and

11 administrative challenges against Urban's other projects spanning across Southern

12 California and the Western United States.

13 **A.    The Glenoaks Project**

14     94.    Urban (through its affiliate Urban Ventures Glenoaks II, LLC) and its

15 partner, Cityview Glenoaks, LLC ("Cityview"), are currently developing a project

16 located in Sun Valley, California (the "Glenoaks Project").  The Glenoaks Project

17 is a 51-unit condominium project that will provide workforce housing.

18     95.    The Glenoaks Project is approximately 21 miles from the nearest

19 Conquest housing development.  Conquest does not own any properties in Sun

20 Valley.  Although the Glenoaks Project does not compete with any of Conquest's

21 projects, the Conquest Defendants sought to delay, hinder, and destroy the Glenoaks

22 Project because Urban is one of the partners involved with the development.

23     96.    The Conquest Defendants first tried to incite nearby residents to sign a

24 petition objecting to the Glenoaks Project.  On September 4, 2006, Defendant Smith

25 met with various residents of a condominium complex located at 8641 Glenoaks

26 Boulevard, which is directly across the street from the Glenoaks Project, and

27 asked them to sign a petition objecting to the Glenoaks Project.  During this visit,

28 Smith met and spoke with Steve Strouth, the Secretary of the homeowners'

association of the condominium complex and asked Mr. Strouth to sign a petition opposing the Glenoaks Project.  Mr. Strouth declined.  (Declaration of Lucinda L. Travis (Ex. 9) at ¶¶ 3-4)

97.     Defendant Smith then met with Steve Inocente, another resident of the condominium complex and the Vice President of the homeowners' association. Defendant Smith asked Mr. Inocente to oppose the Glenoaks Project.  Defendant Smith gave Mr. Inocente his business card and told him to call John Henning, the Conquest Defendants' attorney, if he decided that he would oppose the project. When asked why Conquest was opposing the Glenoaks Project, Defendant Smith said "there was nothing other than the fact that he and Conquest Student Housing were seeking to keep their eyes on Urban Partners because of what Urban Partners did in downtown." (Declaration of Steve Inocente (Ex. 10) at ¶¶ 3-4)

98.     On or about September 8, 2006, Defendant Smith, acting on behalf of the Conquest Defendants, offered Mr. Strouth $1,500 to oppose the Glenoaks Project. (Travis Dec. (Ex. 9) at ¶¶ 5-6; Inocente Dec. (Ex. 10) at ¶ 5)

99.     In response to comments from the community, Urban substantially revised the plans for the Glenoaks Project.  As a result, the Glenoaks Project was approved with strong support from the community and Wendy Greuel, the City Council member representing Sun Valley.  The last approval that Urban needed from the City of Sun Valley was a tentative tract map.

100.    Although the Conquest Defendants had never appeared at any public hearings or expressed any objections to the Glenoaks Project prior to the public hearing for the approval of the tentative tract map, the Conquest Defendants suddenly appeared at the hearing and objected to the approval of the tentative tract map, even though Conquest owned no property in Sun Valley or anywhere near the Glenoaks Project.

101.    In September 2006, Conquest's representatives, including Conquest attorney Jack Rubens, told the managing director of Cityview, that Conquest

SECOND AMENDED COMPLAINT

1  opposed the Glenoaks Project solely because of Urban's involvement with the
2  project, and that Conquest planned to challenge all of Urban's projects in the United
3  States.

4      102.    The City's Deputy Advisory Agency subsequently rejected
5  Conquest's frivolous objection and approved the tentative tract map for the
6  Glenoaks Project.

7      103.    Because Conquest does not own any properties in Sun Valley, the
8  Conquest Defendants then conspired with Defendant Orellano to have Orellano join
9  in the Conquest Defendants' frivolous appeal of the Advisory Agency's approval
10  of the tract map for the project.

11      104.    The house in which Defendant Orellano rented a room is on the other
12  side of the I-5 Freeway from the Glenoaks Project located at 7912 Satsuma Avenue
13  (the "Sun Valley residence").  Defendant Orellano now lives several miles away in
14  North Hollywood, and has lived there for several months.  (Declaration of Bradley
15  Blankenship (Ex. 11) at ¶¶ 14-16)

16      105.    Although Defendant Orellano had never attended any public hearings
17  regarding the Glenoaks Project, Defendant Orellano, along with Conquest and
18  Defendant Smolinisky, improperly and frivolously appealed the Deputy Advisory
19  Agency's decision to the City Planning Commission ("CPC").

20      106.    Conquest and Defendant Smolinisky conceded in their appeal that the
21  only interest they had in opposing the Glenoaks Project was to stifle competition.
22  Their appeal stated: "Conquest faces the specter that new competitive projects more
23  proximate to [Conquest's] Rental Properties may be encouraged" and "[s]uch
24  projects would significantly increase the number of units in the market in which
25  Conquest competes for tenants, and would thus likely reduce the economic viability
26  of [Conquest's] Rental Properties."

27      107.    At a public hearing before the CPC on September 28, 2006,
28  Councilmember Greuel stated that Conquest's anti-competitive activity was

"disgraceful" and that she was "amazed that the group or the individual that appealed [the project was] not from the community and had no involvement in this project whatsoever." (Transcript of City of Los Angeles Planning Commission Regular Meeting on September 28, 2006 (Ex. 12) at 17-18) CPC President Jane Usher noted that Orellano and Smolinsky did not even bother to attend the hearing of their own appeals and described the Conquest Defendants' tactics as "distasteful." (*Id.* at 15-16, 19) President Usher and Councilmember Greuel went on to admonish Conquest's attorneys for abusing environmental legislation and wasting the Commission's time.

108.    Following the public hearing, the CPC unanimously denied Conquest's appeal and adopted detailed findings refuting its claims.

109.    Conquest and Orellano then improperly and frivolously appealed the CPC's decision to approve the tract map for the Glenoaks Project to the City Council.  The matter was heard before the PLUM Committee of the City Council on December 19, 2006.  Councilmember Greuel again spoke in strong support of the Glenoaks Project and again condemned Conquest's tactics, calling the appeal "unwarranted," "cynical," and "without merit." (Transcript of PLUM Commission hearing on December 19, 2006 (Ex. 13) at 6) Councilmember Greuel cited reports that Conquest had paid others to oppose the project and asked that Conquest's conduct be referred to the City Attorney's Office for investigation. (*Id.*)

110.    Councilmember Jack Weiss likewise found the representations made by Conquest at the hearing to be "troubling," "internally inconsistent," and "contradictory." (*Id.* at 26) Councilmember Weiss also questioned "whether the matter was brought in good faith to begin with." (*Id.*)

111.    The PLUM committee voted unanimously to deny the appeal, approve the project, and adopt the findings of the CPC.  On December 20, 2006, the full City Council adopted the PLUM Committee's decision, once again in a unanimous vote.

112.    Undeterred, Conquest and Orellano challenged the decision of the City Council by filing an improper and frivolous Petition for Writ of Mandate with the California Superior Court in Los Angeles County.

113.    Despite Orellano's move to North Hollywood, his attorney continued to represent to the Court that Orellano lived at the Sun Valley residence. Mr. Orellano's (and Conquest's) attorney represented to the California Superior Court, as recently as August 8, 2007, that Orellano lived at the Sun Valley residence.

114.    The Superior Court ruled in Urban's favor on the merits on September 20, 2007. (Court's Decision, Ex. 14)

115.    Each of these frivolous and abusive appeals has delayed the Glenoaks Project for months, and caused significant financial harm to Urban.

116.    Each of these frivolous and abusive appeals were intended by the Conquest Defendants to make Urban abandon the University Gateway Project.

**B.    The Verdugo Gardens Project**

117.    Urban is currently developing a 284-unit mixed use project known as Verdugo Gardens in downtown Glendale, California (the "Verdugo Gardens Project"). The Verdugo Gardens Project is independent of the University Gateway Project and does not compete with any Conquest project.

118.    Conquest does not own any properties in Glendale. Although the Verdugo Gardens Project does not compete with any of Conquest's projects, the Conquest Defendants sought to delay, hinder, and destroy Urban's Verdugo Gardens Project.

119.    In conjunction with Urban's development of the Verdugo Gardens Project, Urban entered into a consulting agreement with 17910 Burbank, LLC. Under the terms of the consulting agreement, Urban was to receive substantial compensation for its services.

120.    In order to hinder and destroy Urban's business, the Conquest Defendants began appearing and objecting to the Verdugo Gardens Project even

though they had no interest in the project. The Conquest Defendants did so by challenging the City of Glendale's Specific Plan, which affected not only the Verdugo Gardens Project but also a much larger area in the City of Glendale and a number of other developments within that area.

121.    The City of Glendale Planning Commission held a public hearing, overruled Conquest's frivolous objection, and approved the Specific Plan.

122.    The Conquest Defendants then improperly and frivolously appealed the decision of the Planning Commission to the Glendale City Council. On November 7, 2006, the Glendale City Council denied Conquest's frivolous appeal.

123.    The Conquest Defendants were undeterred. As they did in opposing the Glenoaks project, Conquest and Smolinisky filed an improper, frivolous, and abusive CEQA lawsuit that would further delay the Verdugo Gardens Project.

124.    The City of Glendale subsequently noticed the depositions of Conquest and Smolinisky to find out the bases, if any, for their claim of injuries allegedly arising out of the Specific Plan. In order to avoid appearing for the depositions, Conquest and Smolinisky admitted and stipulated to the following facts on April 10, 2007:

   a.    Smolinisky has never lived or worked within the City of Glendale.

   b.    Smolinisky does not own, lease, or manage any property within the City of Glendale.

   c.    Smolinisky does not pay any taxes, fees, or assessments to the City of Glendale.

   d.    Smolinisky has not announced any plans to acquire, own, develop, lease or manage any property within the City of Glendale.

   e.    Conquest's principal place of business is located in the City of Los Angeles, more than 7 miles south of the City of Glendale.

SECOND AMENDED COMPLAINT

1           f.     Conquest manages properties for companies which concentrate

2    on student housing around the campuses of USC and the University of California

3    Santa Barbara.

4           g.     Conquest does not operate any business within the City of

5    Glendale.

6           h.     Conquest does not own, lease, or manage any property within the

7    City of Glendale.

8           i.     Conquest does not pay any taxes, fees, or assessments to the City

9    of Glendale.

10          j.     Conquest has not announced any plans to acquire, own, develop,

11   lease, or manage any property within the City of Glendale.

12          k.     The only litigation that Conquest has filed challenging the

13   validity of a project or EIR involves the University Gateway Project, the Glenoaks

14   Project, and the Glendale Specific Plan covering the Verdugo Gardens Project, all of

15   which are being developed by Urban and its partners.

16          l.     Conquest did not challenge the Staples Center expansion project,

17   even though Conquest's business headquarters and student housing managed by

18   Conquest are located between 1 and 3 miles from the Staples Center.

19          m.     Conquest did not challenge the Grand Avenue Redevelopment

20   project even though Conquest's business headquarters and student housing managed

21   by Conquest are located between 3 and 5 miles from the Grand Avenue

22   Redevelopment project.

23        125.    On August 31, 2007, the Los Angeles Superior Court ruled in favor of

24   the City of Glendale on the merits of the Glendale Downtown Specific Plan, which

25   includes the Verdugo Gardens Project, and held that Defendant Smolinisky and

26   Defendant Conquest lacked standing to challenge Glendale land use decisions.

27   (Statement of Decision, Ex. 15)   The court concluded, among other things, that

28   "Defendant Conquest is not Sierra Club." (*Id.* at 2)

126.    The Conquest Defendants' improper and abusive challenges, appeals, and lawsuits caused, and are continuing to cause, unnecessary delays, which have resulted in substantial financial losses to Urban by, among other things, causing the loss of millions of dollars in benefits under Urban's consulting agreement with 17910 Burbank, LLC.

127.    Each of these improper and abusive challenges, appeals, and lawsuits were intended by the Conquest Defendants to make Urban abandon the University Gateway Project

### C.    The Herald Examiner Project

128.    The Hearst Corporation ("Hearst") currently owns three parcels of real property located in downtown Los Angeles, California (the "Herald Examiner Buildings"). Hearst entered into a letter of intent with Urban to form a management agreement, whereby Urban would develop Hearst's Herald Examiner Buildings.

129.    The Conquest Defendants discovered Urban's plan to assist Hearst with the development project and began a series of improper and frivolous challenges to the Herald Examiner Buildings development. The Conquest Defendants conspired with Defendant Baez to bring the challenges with the intent to strain Urban's relationship with Hearst by delaying the development of the Herald Examiner Buildings and to deter and destroy Urban's reputation and business.

130.    The Conquest Defendants opposed and appealed a Zoning Administrator's Interpretation ("ZAI") of the Los Angeles Municipal Code that affected the Herald Examiner Project, even though Conquest had no holdings near the project. On May 10, 2007, the City Planning Commission (CPC) held a hearing to consider Conquest's appeal of the ZAI. During that hearing, a representative from the mayor's office told the CPC that the mayor was "disturbed" by Conquest's appeal and "antagonistic antidevelopment attitude." Councilmember Jan Perry likewise stated on the record that she was "stunned and disappointed and disgusted" by Conquest's challenge to the Hearst project that "was filed to try to prevent the

Gateway project from being built and being in the market." CPC President Jane Usher stated that it was "a waste of time, money, and everyone's resources to be put through appeals" like Conquest's. After the CPC unanimously approved the Herald Examiner Project, including the ZAI, Conquest appealed the approvals.

131.    The Conquest Defendants contacted Hearst and asked questions about Urban's relationship with Hearst on the Herald Examiner Project and whether Urban had any ownership or other interest in the Herald Examiner Project. The Conquest Defendants, through their counsel Greg Yaris, told Harry O'Brien, counsel for Hearst, that Conquest's opposition to the Herald Examiner Project was due to Urban's involvement as development manager of the project and Conquest's desire to stop the unrelated University Gateway Project. In early 2007, Mr. O'Brien informed Mr. Yaris that Hearst had ended its relationship with Urban, and inquired whether the Conquest Defendants would end their opposition to the Herald Examiner Project. Mr. Yaris subsequently contacted Mr. O'Brien, told him that Conquest was not sure Hearst had ended its relationship with Urban, that Conquest believed that of "all the Urban projects" Conquest's challenge to the Herald Examiner Project had the most substance, and that Conquest would "go away" for $1,000,000.

132.    As a result of the Conquest Defendants' extortion and opposition to the project, Hearst terminated its relationship with Urban on that project.

**D.    The Kenmore Project**

133.    Urban is currently developing a project entitled Kenmore Village by the Lake, in Kenmore, Washington (the "Kenmore Project"). The Kenmore Project is independent of the University Gateway Project and does not compete with any Conquest project.

134.    Upon information and belief, Conquest does not own any properties and does not conduct any business in Kenmore, Washington. Although the Kenmore Project does not compete with any of Conquest's projects, the Conquest

Defendants sought to delay, hinder, and destroy Urban's Kenmore Project and interfere with Urban's relationship with the City of Kenmore.

135. To that end, the Conquest Defendants requested confidential documents, including Urban's tax returns, from various agencies in Kenmore connected with the Kenmore Project.

136. To protect its confidential information, Urban was forced to sue the City of Kenmore to enjoin the disclosure of its confidential documents, including Urban's tax returns.

137. Conquest then filed a motion to intervene in the lawsuit to compel the City of Kenmore to disclose and produce Urban's confidential documents, including Urban's tax returns, to Conquest.

138. In or around early February 2007, Urban's counsel noticed the depositions of Defendants Smolinisky and Chen to, among other things, ascertain why Conquest was seeking Urban's confidential documents, including Urban's tax returns, from the City of Kenmore where Conquest conducts no business. After Defendants Smolinisky and Chen refused to appear for their depositions, Urban filed a motion to compel. On February 21, 2007, the Washington Superior Court (Hon. Dean S. Lum presiding) granted Urban's motion to compel, ordered Defendants Smolinisky and Chen to appear for depositions, and imposed sanctions in the amount of $500.

139. Instead of complying with the Court's order and appearing for their depositions, Defendants Smolinisky and Chen filed a motion for protective order to prevent the depositions.

140. On March 15, 2007, Judge Lum denied Smolinisky's and Chen's motion for protective order, found Smolinisky and Chen in contempt of Court, and imposed additional sanctions in the amount of $250 against Smolinisky and Chen.

141. Defendants Smolinisky and Chen still refused to appear for depositions and instead filed an appeal of Judge Lum's orders.

SECOND AMENDED COMPLAINT

142.    The Court of Appeals in Washington refused to hear the appeal and let Judge Lum's ruling stand.  Instead of facing depositions as Judge Lum had ordered eight weeks earlier, Defendants Smolinisky and Chen dropped the underlying request and the lawsuit.   The Conquest Defendants' improper and abusive challenges, motions, and appeals caused unnecessary delays with the Kenmore Project, and have caused Urban to needlessly incur substantial financial losses.

143.    In February 2007, Defendant Smolinisky told USC officials that Conquest's challenges to other Urban projects were part of the strategy to kill the University Gateway Project and explained that it was much easier to tie a project up than to defend one.

## 6.    Conquest Threatened USC With Similar Abusive and Illegal Tactics.

144.    The neighborhood surrounding the USC campus is a place where diverse people from all socioeconomic backgrounds benefit from the presence of a major research university.

145.    USC cares deeply about the surrounding community and has worked for many years to ensure that the area keeps its unique character by engaging the community and seeking to create responsible development projects that will enhance the community.

146.    USC is in the midst of a historic change to being a fully residential campus.  As part of that transaction, USC will need to provide student housing for as many as 8,000 students on and nearby campus.  USC wants all students who desire to live near campus to have access to affordable, suitable housing.

147.    USC embraced the University Gateway Project as a way to enhance student living options while clustering housing along the Jefferson Boulevard and Figueroa Street corridors.  The University Gateway Project would help protect the residential portion of the USC neighborhood from haphazard conversion of single family residences to multiple-unit projects, and provide parking and transportation options that would help reduce congestion.

148.    The Conquest Defendants have obstructed USC's ability to secure responsible new housing sources for its students seeking to live nearby campus. The Conquest Defendants' actions and abusive legal challenges to the University Gateway Project have delayed a project that could already be serving more than 1,600 students as well as providing new retail options for the entire USC neighborhood.

149.    On March 9, 2007, and March 27, 2007, Defendant Smolinisky, Defendant Chen, and Greg Yaris (Conquest's attorney) told USC Associate Senior Vice President Kristina Raspe that Conquest's objections to the University Gateway Project were based solely on competition, and not because of any environmental issues or land use impacts.  (Dec. of Kristina Raspe (Ex. 16) at ¶¶ 3-4)  They also told her that Conquest's tactics of "tying-up" Urban's other projects had been a big success, and that Urban had "not broken ground on a project in a year because of the appeals and lawsuits."  (*Id.* at ¶ 4)  Defendant Smolinisky told Ms. Raspe that Conquest would continue this strategy of opposing Urban's projects until Urban abandoned the University Gateway Project.  (*Id.* at ¶ 4)

150.    The Conquest Defendants' statements demonstrate a clear intent to use the administrative appeals processes and court processes, including CEQA litigation, for Conquest's anti-competitive objectives rather than out of any concern over development issues, land use laws, or the environment.

151.    On April 18, 2007, Ms. Raspe discussed USC's Master Plan — a document USC is in the process of preparing to address the university's future development goals — with Yaris.  (*Id.* at ¶ 5)  Yaris, on behalf of the Conquest Defendants, threatened Ms. Raspe that if the Master Plan contained any new housing developments for students, Conquest would oppose the Master Plan and sue to block or delay its approval.  (*Id.* at ¶ 6)

SECOND AMENDED COMPLAINT

**7.     Conquest Is Actively Attempting to Acquire and Develop Additional Properties Near USC.**

152.    On April 23, 2007, Defendant Smolinisky, on behalf of Conquest, offered to purchase additional property from USC for development (somewhere between 1,406 – 1,621 new beds) including several single family homes with historic designations, Greek housing, and parking lots.  The prices offered for these parcels were substantially below market.    These actions directly contradict Conquest's claims that there is sufficient student housing for USC students, and that the University Gateway Project should not be approved because of a general parking shortage in and around the USC campus.  USC subsequently informed Conquest that it was not interested in selling the parcels of land proposed by Conquest.

153.    The Conquest Defendants have also attempted to extend their dominance and control over the private sector student housing market by purchasing or otherwise tying up additional properties that could be used to develop private sector student housing near USC through sham or abusive litigation, including but not limited to the Conquest Defendants' litigation against Woodland Management Corporation (Woodland), styled as *Vermont Ventures, LLC v. Woodland Management Corporation*, Los Angeles County Superior Court, Case No. BC373968.

154.    Woodland owns a parcel on which the United States Postal Service has a long-term lease and on which a functioning post office is currently located just across Vermont Avenue from the USC campus. (Declaration of John Stichman (Ex. 17) at ¶¶ 2-3)  Defendant Smolinisky and Vermont Ventures, LLC ("Vermont Ventures") negotiated to purchase the property from the owners for $4.4 million. (*Id*. at ¶ 11)  The terms of the purchase agreement provided that the property was to be purchased "as is" subject to the terms of the long term lease with no representations or warranties regarding its potential future uses. (*Id*. at ¶¶ 4-9)  After a purchase agreement was signed, but before the transaction closed, Defendant

Smolinisky and Vermont Ventures contacted the Postal Service to discuss re-negotiation or termination of the long term lease. (*Id.* at ¶ 10) These discussions were a violation of the purchase agreement. (*Id.*; Supplemental Declaration of John Stichman (Ex. 18) at ¶ 3) Defendant Smolinisky and Vermont Ventures sought to re-negotiate the terms of the lease by stating that the property was not worth their $4.4 million initial "as is" offer because of the existence of the long-term lease, even though it is undisputed that Defendant Smolinisky and Vermont Ventures knew about the lease before making their offer. Defendant Smolinisky and Vermont Ventures offered Woodland the alternative of accepting only $1.2 million or agreeing to an additional 18-month closing period. (Ex. 17 at ¶ 11)

155.   On June 19, 2007, Defendant Smolinisky called to pressure John Stichman of Woodland into accepting the $3.2 million price reduction. (Ex. 18 at ¶ 10) Defendant Smolinisky threatened Stichman that "if [he] would not agree to either proposal, [Defendant Smolinisky] could tie up Woodland's Property through litigation for at least 18 months, if not years." (*Id.*)

156.   After Woodland refused, Defendant Smolinisky and Vermont Ventures sued Woodland for, among other things, breach of the sale agreement, fraud, and injunctive relief. On July 17, 2007, Defendant Smolinisky and Vermont Ventures filed a Notice of Lis Pendens on the property.

157.   Woodland subsequently filed a Motion to Expunge the Lis Pendens. On September 27, 2007, the Court granted Woodland's Motion to Expunge the Lis Pendens and awarded Woodland $25,217.66 in attorneys' fees against Defendant Smolinisky and Vermont Ventures.

158.   Plaintiffs anticipate that many more such examples will be uncovered as discovery in this matter progresses.

SECOND AMENDED COMPLAINT

# FIRST CAUSE OF ACTION

## (Monopolization in Violation of Section 2 of the Sherman Act by all Plaintiffs Against the Conquest Defendants)

159.     Paragraphs 1 through 158 are re-alleged and reincorporated herein.

160.     The Conquest Defendants possess monopoly power over suitable student housing within walking distance of the USC campus that is allocated through the private sector student housing market (the "relevant market"). The Conquest Defendants themselves have defined this market as "Adams Street on the north, Figueroa on the east, and Vermont on the west." Further, the Conquest Defendants have defined this market using a detailed map of this area and have openly stated they "dominate and control" it.

161.     Plaintiffs, the Conquest Defendants, consumers of student housing, the real estate development industry around USC, and the community at large recognize the existence of the relevant market as the area of effective competition for the providers of suitable private sector student housing due to the high demand and desirability of housing by USC students who wish to live near campus.

162.     The Conquest Defendants possess at a minimum a 40% share and up to a 70% share of the relevant market.

163.     Students who want to live within walking distance of the USC campus have few choices of private sector student housing other than housing owned and/or operated by the Conquest Defendants. There are no other goods or services outside the relevant market that are reasonably interchangeable with housing within the relevant market.

164.     The Conquest Defendants have actually exercised control and monopoly power over the relevant market by engaging in unfair, unlawful, and fraudulent business practices, including but not limited to initiating or threatening to initiate sham CEQA and entitlement litigation that will prevent or delay the development of new housing within the relevant market. These lawsuits and threats

1    of lawsuits against, among others, Urban, TMG, and FPM, are the means by which
2    the Conquest Defendants actually control the supply of available housing and have
3    resulted in the maintenance of supracompetitive prices for housing within the
4    relevant market.

5         165.    These lawsuits and threats of lawsuits and their anti-competitive
6    effects on the relevant market—including excluding competitors such as Urban,
7    TMG, and FPM from participation in the relevant market—and the consumers
8    within the relevant market, are direct evidence of the actual monopoly power
9    wielded by the Conquest Defendants.   The Conquest Defendants admit they
10   "dominate and control" the student housing market.

11        166.    These lawsuits and threats of lawsuits represent a significant
12   barrier to entry to the relevant market for any new competitor such as Urban,
13   TMG, and FPM, and are a barrier to entry that was not faced by the Conquest
14   Defendants when they entered the relevant market.

15        167.    No existing competitor of the Conquest Defendants in the relevant
16   market has sufficient available inventory of housing to increase its output of
17   housing in the short run to have any impact on the Conquest Defendants'
18   monopoly power and their ability to exclude competition, maintain
19   supracompetitive prices, and exercise control over the relevant market.   There
20   are presently no new student housing projects under construction that would
21   compete within the relevant market.   Defendants have made clear their intent to
22   prevent development of any additional student housing not owned or operated by
23   Conquest.

24        168.    Other existing competitors within the relevant market are relatively
25   small and fragmented such that the Conquest Defendants' monopoly power is
26   augmented by the lack of existence of any large competitor that may challenge
27   the Conquest Defendants' within the relevant market.   Indeed, no existing
28   competitor providing housing within the relevant market has a market share that

- 39 -
SECOND AMENDED COMPLAINT

is more than 1/3 of the market share of Conquest.   Most competitors are insignificant in comparison and possess a very small share of the relevant market.

169.   The Conquest Defendants have excluded and attempted to exclude competitors such as Urban, TMG, and FPM based on something other than their market efficiency; indeed, much of the Conquest Defendants' conduct can only be viewed as remotely rational when viewed in light of its obviously anti-competitive effects.

170.   The Conquest Defendants have willfully acquired and maintained their monopoly in the relevant market.   The Conquest Defendants' acts have prevented or suppressed competition, and continue to prevent or suppress competition, and these acts have permitted the Conquest Defendants to maintain their dominant and monopolistic market position and price control in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

171.   As a direct and proximate result of the Conquest Defendants' anti-competitive activities in violation of Section 2 of the Sherman Act, Plaintiffs Urban and Gateway have suffered business injuries and/or loss of property by, among other things, threats to their projects, loss of goodwill, significant lost profits, a loss of revenue that will impact prices paid by consumers for the Urban projects, and significant cost overruns due to delays in construction of the projects.   Plaintiffs Urban and Gateway have suffered, and will continue to suffer, irreparable harm if the Conquest Defendants are not enjoined from engaging in their anti-competitive conduct.

172.   As a direct and proximate result of the Conquest Defendants' anti-competitive activities in violation of Section 2 of the Sherman Act, Plaintiff USC has suffered business injuries and/or loss of property by, among other things, damage in an amount to be determined at trial as a result of its ownership and leasehold interest in the University Gateway Project, delays in the construction of

SECOND AMENDED COMPLAINT

the new USC bookstore and fitness center, threats to implementation of its master plan, and loss of recruiting opportunities with its potential students.  The Conquest Defendants' anti-competitive activities also have obstructed USC's ability to secure responsible, suitable new housing sources for its students seeking to live nearby campus.  Plaintiff USC has suffered, and will continue to suffer, irreparable harm if the Conquest Defendants are not enjoined from engaging in their anti-competitive conduct.

173.    The Conquest Defendants' unlawful conduct has also caused, and continues to cause, among other things, increased prices to USC students due to the lack of meaningful market competition, reduced competition and reduced supply due to the availability of fewer student housing units, and blocked entry or reduced desirability of entry into the relevant market of Plaintiffs and others, including but not limited to Urban, TMG, and FPM, that are or would be competitors of the Conquest Defendants in the relevant market.  Plaintiff USC has suffered, and will continue to suffer, irreparable harm if the Conquest Defendants are not enjoined from engaging in their anti-competitive conduct.

174.    As a proximate result of the wrongful acts herein alleged, Plaintiffs have been damaged in an amount to be determined at trial.

175.    Plaintiffs are also entitled to recover treble damages, costs of suit, and attorneys' fees.

## SECOND CAUSE OF ACTION

### (Attempted Monopolization in Violation of Section 2 of the Sherman Act by All Plaintiffs Against the Conquest Defendants)

176.    Paragraphs 1 through 175 are re-alleged and reincorporated herein.

177.    Plaintiff Urban and others, including TMG and FPM, compete or have attempted to compete against the Conquest Defendants in the relevant market.

SECOND AMENDED COMPLAINT

178.    The Conquest Defendants have a dominant presence in the relevant market and possess at a minimum a 40% share and up to a 70% share of the relevant market.

179.    By virtue of the Conquest Defendants' threats, statements, behavior, conduct, acts, and omissions to prevent Plaintiffs', TMG's, and FPM's entry into the relevant market, the Conquest Defendants have a specific intent to control prices and destroy competition within the relevant market by the conduct described in this Second Amended Complaint.  The Conquest Defendants' statements, behavior, conduct, acts, and omissions, affirmatively demonstrate their specific intent to control prices and destroy competition in the relevant market.  The Conquest Defendants admit they "dominate and control" the student housing market.

180.    The Conquest Defendants have engaged in predatory or anti-competitive conduct by, among other things attacking Urban, TMG, and FPM, with the objective of obtaining a monopoly by controlling prices and/or destroying competition in the relevant market and to maintain their dominant market position.

181.    The Conquest Defendants' intent, power, and resources create a dangerous probability that they will succeed in monopolizing the relevant market. Indeed, the Conquest Defendants unilateral anti-competitive conduct, and the exclusionary intent that is evident in the Conquest Defendants' conduct and statements, including but not limited to its conduct against Urban, TMG, and FPM, poses such a danger to competition that, if left alone, will result in the Conquest Defendants' acquisition of monopoly power.

182.    The Conquest Defendants have violated, and continue to violate, Section 2 of the Sherman Act, 15 U.S.C. § 2.

183.    As a direct and proximate result of the Conquest Defendants' anti-competitive activities in violation of Section 2 of the Sherman Act, Plaintiffs Urban and Gateway have suffered business injuries and/or loss of property by, among other things, threats to their projects, loss of goodwill, significant lost profits, a loss of

revenue that will impact prices paid by consumers for the Urban projects, and significant cost overruns due to delays in construction of the projects. Plaintiffs Urban and Gateway have suffered, and will continue to suffer, irreparable harm if the Conquest Defendants are not enjoined from engaging in their anti-competitive conduct.

184.   As a direct and proximate result of the Conquest Defendants' anti-competitive activities in violation of Section 2 of the Sherman Act, Plaintiff USC has suffered business injuries and/or loss of property by, among other things, damage in an amount to be determined at trial as a result of its ownership and leasehold interest in the University Gateway Project, delays in the construction of the new USC bookstore and fitness center, threats to implementation of its master plan, and loss of recruiting opportunities with its potential students. The Conquest Defendants' anti-competitive activities also have obstructed USC's ability to secure responsible, suitable new housing sources for its students seeking to live nearby campus. Plaintiff USC has suffered, and will continue to suffer, irreparable harm if the Conquest Defendants are not enjoined from engaging in their anti-competitive conduct.

185.   The Conquest Defendants' unlawful conduct has also caused, and continues to cause, among other things, a loss of revenue due to unlawful delays that will impact prices paid by consumers for the Urban projects, increased prices to USC students due to the lack of meaningful market competition, reduced competition and reduced supply due to the availability of fewer student housing units, and blocked entry or reduced desirability of entry into the relevant market of Plaintiffs and others, including but not limited to Urban, TMG, and FPM, that are or would be competitors of the Conquest Defendants in the relevant market.

186.   As a proximate result of the wrongful acts herein alleged, Plaintiffs have been damaged in an amount to be determined at trial.

187.     Plaintiffs are entitled to recover treble damages, costs of suit, and attorneys' fees.

### THIRD CAUSE OF ACTION

**(Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act by All Plaintiffs Against All Defendants)**

188.     Paragraphs 1 through 187 are re-alleged and reincorporated herein.

189.     Defendants knowingly and willfully conspired among themselves and others to monopolize the relevant market.

190.     The Conquest Defendants possess at a minimum a 40% share and up to a 70% share of the relevant market.

191.     Defendants' specific intent to monopolize the relevant market is apparent from the character of the Defendants' conduct and their actions as alleged in the Second Amended Complaint.

192.     Defendants committed overt acts and engaged in other conduct pursuant to, and in furtherance of, the conspiracy.  Defendants have engaged in predatory conduct and anti-competitive conduct directed toward achieving the objective of controlling prices and destroying competition in the relevant market.

193.     Defendants did the acts and things alleged in this Second Amended Complaint pursuant to, and in furtherance of, the conspiracy.  By virtue of Defendants' statements, behavior, conduct, overt acts, and omissions to prevent or substantially delay Plaintiffs' entry into the market, Defendants have the specific intent to control prices and monopolize the relevant market.

194.     Recent overt acts in pursuit of the above-described conspiracy occurred when the Conquest Defendants, through counsel, recently communicated to USC that Conquest would oppose any Master Plan that included student housing, which would threaten Conquest's monopoly, and Conquest's attack on TMG in May of 2007, which resulted in TMG abandoning its private sector student-housing project and Conquest's attack on FPM in August of 2007.  Defendants' conspiracy is ongoing, and includes

recent retaliatory legal and other actions taken against Urban development projects for the primary, if not sole, purpose of improperly making Urban abandon the University Gateway Project and other potential market competitors abandon their plans to enter the relevant market.

195.    As a direct and proximate result of Defendants' anti-competitive activities in violation of Section 2 of the Sherman Act, Plaintiffs Urban and Gateway have suffered business injuries and/or loss of property by, among other things, threats to their projects, loss of goodwill, significant lost profits, a loss of revenue that will impact prices paid by consumers for the Urban projects, and significant cost overruns due to delays in construction of the projects.  Plaintiffs Urban and Gateway have suffered, and will continue to suffer, irreparable harm if Defendants are not enjoined from engaging in their anti-competitive conduct.

196.    As a direct and proximate result of the Conquest Defendants' anti-competitive activities in violation of Section 2 of the Sherman Act, Plaintiff USC has suffered business injuries and/or loss of property by, among other things, damage in an amount to be determined at trial as a result of its ownership and leasehold interest in the University Gateway Project, delays in the construction of the new USC bookstore and fitness center, threats to implementation of its master plan, and loss of recruiting opportunities with its potential students.  Defendants' anti-competitive activities also have obstructed USC's ability to secure responsible, suitable new housing sources for its students seeking to live nearby campus. Plaintiff USC has suffered, and will continue to suffer, irreparable harm if the Conquest Defendants are not enjoined from engaging in their anti-competitive conduct.

197.    Defendants' unlawful conduct has also caused, and continues to cause, among other things, a loss of revenue due to unlawful delays that will impact prices paid by consumers for the Urban projects, increased prices to USC students due to the lack of meaningful market competition, reduced competition and reduced

supply due to the availability of fewer student housing units, and blocked entry or reduced desirability of entry into the relevant market of Plaintiffs and others, including but not limited to Urban, TMG, and FPM, that are or would be competitors of the Conquest Defendants in the relevant market.

198.    As a proximate result of the wrongful acts herein alleged, Plaintiffs have been damaged in an amount to be determined at trial.

199.    Plaintiffs are entitled to recover treble damages, costs of suit, and attorneys' fees.

## FOURTH CAUSE OF ACTION

### (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), by Plaintiffs Urban and Gateway Against All Defendants)

200.    Paragraphs 1 through 199 are re-alleged and reincorporated herein.

201.    Plaintiffs Urban and Gateway are each "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

202.    All of the companies that Smolinisky and/or Chen own, operate, manage, or control, including but not limited to Conquest and its subsidiaries and affiliated entities, constitute an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Conquest Enterprise"). The Conquest Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

203.    Defendants Conquest, Chen, Smolinisky, Smith, Orellano, and Baez, and the University Park Community Association are each "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who are employed by and/or associated with the Conquest Enterprise.

204.    From January 1, 2005 until the present, the "persons" identified in Paragraph 203 conducted, participated in, engaged in, conspired to engage in, and/or aided and abetted the conduct of the affairs of the Conquest Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1),

1    1961(5), and 1962(c).   The predicate acts constituting the pattern of unlawful

2    activity engaged in by the "persons" identified in Paragraph 203 constitute:

3            a.      Extortion, as defined in 18 U.S.C. § 1961(1)(B) and 18 U.S.C. §

4    1951, including but not limited to:

5                    i.      The litigation and related conduct described above

6    beginning in late 2005 and continuing to the present, in which Conquest, Chen,

7    Smolinsky, Smith, and one or more other of the "persons" identified in Paragraph

8    203 threatened to block and/or delay all Urban development projects including, but

9    not limited to, threatening to initiate and actually initiating unfounded CEQA and/or

10   entitlement litigation if Urban and Gateway continued their efforts to develop the

11   University Gateway Project.  Urban's and Gateway's fear of economic loss from the

12   extortion is reasonable.  This extortion affected and obstructed interstate commerce;

13                   ii.     The threats and statements described above made to FPM

14   and TMG during May and August of 2007, including, but not limited to, threatening

15   to prolong TMG's entitlement process to the maximum extent possible, threatening

16   to slow down TMG's entitlement process, threatening to spend between $1.3 and

17   $1.6 million to prevent the TMG project, threatening to delay the TMG project for

18   six or more years, threatening to make it impossible for FPM to develop its proposed

19   development, and threatening to use CEQA to block FPM's proposed development.

20   This extortion affected and obstructed interstate commerce;

21                   iii.    The threats described above that were made to USC during

22   March and April 2007 regarding USC's master plan and development of student

23   housing.  This extortion affected and obstructed interstate commerce;

24                   iv.     The threats and statements described above to USC, TMG,

25   and FPM during 2007 regarding Conquest's intention and actions to stop the

26   University Gateway Project; Urban's and Gateway's fear of economic loss from the

27   extortion is reasonable.  This conduct occurred as recently as August 7, 2007; and

28

- 47 -

SECOND AMENDED COMPLAINT

1            v.    Upon information and belief, additional acts of extortion

2    were engaged in by one or more of the "persons" identified in Paragraph 203

3    beginning on or after January 1, 2004.   Information regarding each of these

4    additional separate acts of extortion and the identity of the persons engaging in those

5    violations is disguised and is entirely within the custody and control of the

6    Defendants.

7            b.    Mail fraud, as defined in 18 U.S.C. § 1961(1)(B) and 18 U.S.C. §

8    1341, including but not limited to, one or more of the "persons" identified in

9    Paragraph 203 engaged in a scheme and artifice to defraud using the U.S. mails in

10   interstate commerce in or around January 2006 to circulate a brochure that made

11   false and misleading factual representations about the size and scope of the

12   University Gateway Project.   Urban and Gateway received that brochure through

13   3245 S. Figueroa Street, Los Angeles, CA, 9007, one of the physical addresses on

14   which the University Gateway Project will be developed.   The brochures also were

15   mailed to USC students and the general public living in the area near USC.   The

16   scheme and artifice to defraud was specifically designed to defraud students and

17   others and to obtain their property, including student rents, that were to be directed

18   to the Conquest Enterprise's projects.   Upon information and belief, one or more of

19   the "persons" identified in Paragraph 203 made additional uses of the U.S. mails to

20   circulate materially false and misleading information and/or documents about the

21   University Gateway Project.   The information regarding those additional mail fraud

22   violations and the identity of the persons engaging in those violations is disguised

23   and entirely within the custody and control of the Defendants;

24           c.    Wire fraud, as defined in 18 U.S.C. § 1961(1)(B) and 18 U.S.C. §

25   1343, including, but not limited to, one or more of the "persons" identified in

26   Paragraph 203 created a web-site in or around August 2005 that contained false and

27   misleading factual representations about the size and scope of the University

28   Gateway Project that were communicated to Urban, Gateway, USC students, and the

general public via the Internet.  One or more of the "persons" identified in Paragraph 203 engaged in efforts to disseminate the fraudulent representations through interstate commerce by, among other things, using a billboard to encourage Urban, Gateway, USC, USC students, and the general public to view the website.  The website was accessible to Urban and Gateway and they did, in fact, view the website.  USC students and the general public also viewed the website.  The scheme and artifice to defraud was specifically designed to defraud students and others to obtain their property, including student rents, that were to be directed to the Conquest Enterprise's projects.  Upon information and belief, one or more of the "persons" identified in Paragraph 203 made additional Internet postings, facsimile transmissions, telephone calls, or other uses of wires containing materially false and misleading information and/or documents about the University Gateway Project.  The information regarding each of these additional wire fraud violations and the identity of the persons engaging in those violations is disguised and entirely within the custody and control of the Defendants; and

   d. Copyright Infringement, as defined in 18 U.S.C. § 1961(1)(B), 18 U.S.C. § 2319, and 17 U.S.C. § 506, including, but not limited to, the fact that one or more of the "persons" identified in Paragraph 203 improperly obtained a copy of Urban's Confidential Offering Memorandum without Urban's consent and improperly reproduced, displayed, distributed and publicized a copy of that memorandum by filing a copy of it with the City of Los Angeles for the purpose of obtaining a commercial advantage and/or private financial gain.

  205. All of the predicate acts described herein occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

  206. All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the "persons" identified in Paragraph 203 engaged in the predicate acts over a substantial period of time and such predicate acts have become their regular way of conducting business, and these

business practices will continue indefinitely into the future unless restrained by this Court. Specifically, the "persons" identified in Paragraph 203 knowingly violated the extortion, mail and wire fraud statutes and other statutes discussed in the preceding paragraphs in connection with their illegal schemes. Each of these acts constitutes a separate and distinct racketeering activity, as defined in 18 U.S.C. § 1961(a).

207. The "persons" identified in Paragraph 203 have engaged in numerous illegal acts in connection with their fraudulent schemes, as described in the preceding paragraphs. Those illegal acts constitute predicate acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and were perpetrated for the same or similar purpose, and had similar results, participants, victims, and methods of communication.

208. As a direct and proximate result of, and by reason of the activities of the "persons" identified in Paragraph 203, and their conduct in violation of 18 U.S.C. §1962(c), Plaintiffs Urban and Gateway have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c). The above-described actions were taken with the specific intent and for the purpose of carrying out their scheme and artifice to defraud and to conduct or participate in the affairs of the Conquest Enterprise, including but not limited to deterring Urban from entering the relevant market (as defined in Paragraph 160) and for the Conquest Defendants to obtain and maintain their monopoly. These acts are capable of repetition. Furthermore, the predicate acts aimed at TMG, FPM, USC, and Urban was done specifically to prevent construction of the University Gateway Project, and any other project that would compete with the Conquest Defendants and/or the Conquest Enterprise.

209. As a result of these predicate acts and other conduct, Urban and Gateway have been injured in their business or property, having suffered, among other things, threats to their projects, significant lost profits, lost goodwill, and significant cost overruns due to delays in construction of the projects.

210.    Plaintiffs Urban and Gateway are entitled to recover treble the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## FIFTH CAUSE OF ACTION

**(Racketeer Influenced and Corrupt Organizations Act; 18 U.S.C. § 1962(c), by Plaintiffs Urban and Gateway Against All the Defendants)**

211.    Paragraphs 1 through 210 are re-alleged and reincorporated herein.

212.    Conquest and its subsidiaries and affiliated entities, Smolinisky, Chen, Smith, Orellano, and Baez—together with certain entities and individuals associated with them, including all of the companies that Smolinisky and/or Chen own, operate, manage, or control, www.stopuniversitygateway.com, and/or University Park Community Association—constitute a group associated in fact with respect to the unlawful conduct alleged herein and therefore constitute an "enterprise," which is engaged in, or whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Conquest Association Enterprise").    The Conquest Association Enterprise is an informal entity with the common goal of monopolizing the relevant market (as defined in Paragraph 160) through improper means, including extortion, mail and wire fraud, and copyright infringement, done to deter Urban, USC and others, from entering the relevant market, and for the Conquest Defendants to obtain and maintain their monopoly, using the existing corporate structure for controlling and directing the affairs of the enterprise on an ongoing basis.    The Conquest Association Enterprise is an ongoing organization with a consensual decision-making structure, which is characterized by overlapping and interlocking ownership, directorship, and management.    The Conquest Association Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

SECOND AMENDED COMPLAINT

213.    Conquest and its subsidiaries and affiliated entities, Chen, Smolinisky, and Smith are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with the Conquest Association Enterprise.

214.    From January 1, 2005 until the present, the "persons" identified in Paragraph 213 conducted, participated in, engaged in, conspired to engage in, and/or aided and abetted the conduct of the affairs of the Conquest Association Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).   The predicate acts constituting the pattern of unlawful activity engaged in by the "persons" identified in Paragraph 213 include those set forth in Paragraph 204 above.

215.    All of the predicate acts described herein occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

216.    All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the "persons" identified in Paragraph 213 engaged in the predicate acts over a substantial period of time and such predicate acts have become their regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained by this Court.  Specifically, the "persons" identified in Paragraph 213 knowingly violated the extortion, mail and wire fraud statutes and other statutes discussed in the preceding paragraphs in connection with their illegal schemes.  Each of these acts constitutes a separate and distinct racketeering activity, as defined in 18 U.S.C. § 1961(a).

217.    The "persons" identified in Paragraph 213 have engaged in numerous illegal acts in connection with their fraudulent schemes, as described in the preceding paragraphs.  Those illegal acts constitute predicate acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and were perpetrated for the same or similar purpose, and had similar results, participants, victims, and methods of communication.

218.     As a direct and proximate result of, and by reason of the activities of the "persons" identified in Paragraph 213, and their conduct in violation of 18 U.S.C. §1962(c), Plaintiffs Urban and Gateway have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).  The above-described actions were taken, among other purposes described herein, with the specific intent and for the purpose of carrying out their scheme and artifice to defraud and to conduct or participate in the affairs of the Conquest Association Enterprise.  These acts are capable of repetition.  Furthermore, the predicate acts aimed at TMG, FPM, USC and Urban was done specifically to prevent construction of the University Gateway Project, and any other project that would compete with the Conquest Defendants and/or the Conquest Association Enterprise.

219.     As a result of these predicate acts and other conduct, Urban and Gateway have been injured in their business or property, having suffered, among other things, threats to their projects, significant lost profits, lost goodwill, and significant cost overruns due to delays in construction of the projects.

220.     Urban and Gateway are entitled to recover treble the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

### SIXTH CAUSE OF ACTION

### (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(b), by Plaintiffs Urban and Gateway Against Defendants Smolinisky and Chen)

221.     Paragraphs 1 through 220 are re-alleged and reincorporated herein.

222.     The Conquest Enterprise defined in Paragraph 202 constitutes an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b).  The Conquest Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

223.    Additionally, or in the alternative, the Conquest Association Enterprise defined in Paragraph 212 constitutes a group associated in fact with respect to the unlawful conduct alleged herein and therefore constitutes an "enterprise" that is engaged in, or whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b).   The Conquest Association Enterprise is an informal entity with the common goal of monopolizing the relevant market (as defined in Paragraph 160) through improper means, including extortion, mail and wire fraud, and copyright infringement, done solely to deter Urban, USC and others, from entering the relevant market, and for the Conquest Defendants to obtain and maintain their monopoly, using the existing corporate structure for controlling and directing the affairs of the enterprise on an ongoing basis.   The Conquest Association Enterprise is an ongoing organization with a consensual decision-making structure, which is characterized by overlapping and interlocking ownership, directorship, and management.   The Conquest Association Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

224.    Smolinisky, Chen, and certain other individuals or entities to be identified are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(b), who have acquired or maintained an interest in or control of the Conquest Enterprise and/or the Conquest Association Enterprise through a pattern of racketeering activity.   For example, but not by way of limitation, Smolinisky and Chen have acquired or maintained an interest in or control of the Conquest Enterprise and/or the Conquest Association Enterprise in that they are principals of Conquest and its subsidiaries and affiliates.

225.    From January 1, 2005 until the present, the "persons" identified in Paragraph 224 acquired or maintained an interest in or control of the Conquest Enterprise and/or the Conquest Association Enterprise through a pattern of racketeering activity that affects interstate commerce within the meaning of 18

U.S.C. §§ 1961(1), 1961(5), and 1962(b). The predicate acts constituting the pattern of unlawful activity engaged in by the "persons" identified in Paragraph 224 include those set forth in Paragraph 204 above.

226. All of the predicate acts described herein occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

227. All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the "persons" identified in Paragraph 224 engaged in the predicate acts over a substantial period of time and such predicate acts have become their regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained by this Court. Specifically, the "persons" identified in Paragraph 224 knowingly violated the mail and wire fraud statutes and other statutes discussed in the preceding paragraphs in connection with their illegal schemes. Each of these acts constitutes a separate and distinct "racketeering activity," as defined in 18 U.S.C. § 1961(a).

228. The "persons" identified in Paragraph 224 engaged in numerous illegal acts in connection with their fraudulent schemes as described in the preceding paragraphs. Those illegal acts constitute predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) and were perpetrated for the same or similar purpose, and had similar results, participants, victims, and methods of communication.

229. As a direct and proximate result of, and by reason of the racketeering activities of the "persons" identified in Paragraph 224, and their conduct in violation of 18 U.S.C. §1962(b), Gateway and Urban have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c). The "persons" identified in Paragraph 224, through the conduct described above, acquired, maintained and exercised control over the Conquest Enterprise and/or the Conquest Association Enterprise. The above-described actions were taken, among other purposes described herein, with the specific intent and for the purpose of carrying out their

scheme and artifice to defraud and to acquire or maintain and interest in or control of the Conquest Enterprise and/or the Conquest Association Enterprise. These acts are capable of repetition. Furthermore, the predicate acts aimed at TMG, FPM, USC and Urban was done specifically to prevent construction of the University Gateway Project, any other project that would compete with the Conquest Defendants, the Conquest Enterprise and/or the Conquest Association Enterprise.

230. As a result of these predicate acts and other conduct, Urban and Gateway have been injured in their business or property, having suffered, among other things, threats to their projects, significant lost profits, lost goodwill, and significant cost overruns due to delays in construction of the projects.

231. Gateway and Urban are entitled to recover treble the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## SEVENTH CAUSE OF ACTION

**(Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a), by Plaintiffs Urban and Gateway Against Defendants Conquest, Smolinisky, and Chen)**

232. Paragraphs 1 through 231 are re-alleged and reincorporated herein.

233. The Conquest Enterprise defined in Paragraph 202 constitutes an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a). The Conquest Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

234. Additionally, or in the alternative, the Conquest Association Enterprise defined in Paragraph 212 constitutes a group associated in fact with respect to the unlawful conduct alleged herein and therefore constitutes an "enterprise" which is engaged in, or whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a). The Conquest Association

Enterprise is an informal entity with the common goal of monopolizing the relevant market (as defined in Paragraph 160) through improper means, including extortion, mail and wire fraud, and copyright infringement, done solely to deter Urban, USC and others, from entering the relevant market, and for the Conquest Defendants to obtain and maintain their monopoly, using the existing corporate structure for controlling and directing the affairs of the Conquest Association Enterprise on an ongoing basis.  The Conquest Association Enterprise is an ongoing organization with a consensual decision-making structure, which is characterized by overlapping and interlocking ownership, directorship, and management.    The Conquest Association Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

235.    Conquest, Smolinisky, Chen, and certain other individuals or entities to be identified are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(a) who received income derived from a pattern of racketeering activity and have used or invested all or part of that income, or its proceeds, in the acquisition of any interest in or the establishment or operation of the Conquest Enterprise and/or the Conquest Association Enterprise.  The Conquest Enterprise and the Conquest Association Enterprise are in engaged in interstate commerce and/or the activities affect interstate commerce.  For example, but not by way of limitation, Smolinisky and Chen have acquired or maintained an interest in or control of the Conquest Enterprise and/or the Conquest Association Enterprise in that they are principals of Conquest and its subsidiaries and affiliates.

236.    From January 1, 2005 until the present, the "persons" identified in Paragraph 235 have received income derived from a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(a) and have used or invested all or part of that income, or its proceeds, in the acquisition of any interest in or the establishment or operation of the Conquest Enterprise and/or the Conquest Association Enterprise.

SECOND AMENDED COMPLAINT

i.      The income obtained by the "persons" identified in Paragraph 235 has resulted from the pattern of racketeering activity described herein, including, but not limited to, income received as a result of charging and/or maintaining supracompetitive prices within the relevant market (as defined in Paragraph 160) through blocking the development projects of competing developers through a pattern of extortion, mail fraud, wire fraud, and copyright infringement.

ii.     The income obtained that has been used or invested in the operations of the Conquest Enterprise and/or the Conquest Association Enterprise, upon information and belief, includes, but is not limited to, the funds that have been used to finance some or all of the Conquest Enterprise's and/or the Conquest Association Enterprise's activities described herein, including managing and conducting the ongoing affairs of these enterprises, purchasing and circulating flyers, creating websites and billboards, threatening the Plaintiffs and third parties in personal meetings and through written correspondence, and initiating and maintaining sham litigation and administrative challenges.

iii.    By way of example, Defendant Smolinisky specifically told TMG that $1.3 to $1.6 million dollars would be spent to prevent the TMG project.  Defendants made essentially the same threats to FPM in attempting to intimidate FPM from proceeding with its development project.

iv.    The "persons" defined in Paragraph 235 have used some or all of this racketeering income to attempt to prevent development of the University Gateway Project, Urban's other development projects (such as the Verdugo Gardens Project, the Glenoaks Project, and the Kenmore Project), TMG's project, and FPM's project.

v.      Other income, or its proceeds, derived from a pattern of racketeering activity has been used or invested in the acquisition of any interest in or the establishment or ongoing operation of the Conquest Enterprise and/or the Conquest Association Enterprise.

237.   The activities of the Conquest Enterprise and/or the Conquest Association Enterprise affect interstate commerce.  The predicate acts constituting the pattern of unlawful activity engaged in by the "persons" identified in Paragraph 235 include those set forth in Paragraphs 204 above.

238.   All of the predicate acts described herein occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

239.   All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the "persons" identified in Paragraph 235 engaged in the predicate acts over a substantial period of time and such predicate acts have become their regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained by this Court.  Specifically, the "persons" identified in Paragraph 235 knowingly violated the extortion, mail and wire fraud statutes and other statutes discussed in the preceding paragraphs in connection with their illegal schemes.  Each of these acts constitutes a separate and distinct "racketeering activity," as defined in 18 U.S.C. § 1961(a).

240.   The "persons" identified in Paragraph 235 engaged in numerous illegal acts in connection with their fraudulent schemes as described in the preceding paragraphs.  Those illegal acts constitute predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) and were perpetrated for the same or similar purpose, and had similar results, participants, victims, and methods of communication.

241.   As a direct and proximate result of, and by reason of the racketeering activities of the "persons" identified in Paragraph 235, and their conduct in violation of 18 U.S.C. §1962(a), Gateway and Urban have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).  The "persons" identified in Paragraph 235, through the conduct described above, have received income derived from a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1),

1961(5), and 1962(a) and have used or invested all or part of that income, or its proceeds, in the acquisition of any interest in or the establishment or operation of the Conquest Enterprise and/or the Conquest Association Enterprise. This income, and its proceeds, were used to block the University Gateway Project and other projects that might compete with the enterprises. The above-described actions were taken, among other purposes described herein, with the specific intent and for the purpose of carrying out their scheme and artifice to defraud and to use or invest income derived from racketeering activities to acquire an interest, establish, or operate the Conquest Enterprise and/or the Conquest Association Enterprise. These acts are capable of repetition. Furthermore, the predicate acts aimed at TMG, FPM, USC and Urban was done specifically to prevent construction of the University Gateway Project, and any other project that would compete with the Conquest Defendants, the Conquest Enterprise and/or the Conquest Association Enterprise.

242. As a result of these predicate acts and other conduct, Urban and Gateway have been injured in their business or property, having suffered, among other things, threats to their projects, significant lost profits, lost goodwill, and significant cost overruns due to delays in construction of the projects.

243. Gateway and Urban are entitled to recover treble the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## EIGHTH CAUSE OF ACTION

### (Conspiracy To Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (d), by Plaintiffs Urban and Gateway Against All Defendants)

244. Paragraphs 1 through 243 are re-alleged and reincorporated herein.

245. Conquest, Chen, Smolinisky, Smith, Orellano, Baez, University Park Community Association, www.stopuniversitygateway.com, and others are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

SECOND AMENDED COMPLAINT

246.    The "persons" identified in Paragraph 245 knowingly and willfully agreed and conspired to violate 18 U.S.C. § 1962(a), (b), and (c) as described herein, including as set forth in Paragraph 204 above. They knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to ensure the results described above.

247.    Recent overt acts in pursuit of the above-described conspiracy occurred when one or more of the "persons" identified in Paragraph 245, (1) through its counsel recently threatened USC that Conquest would oppose any Master Plan that included student housing, (2) recently threatened TMG in May of 2007, which resulted in TMG abandoning its private sector USC student-housing project, and (3) recently threatened FPM.

248.    As a direct and proximate result of, and by reason of the activities of the "persons" identified in Paragraph 245, and their conduct conspiring to violation of 18 U.S.C. §1962(a), (b), and (c), Gateway and Urban have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c). The above-described actions were taken, among other purposes described herein, with the specific intent and for the purpose of carrying out their conspiracy related to their scheme and artifice to defraud described above, including but not limited to deterring Urban from entering the relevant market (as defined in Paragraph 160) and for the Conquest Defendants to obtain and maintain their monopoly. These acts are capable of repetition. Furthermore, the predicate acts aimed at TMG, FPM, USC and Urban was done specifically to prevent construction of the University Gateway Project, and any other project that would compete with the Conquest Defendants, the Conquest Enterprise and/or the Conquest Association Enterprise.

249.    As a result of these predicate acts and other conduct, Urban and Gateway have been injured in their business or property, having suffered, among other things, threats to their projects, significant lost profits, lost goodwill, and significant cost overruns due to delays in construction of the projects.

250.    Urban and Gateway are entitled to recover treble the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

### NINTH CAUSE OF ACTION

### (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), by Plaintiff USC Against the Conquest Defendants)

251.    Paragraphs 1 through 250 are re-alleged and reincorporated herein.

252.    Plaintiff USC is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

253.    The Conquest Enterprise defined in Paragraph 202 constitutes an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The Conquest Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

254.    Defendants Conquest, Chen, Smolinisky, Smith, and the University Park Community Association are each "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with the Conquest Enterprise.

255.    From January 1, 2005 until the present, the "persons" identified in Paragraph 254  conducted, participated in, engaged in, conspired to engage in, and/or aided and abetted the conduct of the affairs of the Conquest Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).  The predicate acts constituting the pattern of unlawful activity engaged in by the "persons" identified in Paragraph 254, as described herein, constitute:

a.    Extortion, as defined in 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1951, including but not limited to:

i.    The litigation and related conduct described above beginning in late 2005 and continuing to the present, in which Conquest, Chen,

SECOND AMENDED COMPLAINT

1   Smolinisky, Smith, and one or more other of the "persons" identified in Paragraph
2   254 threatened to block and/or delay all Urban development projects including, but
3   not limited to, threatening to initiate and actually initiating unfounded CEQA and/or
4   entitlement litigation if Urban and Gateway continued their efforts to develop the
5   University Gateway Project.   This extortion affected and obstructed interstate
6   commerce;

7           ii.   The threats and statements described above made to FPM
8   and TMG during May and August of 2007, including, but not limited to, threatening
9   to prolong TMG's entitlement process to the maximum extent possible, threatening
10  to slow down TMG's entitlement process, threatening to spend between $1.3 and
11  $1.6 million to prevent the TMG project, threatening to delay the TMG project for
12  six or more years, threatening to make it impossible for FPM to develop its proposed
13  development, and threatening to use CEQA to block FPM's proposed development.
14  This extortion affected and obstructed interstate commerce;

15          iii.   The threats described above that were made to USC during
16  March and April 2007 regarding USC's master plan and development of student
17  housing.   USC's fear of economic loss from the extortion is reasonable.   This
18  extortion affected and obstructed interstate commerce;

19          iv.   The threats and statements described above to USC, TMG,
20  and FPM during 2007 regarding Conquest's intention and actions to stop the
21  University Gateway Project. USC's fear of economic loss from the extortion is
22  reasonable. This conduct occurred as recently as August 7, 2007; and

23          v.   Upon information and belief, additional acts of extortion
24  were engaged in by one or more of the "persons" identified in Paragraph 254
25  beginning on or after January 1, 2004.   Information regarding each of these
26  additional separate acts of extortion and the identity of the persons engaging in those
27  violations is disguised and is entirely within the custody and control of the
28  Defendants.

SECOND AMENDED COMPLAINT

1    b. Mail fraud, as defined in 18 U.S.C. § 1961(1)(B) and 18 U.S.C. §

2 1341, including but not limited to, one or more of the "persons" identified in

3 Paragraph 254 engaged in a scheme and artifice to defraud using the U.S. mails in

4 interstate commerce in or around January 2006 to circulate a brochure that made

5 false and misleading factual representations about the size and scope of the

6 University Gateway Project.  Urban and Gateway received the brochure through

7 3245 S. Figueroa Street, Los Angeles, CA, 9007, one of the physical addresses on

8 which the University Gateway Project will be developed.  The brochures also were

9 sent to USC students and the general public living in the area near USC.  The

10 scheme or artifice to defraud was specifically designed to defraud students and

11 others and to obtain their property, including student rents, that were to be directed

12 to the Conquest Enterprise's projects.  Upon information and belief, one or more of

13 the "persons" identified in Paragraph 254 made additional uses of the U.S. mails to

14 circulate materially false and misleading information and/or documents about the

15 University Gateway Project.  The information regarding those additional mail fraud

16 violations and the identity of the persons engaging in those violations is disguised

17 and entirely within the custody and control of the Defendants;

18    c. Wire fraud, as defined in 18 U.S.C. § 1961(1)(B) and 18 U.S.C. §

19 1343, including, but not limited to, one or more of the "persons" identified in

20 Paragraph 254 created a web-site in or around August 2005 that contained false and

21 misleading factual representations about the size and scope of the University

22 Gateway Project that were communicated to Urban, Gateway, USC students, and the

23 general public via the Internet.  One or more of the "persons" identified in Paragraph

24 254 engaged in efforts to disseminate the fraudulent representations through

25 interstate commerce by, among other things, using a billboard to encourage Urban,

26 Gateway, USC, USC students, and the general public to view the website.  The

27 website was accessible to USC and it did, in fact, view the website.  Urban,

28 Gateway, USC students, and the general public also viewed the website.  The

scheme or artifice to defraud was specifically designed to defraud students and others and to obtain their property, including student rents, that were to be directed to the Conquest Enterprise's projects. Upon information and belief, one or more of the "persons" identified in Paragraph 254 made additional Internet postings, facsimile transmissions, telephone calls, or other uses of wires containing materially false and misleading information and/or documents about the University Gateway Project. The information regarding each of these additional wire fraud violations and the identity of the persons engaging in those violations is disguised and entirely within the custody and control of the Defendants; and

       d.    Copyright Infringement, as defined in 18 U.S.C. § 1961(1)(B), 18 U.S.C. § 2319, and 17 U.S.C. § 506, including, but not limited to, the fact that one or more of the "persons" identified in Paragraph 254 improperly obtained a copy of Urban's Confidential Offering Memorandum without Urban's consent and improperly reproduced, displayed, distributed and publicized a copy of that memorandum by filing a copy of it with the City of Los Angeles for the purpose of obtaining a commercial advantage and/or private financial gain.

    256.    All of the predicate acts described herein occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

    257.    All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the "persons" identified in Paragraph 254 engaged in the predicate acts over a substantial period of time and such predicate acts have become their regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained by this Court. Specifically, the "persons" identified in Paragraph 254 knowingly violated the mail and wire fraud statutes and other statutes discussed in the preceding paragraphs in connection with their illegal schemes. Each of these acts constitutes a separate and distinct "racketeering activity," as defined in 18 U.S.C. § 1961(a).

258.     The "persons" identified in Paragraph 254 have engaged in numerous illegal acts in connection with their fraudulent schemes, as described in the preceding paragraphs.   Those illegal acts constitute predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) and were perpetrated for the same or similar purpose, and had similar results, participants, victims, and methods of communication.

259.     As a direct and proximate result of, and by reason of the activities of the "persons" identified in Paragraph 254, and their conduct in violation of 18 U.S.C. §1962(c), USC has been injured in its business or property within the meaning of 18 U.S.C. § 1964(c).   The above-described actions were taken, among other purposes described herein, with the specific intent and for the purpose of carrying out their scheme and artifice to defraud and to conduct or participate in the affairs of the Conquest Defendants Enterprise.   These acts are capable of repetition. Furthermore, the predicate acts aimed at TMG, FPM, USC and Urban was done specifically to prevent construction of the University Gateway Project, and any other project that would compete with the Conquest Defendants and/or the Conquest Enterprise.

260.     As a result of these predicate acts and other conduct, USC has been injured in its business or property, having suffered business and/or loss of property by, among other things, damage as a result of its ownership and leasehold interest in the University Gateway Project, delays in the construction of the new USC bookstore and fitness center, lost goodwill, increased rental prices, substandard housing, and lack of competition in the relevant market (as defined in Paragraph 160).

261.     USC is entitled to recover treble the damages it has sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

# TENTH CAUSE OF ACTION

## (Racketeer Influenced and Corrupt Organizations Act; 18 U.S.C. § 1962(c), by Plaintiff USC Against the Conquest Defendants)

262.    Paragraphs 1 through 261 are re-alleged and reincorporated herein.

263.    The Conquest Association Enterprise defined in Paragraph 212 constitutes a group associated in fact with respect to the unlawful conduct alleged herein and therefore constitutes an "enterprise," which is engaged in, or whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The Conquest Association Enterprise is an informal entity with the common goal of monopolizing the relevant market (as defined in Paragraph 160) through improper means, including extortion, mail and wire fraud, and copyright infringement, done solely to deter Urban, USC and others, from entering the relevant market, and for the Conquest Defendants to obtain and maintain their monopoly, using the existing corporate structure for controlling and directing the affairs of the enterprise on an ongoing basis.  The Conquest Association Enterprise is an ongoing organization with a consensual decision-making structure, which is characterized by overlapping and interlocking ownership, directorship, and managements.   The Conquest Association Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

264.    Conquest and its subsidiaries and affiliated entities, Chen, Smolinisky, and Smith are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who associated with the Conquest Association Enterprise.

265.    From January 1, 2005 until the present, the "persons" identified in Paragraph 264 conducted, participated in, engaged in, conspired to engage in, and/or aided and abetted the conduct of the affairs of the association-in-fact enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).   The predicate acts constituting the pattern of

1    unlawful activity engaged in by the "persons" identified in Paragraph 264 include
2    those set forth in Paragraph 255 above.

3        266.    All of the predicate acts described herein occurred after the effective
4    date of RICO and more than two such acts occurred within ten years of one another.

5        267.    All of the predicate acts described herein were continuous so as to
6    form a pattern of racketeering activity in that the "persons" identified in Paragraph
7    264 engaged in the predicate acts over a substantial period of time and such
8    predicate acts have become their regular way of conducting business, and these
9    business practices will continue indefinitely into the future unless restrained by this
10   Court.  Specifically, the "persons" identified in Paragraph 264 knowingly violated
11   the extortion, mail and wire fraud statutes and other statutes discussed in the
12   preceding paragraphs in connection with their illegal schemes.  Each of these acts
13   constitutes a separate and distinct "racketeering activity," as defined in 18 U.S.C. §
14   1961(a).

15       268.    The "persons" identified in Paragraph 264 have engaged in numerous
16   illegal acts in connection with their fraudulent schemes, as described in the
17   preceding paragraphs.  Those illegal acts constitute predicate acts of racketeering
18   within the meaning of 18 U.S.C. § 1961(1) and were perpetrated for the same or
19   similar purpose, and had similar results, participants, victims, and methods of
20   communication.

21       269.    As a direct and proximate result of, and by reason of the activities of
22   the "persons" identified in Paragraph 264, and their conduct in violation of 18
23   U.S.C. §1962(c), USC has been injured in its business or property within the
24   meaning of 18 U.S.C. § 1964(c).  The above-described actions were taken with the
25   specific intent and for the purpose of carrying out their scheme and artifice to
26   defraud and to conduct or participate in the affairs of the Conquest Defendants
27   Association.  These acts are capable of repetition.  Furthermore, the predicate acts
28   aimed at TMG, FPM, USC and Urban was done specifically to prevent construction

SECOND AMENDED COMPLAINT

of the University Gateway Project, and any other project that would compete with the Conquest Defendants and/or the Conquest Association Enterprise.

270.     As a result of these predicate acts and other conduct, USC has been injured in its business or property, having suffered business and/or loss of property by, among other things, damage as a result of its ownership and leasehold interest in the University Gateway Project, delays in the construction of the new USC bookstore and fitness center, lost goodwill, increased rental prices, substandard housing, and lack of competition in the relevant market (as defined in Paragraph 160).

271.     USC is entitled to recover treble the damages it has sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## ELEVENTH CAUSE OF ACTION

### (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(b), by Plaintiff USC Against Defendants Smolinisky, and Chen)

272.     Paragraphs 1 through 271 are re-alleged and reincorporated herein.

273.     The Conquest Enterprise defined in Paragraph 202 constitutes an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b). The Conquest Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

274.     Additionally, or in the alternative, the Conquest Association Enterprise defined in Paragraph 212 constitutes a group associated in fact with respect to the unlawful conduct alleged herein and therefore constitutes an "enterprise" that is engaged in, or whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b).  The Conquest Association Enterprise is an informal entity with the common goal of monopolizing the relevant market (as defined in Paragraph 160) through improper means, including extortion, mail and wire fraud, and copyright infringement, done solely to deter Urban, USC

1   and others, from entering the relevant market, and for the Conquest Defendants to
2   obtain and maintain their monopoly, using the existing corporate structure for
3   controlling and directing the affairs of the enterprise on an ongoing basis.   The
4   Conquest Association Enterprise is an ongoing organization with a consensual
5   decision-making structure, which is characterized by overlapping and interlocking
6   ownership, directorship, and management.   The Conquest Association Enterprise
7   exists separate and apart from the pattern of racketeering activity alleged and the
8   Defendants themselves.

9   275.   Smolinsky, Chen, and certain other individuals or entities to be
10  identified are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(b),
11  who have acquired or maintained an interest in or control of Conquest Enterprise
12  and/or the Conquest Association Enterprise through a pattern of racketeering
13  activity.   For example, but not by way of limitation, Smolinsky and Chen have
14  acquired or maintained an interest in or control of the Conquest Enterprise and/or
15  Conquest Association Enterprise in that they are principals of Conquest and its
16  subsidiaries and affiliates.

17  276.   From January 1, 2005 until the present, the "persons" identified in
18  Paragraph 275 acquired or maintained an interest in or control of the Conquest
19  Enterprise and/or the Conquest Association Enterprise through a pattern of
20  racketeering activity that affects interstate commerce within the meaning of 18
21  U.S.C. §§ 1961(1), 1961(5), and 1962(b).   The predicate acts constituting the pattern
22  of unlawful activity engaged in by the "persons" identified in Paragraph 275 include
23  those set forth in Paragraph 255 above.

24  277.   All of the predicate acts described herein occurred after the effective
25  date of RICO and more than two such acts occurred within ten years of one another.

26  278.   All of the predicate acts described herein were continuous so as to
27  form a pattern of racketeering activity in that the "persons" identified in Paragraph
28  275 engaged in the predicate acts over a substantial period of time and such

predicate acts have become their regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained by this Court.  Specifically, the "persons" identified in Paragraph 275 knowingly violated the mail and wire fraud statutes and other statutes discussed in the preceding paragraphs in connection with their illegal schemes.  Each of these acts constitutes a separate and distinct "racketeering activity," as defined in 18 U.S.C. § 1961(a).

279.    The "persons" identified in Paragraph 275 engaged in numerous illegal acts in connection with their fraudulent schemes as described in the preceding paragraphs.  Those illegal acts constitute predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) and were perpetrated for the same or similar purpose, and had similar results, participants, victims, and methods of communication.

280.    As a direct and proximate result of, and by reason of the racketeering activities of the "persons" identified in Paragraph 275, and their conduct in violation of 18 U.S.C. §1962(b), USC has been injured in its business or property within the meaning of 18 U.S.C. § 1964(c). The "persons" identified in Paragraph 275, through the conduct described above, acquired, maintained and exercised control over the Conquest Enterprise and/or the Conquest Association Enterprise.   The above-described actions were taken, among other purposes described herein, with the specific intent and for the purpose of carrying out their scheme and artifice to defraud and to acquire or maintain and interest in or control of the Conquest Enterprise and/or the Conquest Association Enterprise.   These acts are capable of repetition.  Furthermore, the predicate acts aimed at TMG, FPM, USC and Urban was done specifically to prevent construction of the University Gateway Project, any other project that would compete with the Conquest Defendants, the Conquest Enterprise and/or the Conquest Enterprise Association.

281.    As a result of these predicate acts and other conduct, USC has been injured in its business or property, having suffered business and/or loss of property

by, among other things, damage as a result of its ownership and leasehold interest in the University Gateway Project, delays in the construction of the new USC bookstore and fitness center, lost goodwill, increased rental prices, substandard housing, and lack of competition in the relevant market (as defined in Paragraph 160).

282.    USC is entitled to recover treble the damages it has sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## TWELFTH CAUSE OF ACTION

### (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a), by Plaintiffs USC Against Defendants Conquest, Smolinisky, and Chen)

283.    Paragraphs 1 through 282 are re-alleged and reincorporated herein.

284.    The Conquest Enterprise defined in Paragraph 202 constitutes an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).  The Conquest Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

285.    Additionally, or in the alternative, the Conquest Association Enterprise defined in Paragraph 212 constitutes a group associated in fact with respect to the unlawful conduct alleged herein and therefore constitutes an "enterprise" which is engaged in, or whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a). The Conquest Association Enterprise is an informal entity with the common goal of monopolizing the relevant market (as defined in Paragraph 160) through improper means, including extortion, mail and wire fraud, and copyright infringement, done solely to deter Urban, USC and others, from entering the relevant market, and for the Conquest Defendants to obtain and maintain their monopoly, using the existing corporate structure for controlling and directing the affairs of the enterprise on an ongoing basis.  The Conquest Association Enterprise is an ongoing organization with a consensual

1   decision-making structure, which is characterized by overlapping and interlocking

2   ownership, directorship, and management.   The Conquest Association Enterprise

3   exists separate and apart from the pattern of racketeering activity alleged and the

4   Defendants themselves.

5        286.   Conquest, Smolinsky, Chen, and certain other individuals or entities

6   to be identified are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and

7   1962(a) who received income derived from a pattern of racketeering activity and

8   have used or invested all or part of that income, or its proceeds, in the acquisition of

9   any interest in or the establishment or operation of the Conquest Enterprise and/or

10  the Conquest Association Enterprise.   The Conquest Enterprise and the Conquest

11  Association Enterprise are in engaged in interstate commerce and/or the activities

12  affect interstate commerce.   For example, but not by way of limitation, Smolinsky

13  and Chen have acquired or maintained an interest in or control of the Conquest

14  Enterprise and/or the Conquest Association Enterprise in that they are principals of

15  Conquest and its subsidiaries and affiliates.

16       287.   From January 1, 2005 until the present, the "persons" identified in

17  Paragraph 286 have received income derived from a pattern of racketeering activity

18  within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(a) and have used or

19  invested all or part of that income, or its proceeds, in the acquisition of any interest

20  in or the establishment or operation of the Conquest Enterprise and/or the Conquest

21  Association Enterprise.

22       i.   The income obtained by the "persons" identified in

23  Paragraph 286 has resulted from the pattern of racketeering activity described

24  herein, including, but not limited to, income received as a result of charging and/or

25  maintaining supracompetitive prices within the relevant market (as defined in

26  Paragraph 160) through blocking the development projects of competing developers

27  through a pattern of extortion, mail fraud, wire fraud, and copyright infringement.

28

ii.    The income obtained that has been used or invested in the operations of the Conquest Enterprise and/or the Conquest Association Enterprise, upon information and belief, includes, but is not limited to, the funds that have been used to finance some or all of the Conquest Enterprise's and/or the Conquest Association Enterprise's activities described herein, including managing and conducting the ongoing affairs of these enterprises, purchasing and circulating flyers, creating websites and billboards, threatening the Plaintiffs and third parties in personal meetings and through written correspondence, and initiating and maintaining sham litigation and administrative challenges.

iii.    By way of example, Defendant Smolinisky specifically told TMG that $1.3 to $1.6 million dollars would be spent to prevent the TMG project.    Defendants made essentially the same threats to FPM in attempting to intimidate FPM from proceeding with its development project.

iv.    The "persons" defined in Paragraph 286 have used some or all of this racketeering income to attempt to prevent development of the University Gateway Project, Urban's other development projects (such as the Verdugo Gardens Project, the Glenoaks Project, and the Kenmore Project), TMG's project, and FPM's project.

v.    Other income, or its proceeds, derived from a pattern of racketeering activity has been used or invested in the acquisition of any interest in or the establishment or ongoing operation of the Conquest Enterprise and/or the Conquest Association Enterprise.

288.    The activities of the Conquest Enterprise and/or the Conquest Association Enterprise affect interstate commerce.    The predicate acts constituting the pattern of unlawful activity engaged in by the "persons" identified in Paragraph 286 include those set forth in Paragraph 255 above.

289.    All of the predicate acts described herein occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

290.    All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the "persons" identified in Paragraph 286 engaged in the predicate acts over a substantial period of time and such predicate acts have become their regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained by this Court.  Specifically, the "persons" identified in Paragraph 286 knowingly violated the extortion, mail and wire fraud statutes and other statutes discussed in the preceding paragraphs in connection with their illegal schemes.  Each of these acts constitutes a separate and distinct "racketeering activity," as defined in 18 U.S.C. § 1961(a).

291.    The "persons" identified in Paragraph 286 engaged in numerous illegal acts in connection with their fraudulent schemes as described in the preceding paragraphs.  Those illegal acts constitute predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) and were perpetrated for the same or similar purpose, and had similar results, participants, victims, and methods of communication.

292.    As a direct and proximate result of, and by reason of the racketeering activities of the "persons" identified in Paragraph 286, and their conduct in violation of 18 U.S.C. §1962(a), USC has been injured in its business or property within the meaning of 18 U.S.C. § 1964(c).  The "persons" identified in Paragraph 286, through the conduct described above, have received income derived from a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(a) and have used or invested all or part of that income, or its proceeds, in the acquisition of an interest in, or the establishment or operation of the Conquest Enterprise and/or the Conquest Association Enterprise.  This income, and its proceeds, were used to block the University Gateway Project and other projects that might compete with the enterprises.  The above-described actions were taken, among other purposes described herein, with the specific intent and for the purpose

of carrying out their scheme and artifice to defraud and to use or invest income derived from racketeering activities to acquire an interest, establish, or operate the Conquest Enterprise and/or the Conquest Association Enterprise.    These acts are capable of repetition.    Furthermore, the predicate acts aimed at TMG, FPM, USC, and Urban was done specifically to prevent construction of the University Gateway Project, any other project that would compete with the Conquest Defendants, the Conquest Enterprise and/or the Conquest Enterprise Association.

293.    As a result of these predicate acts and other conduct, USC has been injured in its business or property, having suffered business and/or loss of property by, among other things, damage as a result of its ownership and leasehold interest in the University Gateway Project, delays in the construction of the new USC bookstore and fitness center, lost goodwill, increased rental prices, substandard housing, and lack of competition in the relevant market (as defined in Paragraph 160).

294.    USC is entitled to recover treble the damages it has sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## THIRTEENTH CAUSE OF ACTION

### (Conspiracy To Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (d), by Plaintiff USC Against Conquest Defendants)

295.    Paragraphs 1 through 294 are reincorporated and re-alleged herein.

296.    Conquest, Chen, Smolinisky, Smith, and others are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

297.    The "persons" identified in Paragraph 296 knowingly and willfully agreed and conspired to violate 18 U.S.C. § 1962(a), (b), and (c) as described herein, including as set forth in Paragraph 255 above.    They knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to ensure the results described above.

298.   Recent overt acts in pursuit of the above-described conspiracy occurred when one or more of the "persons" identified in Paragraph 296, (1) through its counsel recently threatened USC that Conquest would oppose any Master Plan that included student housing, (2) recently threatened TMG in May of 2007, which resulted in TMG abandoning its private sector USC student-housing project, and (3) recently threatened FPM.

299.   As a direct and proximate result of, and by reason of the activities of "persons" identified in Paragraph 296, and their conduct conspiring to violation of 18 U.S.C. §1962(a), (b), and (c), USC has been injured in its business or property within the meaning of 18 U.S.C. § 1964(c).   The above-described actions were taken, among other purposes described herein, with the specific intent and for the purpose of carrying out their conspiracy related to their scheme and artifice to defraud described above, including but not limited to deterring Urban from entering the relevant market (as defined in Paragraph 160) and for the Conquest Defendants to obtain and maintain their monopoly.   These acts are capable of repetition. Furthermore, the predicate acts aimed at TMG, FPM, USC and Urban was done specifically to prevent construction of the University Gateway Project, any other project that would compete with the Conquest Defendants, the Conquest Enterprise and/or the Conquest Enterprise Association.

300.   As a result of these predicate acts and other conduct, USC has been injured in its business or property, having suffered, among other things, significant lost profits due to the delay in opening its bookstore, lost goodwill, increased rental prices, substandard housing, and lack of competition in the relevant market (as defined in Paragraph 160).

301.   USC is entitled to recover treble the damages it has sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

# FOURTEENTH CAUSE OF ACTION

## (Unfair Competition, Cal. Bus. & Prof. Code § 17200, By All Plaintiffs Against The Conquest Defendants)

302.    Paragraphs 1 through 301 are re-alleged and reincorporated herein.

303.    The plaintiffs bring this action on their own behalf as entities that have suffered injury in fact and have lost money or property as a result of the Conquest Defendants' unfair competition and on behalf of consumers of housing within the relevant market (as defined in Paragraph 160).

304.    The Conquest Defendants have engaged in unfair competition by committing acts that are unlawful, unfair, and fraudulent business practices or acts as defined by the California Business and Professions Code sections 17200, *et seq.* by, among other things, engaging in the acts described above, including but not limited to:

a.    Conduct that constitutes or threatens incipient violation of the Sherman and Clayton Acts, 15 U.S.C. § 2, *et seq.*, and/or violates the policy and spirit of these laws by significantly threatening or actually harming lawful competition, including but not limited to the conduct described in the first, second, and third causes of action;

b.    Conduct that violates the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1960, *et seq.*, including but not limited to the predicate acts described in Paragraph 204 above;

c.    Misappropriating Urban's confidential information, including the Confidential Offering Memorandum and the conceptual drawings;

d.    Intentionally and improperly interfering with Urban's contracts with Clark Construction, 17910 Burbank LLC, and with its other partners, investors, joint venturers, including but not limited to the conduct described in the fifteenth and sixteenth causes of action;

- 78 -
SECOND AMENDED COMPLAINT

e.     Intentionally and improperly interfering with Urban's business relationship with Hearst and thereby causing the breach or termination of the business relationships and/or lawful business expectancies Urban had with Hearst, including but not limited to the conduct described in the seventeenth cause of action;

f.     Offering compensation or other financial incentives to members of the public and private entities that did not otherwise intend to appear at events and hearings related to Urban's projects to induce them to appear and object to Urban's projects for the sole purpose of halting or delaying completion of those projects;

g.     Initiating and maintaining frivolous sham inquiries or objections to Urban projects in (a) Burien, Washington, (b) Washington National Station, Washington, (c) Mount Baker, Washington, (d) Seattle, Washington, (e) Glendale, California (f) Oxnard, California, (g) Culver City, California, (h) Wilshire Vermont Project, Los Angeles, California, (i) Herald Examiner Project, Los Angeles, California, and (h) Sun Valley, California, with the sole purpose of halting or delaying completion of the University Gateway Project; and

h.     Making unfair, deceptive, untrue, fraudulent, and/or misleading representations to the public by direct and indirect commercial advertising regarding the nature and scope of the University Gateway Project over the Internet, in flyers, on billboards, in person, and, on information and belief, by other means.

(1)     These Defendants made the fraudulent, untrue, misleading, and/or materially incomplete representations to the public in order to provide new housing and/or continue to provide the same housing to USC students and other members of the public by eliminating the competition that would be present if the University Gateway Project were completed.   The Conquest Defendants intentionally omitted material information about the University Gateway Project with the intention of misleading the public about its nature and scope.

(2)     As evidenced by the factual allegations set forth above, these Defendants' fraudulent misrepresentations and/or material omissions were

likely to cause, and did in fact cause, members of the public, including reasonable consumers, to be deceived about the nature and scope of the University Gateway Project.

(3)    As a result of these fraudulent misrepresentations, many individuals and entities initially opposed the University Gateway Project based on the fraudulent, untrue, misleading, and/or materially incomplete information provided by one or more of the Conquest Defendants, and when the true facts came to light most of those who opposed the project dropped their opposition to it.

(4)    Once Plaintiffs and/or others provided these individuals and entities that initially opposed the University Gateway Project with true and correct information regarding the nature and scope of the Gateway Project, many of these individuals and entities affirmatively supported the Gateway Project, including but not limited to the Shrine Auditorium.

305.    The acts described in this Second Amended Complaint constitute numerous individual and combined unfair, unlawful, and/or fraudulent acts or practices within the meaning of Business and Professions Code sections 17200, *et seq.*   The totality of these Defendants' conduct has enabled Conquest, among other things, to dominate and control and to force competition, including but not limited to TMG and FPM, out of the relevant market (as defined in Paragraph 160).   The Conquest Defendants' conduct also harmed the local community by restricting the availability of private sector student housing in the relevant market (as defined in Paragraph 160) and affordable housing in other communities.

306.    The gravity of the harm of the Conquest Defendants' conduct on Urban, USC, and consumers within the relevant market (as defined in Paragraph 160) outweighs any potential benefits of such conduct.   The Conquest Defendants' conduct described herein offends established public policies, is immoral, unethical, oppressive, unscrupulous, and is substantially injurious to consumers.

307.    The Conquest Defendants' unfair and unlawful business practices are likely to continue to harm the public and consumers by, among other things, forcing the public to pay higher rents due to the limited availability of housing in the relevant market (as defined in Paragraph 160).  As such, the Conquest Defendants' conduct presents a continuing threat to the public.

308.    As a direct and proximate result of the Conquest Defendants' conduct, the Conquest Defendants have received and continue to charge supracompetittive prices and receive inflated profits and economic advantages that rightfully belong to the consumers living in the relevant market (as defined in Paragraph 160) who have been adversely affected by the Conquest Defendants' conduct.

309.    As a direct and proximate result of the Conquest Defendants' conduct, Urban has suffered a loss in fact by losing money and/or property by virtue of its loss of revenues and business relationships, increases in expenses and carrying costs caused by the delays inflicted by the Conquest Defendants, and costs of pursuing this action and pursuing and defending other the actions described herein.

310.    As a direct and proximate result of the Conquest Defendants' conduct, USC has suffered a loss in fact by losing money and/or property by virtue of by virtue of its ownership interest in the University Gateway Project, its rental of the commercial space in the University Gateway Project, which will include a fitness center and a USC book store facility that would significantly expand the capacity, and enhance the quality, of USC's current book store facilities, its compelling interest to encouraging the private sector to develop suitable student housing within the relevant market (as defined in Paragraph 160), and it costs of pursuing this action and/or any other actions as described herein.

# FIFTEENTH CAUSE OF ACTION

## (Interference With Economic Relations By Plaintiff Urban Against The Conquest Defendants)

311.    Paragraphs 1 through 310 are re-alleged and reincorporated herein.

312.    Urban had a valid contract with Clark Construction.

313.    The Conquest Defendants knew of the contractual relationship between Urban and Clark Construction.

314.    The Conquest Defendants intentionally and improperly interfered with Urban's contract with Clark Construction through unlawful and illegitimate means.

315.    The Conquest Defendants' misconduct and that of their agents was intentional and outrageous and committed with the purpose of causing injury, or in reckless disregard of harm, to Urban to serve the Conquest Defendants' own interests.

316.    As a direct and proximate cause of the Conquest Defendants' interference, Urban has experienced an actual disruption of its relationship with Clark such that cost of constructing the University Gateway Project has increased tens of millions of dollars; Clark has been forced to delay performance, causing a substantial increase in the fees owed to Clark or any other competent and reputable contractor who would construct the project; Urban has experienced an actual disruption of its relationship with its partners, investors, and joint venturers because the investors, joint venturers, and partners are and will be reluctant to invest in, partner, or joint venture with Urban in any future development projects for fear that such projects will be challenged and delayed by the Conquest Defendants.

317.    Urban has been damaged in an amount to be proven at trial as a result of the intentional interference.

318.    The Conquest Defendants' misconduct and that of their agents was intentional and outrageous and committed with the purpose of causing injury to, or

in reckless disregard of harm, to Urban in order to serve the Conquest Defendants' own interests.

## SIXTEENTH CAUSE OF ACTION

### (Interference With Economic Relations By Plaintiff Urban Against The Conquest Defendants and Defendant Orellano)

319. Paragraphs 1 through 318 are re-alleged and reincorporated herein.

320. Urban had a valid contract with 17910 Burbank, LLC ("17910 Burbank"), and its investors, joint venturers and partners.

321. The Conquest Defendants and Defendant Orellano knew of the contractual relationship between Urban and 17910 Burbank, and its investors, joint venturers and partners.

322. These Defendants intentionally and improperly interfered with Urban's contract with 17910 Burbank, and its investors, joint venturers, and partners through unlawful and illegitimate means.

323. These Defendants' misconduct, and that of their agents, was intentional and outrageous and committed with the purpose of causing injury, or in reckless disregard of harm, to Urban in order to serve these Defendants' own interests.

324. As a direct and proximate cause of these Defendants' interference, Urban has experienced an actual disruption of its relationship with 17910 Burbank by causing unnecessary delays and causing the loss of millions of dollars in benefits under Urban's consulting agreement with 17910 Burbank; Urban has experienced an actual disruption of its relationship with its partners, investors, and joint venturers because the investors, joint venturers, and partners are and will be reluctant to invest in, partner, or joint venture with Urban in any future development projects for fear that such projects will be challenged and delayed by these Defendants.

325. Urban has been damaged in an amount to be proven at trial as a result of the intentional interference.

326.    These Defendants' misconduct and that of their agents was intentional and outrageous and committed with the purpose of causing injury to, or in reckless disregard of harm, to Urban in order to serve these Defendants' own interests.

## SEVENTEENTH CAUSE OF ACTION

**(Interference With Prospective Economic Advantage By Plaintiff Urban Against The Conquest Defendants and Defendant Baez)**

327.    Paragraphs 1 through 326 are reincorporated and re-alleged herein.

328.    Urban had a valid and existing business relationship with Hearst.

329.    The Conquest Defendants and Defendant Baez knew of the business relationship and business expectancy between Urban and Hearst.

330.    These Defendants intentionally interfered with Urban's prospective economic benefit with Hearst through unlawful and illegitimate means, causing the breach or termination of expectancies by questioning Hearst about the Herald Examiner Project, resulting in Hearst's decision not to renew its contract with Urban in February, 2007.

331.    These Defendants' misconduct, and that of their agents, was intentional and outrageous and committed with the purpose of causing injury to or in reckless disregard of harm to Urban in order to serve these Defendants' own interests.

332.    As a direct and proximate result of these Defendants' actions, Urban has been damaged in an amount to be proven at trial. These Defendants' misconduct was of such a degree as to entitle Urban to punitive or exemplary damages from these Defendants.

## EIGHTEENTH CAUSE OF ACTION

### (Copyright Infringement By Plaintiff Urban Against Conquest,

### Chen and Smolinisky)

333.    Paragraphs 1 through 332 are reincorporated and re-alleged herein.

334.    Urban is the sole owner of the Gateway Project Confidential Offering Memorandum with rights of possession and use.

335.    Urban has complied in all respect with 17 U.S.C. §§ 101 *et seq.*, and secured the exclusive rights and privileges in and to the copyrights of the above-referenced works.

336.    Conquest's conduct, described above, violates the exclusive rights belonging to Urban as owners of the copyright in its confidential documents, including without limitation Urban's rights under 17 U.S.C. § 106.   Defendants Chen and Smolinisky, as Conquest's owners, direct, control, and ratify the actions of Conquest, including the unlicensed and unauthorized replication and distribution of the Confidential Offering Memorandum.

337.    As a direct and proximate result of their wrongful conduct, the Conquest Defendants have realized and continue to realize profits and other benefits rightfully belonging to Urban.   Accordingly, Urban seeks an award of damages pursuant to 17 U.S.C. §§ 504 and 505.

338.    Defendants Smolinisky's, Chen's and Conquest's actions have caused, and will continue to cause, irreparable damage to Urban for which they have no remedy at law.   Urban is entitled to a preliminary injunction enjoining Smolinisky, Chen, and Conquest and their agents, servants, employees, and all persons acting in concert with or on their behalf, from copying, displaying, distributing, or otherwise using Plaintiffs' copyrighted materials in violation of 17 U.S.C. § 106.

339.    Upon information and belief, Conquest, Chen and Smolinisky have willfully engaged in, and are willfully engaging in, the acts complained of with

oppression, fraud and malice, and in conscious disregard of the rights of Urban. Urban therefore is entitled to the maximum statutory damages allowable.

**WHEREFORE,** Plaintiffs request judgment against Defendants, and each of them, for the following:

**ON THE FIRST, SECOND AND THIRD CAUSES OF ACTION**

1.      The Conquest Defendants and their agents be enjoined during this litigation, and permanently thereafter, from ongoing and future acts constituting violations of Federal antitrust laws to maintain or secure a monopoly, as provided for by 15 U.S.C. § 26;

2.      Treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, arising from harm the Plaintiffs have sustained as a result of the Conquest Defendants' violation of section 2 of the Sherman Act, 15 U.S.C. § 2;

3.      Prejudgment interest;

4.      Costs of suit incurred;

5.      All costs, expenses and attorneys' fees; and

6.      Such other and further relief as the court deems just and proper.

**ON THE FOURTH, FIFTH, SIXTH, SEVENTH, AND EIGHTH CAUSES OF ACTION**

1.      Issue a permanent injunction restraining the Defendants, their officers, employees, agents, affiliates, parents, subsidiaries and all other persons who act in concert with them from making false, misleading or deceptive statements or representations about Urban, Gateway, or the Gateway Project;

2.      Issue a permanent injunction restraining the Defendants, their officers, employees, agents, affiliates, parents, subsidiaries and all other persons who act in concert with them from extorting Urban or Gateway;

3.      Issue a permanent injunction restraining the Conquest Defendants, their officers, employees, agents, affiliates, parents, subsidiaries and all other persons who

act in concert with them from all copying, duplicating, distributing, reproducing, or creating additional works derived from Plaintiffs' copyrighted material;

    4.    Award damages against the Defendants, jointly and severally, for a sum of money equal to the amount of damages Urban has sustained or will sustain, said amount to be trebled pursuant to 18 U.S.C. § 1964(c);

    5.    Award prejudgment interest on the amount of damages that Urban and Gateway has sustained;

    6.    Award all costs of litigation incurred by Urban and Gateway, including its reasonable attorneys' fees and expert witnesses fees, pursuant to 18 U.S.C. § 1964(c);

    7.    Award punitive damages; and

    8.    Award such other further relief as the Court deems just and equitable.

**ON THE NINTH, TENTH, ELEVENTH, TWELFTH, AND THIRTEENTH CAUSES OF ACTION**

    1.    Issue a permanent injunction restraining the Conquest Defendants, their officers, employees, agents, affiliates, parents, subsidiaries and all other persons who act in concert with them from making false, misleading or deceptive statements or representations about the University Gateway Project and USC;

    2.    Issue a permanent injunction restraining the Conquest Defendants, their officers, employees, agents, affiliates, parents, subsidiaries and all other persons who act in concert with them from extorting USC;

    4.    Award damages against the Conquest Defendants, jointly and severally, for a sum of money equal to the amount of damages USC sustained or will sustain, said amount to be trebled pursuant to 18 U.S.C. § 1964(c);

    5.    Award prejudgment interest on the amount of damages that USC has sustained;

    6.    Award all costs of litigation incurred by USC, including its reasonable attorneys' fees and expert witnesses fees, pursuant to 18 U.S.C. § 1964(c);

7.      Award punitive damages; and

8.      Award such other further relief as the Court deems just and equitable.

**ON THE FOURTEENTH CAUSE OF ACTION**

1.      A permanent injunction pursuant to Business and Professions Code section 17203, restraining and enjoining Conquest Defendants from continuing the acts of unfair competition set forth above;

2.      During this action, a preliminary injunction pursuant to Business and Professions Code section 17203 to enjoin and restrain the Conquest Defendants from the acts of unfair competition set forth above;

3.      The Conquest Defendants be ordered to restore to the public all funds acquired by the acts of unfair competition set forth above pursuant to Business and Professions Code section 17203;

4.      For restitutionary disgorgement of profits and other economic benefits unjustly obtained by the Conquest Defendants from the Plaintiffs as a result of their acts of unfair competition;

5.      For all costs, expenses and attorney's fees of suit pursuant to 17 U.S.C. §§ 503-05; and

6.      Any other and further relief as the court deems just and equitable.

**ON THE FIFTEENTH, SIXTEENTH, AND SEVENTEENTH CAUSES OF ACTION**

1.      Compensatory damages;

2.      Punitive damages;

3.      All costs of suit; and

4.      Such other and further relief as the court considers proper.

**ON THE EIGHTEENTH CAUSE OF ACTION**

1.      Defendants Conquest, Chen, Smolinisky and their agents be enjoined during the pendency of this action, and permanently thereafter, from all copying, duplicating, distributing, reproducing, or creating additional works

derived from Urban's copyrighted material.

2.     Damages and Defendant Conquest, Chen, and Smolinisky's profits resulting from their copyright infringement, or at Urban's election, statutory damages up to $150,000 for each copyrighted work;

3.     Costs of suit pursuant to 17 U.S.C. §§ 503-05;

4.     Attorneys' fees pursuant to 17 U.S.C. §§ 503-05; and

5.     Any other and further relief as the court deems just and proper.

## <u>Jury Demand</u>

Plaintiffs demand a trial by jury.


DATED:  October 17, 2007                    STEPTOE & JOHNSON LLP


                                            By: _____
                                               Lawrence P. Riff
                                               Jason Levin
                                               Howard H. Stahl
                                               Karl M. Tilleman
                                               633 West Fifth Street, Suite 700
                                               Los Angeles, California 90071

                                               Attorneys for Plaintiffs

## DECLARATION OF HOWARD J. KOZLOFF

I, Howard J. Kozloff, declare as follows:

1.      I am currently the Development Manager of The Martin Group ("TMG"). I have held this position since 2006. In my role at TMG, I have had the opportunity to interact with Mssrs. Alan Smolinisky and Brian Chien-Chih Chen of Conquest Student Housing, LLC ("Conquest"). I have firsthand personal knowledge of the facts set forth below, and if called upon to do so, I could and would testify competently thereto under oath.

2.      TMG is a real estate development and management company that was founded in 1984. TMG's headquarters is located in Santa Monica, California. TMG recently became involved in the potential acquisition and development of a property located at 3800 S. Figueroa St., in the University Park area of South Los Angeles, near the University of Southern California ("USC").

3.      On May 9, 2007, Mr. Lee Wagman (TMG's Chief Executive Officer), and I met with Conquest representatives, Alan Smolinisky and Brian Chien-Chih Chen, at TMG's offices in Santa Monica. Mr. Smolinisky had previously requested this meeting, and TMG agreed to host it. Prior to that meeting, I had never met or had any relationship with either of these individuals.

4.      During the May 9 meeting, Mr. Smolinisky tried to convince us that TMG should not proceed with a development project at 3800 S. Figueroa and then threatened to sue any TMG project at that location using the California Environmental Quality Act ("CEQA"). Mr. Smolinisky stated that there is no market depth for student housing near USC, that TMG would be making a huge mistake by developing student housing near USC, and that any TMG student housing project near USC would not reach functional occupancy levels. Mr. Smolinisky also said that if TMG decides to proceed with a student housing project at 3800 S. Figueroa, that Conquest would prolong TMG's entitlement process to the maximum extent possible by opposing those entitlements and by suing to try to delay any project approvals under CEQA. Mr. Smolinisky said that those delays would make our purchase of this site economically infeasible. He also said that he knows exactly what it would cost Conquest to slow down a project like

<div align="center">1</div>

1   TMG's, that he would spend between $1.3 and $1.6 million to prevent the TMG project, and that

2   he could delay the TMG project by six or more years using CEQA litigation.  Mr. Smolinisky

3   also stated that we should think of him and Conquest like "Al Qaeda," adding that it does not

4   cost a lot to build a "bomb" and cause extensive damage to a development project, and that it

5   only takes a single person to cause serious harm to real estate projects using CEQA.

6          5.          During the May 9 meeting, Mr. Smolinisky also discussed how his CEQA

7   litigation tactics have successfully delayed the University Gateway Project near USC.  Mr.

8   Smolinisky said that his lawsuits opposing the University Gateway Project have delayed that

9   project's groundbreaking, and he boasted that he is using CEQA to oppose other projects

10  involving Urban Partners, one of the developers involved in the University Gateway Project.

11  Mr. Smolinisky said that he has delayed Urban Partners' project downtown, that he has delayed

12  Urban Partners' project in Sun Valley, and that he has "chased" Urban Partners to Seattle to

13  oppose Urban's project in that city.  Mr. Smolinisky also said that he is meeting with the

14  Blackstone Group, one of the investors in the University Gateway Project, to threaten them about

15  their involvement in that project.  Mr. Smolinisky said that he has successfully made Urban

16  Partners and the Shammas family the "victim" for proceeding with the University Gateway

17  Project.  Mr. Smolinisky told us that he views CEQA as a powerful tool to delay real estate

18  projects, that he has highly effective legal counsel, and that his tactics are protected by the First

19  Amendment and the "anti-SLAP lawsuit" rules .  Mr. Smolinisky also explained that he knows

20  about TMG's projects in Downtown Los Angeles, Agoura Hills and on La Brea Blvd, and that he

21  knows the La Brea project already has experienced some delay.

22         6.          During the May 9 meeting, Mr. Smolinisky also said that he is aware of a

23  personal legal issue that involves Mr. Wagman, and that as an inducement for TMG not to

24  proceed with the 3800 S. Figueroa project he could  arrange to call off the opposition in that

25  personal matter because the attorney involved, John Henning, works for him in some capacity.

26         7.          Within a day or so of the May 9 meeting, we received notice that

27  Conquest had filed requests for documents concerning TMG's development projects in Agoura

28  Hills and on La Brea through California's Public Records Act.

2

8.        On May 16, 2007, Mr. Wagman received a letter from Mssrs. Smolinisky and Chen that renewed the threat that Conquest intends to initiate litigation and draw out appeals if TMG develops the 3800 S. Figueroa property. A true and correct copy of that letter is attached hereto as Exhibit A. That letter sets forth Conquest's projected development timeline for a TMG project at 3800 S. Figueroa, and states that "we have assumed that a consortium of existing tenants and neighbors object to the project," and that a litigation involving such a project would delay construction until "mid-2013." The letter also states that "If you were to construct the improvements, we are unable to envision any reality in which you would be able to generate sufficient income to break even."

9.        On May 17, 2007, Mr. Wagman sent a letter to Mr. Smolinisky explaining that TMG believes Mr. Smolinisky is trying to harass TMG, and that TMG believes his tactics and motives are anticompetitive. A true and correct copy of this letter is attached hereto as Exhibit B.

10.       Based on the conduct of Mr. Smolinisky and Mr. Chen, I believe that these individuals are trying to threaten and harass TMG to keep our company from entering the student housing market near USC, and that these individuals have used similar tactics against other potential competitors to prevent them from entering this market.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 11th day of June, 2007 in Los Angeles, California.

Howard J. Kozloff

3

# EXHIBIT A

**1**
**93**



May 16, 2007

Mr. Lee Wagman
The Martin Group of Companies, LLC
100 Wilshire Blvd.
Suite 1845
Santa Monica, CA 90401

     Re:   <u>3800 S. Figueroa Street Development</u>

Dear Mr. Wagman:

     We are disappointed that you have elected not to avail yourself of the further opportunity to meet with us at our office and hear further our issues and concerns regarding your company's potential acquisition and development of the 3800 S. Figueroa property. Other than the actual tenants of the property, we are your closest neighbor, and as the owners of 18 other buildings in the general vicinity, will be most affected by your development.

     We have been developing ground up construction properties in this area for the past 6 years. Our offices are located here as well. We have more knowledge of this area than anyone else. At the meeting we had hoped to have, we intended to show you property by property our actual income and expenses based on Federal tax returns (the numbers for Tuscany are based on monthly rent rolls since the property has not been in operation for an entire year yet). With this information in hand, we had hoped to help you ascertain the following: (i) the per square foot sales price you would need in order to break even, assuming that you sold the property after entitlements, and (ii) your total cost of development, assuming that you built the improvements and maintained ownership.

     We believe that it is so important that you receive this information that even though you would not meet, we have taken the liberty of compiling the relevant information for you anyway. For now, you will have to take our word that all of the financial information is taken directly off of our tax returns. Of course, after you have reviewed this information, if you would like to meet at our office, we would be happy to walk you through all of the backup documentation.

3770 South Figueroa Street, Los Angeles, California 90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

The attached pages contain the following information:

1.     Rents.

These are our actual rent figures on a cumulative basis, property by property.  For Tuscany, we have provided monthly figures because the property has not been operational for an entire year yet.  Rents are "gross", that is, all Conquest apartments include parking, Ethernet, DISH Network television and trash pickup for no additional charge.

2.     Operating Expenses.

Even with our ability to manage expenses across a platform of properties, student housing is still a very labor intensive, high expense business.  As you can see, our expenses per property run between 35% and 52%.  We do not yet have Tuscany's year based expenses, but we expect these expenses to run towards the higher end of the expense range because of the additional services offered at Tuscany free of charge, including concierge, yoga classes, movie night, gym, pool, spas, steam and saunas.

3.     Development Timeline.

We have created the type of timeline we would use assuming we were developing the property and we intended to build a project with the same uses and development intensity as Tuscany (that is, we have assumed that you will need certain discretionary approvals from the City of Los Angeles, but we have not assumed that you intend to construct a fifty story tower).  We have also assumed that you have a team of consultants ready to go immediately upon acquisition of the land.  Finally, we have assumed that a consortium of existing tenants and neighbors object to the project, and that therefore you must be successful in obtaining all governmental entitlements notwithstanding the opposition from tenants and affected neighbors, and then after that you must win both at trial court and on appeal before you can either sell the property with entitlements or break ground.

Based on these assumptions, and assuming that neither the trial court nor appeals court invalidates any of your entitlements or requires you to redo any of your reports or studies, we believe that you would be in position to either sell the property or commence construction mid-2013.  Assuming it takes approximately 24 months to construct the improvements, if you were to do so, the improvements would be completed summer 2015.  That means that you would be open for students for the 2015-2016 school year.

4.     Development and Construction Costs.

3770 South Figueroa Street, Los Angeles, California  90007
Tel: (213) 746-7121    Fax: (213) 748-9722
www.ConquestHousing.com

**1**
**95**

We have attempted to ballpark your cost of carrying the land through the entitlement process. We have assumed a land carrying cost of 5.5% per annum. This is either a very optimistic figure if you are using third party financing of any kind, or a reasonable missed return on investment if you were to be utilizing equity only. We have added anticipated annual real property tax payments based on your purchase price, as well as liability insurance for the property.

Our conclusion is that as of mid-2013, your cost in the project, exclusive of entitlement cost, would be approximately **$29,500,000**, which translates into **$422 per foot** for the land. If you add **$6,000,000** for the cost of entitlements through appeal court, including all consultants and attorneys, your cost is approximately **$35,500,000**, which translates into **$500 per square foot** for the land. Assuming 3% brokerage and closing costs, you would need to realize **$520 per foot** for the land just to break even.

Finally, assuming that you were to build a project of the same size as Tuscany, we believe that your construction costs would be at least **$50,000,000**. We have assumed that you would obtain a construction loan for the improvements. We have assumed interest on the construction loan of 7%, inclusive of fees and costs. We have therefore concluded that upon completion, between equity, deemed return on equity and construction, your cost in the project would be at least **$85,000,000**. As a comparison, it cost us less than half of that to buy the land and build Tuscany.

Obviously there are a variety of unknowns which could greatly affect the numbers. Interest rates and construction costs could be higher or lower. USC could greatly increase or decrease the size of its freshman class, thereby altering demand. Supply of units will certainly increase based on downtown LA construction as well as the proposed redevelopment by USC of University Village.

Notwithstanding the foregoing, we believe that it is clear that barring something quite extraordinary, if you were to sell the property post-entitlement pre-construction, you would need to receive a land price not seen anywhere but in Beverly Hills just to break even. If you were to construct the improvements, we are unable to envision any reality in which you would be able to generate sufficient income to break even.

We would be happy to go over this analysis and the backup information on which it was based if you elect to meet with us in our office.


Very truly yours,


Alan Smolinisky/Brian Chen


3770 South Figueroa Street, Los Angeles, California  90007
Tel: (213) 746-7121    Fax: (213) 748-9722
www.ConquestHousing.com

# Conquest Student Housing Rents

## TUSCANY

| | 2006 Monthly Rent |
|---|---|
| TUSCANY Monthly Rent: | $ 401,335 |
| Monthly Rent Per Bed: | $ 784 |

## OTHER PROPERTIES

| | Number of Beds | 2006 Annual Rent | 2006 Annual Rent Per Bed |
|---|---|---|---|
| Chez Ronnee & The Bungalows | 148 | $ 1,101,950 | $ 7,445.61 |
| Habitat Soo Zee | 96 | $ 673,917 | $ 7,019.97 |
| The Pad | 37 | $ 230,177 | $ 6,221.00 |
| Abbey Road/The Palazzo | 48 | $ 395,395 | $ 8,237.40 |
| Providence | 97 | $ 627,693 | $ 6,471.06 |
| Palisades I & II | 136 | $ 930,916 | $ 6,844.97 |

**Notes:**
The figures above for "Other Properties" were taken directly from IRS Form 8825 of each respective 2006 LLC tax return.
The 2006 Monthly rent for Tuscany is the actual monthly rent collection since we have no tax returns for a full year of operation.
The above properties do not include graduate buildings that consist of studio and 1BR units only.
All Conquest apartments include parking, Ethernet, Dish Network television and trash pick up included in rent.

1
97

The figures below were taken directly from IRS Form 8825 of each respective 2006 LLC tax return

| Building Name | Owner (LLC) | # of units | # of beds | 2006 Revenue | 2006 Operating Expenses (actual interest, depreciation, and amortization) | % Expenses | NOI | % NOI |
|---|---|---|---|---|---|---|---|---|
| Chez Ronnee & The Bungalows | Chez Investments, LLC | 42 | 148 | $ 1,101,950.00 | $ 390,525.00 | 35.44% | $ 711,425.00 | 64.56% |
| Haban See Zee | Haban See Zee, LLC | 24 | 96 | $ 673,917.00 | $ 267,702.00 | 39.72% | $ 406,215.00 | 60.28% |
| The Pad | The Pad on 30th Street, LLC | 14 | 57 | $ 229,177.00 | $ 118,743.00 | 51.82% | $ 111,434.00 | 48.41% |
| Abbey Rosyline Plaza | Sgt. Pepper Housing, LLC | 12 | 48 | $ 295,368.00 | $ 173,020.00 | 43.82% | $ 122,348.00 | 56.34% |
| Providence | Providence Apartments on Menlo, LLC | 20 | 57 | $ 627,693.00 | $ 295,261.00 | 47.04% | $ 332,432.00 | 52.86% |
| Palisades I & II | Palomar Housing, LLC | 28 | 136 | $ 930,916.00 | $ 389,586.00 | 41.85% | $ 541,330.00 | 58.15% |



1
99





*Purchase Price:* $ 21,000,000
*Square Footage:* 70,130
*Price per foot:* $ 299.44

| | | | | | 2013 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| Acquisition of Land: | | | | | | | | | | | | | | | | |
| Engage Primary Consultants *(architect, surveyor, soil engineer, zoning consultant, EIR consultant, traffic consultant, historical consultant, community relations)*: | | | | | | | | | | | | | | | | |
| Prepare Architectural Design and Project Description: | | | | | | | | | | | | | | | | |
| City and CRA Meetings and Community Outreach: | | | | | | | | | | | | | | | | |
| Notice of Preparation and Scoping Meeting (30 days): | | | | | | | | | | | | | | | | |
| Preparation of Draft EIR including all technical reports: | | | | | | | | | | | | | | | | |
| Public Comment Period for Draft EIR (45 days): | | | | | | | | | | | | | | | | |
| Preparation of Responses to Draft EIR Comments, and Preparation of Final EIR: | | | | | | | | | | | | | | | | |
| CRA Board Hearing (Certify Final EIR and Approves Variations): | | | | | | | | | | | | | | | | |
| Lawsuit Challenging Final EIR and Board Approvals: | | | | | | | | | | | | | | | | |
| File Applications for City Entitlements: | | | | | | | | | | | | | | | | |
| Hearing by CPC Hearing Officer: | | | | | | | | | | | | | | | | |
| CPC Hearing: | | | | | | | | | | | | | | | | |
| Issuance of CPC determination: | | | | | | | | | | | | | | | | |
| Appeal CPC Determination and Processing by City: | | | | | | | | | | | | | | | | |
| Submit Building Permit Application: | | | | | | | | | | | | | | | | |
| PLUM Committee Hearing: | | | | | | | | | | | | | | | | |
| City Council Approval of Project: | | | | | | | | | | | | | | | | |
| City Entitlements Complete: | | | | | | | | | | | | | | | | |
| Lawsuit Challenging Final EIR and City Approvals: | | | | | | | | | | | | | | | | |
| Appeal of CRA and City Lawsuit (Court of Appeal): | | | | | | | | | | | | | | | | |
| Best Case to Break Ground: (assumes complete victory) | | | | | | | | | | | | | | | | |

| | | |
|---|---|---|
| Purchase Price: | $ | 21,000,000 |
| Land Square Footage: | | 70,000 |
| Price per SQF: | | 300.00 |
| Property Tax Rate: | | 1.14% |
| | | |
| Total Land Purchase Carrying Cost: | $ | 21,000,000 |
| | | |
| Annual Insurance Cost: | | 17,500 |
| April 10 Property Tax Payment: | | 119,700 |
| December 10 Property Tax Payment: | | 119,700 |

| | | |
|---|---|---|
| TOTAL COST (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING) | $ | 28,537,336 |
| TOTAL COST PER FOOT (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING) | $ | 421.96 |

Note:
We have assumed no increase in property taxes, insurance or interest rate.

1
102

**EXHIBIT B**

1

103

# THE MARTIN GROUP

May 17, 2007

Alan Smolinisky
Conquest Student Housing
3770 South Figueroa Street
Los Angeles, CA 90007

Dear Alan,

We've been reluctant to respond to your calls or to answer the letter you sent yesterday in light of the threatening statements you made in our meeting last week and because of the aggressive and, we believe, inappropriate actions you've taken subsequently. In particular, we are concerned by the document requests you immediately filed in communities where we are doing business in which you have absolutely no interest other than to harass us; the introduction of personal, non-business matters to induce us to change course; the letter that you sent that reiterated in bold face type your threats to initiate litigation and draw out appeals; the effort you made to go around one of us with calls to the other simply because your call wasn't returned in 20 hours; the letter that appears to have been carefully crafted by litigation lawyers; and the numerous inquiries you've made about us to third parties.

This all creates an alarming pattern and causes us to regard your motives and tactics as anti-competitive. It also convinces us that we should not consider, let alone rely, on any information that you proffer. Indeed, we prefer not to have any conversation with you in which you don't consent in advance to record, or in which counsel is not present.

Your actions and threats to "tie us up in CEQA litigation for six or more years" are, to my mind, completely inappropriate. You know nothing about our project, the process we intend to follow, or any potential CEQA issues. Your only goal seems to be to convince us to either back away from our purchase or end up "the victim", as you bragged you made us out of Urban Partners and the Shammas family. In our meeting, you analogized yourself to Al Qaeda. We are starting to agree.

Instead of this type of dialogue, I would welcome the opportunity to share with you our thoughts about why we think our project will be good for you.

> – Because we are spending so much on the land, we will need to achieve substantial rents which will uplift the entire market and inure the benefit of Tuscany.

The Martin Group

**1**
**104**

- We build quality projects which improve the neighborhoods in which we locate.
- We will attract more people to the area who will shop and dine at Tuscany and who will walk by and appreciate the building first hand.

We believe that our project will be highly complementary. We encourage your support, not your threats and opposition. We do not wish to be an adversary and warmly welcomed you in our office as a neighbor when you first called.

We simply want to develop a first rate project, one that we believe will be well received by the market, by the University and by the City. Unfairly competing and attempting to create and maintain a market monopoly through the tactics of intimidation are not, as you suggested in person, the protected exercise of any constitutional right.

We hope that what we've said may persuade you to take a different course. But from the impression you've quickly given and your past actions, we doubt it. Please know that we don't consider your threats as idle or dismiss them. As you reminded us several times, you've done this successfully in the past, have all the resources you need to do it again, and know how to use lawsuits as weapons to chill our purchase or damage our project. We hear you, but we'll make our own decisions based on what is right, not on threats.

Sincerely,

The Martin Group

Lee H. Wagman

J. David Martin

**1**
**105**

## DECLARATION OF LEE H. WAGMAN

I, Lee H. Wagman, declare as follows:

1.       I am currently the Chief Executive Officer and a Partner of The Martin Group ("TMG"). I have held these positions since 2005. In my role at TMG, I have had the opportunity to interact with Mssrs. Alan Smolinisky and Brian Chien-Chih Chen of Conquest Student Housing, LLC ("Conquest"). I have firsthand personal knowledge of the facts set forth below, and if called upon to do so, I could and would testify competently thereto under oath.

2.       TMG is a real estate development and management company that was founded in 1984. TMG's headquarters is located in Santa Monica, California. TMG recently became involved in the potential acquisition and development of a property located at 3800 S. Figueroa St., in the University Park area of South Los Angeles, near the University of Southern California ("USC").

3.       On May 9, 2007, Mr. Howard Kozloff (TMG's Development Manager) and I met with Conquest representatives, Alan Smolinisky and Brian Chien-Chih Chen, at TMG's offices in Santa Monica. Mr. Smolinisky had previously requested this meeting, and TMG agreed to host it. Prior to that meeting, I had never met or had any relationship with either of these individuals.

4.       During the May 9 meeting, Mr. Smolinisky tried to convince us that TMG should not proceed with a development project at 3800 S. Figueroa and then threatened to sue any TMG project at that location using the California Environmental Quality Act ("CEQA"). Mr. Smolinisky stated that there is no market depth for student housing near USC, that TMG would be making a huge mistake by developing student housing near USC, and that any TMG student housing project near USC would not reach functional occupancy levels. Mr. Smolinisky also said that if TMG decides to proceed with a student housing project at 3800 S. Figueroa, that Conquest would prolong TMG's entitlement process to the maximum extent possible by opposing those entitlements and by suing to try to delay any project approvals under CEQA. Mr. Smolinisky said that those delays would make our purchase of this site economically infeasible. He also said that he knows exactly what it would cost Conquest to slow down a project like

<div align="center">1</div>

1   TMG's, that he would spend between $1.3 and $1.6 million to prevent the TMG project, and that

2   he could delay the TMG project by six or more years using CEQA litigation.  Mr. Smolinisky

3   also stated that we should think of him and Conquest like "Al Qaeda," adding that it does not

4   cost a lot to build a "bomb" and cause extensive damage to a development project, and that it

5   only takes a single person to cause serious harm to real estate projects using CEQA.

6          5.          During the May 9 meeting, Mr. Smolinisky also discussed how his CEQA

7   litigation tactics have successfully delayed the University Gateway Project near USC.  Mr.

8   Smolinisky said that his lawsuits opposing the University Gateway Project have delayed that

9   project's groundbreaking, and he boasted that he is using CEQA to oppose other projects

10   involving Urban Partners, one of the developers involved in the University Gateway Project.

11   Mr. Smolinisky said that he has delayed Urban Partners' project downtown, that he has delayed

12   Urban Partners' project in Sun Valley, and that he has "chased" Urban Partners to Seattle to

13   oppose Urban's project in that city.  Mr. Smolinisky also said that he is meeting with the

14   Blackstone Group, one of the investors in the University Gateway Project, to threaten them about

15   their involvement in that project.  Mr. Smolinisky said that he has successfully made Urban

16   Partners and the Shammas family the "victim" for proceeding with the University Gateway

17   Project.  Mr. Smolinisky told us that he views CEQA as a powerful tool to delay real estate

18   projects, that he has highly effective legal counsel, and that his tactics are protected by the First

19   Amendment and the "anti-SLAP lawsuit" rules.  Mr. Smolinisky also explained that he knows

20   about TMG's projects in Downtown Los Angeles, Agoura Hills and on La Brea Blvd, and that he

21   knows the La Brea project already has experienced some delay.

22          6.          During the May 9 meeting, Mr. Smolinisky also said that he is aware of a

23   personal legal issue that involves me, and that as an inducement for TMG not to proceed with the

24   3800 S. Figueroa project he could arrange to call off the opposition in that personal matter

25   because the attorney involved, John Henning, works for him in some capacity.

26          7.          Within a day or so of the May 9 meeting, we received notice that

27   Conquest bad filed requests for documents concerning TMG's development projects in Agoura

28   Hills and on La Brea through California's Public Records Act.

                                          2

8.        On May 16, 2007, I received a letter from Mssrs. Smolinsky and Chen that renewed the threat that Conquest intends to initiate litigation and draw out appeals if TMG develops the 3800 S. Figueroa property.  A true and correct copy of that letter is attached hereto as Exhibit A.  That letter sets forth Conquest's projected development timeline for a TMG project at 3800 S. Figueroa, and states that "we have assumed that a consortium of existing tenants and neighbors object to the project," and that a litigation involving such a project would delay construction until "mid-2013."  The letter also states that "If you were to construct the improvements, we are unable to envision any reality in which you would be able to generate sufficient income to break even."

9.        On May 17, 2007, I sent a letter to Mr. Smolinisky explaining that TMG believes Mr. Smolinisky is trying to harass TMG, and that TMG believes his tactics and motives are anticompetitive.  A true and correct copy of this letter is attached hereto as Exhibit B.

10.        Based on the conduct of Mr. Smolinisky and Mr. Chen, I believe that these individuals are trying to threaten and harass TMG to keep our company from entering the student housing market near USC, and that these individuals have used similar tactics against other potential competitors to prevent them from entering this market.

        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this _11_ th day of June, 2007 in Los Angeles, California.

Lee H. Wagman

3

2
108

**EXHIBIT A**

**2**
**109**



**CON UEST**
STUDENT HOUSING

May 16, 2007

Mr. Lee Wagman
The Martin Group of Companies, LLC
100 Wilshire Blvd.
Suite 1845
Santa Monica, CA 90401

      Re:    <u>3800 S. Figueroa Street Development</u>

Dear Mr. Wagman:

      We are disappointed that you have elected not to avail yourself of the further opportunity to meet with us at our office and hear further our issues and concerns regarding your company's potential acquisition and development of the 3800 S. Figueroa property. Other than the actual tenants of the property, we are your closest neighbor, and as the owners of 18 other buildings in the general vicinity, will be most affected by your development.

      We have been developing ground up construction properties in this area for the past 6 years. Our offices are located here as well. We have more knowledge of this area than anyone else. At the meeting we had hoped to have, we intended to show you property by property our actual income and expenses based on Federal tax returns (the numbers for Tuscany are based on monthly rent rolls since the property has not been in operation for an entire year yet). With this information in hand, we had hoped to help you ascertain the following: (i) the per square foot sales price you would need in order to break even, assuming that you sold the property after entitlements, and (ii) your total cost of development, assuming that you built the improvements and maintained ownership.

      We believe that it is so important that you receive this information that even though you would not meet, we have taken the liberty of compiling the relevant information for you anyway. For now, you will have to take our word that all of the financial information is taken directly off of our tax returns. Of course, after you have reviewed this information, if you would like to meet at our office, we would be happy to walk you through all of the backup documentation.

3770 South Figueroa Street, Los Angeles, California 90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

**2
110**

The attached pages contain the following information:

1.   Rents.

These are our actual rent figures on a cumulative basis, property by property. For Tuscany, we have provided monthly figures because the property has not been operational for an entire year yet. Rents are "gross", that is, all Conquest apartments include parking, Ethernet, DISH Network television and trash pickup for no additional charge.

2.   Operating Expenses.

Even with our ability to manage expenses across a platform of properties, student housing is still a very labor intensive, high expense business. As you can see, our expenses per property run between 35% and 52%. We do not yet have Tuscany's year based expenses, but we expect these expenses to run towards the higher end of the expense range because of the additional services offered at Tuscany free of charge, including concierge, yoga classes, movie night, gym, pool, spas, steam and saunas.

3.   Development Timeline.

We have created the type of timeline we would use assuming we were developing the property and we intended to build a project with the same uses and development intensity as Tuscany (that is, we have assumed that you will need certain discretionary approvals from the City of Los Angeles, but we have not assumed that you intend to construct a fifty story tower). We have also assumed that you have a team of consultants ready to go immediately upon acquisition of the land. Finally, we have assumed that a consortium of existing tenants and neighbors object to the project, and that therefore you must be successful in obtaining all governmental entitlements notwithstanding the opposition from tenants and affected neighbors, and then after that you must win both at trial court and on appeal before you can either sell the property with entitlements or break ground.

Based on these assumptions, and assuming that neither the trial court nor appeals court invalidates any of your entitlements or requires you to redo any of your reports or studies, we believe that you would be in position to either sell the property or commence construction mid-2013. Assuming it takes approximately 24 months to construct the improvements, if you were to do so, the improvements would be completed summer 2015. That means that you would be open for students for the 2015-2016 school year.

4.   Development and Construction Costs.

3770 South Figueroa Street, Los Angeles, California 90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

**2**
**111**

We have attempted to ballpark your cost of carrying the land through the entitlement process. We have assumed a land carrying cost of 5.5% per annum. This is either a very optimistic figure if you are using third party financing of any kind, or a reasonable missed return on investment if you were to be utilizing equity only. We have added anticipated annual real property tax payments based on your purchase price, as well as liability insurance for the property.

Our conclusion is that as of mid-2013, your cost in the project, exclusive of entitlement cost, would be approximately $29,500,000, which translates into $422 per foot for the land. If you add $6,000,000 for the cost of entitlements through appeal court, including all consultants and attorneys, your cost is approximately $35,500,000, which translates into $500 per square foot for the land. Assuming 3% brokerage and closing costs, you would need to realize $520 per foot for the land just to break even.

Finally, assuming that you were to build a project of the same size as Tuscany, we believe that your construction costs would be at least $50,000,000. We have assumed that you would obtain a construction loan for the improvements. We have assumed interest on the construction loan of 7%, inclusive of fees and costs. We have therefore concluded that upon completion, between equity, deemed return on equity and construction, your cost in the project would be at least $85,000,000. As a comparison, it cost us less than half of that to buy the land and build Tuscany.

Obviously there are a variety of unknowns which could greatly affect the numbers. Interest rates and construction costs could be higher or lower. USC could greatly increase or decrease the size of its freshman class, thereby altering demand. Supply of units will certainly increase based on downtown LA construction as well as the proposed redevelopment by USC of University Village.

Notwithstanding the foregoing, we believe that it is clear that barring something quite extraordinary, if you were to sell the property post-entitlement pre-construction, you would need to receive a land price not seen anywhere but in Beverly Hills just to break even. If you were to construct the improvements, we are unable to envision any reality in which you would be able to generate sufficient income to break even.

We would be happy to go over this analysis and the backup information on which it was based if you elect to meet with us in our office.

Very truly yours,

Alan Smolinisky/Brian Chen


3770 South Figueroa Street, Los Angeles, California 90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

**2**
**112**

# Conquest Student Housing Rents

## TUSCANY

|  | 2006 Monthly Rent |
|---|---|
| TUSCANY Monthly Rent: | $ 401,335 |
| Monthly Rent Per Bed: | $ 784 |

## OTHER PROPERTIES

|  | Number of Beds | 2006 Annual Rent | 2006 Annual Rent Per Bed |
|---|---|---|---|
| Chez Ronnee & The Bungalows | 148 | $ 1,101,950 | $ 7,445.61 |
| Habitat Soo Zee | 96 | $ 673,917 | $ 7,019.97 |
| The Pad | 37 | $ 230,177 | $ 6,221.00 |
| Abbey Road/The Palazzo | 48 | $ 395,395 | $ 8,237.40 |
| Providence | 97 | $ 627,693 | $ 6,471.06 |
| Palisades I & II | 136 | $ 930,916 | $ 6,844.97 |

Notes:
The figures above for "Other Properties" were taken directly from IRS Form 8825 of each respective 2006 LLC tax return.
The 2006 Monthly rent for Tuscany is the actual monthly rent collection since we have no tax returns for a full year of operation.
The above properties do not include graduate buildings that consist of studio and 1BR units only.
All Conquest apartments include parking, Ethernet, Dish Network television and trash pick up included in rent.

**2**
**113**

The figures below were taken directly from IRS Form 8825 of each respective 2006 LLC tax return

| Building Name | Owner (LLC) | # of units | # of beds | 2006 Revenue | 2006 Operating Expenses (w/out Interest, depreciation, and amortization) | % Expenses | NOI | % NOI |
|---|---|---|---|---|---|---|---|---|
| Chat Review & The Bungalows | Chat Review/etc, LLC | 42 | 149 | $ 1,101,050.00 | $ 389,528.00 | 35.44% | $ 711,421.00 | 64.56% |
| Habitat Sao Zea | Habitat Sao Zea, LLC | 24 | 95 | $ 673,817.00 | $ 267,702.00 | 39.72% | $ 406,215.00 | 60.28% |
| The Pad | The Pad at 30th Street, LLC | 14 | 37 | $ 230,177.00 | $ 118,743.00 | 51.59% | $ 111,434.00 | 48.41% |
| Abbey Road/The Palazzo | Sgt. Pepper Housing, LLC | 13 | 49 | $ 385,295.00 | $ 172,930.00 | 43.79% | $ 212,365.00 | 54.34% |
| Providence | Providence Apartments on Manor, LLC | 20 | 57 | $ 527,693.00 | $ 295,241.00 | 47.04% | $ 232,452.00 | 52.96% |
| Palazzo II & III | Palenar Housing, LLC | 24 | 136 | $ 930,916.00 | $ 289,586.00 | 41.85% | $ 641,330.00 | 68.15% |





**2**
**116**



| | | |
|---|---|---|
| Purchase Price: | $ | 21,000,000 |
| Land Sale(s) Savings: | | 78,000 |
| Price per Acre: | $ | 300.00 |
| Property Tax Rate: | | 1.14% |
| | | |
| Total Land Purchase Carrying Cost: | $ | 21,000,000 |
| | | |
| Original Footprint: | | |
| Annual Insurance Cost: | $ | 17,250 |
| April 10 Property Tax Payment: | $ | 119,700 |
| December 10 Property Tax Payment: | $ | 119,700 |

| | 8/2/10 - 1/2/10 | 2/10 - 7/10/10 | 8/10/10 - 1/10/10 | 2/10/10 - 7/10/10 | 8/10 - 1/11/11 | 2/11 - 7/11/11 | 8/11 - 1/10/11 | 2/11 - 7/11/11 | 8/11 - 1/10/11 | 2/11 - 7/11/11 | 8/11 - 1/10/11 | 2/11 - 7/11/11 | 8/11 - 12/11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Compounded Carrying Cost: | 21,128,400 | 21,256,800 | 21,385,360 | 21,513,900 | 21,642,250 | 21,770,760 | 21,899,156 | 22,027,560 | 22,155,960 | 22,284,360 | 22,412,680 | | |
| Property Taxes (April 10 Payment): | 119,700 | | 119,700 | | 119,700 | | 119,700 | | 119,700 | | 119,700 | | |
| Property Taxes (December 10 Payment): | | 119,700 | | 119,700 | | 119,700 | | 119,700 | | 119,700 | | 119,700 | |
| Property Insurance: | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | | |
| Total Carrying Cost: | 21,256,850 | 21,385,350 | 21,513,950 | 21,642,350 | 21,770,700 | 21,899,156 | 22,027,600 | 22,155,960 | 22,284,300 | 22,412,960 | 22,412,430 | | |
| Opportunity Cost Interest Rate: | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | | |
| Semi-Annual Opportunity Cost: | 544,565 | 588,067 | 591,878 | 595,182 | 598,604 | 602,227 | 605,729 | 609,281 | 612,824 | 616,356 | 615,200 | | |
| Compounded Opportunity Cost: | 1,165,587 | 1,763,654 | 2,345,324 | 2,940,444 | 3,529,160 | 4,141,407 | 4,747,146 | 5,356,457 | 5,969,281 | 6,585,837 | 6,996,842 | | |
| TOTAL COST: | $ 21,779,483 | $ 23,139,264 | $ 23,659,124 | $ 24,582,734 | $ 25,304,840 | $ 26,040,357 | $ 26,774,746 | $ 27,512,067 | $ 28,252,781 | $ 28,998,297 | $ 29,357,218 | | |

| | | |
|---|---|---|
| TOTAL COST (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING) | $ | 29,357,229 |
| TOTAL COST PER SF (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING) | $ | 431.96 |

Note:
We have assumed no increase in property taxes, insurance or interest rates.

**2**
**118**

**EXHIBIT B**

**2**

**119**

# THE MARTIN GROUP

May 17, 2007

Alan Smolinisky
Conquest Student Housing
3770 South Figueroa Street
Los Angeles, CA 90007

Dear Alan,

We've been reluctant to respond to your calls or to answer the letter you sent yesterday in light of the threatening statements you made in our meeting last week and because of the aggressive and, we believe, inappropriate actions you've taken subsequently.  In particular, we are concerned by the document requests you immediately filed in communities where we are doing business in which you have absolutely no interest other than to harass us; the introduction of personal, non-business matters to induce us to change course; the letter that you sent that reiterated in bold face type your threats to initiate litigation and draw out appeals; the effort you made to go around one of us with calls to the other simply because your call wasn't returned in 20 hours; the letter that appears to have been carefully crafted by litigation lawyers; and the numerous inquiries you've made about us to third parties.

This all creates an alarming pattern and causes us to regard your motives and tactics as anti-competitive. It also convinces us that we should not consider, let alone rely, on any information that you proffer. Indeed, we prefer not to have any conversation with you in which you don't consent in advance to record, or in which counsel is not present.

Your actions and threats to "tie us up in CEQA litigation for six or more years" are, to my mind, completely inappropriate. You know nothing about our project, the process we intend to follow, or any potential CEQA issues. Your only goal seems to be to convince us to either back away from our purchase or end up "the victim", as you bragged you made out of Urban Partners and the Shammas family. In our meeting, you analogized yourself to Al Qaeda. We are starting to agree.

Instead of this type of dialogue, I would welcome the opportunity to share with you our thoughts about why we think our project will be good for you.

- Because we are spending so much on the land, we will need to achieve substantial rents which will uplift the entire market and inure the benefit of Tuscany.

The Martin Group
1299 Wilshire Blvd., Suite 1845, Santa Monica, CA 90401
310.395.8800 tel   310.395.2900 fax

www.themartingroup.com

**2**
**120**

- We build quality projects which improve the neighborhoods in which we locate.
- We will attract more people to the area who will shop and dine at Tuscany and who will walk by and appreciate the building first hand.

We believe that our project will be highly complementary. We encourage your support, not your threats and opposition. We do not wish to be an adversary and warmly welcomed you in our office as a neighbor when you first called.

We simply want to develop a first rate project, one that we believe will be well received by the market, by the University and by the City. Unfairly competing and attempting to create and maintain a market monopoly through the tactics of intimidation are not, as you suggested in person, the protected exercise of any constitutional right.

We hope that what we've said may persuade you to take a different course. But from the impression you've quickly given and your past actions, we doubt it. Please know that we don't consider your threats as idle or dismiss them. As you reminded us several times, you've done this successfully in the past, have all the resources you need to do it again, and know how to use lawsuits as weapons to chill our purchase or damage our project. We hear you, but we'll make our own decisions based on what is right, not on threats.

Sincerely,

The Martin Group

Lee H. Wagman

J. David Martin

**2**
**121**



May 16, 2007

Mr. Lee Wagman
The Martin Group of Companies, LLC
100 Wilshire Blvd.
Suite 1845
Santa Monica, CA 90401

Re:   3800 S. Figueroa Street Development

Dear Mr. Wagman:

We are disappointed that you have elected not to avail yourself of the further opportunity to meet with us at our office and hear further our issues and concerns regarding your company's potential acquisition and development of the 3800 S. Figueroa property. Other than the actual tenants of the property, we are your closest neighbor, and as the owners of 18 other buildings in the general vicinity, will be most affected by your development.

We have been developing ground up construction properties in this area for the past 6 years. Our offices are located here as well. We have more knowledge of this area than anyone else. At the meeting we had hoped to have, we intended to show you property by property our actual income and expenses based on Federal tax returns (the numbers for Tuscany are based on monthly rent rolls since the property has not been in operation for an entire year yet). With this information in hand, we had hoped to help you ascertain the following: (i) the per square foot sales price you would need in order to break even, assuming that you sold the property after entitlements, and (ii) your total cost of development, assuming that you built the improvements and maintained ownership.

We believe that it is so important that you receive this information that even though you would not meet, we have taken the liberty of compiling the relevant information for you anyway. For now, you will have to take our word that all of the financial information is taken directly off of our tax returns. Of course, after you have reviewed this information, if you would like to meet at our office, we would be happy to walk you through all of the backup documentation.

3770 South Figueroa Street, Los Angeles, California  90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

**3**
**122**

The attached pages contain the following information:

1.    <u>Rents</u>.

These are our actual rent figures on a cumulative basis, property by property. For Tuscany, we have provided monthly figures because the property has not been operational for an entire year yet. Rents are "gross", that is, all Conquest apartments include parking, Ethernet, DISH Network television and trash pickup for no additional charge.

2.    <u>Operating Expenses</u>.

Even with our ability to manage expenses across a platform of properties, student housing is still a very labor intensive, high expense business. As you can see, our expenses per property run between 35% and 52%. We do not yet have Tuscany's year based expenses, but we expect these expenses to run towards the higher end of the expense range because of the additional services offered at Tuscany free of charge, including concierge, yoga classes, movie night, gym, pool, spas, steam and saunas.

3.    <u>Development Timeline</u>.

We have created the type of timeline we would use assuming we were developing the property and we intended to build a project with the same uses and development intensity as Tuscany (that is, we have assumed that you will need certain discretionary approvals from the City of Los Angeles, but we have not assumed that you intend to construct a fifty story tower). We have also assumed that you have a team of consultants ready to go immediately upon acquisition of the land. Finally, we have assumed that a consortium of existing tenants and neighbors object to the project, and that therefore you must be successful in obtaining all governmental entitlements notwithstanding the opposition from tenants and affected neighbors, and then after that you must win both at trial court and on appeal before you can either sell the property with entitlements or break ground.

Based on these assumptions, and assuming that neither the trial court nor appeals court invalidates any of your entitlements or requires you to redo any of your reports or studies, we believe that you would be in position to either sell the property or commence construction mid-2013. Assuming it takes approximately 24 months to construct the improvements, if you were to do so, the improvements would be completed summer 2015. That means that you would be open for students for the 2015-2016 school year.

4.    <u>Development and Construction Costs</u>.

3770 South Figueroa Street, Los Angeles, California  90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

**3**
**123**

We have attempted to ballpark your cost of carrying the land through the entitlement process. We have assumed a land carrying cost of 5.5% per annum. This is either a very optimistic figure if you are using third party financing of any kind, or a reasonable missed return on investment if you were to be utilizing equity only. We have added anticipated annual real property tax payments based on your purchase price, as well as liability insurance for the property.

Our conclusion is that as of mid-2013, your cost in the project, exclusive of entitlement cost, would be approximately **$29,500,000**, which translates into **$422** per foot for the land. If you add **$6,000,000** for the cost of entitlements through appeal court, including all consultants and attorneys, your cost is approximately **$35,500,000**, which translates into **$500** per square foot for the land. Assuming 3% brokerage and closing costs, you would need to realize **$520** per foot for the land just to break even.

.Finally, assuming that you were to build a project of the same size as Tuscany, we believe that your construction costs would be at least **$50,000,000**. We have assumed that you would obtain a construction loan for the improvements. We have assumed interest on the construction loan of 7%, inclusive of fees and costs. We have therefore concluded that upon completion, between equity, deemed return on equity and construction, your cost in the project would be at least **$85,000,000**. As a comparison, it cost us less than half of that to buy the land and build Tuscany.

Obviously there are a variety of unknowns which could greatly affect the numbers. Interest rates and construction costs could be higher or lower. USC could greatly increase or decrease the size of its freshman class, thereby altering demand. Supply of units will certainly increase based on downtown LA construction as well as the proposed redevelopment by USC of University Village.

Notwithstanding the foregoing, we believe that it is clear that barring something quite extraordinary, if you were to sell the property post-entitlement pre-construction, you would need to receive a land price not seen anywhere but in Beverly Hills just to break even. If you were to construct the improvements, we are unable to envision any reality in which you would be able to generate sufficient income to break even.

We would be happy to go over this analysis and the backup information on which it was based if you elect to meet with us in our office.

Very truly yours,

Alan Smolinisky/Brian Chen

3770 South Figueroa Street, Los Angeles, California 90007
Tel: (213) 746-7121   Fax: (213) 748-9722
www.ConquestHousing.com

**3**
**124**

# Conquest Student Housing Rents

## TUSCANY

|  | 2006 Monthly Rent |
|---|---|
| TUSCANY Monthly Rent: | $ 401,335 |
| Monthly Rent Per Bed: | $ 784 |

## OTHER PROPERTIES

|  | Number of Beds | 2006 Annual Rent | 2006 Annual Rent Per Bed |
|---|---|---|---|
| Chez Ronnee & The Bungalows | 148 | $ 1,101,950 | $ 7,445.61 |
| Habitat Soo Zee | 96 | $ 673,917 | $ 7,019.97 |
| The Pad | 37 | $ 230,177 | $ 6,221.00 |
| Abbey Road/The Palazzo | 48 | $ 395,395 | $ 8,237.40 |
| Providence | 97 | $ 627,693 | $ 6,471.06 |
| Palisades I & II | 136 | $ 930,916 | $ 6,844.97 |

Notes:

The figures above for "Other Properties" were taken directly from IRS Form 8825 of each respective 2006 LLC tax return.

The 2006 Monthly rent for Tuscany is the actual monthly rent collection since we have no tax returns for a full year of operation.

The above properties do not include graduate buildings that consist of studio and 1BR units only.

All Conquest apartments include parking, Ethernet, Dish Network television and trash pick up included in rent.

**3**
**125**

The figures below were taken directly from IRS Form 8825 of each respective 2006 LLC tax return

| Building Name | Owner (LLC) | # of units | # of beds | 2006 Revenue | 2006 Operating Expenses (select interest, depreciation, and amortization) | % Expenses | NOI | % NOI |
|---|---|---|---|---|---|---|---|---|
| Crew Barracks & The Barnabery | Crew Investments, LLC | 42 | 148 | $ 1,161,926.00 | $ 370,528.00 | 31.44% | $ 711,458.00 | 64.56% |
| Habitat Soo Zee | Habitat Soo Zee, LLC | 21 | 96 | $ 729,877.00 | $ 307,728.00 | 39.73% | $ 426,216.00 | 59.13% |
| The Pad | The Pad on 20th Street, LLC | 14 | 57 | $ 230,177.00 | $ 118,742.00 | 51.59% | $ 111,434.00 | 48.41% |
| Abbey Road/The Palazzo | Std. Palazzo Housing, LLC | 15 | 48 | $ 393,865.00 | $ 170,920.00 | 43.78% | $ 222,945.00 | 56.24% |
| Providence | Providence Apartments on Menlo, LLC | 20 | 97 | $ 627,803.00 | $ 295,261.00 | 47.04% | $ 332,453.00 | 52.96% |
| Chalet #1 & II | Palmer Housing, LLC | 24 | 156 | $ 430,311.00 | $ 248,033.00 | 41.48% | $ 841,339.00 | 58.15% |







*Purchase Price:* $ 21,000,000
*Square Footage:* 70,130
*Price per foot:* $ 299.44

| | | | | | 2013 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| Acquisition of Land: | | | | | | | | | | | | | | | | |
| Engage Primary Consultants (architect, surveyor, soil engineer, zoning consultant, EIR consultant, traffic consultant, historical consultant, community relations): | | | | | | | | | | | | | | | | |
| Prepare Architectural Design and Project Description: | | | | | | | | | | | | | | | | |
| City and CRA Meetings and Community Outreach: | | | | | | | | | | | | | | | | |
| Notice of Preparation and Scoping Meeting (30 days): | | | | | | | | | | | | | | | | |
| Preparation of Draft EIR including all technical reports: | | | | | | | | | | | | | | | | |
| Public Comment Period for Draft EIR (45 days): | | | | | | | | | | | | | | | | |
| Preparation of Responses to Draft EIR Comments, and Preparation of Final EIR: | | | | | | | | | | | | | | | | |
| CRA Board Hearing (Certify Final EIR and Approves Variations): | | | | | | | | | | | | | | | | |
| Lawsuit Challenging Final EIR and Board Approvals: | | | | | | | | | | | | | | | | |
| File Applications for City Entitlements: | | | | | | | | | | | | | | | | |
| Hearing by CPC Hearing Officer: | | | | | | | | | | | | | | | | |
| CPC Hearing: | | | | | | | | | | | | | | | | |
| Issuance of CPC determination: | | | | | | | | | | | | | | | | |
| Appeal CPC Determination and Processing by City: | | | | | | | | | | | | | | | | |
| Submit Building Permit Application: | | | | | | | | | | | | | | | | |
| PLUM Committee Hearing: | | | | | | | | | | | | | | | | |
| City Council Approval of Project: | | | | | | | | | | | | | | | | |
| City Entitlements Complete: | | | | | | | | | | | | | | | | |
| Lawsuit Challenging Final EIR and City Approvals: | | | | | | | | | | | | | | | | |
| Appeal of CRA and City Lawsuit (Court of Appeal): | | | | | | | | | | | | | | | | |
| Best Case to Break Ground: (assumes complete victory) | | | | | | | | | | | | | | | | |

| | |
|---|---|
| Purchase Price: | $ 21,000,000 |
| Land Square Footage: | 70,000 |
| Price per Foot: | 300.00 |
| Property Tax Rate: | 1.14% |
| | |
| Total Land Purchase Carrying Cost: | $ 21,000,000 |
| | |
| _Ongoing Expenses:_ | |
| Annual Insurance Costs: | $ 17,800 |
| April 10 Property Tax Payment: | $ 119,700 |
| December 10 Property Tax Payment: | $ 119,700 |

| | 3/1/07 - 5/31/08 | 2/1/08 - 7/31/08 | 8/1/08 - 1/31/09 | 2/1/09 - 7/31/09 | 8/1/09 - 1/31/10 | 2/1/10 - 7/31/10 | 8/1/10 - 1/31/11 | 2/1/11 - 7/31/11 | 8/1/11 - 1/31/12 | 2/1/12 - 7/31/12 | 8/1/12 - 1/31/13 | 2/1/13 - 6/1/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Compounded Carrying Cost | $ 21,000,000 | $ 21,126,450 | $ 21,254,900 | $ 21,349,550 | $ 21,515,600 | $ 21,642,350 | $ 21,770,700 | $ 21,896,150 | $ 22,027,500 | $ 22,158,250 | $ 22,165,450 | $ 22,412,350 |
| Property Taxes (April 10 Payment) | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 | 119,700 |
| Property Taxes (December 10 Payment) | 119,700 | | | | | | | | | | | |
| Property Insurance | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 |
| _Total Carrying Cost_ | $ 21,126,450 | $ 21,255,900 | $ 21,349,550 | $ 21,515,600 | $ 21,642,350 | $ 21,770,700 | $ 21,896,150 | $ 22,027,500 | $ 22,158,250 | $ 22,165,450 | $ 22,412,350 | $ 22,531,450 |
| Opportunity Cost Interest Rate: | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% |
| Annual Opportunity Cost | $ 581,032 | $ 584,565 | $ 588,097 | $ 591,830 | $ 595,162 | $ 598,894 | $ 602,227 | $ 605,758 | $ 609,291 | $ 612,824 | $ 616,356 | $ 413,209 |
| Compounded Opportunity Cost | $ 581,032 | $ 1,165,597 | $ 1,753,894 | $ 2,345,524 | $ 2,940,685 | $ 3,539,180 | $ 4,141,407 | $ 4,747,166 | $ 5,356,457 | $ 5,969,281 | $ 6,585,637 | 6,998,842 |
| TOTAL COST: | $ 21,719,442 | $ 22,422,497 | $ 23,121,044 | $ 23,864,104 | $ 24,483,734 | $ 25,309,810 | $ 26,040,557 | $ 26,774,716 | $ 27,512,937 | $ 28,252,791 | $ 24,944,567 | 23,437,334 |

| | |
|---|---|
| TOTAL COST (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING) | $ 29,537,238 |
| TOTAL COST PER FOOT (WITHOUT ANY ENTITLEMENT EXPENSES AT TIME OF GROUNDBREAKING) | $ 421.96 |

_Note:_
We have assumed no increase in property taxes, insurance or interest rate.

**3**
**130**

# THE MARTIN GROUP

May 17, 2007

Alan Smolinisky
Conquest Student Housing
3770 South Figueroa Street
Los Angeles, CA 90007

Dear Alan,

We've been reluctant to respond to your calls or to answer the letter you sent yesterday in light of the threatening statements you made in our meeting last week and because of the aggressive and, we believe, inappropriate actions you've taken subsequently. In particular, we are concerned by the document requests you immediately filed in communities where we are doing business in which you have absolutely no interest other than to harass us; the introduction of personal, non-business matters to induce us to change course; the letter that you sent that reiterated in bold face type your threats to initiate litigation and draw out appeals; the effort you made to go around one of us with calls to the other simply because your call wasn't returned in 20 hours; the letter that appears to have been carefully crafted by litigation lawyers; and the numerous inquiries you've made about us to third parties.

This all creates an alarming pattern and causes us to regard your motives and tactics as anti-competitive. It also convinces us that we should not consider, let alone rely, on any information that you proffer. Indeed, we prefer not to have any conversation with you in which you don't consent in advance to record, or in which counsel is not present.

Your actions and threats to "tie us up in CEQA litigation for six or more years" are, to my mind, completely inappropriate. You know nothing about our project, the process we intend to follow, or any potential CEQA issues. Your only goal seems to be to convince us to either back away from our purchase or end up "the victim", as you bragged you made out of Urban Partners and the Shammas family. In our meeting, you analogized yourself to Al Qaeda. We are starting to agree.

Instead of this type of dialogue, I would welcome the opportunity to share with you our thoughts about why we think our project will be good for you.

- Because we are spending so much on the land, we will need to achieve substantial rents which will uplift the entire market and inure the benefit of Tuscany.

The Martin Group
100 Wilshire Blvd., Suite 1845, Santa Monica, CA 90401
310-393-8006 tel  310-393-2401 fax

www.themartingroup.com

**4**
**131**

– We build quality projects which improve the neighborhoods in which we locate.
– We will attract more people to the area who will shop and dine at Tuscany and who will walk by and appreciate the building first hand.

We believe that our project will be highly complementary. We encourage your support, not your threats and opposition. We do not wish to be an adversary and warmly welcomed you in our office as a neighbor when you first called.

We simply want to develop a first rate project, one that we believe will be well received by the market, by the University and by the City. Unfairly competing and attempting to create and maintain a market monopoly through the tactics of intimidation are not, as you suggested in person, the protected exercise of any constitutional right.

We hope that what we've said may persuade you to take a different course. But from the impression you've quickly given and your past actions, we doubt it. Please know that we don't consider your threats as idle or dismiss them. As you reminded us several times, you've done this successfully in the past, have all the resources you need to do it again, and know how to use lawsuits as weapons to chill our purchase or damage our project. We hear you, but we'll make our own decisions based on what is right, not on threats.

Sincerely,

The Martin Group

*[signature]*

Lee H. Wagman

*[signature]*

J. David Martin

**4**
**132**

## DECLARATION OF WILLIAM "BILLY" RUVELSON

I, William "Billy" Ruvelson, declare as follows:

1.  I am currently the President of Forward Progress Management Real Estate, Inc. ("FPM"). I have held this position since 2006. I have firsthand personal knowledge of the facts set forth below and, if called upon to do so, I would testify to these facts under oath.

2.  FPM is a real estate investment and management company located in Beverly Hills, California.

3.  In mid July, 2007, I received a phone call on my cell phone from Mr. Alan Smolinisky, a principal of Conquest Housing. Mr. Smolinisky introduced himself and requested a meeting with me at Conquest's Tuscany apartment building, to which I agreed.

4.  On August 7th, 2007, I went to the Tuscany to meet with Mr. Smolinisky and Mr. Brian Chen, Mr. Smolinisky's partner and other principal of Conquest Housing. The meeting lasted about one half hour.

5.  The meeting began at Tuscany's conference room where Conquest maintains a large color coded map of the USC area that includes all buildings and owners of sites surrounding USC and soon moved to a private office that was described to me as Mr. Chen's office.

6.  Mr. Smolinisky commented that Conquest knows who owns every site and building on such map and monitors every development that takes place. Mr. Smolinisky boasted about how powerful Conquest is and that it dominates and controls the student housing market near USC.

7.  While discussing rental properties in general, I stated that owning multi-family units was not only a good investment for income purposes, but even more so for appreciation, as the City's population was growing and there was not much in the way of vacant land to develop. Mr. Chen responded that my opinion was inaccurate because now developers are building vertically, or taller, thus reducing the importance of owning land. Mr. Chen's demeanor was becoming hostile at that point.

8.  Mr. Smolinisky expressed to me that it would not be wise of me to get out of my "comfort zone" of owning and managing smaller apartment buildings and compete against Conquest since Conquest has successfully blocked the proposed development projects of much larger developments. Mr. Smolinisky specifically identified Urban Partners and the University Gateway project as one of the developments that Conquest has successfully blocked through litigation.

9.  Mr. Smolinisky stated that he understood from my company's website that FPM planned on developing a 50 unit apartment complex on the Figueroa Corridor just north of their Tuscany project. Mr. Smolinisky represented to me that the City's general plan provides for a floor area ration ("FAR") of no more than 1.5 to 1 when in fact a plan amendment allows for a 4.5 to 1 FAR for a mixed use project that includes a student housing component above retail. Mr. Smolinisky stated something to the effect of "whatever you do, you better keep the property as a gas station. We will make it impossible for you to develop student housing on the property." Mr. Smolinisky further stated something to the effect "that you are sadly mistaken if you think that you will be

**5**
**133**

able to come in and develop a project next to our flagship project." Mr. Smolinisky commented that they have been successful using CEQA to block other projects.

10.    I commented that I had no definitive plans for the property and at no point during the meeting expressed what I intended to develop on the property. Mr. Smolinisky claimed that FPM could only build up to 17 units on the property.

11.    Near the conclusion of the meeting, Mr. Smolinisky stated that because they had informed me of Conquest's intension of blocking the project using litigation, I now had an obligation to disclose these facts to my investors. I viewed that comment as a direct threat. Mr. Smolinisky stated that due to Conquest's litigation, my project will not be completed until 2013. Mr. Smolinisky then showed me a projected costs document relating to my potential development which included a breakdown of over 3 years of litigation.

12.    As I was leaving the meeting, I stated that if FPM is limited to developing only 17 units on the property then I did not understand why such a small project was such a concern for Conquest, and, if it was, that they should consider re-evaluating their business plan.

13.    Following the meeting, I immediately phoned Mr. Eran Fields, my partner on my USC project, to relay the above experience.

14.    Later that day on August 7, 2007, Mr. Smolinisky sent me an email with three attachments which included "FAR Calculation and Costs for Lot", which articulated that without the Plan Amendment, I will only be able to develop 17 units, "Entitlement Information and Costs" which listed Forward Progress Management's costs and again included over 3 years of litigation from Conquest and that stated that "Best Case to Break Ground (assumes complete victory)" would be October 2013 and "GPA Lawsuit" which was a copy of Conquest's CEQA lawsuit against the City. In his email, Mr. Smolinisky stated that I should "feel free to disclose with your investors" the email.

15.    Following receipt of Mr. Smolinisky's email, I forwarded the email to Mr. Fields. Mr. Fields responded to me by noting that the email had confirmed Conquest's threats in the meeting and that Mr. Fields considered Conquest's actions to be blackmail.

16.    Mr. Fields then requested that I send him a brief email summarizing my meeting with Conquest. In response to such request, I sent the following: "They told me that they would sue me if I tried to build any student housing at the location due to the fact that since they are the largest provider of student housing for USC that they didn't want outsiders encroaching on their business."

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 4th day of October, 2007.

William "Billy" Ruvelson

**5**

**134**



# It's Just Too Big

**Phase 1** of University Gateway would dwarf our neighborhood and will be totally incompatible with the surrounding community.

- Eight stories tall, with a total height of 87 feet
- A massive 923,000 square foot building with an 8-story, above-ground parking structure
- 450% bigger (above ground) than the Tuscany student housing project that is currently under construction at Figueroa and Flower
- Dwarfs our small, code-compliant, two- and three-story residential and commercial buildings, as well as a historic single-family home located right across the street from the **Phase 1** project site
- With 421 apartments, almost twice as many residential units as permitted by code in our neighborhood
- All cars will enter and leave the site from 32nd street, a small residential street
- 83,000 square feet of commercial, including a USC bookstore, a USC health and fitness center, and a small amount of student-serving retail and restaurant space – virtually nothing for local residents and families
- Creates more traffic congestion, clogging our streets with cars, including the already gridlocked intersections of Jefferson/Figueroa, Hoover/Jefferson and Figueroa/Adams
- Inevitably leads to Phase 2 and Phase 3 – another 639 apartments
- Allows other developers to come into our neighborhood and build more oversized buildings without creating enough parking – bringing more traffic and crowding to our streets
- The developer is seeking a 93% increase over the maximum residential density, a 145% increase above the the maximum floor area, a 93% increase above the maximum height, a 167% increase in the maximum number of stories, and would use up to 4 acres of scarce land, but is **not providing any community benefit in return**
- The only new residential building in the area with an above ground parking structure
- The project will **not provide any living wage permanent jobs.** All of the jobs created from the USC Bookstore and Health and Fitness Center will be mostly low-paying jobs with the majority of the jobs being filled by USC students

If Phase 1 of University Gateway is allowed to go through – it will mean the end of our neighborhood as we know it.

## WWW.STOPUNIVERSITYGATEWAY.COM



P.O. Box 18199
Los Angeles, CA 90018

Presorted Std
US Postage
PAID
Victory Mail

*Come to the public hearing to stop University Gateway Thursday February 2nd at The CRA, 354 S. Spring St. 4th floor*

S33 P2**********ECRLOT**C033
OCCUPANT
3245 S FIGUEROA ST
LOS ANGELES CA 90007-3739

**6**
**136**

# The Real Plan

University Gateway is just Phase 1 of Urban Partners' and the Shammas family's Master Plan.

Ultimately, Urban Partners and the Shammas family intend to build 1,060 student-oriented apartments on about 16 acres of land on both sides of Figueroa Street. How do we know that? We captured the master plan that was on the Urban Partner's website until February 25, 2005 *(shown at right)*.

**Prior to Feb. 25, 2005, the Urban Partners website stated that:**

One of its "completed projects" was the "University Gateway Master Plan" for "the redevelopment of 16 acres of privately owned land on three parcels immediately north of the USC campus" and that the "first phase, involving 400 units of student-oriented, market rate housing, is under development."



Working with a local property owner and the University of Southern California, Urban Partners created a master plan for redevelopment of 16 acres of privately-owned land on three parcels immediately north of the USC campus. The first phase, involving 400 units of student-oriented, market-rate housing, is under development.
— *from the Urban Partner's website on February 25, 2005*

Their website also included a detailed graphic rendering of the Master Plan (see above), which included:

- Two additional phases of development directly across from the site on the east side of Figueroa Street
- 639 additional apartments in Phase 2 and 3
- Oversized buildings
- Additional parking deficits

When they realized that they could not sneak this past the community, Urban Partners quickly covered up its intentions by removing this material from its website. But we captured the evidence before they could destroy it!

Then, they convinced the Community Redevelopment Agency (CRA) to unlawfully "split" the project to conceal their true intent, while attempting to avoid the preparation of an Environmental Impact Report (EIR) for the whole project or, for that matter, even the **Phase 1** development.

However, when the community learned the real facts, it rose up and forced the CRA to prepare the EIR that has just been released for public comment. Urban Partners and the Shammas family now insist that there are not any other phases planned.

**WE MUST CONTINUE TO SPEAK WITH ONE VOICE TO PROTECT OUR NEIGHBORHOOD!**

**6**
**137**



Here are the facts. They are verified by documents and by common sense experience.

### THE PROJECT DOES NOT COME CLOSE TO MEETING RESIDENTIAL PARKING DEMAND.

- Number of students living in University Gateway: 1,656
- Minimum residential parking demand: 1,200 spaces (Estimated by Glenn Togawa, of Togawa & Smith, the project architect)
- Number of onsite residential spaces: 402

**Do the Math:**
**1,200 - 402 = 798**
DEFICIT of ONSITE RESIDENTIAL PARKING SPACES

### THE PROJECT DOES NOT COME CLOSE TO MEETING CODE REQUIRED ONSITE PARKING EITHER

- Code parking requirement: 1,449 spaces (835 residential + 614 retail)
- Actual onsite parking spaces: 770 spaces (402 residential + 368 retail)
- Number of guest parking spaces for residents: 0
- Offsite parking spaces at UPC: 440 spaces (1,729 walking feet away)

**Do the Math:**
**1,449 - 770 = 679**
DEFICIT of CODE PARKING SPACES ONSITE

### AND THE PROPOSED OFF-SITE PARKING IS MUCH TOO FAR AWAY

- Code limitation for off-site parking distance: not more than 750 feet away
- Actual walking distance: 1,729 feet away from the residential front door of University Gateway to the entrance of the University Parking Center. The UPC can only be accessed by going through a dark tunnel underneath the Harbor Freeway. The tunnel is unsafe and is frequently used as a homeless encampment.

*WOULD YOU WALK A THIRD OF A MILE THROUGH A DARK TUNNEL UNDER A FREEWAY TO A PARKING STRUCTURE THAT HAS INADEQUATE CAPACITY TO GET TO OR FROM YOUR CAR?*

**FACT:**  University Parking Center capacity: 1,911 spaces

**FACT:**  The UPC and all the other University lots are ALL SOLD OUT.

**FACT:**  The Galen Center, a 10,000-seat event center, already has a legal claim to 1,052 of the UPC spaces through a covenant that was recorded on the property on November 24, 2004.

**FACT:**  Even if there were UPC spaces available and anyone was going to walk 1,729 feet under the freeway, the project would still be 358 residential parking spaces short of the minimum residential parking demand (1,200 spaces).

**FACT:**  Phase 1 will house 1,656 students.

**6**
**138**



The Real Troubling Story

**Phase 1** of University Gateway would have significant traffic impacts on our Neighborhood

Student housing has more occupants in a unit than normal apartment housing and generates significantly more traffic



- **Phase 1** of University Gateway would have 1,656 occupants
- There would be four students in each two-bedroom apartment and two students in each one-bedroom apartment.
- Most of the students would have their own cars
- The University Gateway architect has stated that four students in a two-bedroom apartment will have at least three vehicles

**In comparison:** The occupants of most non-student, two-bedroom apartments do not have more than two cars. This is why the Los Angeles Municipal Code only requires two parking spaces for such apartments, and why the actual parking demand is higher than what the city code requires for parking. As previously discussed, they do not meet city code parking either.

Many students already cut through our neighborhood on a regular basis because Figueroa Street and the other commercial streets in the area are already so congested. **Phase 1** of University Gateway would add to the gridlock, endanger pedestrians and further erode our quality of life.

Join your friends, neighbors, fellow students, community groups, and the **Shrine Auditorium** in opposing this project and ask Urban Partners and the Shammas family to be our partners in Responsible Development. This is a low-density community with families, businesses and other students. We welcome code-compliant student housing with adequate parking in our low-rise neighborhood.

If you would like to learn more about Phase 1 of the UNIVERSITY GATEWAY PROJECT or express your concerns or opposition to their plans, please complete the response form below. *Check off or enter all that apply:*

Please let my Government Leaders know that I am most concerned about:

- ❑ Lack of Onsite Parking
- ❑ Too Big for Neighborhood
- ❑ Increased Traffic
- ❑ Neighborhood Safety
- ❑ Serious Violations of City Code
- ❑ Real Intentions of Urban Partners/Shammas Family
- ❑ No community benefits such as low income/affordable housing and living wage permanent jobs
- ❑ Other Concerns _____

_____

Please list me as a supporter of Stop University Gateway.

- ❑ Add me to your mailing/emailing list.
- ❑ Please deliver a "Stop Gateway" sign for my lawn
- ❑ Please deliver a "Stop Gateway" sign for my window

NAME: _____

ADDRESS: _____

CITY: _____

STATE: _____ ZIP: _____

PHONE: _____

FAX: _____

EMAIL: _____

COMMENTS: _____

_____

**6**

**139**



Investment in our neighborhood is vital. However, we want responsible development that conforms to planning and building codes. We want responsible development that provides safety, security, adequate parking, and respect for resident stakeholders. Last year, Urban Partners, LLC and the Shammas family tried to sneak past us Phase 1 of the massive University Gateway development, without an Environmental Impact Report (EIR) and without any public participation.

However, in response to overwhelming opposition, the Community Redevelopment Agency (CRA) finally agreed with us that an EIR was required. On January 9, 2006, the CRA released the Draft EIR for public comment. We have until February 22, 2006 to submit written comments to the CRA expressing our concerns with the project.

**Here are the real facts about the University Gateway project. Facts that Urban Partners and the Shammas family do NOT want you to have...**

University Gateway Phase 1 Parking Problems:
- Only 402 onsite residential parking spaces for 1,656 students
- Requires at least 440 students to walk 1,729 feet through a dark unsafe tunnel underneath the Harbor Freeway to their cars parked at the University Parking Center
- Does not provide nearly enough residential parking for student occupants and no guest parking
- Does not include adequate parking for proposed health and fitness center and the other commercial tenants

How Big Is Phase 1?
- 923,000 square feet above ground
- 450% bigger than the nearby Tuscany Project (above ground)
- 378,000 square feet bigger and nearly double the maximum height permitted by code
- Nearly three times number of allowed floors

What will Phase 1 of University Gateway do?
- Swamp our neighborhood with cars, endlessly circling, seeking a place to park
- Create traffic gridlock in an already congested area and take street parking away from existing residents
- Establish a dangerous precedent by permitting development that ignores all major zoning limitations and is wholly incompatible with our low-density neighborhood





NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

## BUSINESS REPLY MAIL
FIRST-CLASS MAIL      PERMIT NO. 74385      LOS ANGELES CA

POSTAGE WILL BE PAID BY ADDRESSEE

STOP UNIVERSITY GATEWAY
PO BOX 18199
LOS ANGELES CA 90018-0199

Herald Examiner Hearing.txt

1                    LOS ANGELES, CALIFORNIA

2        PLANNING AND LAND USE MANAGEMENT COMMITTEE

3

4     In re:                    )
                                )
5     South Los Angeles Area    )
      Planning Commission       )
6     Meeting.                  )
      _____  )

7

8

9

10

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16

17              Los Angeles City Hall

18              Los Angeles, California

19              Tuesday, March 6, 2007

20

21

22

23    Reported by:
24    DEBBI J. ZAMBITO
      CSR No. 6651
25    JOB No. 207692

0

                                                    2

1                    LOS ANGELES, CALIFORNIA

2        PLANNING AND LAND USE MANAGEMENT COMMITTEE

**7**
**141**

Herald Examiner Hearing.txt

```
 3
 4   In re:                          )
 5   South Los Angeles Area          )
     Planning Commission             )
 6   Meeting.                        )
     ──────────────────────────────  )
 7
 8
 9
10
11
12
13
14        REPORTER'S TRANSCRIPT OF
15   PROCEEDINGS, reported March 6,
16   2007, in Los Angeles, California,
17   by DEBBI J. ZAMBITO, Certified
18   Shorthand Reporter No. 6651.
19
20
21
22
23
24
25
```

0

                                        3

```
 1   APPEARANCES:
 2
 3        COUNCILMEMBERS PRESENT:
 4           ED P. REYES, Chairman
 5           JACK WEISS
```

**7**
**142**

Herald Examiner Hearing.txt

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D

4

1      Los Angeles, California

2      Tuesday, March 6, 2007

3      Los Angeles City Hall

4

5  MS. DIVFENDERFER:  Good afternoon.  Patricia

6 Divfenderfer, staff for the planning department.  The

7 item before you involves a number of requests

8 associated with a project that is a 421-unit student

**7**
**143**

Herald Examiner Hearing.txt

7   Partners projects.

8          But, you know, I do have to add one thing.

9.  I know in this hearing and others you have really

10  focused on this point and I think I would like to say

11  for the record that with respect to the University

12  Gateway project Conquest owns or manages numerous

13  apartment buildings within a block or two blocks or

14  three blocks of this site and has raised very

15  legitimate, and I think overwhelmingly compelling,

16  arguments as to why the EIR is inadequate and why a

17  number of the other actions that you're being asked

18  to take are unlawful.  And that to us is the focus of

19  the proceeding here today and the reason that this

20  appeal was filed.

21          COUNCILMEMBER WEISS:  And let me just say for

22  the record, Mr. Rubens, that the reason in a few

23  moments that I will move to deny the appeal is

24  because I don't think the appeal is meritorious.  I

25  think the applicant's positions are meritorious for

0

57

1   the reasons that have been stated earlier and the

2   reasons that have been stated and worked up by city

3   staff.

4          I will say to you and your client that we

5   don't have a vexatious litigant rule here in the

6   council, but courts do.  There are reasons that

7   courts do and courts are well able to look into

8   records and see what individuals are using the legal

9   system and legal processes appropriately and when

**7
144**

Herald Examiner Hearing.txt

10   they are using it inappropriately, vexatiously and

11   for inappropriate reasons.  I'll leave that at that.

12        Thank you, Mr. Rubens.

13        MR. RUBENS:  Thank you.

14        CHAIRMAN REYES:  Mr. Whitaker.

15        MR. WHITAKER:  The fifth attachment, just so

16   it's in the record and that's -- the fourth one is

17   the California Real Estate Journal article dated

18   September 25, 2006 describing Conquest's actions and

19   tactics.  And the last one is the article to which

20   the USC student referred earlier dated March 1

21   describing the adverse effects of the

22   anti-competition as being created around USC by

23   Conquest in its acquisition -- or dominating the

24   student housing market around USC.  Thank you very

25   much.

0

58

1        CHAIRMAN REYES:  Thank you, Mr. Whitaker.  Thank

2   you, Mr. Rubens.

3        Okay.  Last but not least we have Gabriel

4   Sermino.  I hope you're still in the room.  Thank

5   you, sir.  And this will conclude our public hearing.

6        Thank you for your patience, Mr. Sermino.

7        MR. SERMINO:  Good afternoon, Councilmember

8   Weiss and Chairman Reyes.  My name is Gabriel

9   Sermino.  I represent the mayor's office of housing

10   and economic development and we're here to support

11   the general plan amendment, to change the necessary

12   designations to complete the University Gateway

**7**
**145**



333 South Hope Street | 48th Floor | Los Angeles, CA 90071-1448
213-620-1780 office | 213-620-1398 fax | www.sheppardmullin.com

Writer's Direct Line: 213-617-4155
mklima@sheppardmullin.com

Our File Number: 07BK-114213.

May 26, 2006

BY U.S. MAIL AND FACSIMILE

Mr. Daniel Martinez
City Clerk
City of Oxnard
305 West Third Street
First Floor, West Wing
Oxnard, California  93030
Facsimile: (805) 385-7806

      Re:   RiverPark Apartments Project (RiverPark Master
           Planned Community) – Public Records Act Request

Dear Mr. Martinez:

      Pursuant to the California Public Records Act, we request copies of all of the documents in the files or possession of the City of Oxnard (the "City") regarding the RiverPark Apartments project consisting of 400 apartments (the "Project"), proposed by an entity involving Urban Partners LLC, located in the RiverPark Master Planned Community and designated as Assessor Parcel Number 132011004, including, but not limited to, all of the following:

      1.    Any and all documents relating to environmental review for the Project pursuant to the California Environmental Quality Act, including all technical reports relating thereto.

      2.    Any and all documents relating to any discretionary approval or contract relating to the Project.

      3.    Any and all project, construction or other schedules relating in any way to the Project.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Mr. Daniel Martinez
May 26, 2006
Page 2

4.    Any and all project descriptions, plans, renderings, drawings or specifications relating in any manner to the Project.

5.    Any and all internal memoranda, notes and emails relating in any manner to the Project.

6.    Any and all documents relating in any manner to financing or funding for the Project.

7.    Any and all correspondence between the City and any other person or entity relating in any manner to the Project.

Pursuant to the Public Records Act, we look forward to receiving the requested documents on or before June 6, 2006.  If you let me know when the documents are ready (please call 213-617-4155), I will send someone to your offices to pick them up and pay for them.

We look forward to your prompt response.

Very truly yours,

Mary C. Klima

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-LA:1MCK1\209547359.1

8

147



**SHEPPARD MULLIN**

A T T O R N E Y S   A T   L A W

333 South Hope Street | 48th Floor | Los Angeles, CA 90071-1448
213-620-1780 office | 213-620-1398 fax | www.sheppardmullin.com

Writer's Direct Line: 213-617-4155
mklima@sheppardmullin.com

Our File Number: 07BK-114213

May 26, 2006

**BY U.S. MAIL, FACSIMILE AND EMAIL**

Mr. Scott Greenberg
Director
Department of Community Development
City of Burien
415 SW 150th Street
Burien, Washington 98166-1957
Facsimile: (206) 248-5539
Email: scottg@ci.burien.wa.us

Re:   Burien Town Square Project – Public Records Request

Dear Mr. Greenberg:

Pursuant to RCW Chapter 42.17, we request copies of all of the documents in the files or possession of the City of Burien Department of Community Development (the "Department") regarding the Burien Town Square mixed-use project (the "Project") proposed by Urban Partners LLC and located in the area bounded by 4th Avenue SW to the east, 6th Avenue SW to the west, SW 150th Street to the north, and SW 152nd Street to the south, including, but not limited to, all of the following:

1.      Any and all documents relating to environmental review for the Project pursuant to the State Environmental Policy Act, including all technical reports relating thereto.

2.      Any and all documents relating to any discretionary approval or contract relating to the Project.

3.      Any and all project, construction or other schedules relating in any way to the Project.

**8**
**148**

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Mr. Scott Greenberg
May 26, 2006
Page 2

    4.    Any and all project descriptions, plans, renderings, drawings or specifications relating in any manner to the Project.

    5.    Any and all internal memoranda, notes and emails relating in any manner to the Project.

    6.    Any and all documents relating in any manner to financing or funding for the Project.

    7.    Any and all correspondence between the Department and any other person or entity relating in any manner to the Project.

Pursuant to RCW Chapter 42.17, we look to receiving your response to this document request on or before June 5, 2006. When the documents are ready, please let me know the copy costs (my email address and direct line are set forth at the top of page one) and I will send a check to cover those costs. I will also provide your with our Federal Express billing number to facilitate the overnight delivery of the documents to us.

We look forward to your prompt response.

Very truly yours,

Mary C. Klima

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-LA:1MCK1\0995456&.1

**8**
**149**

C-T 9990



333 South Hope Street | 48th Floor | Los Angeles, CA 90071-1448
213-620-1780 office | 213-620-1398 fax | www.sheppardmullin.com

Writer's Direct Line: 213-617-4155
niklima@sheppardmullin.com

Our File Number: 07BK-114213

May 26, 2006

**BY U.S. MAIL, EMAIL AND FACSIMILE**

Ms. Diane Wren
Custodian of Records
Community Redevelopment Agency
   of the City of Los Angeles
Records Department
354 South Spring Street, Suite 500
Los Angeles, California 90013
Facsimile: (213) 977-1665
Email: dwren@cra.lacity.org

Re:   Herald Examiner Project – Public Records Act Request

Dear Ms. Wren:

Pursuant to the California Public Records Act, we request copies of all of the documents in the files or possession of the City of Los Angeles Community Redevelopment Agency (the "Agency") regarding the Herald Examiner project (the "Project") proposed by Urban Partners LLC and commonly known as 1111 S. Broadway, 1108 S. Hill Street and 120 W. 12th Street (the "Project"), including, but not limited to, all of the following:

1.    Any and all documents relating to environmental review for the Project pursuant to the California Environmental Quality Act, including all technical reports relating thereto.

2.    Any and all documents relating to any discretionary approval or contract relating to the Project.

3.    Any and all project, construction or other schedules relating in any way to the Project.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Ms. Diane Wren
May 26, 2006
Page 2

4.     Any and all project descriptions, plans, renderings, drawings or specifications relating in any manner to the Project.

5.     Any and all internal memoranda, notes and emails relating in any manner to the Project.

6.     Any and all documents relating in any manner to financing or funding for the Project.

7.     Any and all correspondence between the Agency and any other person or entity relating in any manner to the Project.

Pursuant to the Public Records Act, we look forward to receiving the requested documents on or before June 6, 2006. If you let me know when the documents are ready (please call 213-617-4155), I will send someone to your offices to pick them up and pay for them.

We look forward to your prompt response.

Very truly yours,

Mary C. Klima

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-WEST:1MCK1\400000203.1

W K2220



**SHEPPARD MULLIN**

· 333 South Hope Street | 48th Floor | Los Angeles, CA 90071-1448
213-620-1780 *office* | 213 620 1398 *fax* | www.sheppardmullin.com

Writer's Direct Line: 213-617-4155
mkline@sheppardmullin.com

Our File Number: 07BK-114213

May 26, 2006

**BY U.S. MAIL, EMAIL AND FACSIMILE**

Ms. Diane Wren
Custodian of Records
Community Redevelopment Agency
  of the City of Los Angeles
Records Department
354 South Spring Street, Suite 500
Los Angeles, California 90013
Facsimile: (213) 977-1665
Email: dwren@cra.lacity.org

Re:   Wilshire Vermont Project (Northeast Corner of Wilshire Boulevard and Vermont Avenue) – Public Records Act Request

Dear Mr. Martinez:

        Pursuant to the California Public Records Act, we request copies of all of the documents in the files or possession of the City of Los Angeles Community Redevelopment Agency (the "Agency") regarding the Wilshire Vermont mixed-use project (the "Project") consisting of 71,000 square feet of retail space, a Los Angeles Unified School District middle school, 358 new housing units and 90 units of affordable housing, being developed by an entity involving Urban Partners LLC and located adjacent to the Wilshire/Vermont Metro Red Line station and the Metro bus terminal at the northeast corner of Wilshire Boulevard and Vermont Avenue, including, but not limited to, all of the following:

        1.      Any and all documents relating to environmental review for the Project pursuant to the California Environmental Quality Act, including all technical reports relating thereto.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Ms. Diane Wren
May 26, 2006
Page 2

       2.      Any and all documents relating to any discretionary approval or contract relating to the Project.

       3.      Any and all project, construction or other schedules relating in any way to the Project.

       4.      Any and all project descriptions, plans, renderings, drawings or specifications relating in any manner to the Project.

       5.      Any and all internal memoranda, notes and emails relating in any manner to the Project.

       6.      Any and all documents relating in any manner to financing or funding for the Project.

       7.      Any and all correspondence between the Agency and any other person or entity relating in any manner to the Project.

       Pursuant to the *Public Records Act*, we look forward to receiving the requested documents on or before June 6, 2006. If you let me know when the documents are ready (please call 213-617-4155), I will send someone to your offices to pick them up and pay for them.

       We look forward to your prompt response.

                Very truly yours,

                Mary C. Klima

       for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-WEST:1MCK1\400001669.1

**8**
**153**

## DECLARATION OF LUCINDA L. TRAVIS

I, Lucinda L. Travis, declare as follows:

1.     I reside in a condominium complex located at 8641 Glenoaks Boulevard, Unit 116, Sun Valley, California ("Unit"). I am the owner of the Unit as well as the President of the homeowners' association ("Association") of the condominium complex at the above address. I have personal knowledge of the facts set forth herein and if called and sworn as a witness, I could and would testify competently thereto.

2.     In or around 2003, I was informed that an apartment project ("Project") was being proposed on the vacant lots located at 8612, 8614, and 8616 Glenoaks Boulevard, Sun Valley, California, which are directly across the street from our condominium complex. Initially, I was opposed to the Project because I believed that the apartment Project was not a positive addition to our neighborhood because of the number of units (population density), insufficient parking (apartments do not require the same amount of parking as condos), and the Project would alter the look of Glenoaks by destroying our trees on the Boulevard. Subsequently, the developer of the Project proposed condominiums in lieu of apartment units, which adequately addressed my and the Association's concerns.

3.     Steve Strouth owns the condominium unit located at 8641 Glenoaks Boulevard, Unit 221, Sun Valley, California. Mr. Strouth is also the Secretary of the Association.

4.     While I was in Arizona on Labor Day, September 4, 2006, I received a telephone call from Mr. Strouth stating that a person named Casey Smith with Conquest Student Housing was at Mr. Strouth's unit and was telling him that he wanted to help us with our problem across the street. Mr. Strouth stated that Mr. Smith requested him to sign a petition opposing the Project and asked me whether the Association had any opposition to the Project. I told Mr. Strouth that while he was away for several months in India and Ireland, the Project had changed from apartments to condos, less units were being proposed, more parking was being provided, and that we had attended meetings in support of the revised Project. I asked Mr. Strouth not to sign the petition. Mr. Strouth thanked me for informing him of the changes and said he would not

-1-

sign the petition.

     5.    On or about September 8, 2006, Mr. Strouth advised me that Mr. Smith had subsequently called and offered him $1,500 to sign the petition opposing the Project. Mr. Strouth told me that he had not accepted the money at that time. Mr. Strouth asked me what I thought he should do. I told Mr. Strouth that I thought it was wrong, probably illegal, and immoral and unethical to say the least and told him he should not take the money.

     6.    A couple of days later, Mr. Strouth told me that he called Mr. Smith and told him that he decided not to get involved. Mr. Strouth stated that Mr. Smith said he respected Mr. Strouth's integrity.

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this ___17th___ day of September 2006, at San Valley, California.

_Lucinda Travis_
Lucinda L. Travis

-2-
DECLARATION OF LUCINDA L. TRAVIS

9
155

## DECLARATION OF STEVE INOCENTE

I, Steve Inocente, declare as follows:

1.      I reside in a condominium complex located at 8641 Glenoaks Boulevard, Unit 107, Sun Valley, California ("Unit"). I am the owner of the Unit as well as the Vice President of the homeowners' association ("Association") of the condominium complex at the above address. I have personal knowledge of the facts set forth herein and if called and sworn as a witness, I could and would testify competently thereto.

2.      In or around 2003, I was informed that an apartment project ("Project") was being proposed on the vacant lots located at 8612, 8614, and 8616 Glenoaks Boulevard, Sun Valley, California, which are directly across the street from our condominium complex. Initially, I was opposed to the Project because I believed that the Project contained too many units and did not provide sufficient parking. Subsequently, the developer of the Project reduced the number of units, provided additional parking, and proposed condominiums in lieu of apartment units, which adequately addressed my and the Association's concerns.

3.      Steve Strouth owns the condominium unit located at 8641 Glenoaks Boulevard, Unit 221, Sun Valley, California. Mr. Strouth is also the Secretary of the Association.

4.      On September 4, 2006, a person named Casey Smith with Conquest Student Housing visited Mr. Strouth regarding the Project. After Mr. Smith was done meeting with Mr. Strouth, Mr. Smith came to my Unit asking for support to oppose the Project. I told him I would think about it and asked Mr. Smith for his business card, which he gave me. Mr. Smith told me that if I decided to oppose the Project, I should call the person whose name and telephone number Mr. Smith wrote on the back of his business card. A true and correct copy of the front and back side of the business card which Mr. Smith gave me is attached hereto as Exhibit "A" and incorporated by reference herein. Out of curiosity, I asked Mr. Smith what was in it for him and he told me that there was nothing other than the fact that he and Conquest Student Housing were seeking to keep their eyes on Urban Partners because of what Urban Partners did in downtown.

-1-

DECLARATION OF STEVE INOCENTE

**10**
**156**

1       5.      On or about September 8, 2006, Mr. Strouth advised me that Mr. Casey

2   Smith of Conquest Student Housing had called and offered him $1,500 to sign a petition opposing

3   the Project.  Mr. Strouth told me that he refused to accept the money or sign the petition because

4   the Association was now supporting the Project.

5

6       I declare under penalty of perjury under the laws of the State of California that the

7   foregoing is true and correct.

8       Executed this ___/ 7___ day of September 2006, at San Valley, California.

9

10                      Steve Inocente

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

DECLARATION OF STEVE INOCENTE

**10**
**157**

EXHIBIT  A

# CON UEST
## STUDENT HOUSING

### CASEY SMITH

casey@conquesthousing.com

(213) 746-7121
Fax (213) 232-3719
Cell (213) 305-0144

2343 Scarff Street, Suite A
Los Angeles, CA 90007

John Henning
(323) 252 - 4650

**10**
**160**

# DECLARATION OF BRADLEY BLANKENSHIP

1.    The facts set forth herein are true and correct and within my personal knowledge.

2.    I am authorized pursuant to the laws of the State of California to serve legal process.

3.    I was retained by Steptoe & Johnson LLP to serve a Summons, Complaint, and other documents on Julio Orellano ("Orellano"), a named defendant in the matter styled *University of Southern California, et al., v. Conquest Student Housing, LLC, et al.*, United States District Court for the Central District of California, Case No. CV07-05737ER (AJWx).

4.    I was provided with a service address for Orellano of 7912 Satsuma Avenue, Sun Valley, California 91352 (the "Satsuma Residence").

5.    I was aware that a "Mrs. Serrano" at the Satsuma Residence had already told Paul Miller, a process server with First Legal Support Services, that she did not know Orellano. (*See* Affidavit of Reasonable Diligence of Paul Miller, attached as Exhibit A.)

6.    I returned to the Satsuma Residence to inquire further about Orellano's whereabouts in my efforts to locate and serve him.

7.    I spoke with a female at the Satsuma Residence and inquired whether Orellano lived at the Satsuma Residence.

8.    The female stated that she was "just visiting" and did not live at the Satsuma Residence.

9.    I asked the female to locate the person in charge at the residence so I could speak with that individual.

10.    An individual who later identified himself as "Benny" Serrano ("Serrano") and said he was a renter of the Satsuma Residence came to the door. I explained that I was looking for Orellano.

DOC. #536920 V.1

11.    Serrano stated that Orellano had previously rented a room in the back of the Satsuma Residence, but Orellano no longer lived there.  Serrano also stated that Orellano had not lived at the Satsuma Residence for "several months."

12.    When I explained to Serrano that I was attempting to locate and serve Orellano, Mr. Serrano showed me a package addressed to Orellano that the subject had failed to pick up or have forwarded to his new address.

13.    During the course of this conversation with Serrano, I learned that the female that stated she was "just visiting" was the wife of the owner of the Satsuma Residence, Mrs. Serrano.

14.    Later in the evening of Thursday, September 6, 2007, with the intent of locating and serving Orellano, I then proceeded to a residence in North Hollywood, California ("North Hollywood Residence") where I believed Orellano might be living.

15.    At 9:22 p.m. on Thursday, September 6, 2007, I identified an individual at the North Hollywood Residence whom I believed to be Orellano.  Upon inquiring whether he was the Julio Orellano that had lived at the Satsuma Residence, Orellano stated that he previously lived at the Satsuma Residence, but that he moved from the Satsuma Residence to the North Hollywood Residence four to six months ago.

16.    With this positive identification, I served Orellano at the North Hollywood Residence.

I declare under penalty of perjury that the foregoing is true and correct.


_____
BRADLEY BLANKENSHIP

9-11-07
_____
DATE


2
DECLARATION OF BRADLEY BLANKENSHIP

DOC. #536920 V.1

**11**
**162**

**EXHIBIT A**

**11**
**163**

| Attorney or Party without Attorney: LAWRENCE P. RIFF, Bar #104826 STEPTOE & JOHNSON LLP 633 WEST FIFTH STREET SUITE 700 LOS ANGELES, CA  90071 Telephone No: 213-439-9400 | For Court Use Only |
|---|---|

Insert name of Court, and Judicial District and Branch Court:
United States District Court, Central District Of California

Ref. No or File No.:

Plaintiff: UNIVERSITY OF SOUTHERN CALIFORNIA, ETC., ET AL.

Defendant: CONQUEST STUDENT HOUSING, LLC, ETC., ET AL.

| AFFIDAVIT OF REASONABLE DILIGENCE | Hearing Date: | Time: | Dept/Div: | Case Number: CV07-05737 ER (AJWX) |
|---|---|---|---|---|

1.  I, PAUL MILLER, and any employee or independent contractors retained by FIRST LEGAL SUPPORT SERVICES are and were on the dates mentioned herein over the age of eighteen years and not a party to this action.  Personal service was attempted on Defendant JULIO ORELLANO, AN INDIVIDUAL as follows:

2.  Documents:   Summons And Complaint; Civil Cover Sheet; Certification And Notice Of Interested Parties (Local Rule 7.1-1); Notice Of Assignment To United States Magistrate Judge For Discovery; Optical Scanning Enrollment/Update Form; Clerk's Office Services For Attorneys And The General Public ; United States District Court Central District Of California Civility And Professionalism Guidelines ; Notice To Counsel

| Day | Date | Time | Location | Results |
|---|---|---|---|---|
| Tue | 09/04/07 | 2:20pm | Home | PER MRS. SORRANO AT THE DOOR SUBJECT IS UNKNOWN. Attempt made by: PAUL MILLER. Attempt at: 7912 SATSUMA AVE.  SUN VALLEY CA 91352. |
| Tue | 09/04/07 | 5:00pm | Home | Returned Not Served on: JULIO  ORELLANO, AN INDIVIDUAL Home - 7912 SATSUMA AVE. SUN VALLEY, CA. 91352 |

3.  Person Executing
    a. PAUL MILLER
    b. FIRST LEGAL SUPPORT SERVICES
       1511 BEVERLY BOULEVARD
       LOS ANGELES, CA 90026
    c. (213) 250-1111, FAX (213) 250-1197

Recoverable Costs Per CCP 1033.5(a)(4)(B)
d. The Fee for service was:
e. I am: (3) registered California process server
    (i)  Independent Contractor
    (ii)  Registration No.:          5173
    (iii)  County:                  Los Angeles

4.  I declare under penalty of perjury under the laws of the State of California and under the laws of the United States Of America that the foregoing is true and correct.

Date: Wed, Sep. 05, 2007                    AFFIDAVIT OF REASONABLE DILIGENCE                    _____
                                                                                                (PAUL MILLER)

**11**
**164**

CITY OF LOS ANGELES PLANNING COMMISSION

REGULAR MEETING

THURSDAY, SEPTEMBER 28, 2006

VAN NUYS CITY HALL

14410 SYLAN STREET

COUNCIL CHAMBERS, SECOND FLOOR

VAN NUYS, CALIFORNIA 91401

# CERTIFIED COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

IN RE: AGENDA ITEM NO. 4 ONLY

TENTATIVE TRACT NO. 65528-1A

Reported By:

CAROL LYNN COX,

CSR No. 5128

*Karyn Abbott & Associates, Inc.*
Certified Shorthand Reporters
Transamerica Center
1130 S. Olive Street, Suite GL-29
Los Angeles, California 90015
(213) 749 - 1234

1   doesn't review the design of the project.

2       Well, when a tentative tract map says four

3   stories on it, with an application that says four

4   stories on it, and when the subdivider statement says

5   four stories on it, and the design of your condos is

6   two-story units stacked on top of each other equals --

7   two times two equals four stories -- do you really

8   think that if they go ahead and get an approval from

9   this commission and then go to the Department of

10  Building and Safety and they say, "Well, you can't

11  have a four-story project because of the general plan"

12  that they're not going to be in the court suing the

13  City?

14      You're giving them a discretionary approval

15  for a four-story project.  You cannot paint a

16  different picture.

17      COMMISSION PRESIDENT USHER:  Mr. Henning, thank

18  you.  It's my unhappy task to ask you some tough

19  questions that I hope you will understand it's just my

20  role.  I have to do it.

21      There are allegations regarding the

22  appellant Mr. Orellano, and the allegations go

23  something like this:  That he was compensated to file

24  his appeal, that he was solicited by one of the other

25  appellants, that he was put in contact with you by

Karyn Abbott & Associates

14

**12**
**166**

1   virtue of a business card that was left behind.

2          So, Mr. Henning, I'd like to ask you, how

3   did Mr. Orellano come to be an appellant and how did

4   he come to be your client?

5          MR. HENNING:  Mr. Orellano contacted me to

6   represent him.  Further than that, I will not speak to

7   the relationship that I have with him because it will

8   breach my privilege with that client.

9          So I was approached by Mr. Orellano, as

10  lawyers frequently are, to represent him.  That's

11  really all I can say about the relationship.  I'm not

12  going to confirm or deny things that people throw out

13  at me about it.

14         COMMISSION PRESIDENT USHER:  Do you know whether

15  he was compensated in any way to file?

16         MR. HENNING:  I don't know of anything like that.

17  But if I did, I wouldn't be telling the commission,

18  quite frankly, because to discuss anything would --

19         COMMISSION PRESIDENT USHER:  Well,

20  Mr. Orellano -- it would have been very helpful if the

21  appellants themselves would have been here today

22  because they wouldn't be claiming attorney-client

23  privilege.

24         So really, Mr. Henning, your testimony is

25  deficient in some areas that are of great interest to

Karyn Abbott & Associates

15

12
167

1   this commission because we can't understand whether
2   these allegations are true because you won't answer to
3   them.  I can understand why you won't answer to them,
4   but frankly, then, the appellants themselves should
5   have been here today and you indicate they are not.

6       MR. HENNING:  Yes, in fact, they are not.  There
7   are three appellants here, just so I might add.  I
8   might also add that the argument that's being made is
9   really not -- is not -- does not stand and fall on the
10  motivation of a particular appellant.

11      Whatever this commission or the opponents
12  of this particular appellant may characterize, there
13  is -- it's really not relevant to whether this
14  particular project complies with the law.  But I
15  appreciate the question.

16      I'm sure you can understand the limits on
17  what I can talk about.  I was approached to represent
18  this client by this client and I am now his lawyer.

19      COMMISSION PRESIDENT USHER:  Well, let me just
20  suggest to the audience and to staff, if you intend to
21  be an appellant or a party in a case, it would be
22  tremendously important for you yourself to do us the
23  honor of joining us when your case is before us.

24      Okay, Mr. Henning.  Thank you so much.  We
25  do have other speakers on this matter.

16

Karyn Abbott & Associates

12
168

```
 1              Let me next -- Dale, if you are prepared,
 2    I'd like to call Wendy at this time.
 3              I am now turning to the speaker cards that
 4    I have that are opposed to the appeal, and the first
 5    Councilwoman Wendy Greuel.
 6              Dale, do you also wish to speak
 7    separately?
 8         MR. THRUSH:  No.
 9         COMMISSION PRESIDENT USHER:  Very good.
10         COUNCILWOMAN GREUEL:  You called me just as I
11    was walking in.
12         COMMISSION PRESIDENT USHER:  Sorry.  Good
13    morning.
14         COUNCILWOMAN GREUEL:  Good morning.
15         COMMISSION PRESIDENT USHER:  Thank you so much
16    for coming.  And please take the time you need.
17         COUNCILWOMAN GREUEL:  I'm out of breath from
18    running up the stairs.  Thank you very much.
19              I wanted to be here this morning because
20    this is a project, as you see here, one that has been
21    worked -- they worked very closely with the community
22    to make some changes I think that were critically
23    important on landscaping, et cetera.
24              One of the reasons I also wanted to be here
25    is that I was somewhat amazed that the group or the
```

17

1    individual that appealed this project is not from the

2    community and had no involvement in this project

3    whatsoever.  That's not something that I think is very

4    acceptable in the City of Los Angeles and wanted to be

5    here to say very strongly that when you make a

6    decision, you're making a decision on people who are

7    interested in this community, interested in what's

8    going to happen in the creation of affordable housing

9    and building and particularly this area and bringing

10   up the area.  And for individuals who for whatever

11   reason appeal something just for their fancy I think

12   is really, you know, disgraceful.

13          So that's why I wanted to be here this

14   morning, to ask you to support this project and to let

15   it go forward.  We have worked very closely with Dale

16   Thrush -- I'm out of breath, sorry -- with the

17   developer this morning.

18          So really, I wanted just to say I know you

19   understand the importance of it being a project that

20   is supported by the community and the City Council

21   office who has worked very closely with them.

22          I'll answer any questions that you have.

23   COMMISSION PRESIDENT USHER:  Councilwoman, it

24   means everything to us that you came here this

25   morning.  We really appreciate it.

Karyn Abbott & Associates

18

12
170

1     Certainly for the audience, you don't

2  realize it, but we do have a volume of paperwork

3  regarding this case, and the implications about the

4  appellants are very distasteful.

5     You can see that I tried to get some more

6  information, but I was not able to because of the

7  attorney-client privilege, which I do understand and

8  respect, but it does make it quite difficult.

9     COUNCILWOMAN GREUEL:  And I think it's

10  important -- again, that's why I wanted to be here

11  personally -- to send a message to that appellant that

12  it is unacceptable in the City of Los Angeles to go

13  after, for whatever grudge position they have, after a

14  project has been worked on very closely, and I know

15  the Planning Commission today will, as I've heard you

16  say, Jane, the importance of sending a message.

17     This is not a folly.  This is about the

18  creation of some wonderful humans in that community

19  and that we should not be held back based upon this

20  appellant's case.

21     COMMISSION PRESIDENT USHER:  And I'd like all of

22  us to consider the time and resources that are going

23  into this case.

24     COUNCILWOMAN GREUEL:  Yes.

25     COMMISSION PRESIDENT USHER:  You know, I'm

19

CITY OF LOS ANGELES

PLANNING AND LAND USE MANAGEMENT COMMISSION

TUESDAY, DECEMBER 19, 2006

2:00 P.M.

CERTIFIED COPY

BOARD OF PUBLIC WORKS

LOS ANGELES CITY HALL

200 NORTH SPRING STREET

ROYBAL HEARING ROOM 350

REPORTER'S TRANSCRIPT OF PROCEEDINGS

AGENDA ITEM NO. 8 ONLY

APPEAL FILED BY CONQUEST STUDENT HOUSING, ET AL.

RE:   TENTATIVE TRACT NO. 65528

Reported By:

CAROL LYNN COX,

CSR No. 5128

*Karyn Abbott & Associates, Inc.*
Certified Shorthand Reporters
Transamerica Center
1150 S. Olive Street, Suite GL-29
Los Angeles, California 90015
(213) 749-1234



1   A P P E A R A N C E S :

2

3

4                   CITY OF LOS ANGELES
         PLANNING AND LAND USE MANAGEMENT COMMITTEE:

5

6

7       COUNCILMEMBER ED P. REYES, Chair

8       COUNCILMEMBER JOSE HUIZAR

9       COUNCILMEMBER JACK WEISS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                2

1    Los Angeles, California; Tuesday, December 19, 2006

2             (Agenda Item No. 8 Only)

3                  2:00 p.m.

4                     *

5                 -o0o-

6                    *

7    COUNCILMEMBER REYES:  We'll move to agenda

8    item No. 8.

9    MR. MEJIA:  This is an appeal by Conquest

10   Student Housing and they are appealing the CPC

11   decision to approve a tract map for 51-unit

12   residential condominiums, CD2.

13   COUNCILMEMBER REYES:  Okay.  Can we start

14   with No. 8?

15   MR. LOGRANDE:  Good morning.  I'm Mike

16   Logrande, Los Angeles City Planning Department.

17   This appeal is before you.  It went to the

18   citywide planning commission where they held at the

19   advisory agency level to deny the appeal.

20   We'll let the applicant speak about the

21   reason for appealing this, but this is a continued

22   discussion at the citywide planning commission.

23   The commission chair has some very good

24   points in terms of the looking at some of the issues

25   as to why they've appealed and justification for the

3

KARYN ABBOTT & ASSOCIATES

**13
174**

1    appeal.

2            The staff's recommendation is to deny the

3    appeal and sustain the action of the deputy advisory

4    agency of the planning commission.

5    COUNCILMEMEBER REYES:  Any questions?  Seeing

6    none, thank you, sir.

7            Councilwoman Greuel?

8    COUNCILWOMAN GREUBL:  Thank you very much.  I

9    ran, just like I did, actually, to the planning

10   commission to hear me.  I'm breathing heavily a

11   little bit, but it was very, very important for me

12   not only to be at the citywide planning commission

13   but to be here today.

14           I know you all will do the right thing,

15   but I think I wanted to share with you why it's so

16   important that I'm standing here and that we send a

17   clear message.

18           The project before you is a model for the

19   type of planning and development that should be

20   replicated throughout the city.

21           This project started out as a 66-unit

22   apartment complex in Sun Valley.  After opposing the

23   project, the developer engaged in various area

24   outreach and discussions with the stake holders.

25           Through this project, you'll find that it

4

KARYN ABBOTT & ASSOCIATES

**13
175**

1   evolved into a 51-unit condo project with nearly

2   unanimous support from the community.  They worked on

3   landscaping, they worked on access, all of those

4   things that were critically important.

5          Surrounding residents support this

6   project.  The local businesses support the project.

7   The Sun Valley Neighborhood Council supports this

8   project.  And I support this project.  I support this

9   project because it brings needed quality affordable

10  housing to Sun Valley.

11         Now, the tract map was actually approved

12  September 1 of this year.  The only dissenting voice

13  was from a competitor called Conquest Student

14  Housing, the organization that is orchestrating this

15  appeal.

16         Do you know why Conquest opposes this

17  appeal?  I'm still trying to figure out or purporting

18  to figure out the reason.  I know the council will

19  look at this and find this doesn't have much to do

20  with the issue before us, but I do think it's

21  important to send this message.

22         It's because the developer that we have

23  before you today dared to challenge their projects at

24  USC.  They have been retaliating against the

25  applicant by challenging its projects all over the

5

**13**
**176**

1    county, five alone here in the City of Los Angeles.

2         I feel very strongly that this strategy

3    has diminished the city council's ability to do what

4    is right in this instance and in my district.  We

5    have been on appeal for four months.

6         If you could have heard the discussion

7    that occurred at the planning commission, the message

8    was sent not only by me but by the commission that

9    this appeal was unwarranted.  It's cynical, without

10   merit, and it deprives the Sun Valley community of a

11   project that it truly wants and needs.

12        As I mentioned, it has delayed the project

13   by four months.  I hope, and I know you will do this,

14   I hope you will not allowed this charade to continue.

15        There are sort of reports that the

16   appellant in this case has recruited others, paid for

17   by Conquest, and if these reports are true, it really

18   is outrageous to me and I think it's potentially

19   illegal and hope that if possible we refer this

20   matter to the criminal division of the city

21   attorney's office for investigation.

22        So as you can see, I feel pretty strongly

23   about this project.  So I urge you to deny this

24   appeal in the strongest possible terms.

25        We need to send a clear message to

                                                    6

1    Conquest Student Housing, and I will point out to

2    them and anyone else who would consider these tactics

3    in the City of Los Angeles that we will not stand

4    idly by while they harm our communities and stop

5    projects that are wanted and needed in our neighbors.

6

7           I hope that you will send the same message

8    to the planning commission that this is unacceptable.

9    It is time, it is money, and I think it diminishes

10   what we are trying to do in the City of Los Angeles.

11          When you see the staff sitting here, the

12   staff that is back here that was at the planning

13   commission, the time that we have had to spend in my

14   office on this appeal and this issue is outrageous

15   when we could be working on creating more affordable

16   housing in the city.

17          I hope you will deny very strongly this

18   appeal.

19          COUNCILMEMBER REYES:  We have a comment.

20          COUNCILMEMBER WEISS:  Explain the following in

21   terms of the criminal issue.  What was the nature of

22   that?

23          COUNCILWOMAN GREUEL:  Maybe my staff who is

24   present here can present it.  The local appellant in

25   the case, the suggestion was they were recruited and

                                                        7

KARYN ABBOTT & ASSOCIATES              **13**
                                       **178**

1    response to my question was a few miles away.  That
2    was your first statement.  Then you got to ten, and
3    now we're at 20.  You're not disputing that, are you?
4         MR. HENNING:  I don't know one way or the other.
5    It might be 21 miles.  It could be or it might not
6    be.  And I don't deny it.  The addresses will speak
7    for themselves.  I don't have all the addresses.
8         COUNCILMEMBER WEISS:  That's enough.  I think
9    you're done.
10        I think that the record is very clear in
11   terms of the planning record that has been developed
12   in support of Mr. Huizar's motion, and I second
13   Mr. Huizar's motion.
14        I do think that in addition to that, I
15   will just say that there's nothing more important to
16   an advocate in any legal proceeding than credibility.
17   And when an advocate loses his or her credibility, it
18   can cause a decision maker to draw inferences against
19   that client for a variety of reasons.
20        I have found the representations here
21   today by the appellant troubling.  They're certainly
22   internally inconsistent and contradictory, and that
23   leads me to question whether the matter was brought
24   in good faith, to begin with, and I just want to make
25   that part of our records as well.

                                                    26

KARYN ABBOTT & ASSOCIATES

**13
179**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 09/20/07

HONORABLE JOHN A. TORRIBIO     JUDGE    M. VERMILYE      DEPT. SE-G

HONORABLE        JUDGE PRO TEM        DEPUTY CLERK

    R. MASON     Deputy Sheriff    NONE      ELECTRONIC RECORDING MONITOR

| 1:30 pm | BS107193 | | | Reporter |

Plaintiff Counsel    N/A

JULIO ORELLANO; ALAN SMOLINISKY
CONQUEST STUDENT HOUSING LLC
VS.        Defendant Counsel    N/A
CITY OF LOS ANGELES

## NATURE OF PROCEEDINGS:

COURT'S DECISION;

THE LAW IS SETTLED THAT THE CITY'S FINDINGS THAT A
PROJECT IS CONSISTENT WITH ITS GENERAL PLAN CAN BE
REVERSED BY THE COURT ONLY IF THE DECISION IS "BASED
ON EVIDENCE FROM WHICH NO REASONABLE PERSON COULD HAVE
REACHED THE SAME CONCLUSION."  A LOCAL & REGIONAL
MONITOR V. CITY OF LOS ANGELES (1993) 16 CAL.APP.4TH
630, 648 THE COURT "MUST RESOLVE ALL CONFLICTS IN
EVIDENCE IN FAVOR OF THE JUDGMENT OR DECISION OF THE
TRIBUNAL BELOW AND INDULGE IN ALL LEGITIMATE AND
REASONALBE INFERENCE TO SUPPORT IT."  AND WHEN
CONFLICTING EVIDENCE IS BEFORE IT, "IT IS FOR THE
AGENCY TO WEIGH THE PREPONDERANCE OF THE CONFLICTING
EVIDENCE.  GREENEBAUM V. THE CITY OF LOS ANGELES
(1984) 53 CAL.APP3RD 408 AND AT 407-408.

THE COURT FINDS THAT MR. ORELLANO HAS STANDING TO
PURSUE THIS PETITION.  HE IS A RESIDENT OF THE CITY OF
LOS ANGELES AND ALSO HE IS A RESIDENT OF THE GENERAL
AREA WHERE THE PROJECT IS LOCATED.  SEE RESIDENTS
ASSOC. V. CITY COUNCIL (1979) 23 CAL3RD 917, 936 AND
CCP 1921.5.  THIS FINDING RENDERS MOOT THE STATUS OF
THE REMAINING PETITIONERS.

THE COURT FINDS THAT THE PROJECT CONSISTS OF FOUR
FLOORS AS CONTENDED BY THE PETITIONER AND NOT A
MEZZANINE AND ONE FLOOR AS CONTENDED BY THE CITY.  THE

Page   1 of   5    DEPT. SE-G

MINUTES ENTERED
09/20/07
COUNTY CLERK

**14**
**180**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 09/20/07

DEPT. SE-G

HONORABLE JOHN A. TORRIBIO          JUDGE | M. VERMILYE          DEPUTY CLERK

HONORABLE                    JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR

R. MASON          Deputy Sheriff | NONE          Reporter

1:30 pm | BS107193

JULIO ORELLANO; ALAN SMOLINISKY
CONQUEST STUDENT HOUSING LLC
VS.
CITY OF LOS ANGELES

Plaintiff Counsel          N/A

Defendant Counsel          N/A

**NATURE OF PROCEEDINGS:**

COURT IN REACHING THIS DECISION ACCEPTS THE
PETITIONER'S ARGUMENT THAT WHEN YOU DIVIDE THE 96,000
SQUARE FEET OF BUILDING SPACE BY THE NUMBER 4
(4 FLOORS) THE AVERAGE FLOOR IS 24,000 SQUARE FEET.  A
MEZZANINE CANNOT BE MORE THAN 1/3 OF THE FLOOR SPACE
IT COVERS AND THE MATH DOESN'T WORK FOR THE CITY.

IT IS CLEAR THAT AN EXACT MATCH IS NOT REQUIRED
BETWEEN THE GENERAL PLAN AND AN APPROVAL.  THE
APPROVAL ONLY NEED BE IN HARMONY WITH THE PLAN.
SEQUOYA HILLS HOMEOWNERS ASSN. V. CITY OF OAKLAND
(1993) 23 CAL.APP.4TH 704, 717-718. FURTHER THE AGENCY
WHICH ADOPTED THE GENERAL PLAN IN THE FIRST INSTANCE
PURSUANT TO ITS LEGISLATIVE CAPACITY "HAS THE UNIQUE
COMPETENCE TO INTERPRET THOSE POLICIES WHEN APPLYING
THEM IN ITS ADJUDICATORY CAPACITY."  SAVE OUR
PENINSULA COMM. V. MONTEREY COUNTY BD. OF SUPERVISORS
(2001) 87 CAL.APP.4TH 99, 142  THE AGENCY CONSIDERED
THE EFFECTS OF THE PROJECT AND FOUND THAT:

1.   THE PROJECT LOCATES RESIDENTIAL DEVELOPMENT
     ALONG COMMERCIAL CORRIDORS (1 AR, TAB 2, P.6)
2.   LOCATED NEW HOUSING IS A MANNER WHICH REDUCES
     VEHICULAR TRIPS AND INCREASES ACCESSIBILITY
     TO SERVICES AND FACILITIES (1 AR, TAB 2, P.19)
3.   LOCATES HIGHER RESIDENTIAL DENSITIES NEAR
     COMMERCIAL CENTERS, AND MAJOR BUS ROUTES WHERE
     PUBLIC SERVICES, UTILITIES AND TOPOGRAPHY WILL
     ACCOMMODATE THE DEVELOPMENT (1 AR, TAB 2, P.19)

ALSO, DURING THE COURT HEARING IT WAS ADMITTED THAT

Page   2 of   5   DEPT. SE-G

MINUTES ENTERED
09/20/07
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 09/20/07 | | | DEPT. SE-G |
|---|---|---|---|
| HONORABLE JOHN A. TORRIBIO | JUDGE | M. VERMILYE | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| R. MASON | Deputy Sheriff | NONE | Reporter |

| 1:30 pm | BS107193 | Plaintiff Counsel | N/A |
|---|---|---|---|
| | JULIO ORELLANO; ALAN SMOLINISKY CONQUEST STUDENT HOUSING LLC VS. CITY OF LOS ANGELES | Defendant Counsel | N/A |

**NATURE OF PROCEEDINGS:**

THE OCCUPATION DENSITY OF THE CONDOMINIUM PROJECT WAS LESS THAN THE ORIGINAL APARTMENT COMPLEX, BUT THE FLOOR SPACE WAS GREATER.  THE PROJECT WOULD HAVE LESS IMPACT ON TRAVEL, SERVICES ETC. THAN THE APARTMENT COMPLEX.

PETITIONERS CONTEND THAT THE DEVELOPMENT IS IN CONTRA- VENTION OF THE GENERAL PLAN AS IT LIMITS BUILDING TO 3 STORIES.  THE PLANNING STAFF RESPONDED TO THIS BY EXPLAINING THAT THE FOOTNOTE IN QUESTION APPLIED ONLY TO THE COMMERCIALLY PLANNED DEVELOPMENTS AND NOT TO RESIDENTIAL PROPERTY. 8 AR, TAB 182, 1921-22.  THE COURT HAS REVIEWED THE GENERAL PLAN AND IT IS CLEAR THAT THE STORY RESTRICTION APPLIES TO COMMERCIAL AREAS ONLY WHICH ARE DESIGNATED BY THE ORANGE SHADES WHILE THE RESIDENTIAL ARES ARE DESIGNATED BY GREEN SHADES.  THE COURT CANNOT SAY THAT THIS IS AN UNREASONABLE INTERPRETATION OF THE PLAN BY THE AGENCY. DEFERANCE MUST BE GIVEN TO THIS DETERMINATION.  SEE SAVE OUR PENINSULA COMM. PAGE 142.  THIS IS CLEARLY NOT A COMMERCIAL DEVELOPMENT BUT A RESIDENTIAL ONE.

IT IS ALSO IMPORTANT TO NOTE THAT PROJECT IS LIMITED TO 45 FEET IN ELEVATION AND THAT RESPONDENT HAS ASSERTED THAT THIS WILL BE THE HEIGHT OF THE PROJECT. THIS HEIGHT RESTRICTION CONFORMS TO THE ZONING LAWS AND AS NOTED ABOVE THIS IS A RESIDENTIAL PROJECT AND NOT A COMMERCIAL ONE.  THE BOWMAN COURT OF APPEAL WHEN FACED WITH A CHANGE FROM A THREE STORY BUILDING AND A FOUR STORY BUILDING NOTED THAT "(T)HE AESTHETIC DIFFERENCE BETWEEN A FOUR STORY BUIDLING AND A THREE

MINUTES ENTERED
09/20/07
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 09/20/07

DEPT. SE-G

HONORABLE JOHN A. TORRIBIO    JUDGE

HONORABLE    JUDGE PRO TEM

R. MASON    Deputy Sheriff

M. VERMILYE    DEPUTY CLERK

ELECTRONIC RECORDING MONITOR

NONE    Reporter

| 1:30 pm | BS107193 | Plaintiff Counsel | N/A |
|---|---|---|---|
| | JULIO ORELLANO; ALAN SMOLINISKY CONQUEST STUDENT HOUSING LLC VS. CITY OF LOS ANGELES | Defendant Counsel | N/A |

**NATURE OF PROCEEDINGS:**

STORY BUILDING...IS NOT A SIGNIFICANT ENVIRONMENTAL
IMPACT, EVEN UNDER THE FAIR ARGUMENT STANDARD."
EMPHASIS BY THE TRIAL COURT. BOWMAN V. CITY OF
BERKELEY (2004) 122 CAL.APP.4TH 572, 592. IF AN
ADDITION OF ONE STORY IS NOT A SIGNIFICANT ENVIRON-
MENTAL IMPACT THEN CEQA DOES NOT APPLY.

IT MUST ALSO BE REMEMBERED THAT THIS IS A MODIFICATION
OF AN EARLIER MITIGATED NEGATIVE DECLARATION THAT WENT
UNCHALLENGED. SINCE THE MERITS OF THAT MND CANNOT BE
ATTACKED (TEMECULA BAND OF LUISENO MISSION INDIANS V.
RANCHO CALIFORNIA WATER DISTRICT (1964) THE ONLY
REMAINING ISSUE IS WHETHER A SUPPLEMENTAL ENVIRON-
MENTAL REVIEW IS REQUIRED. A SUPPLEMENTAL ENVIRON-
MENTAL REVIEW IS REQUIRED ONLY WHERE THERE ARE
"SUBSTANTIAL CHANGES" TO THE PROJECT. PRC SECTION
21166, 14 CCR SECTION 15612. BASED ON THE BOWMAN CASE
AND THE HEIGHT LIMITATIONS THIS DOES NOT APPEAR TO THE
CASE. PETITIONERS HAVE NOT PRESENTED ANY EVIDENCE,
LET ALONE "SUBSTANTIAL EVIDENCE" THAT THE COURT COULD
CONSIDER TO DETERMINE IF "NO REASONABLE PERSON COULD
HAVE REACHED THE SAME CONCLUSION."

THE WRIT IS DENIED.

A COPY OF THIS MINUTE ORDER IS MAILED VIA U.S. MAIL
ON 9-21-07 TO THE FOLLOWING.

JOHN A. HENNING JR.
125 N. SWEETZER AVE.
LOS ANGELES, CA  90048

Page   4 of   5   DEPT. SE-G

MINUTES ENTERED
09/20/07
COUNTY CLERK

14
183

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 09/20/07

| | | |
|---|---|---|
| HONORABLE JOHN A. TORRIBIO | JUDGE | M. VERMILYE | DEPT. SE-G |
| HONORABLE | JUDGE PRO TEM | | DEPUTY CLERK |
| R. MASON | Deputy Sheriff | NONE | ELECTRONIC RECORDING MONITOR |

|  |  |  |
|---|---|---|
| 1:30 pm | BS107193 | |

JULIO ORELLANO; ALAN SMOLINISKY
CONQUEST STUDENT HOUSING LLC
VS.
CITY OF LOS ANGELES

Plaintiff Counsel    N/A

Defendant Counsel    N/A

Reporter

NATURE OF PROCEEDINGS:

JAMES R. REPKING
COX, CASTLE & NICHOLSON
2049 CENTURY PARK EAST, 28TH FLOOR
LOS ANGELES, CA  90067-3284

MICHAEL H. ZISCHKE
COX, CASTLE & NICHOLSON
555 CALIFORNIA ST. 10TH FLOOR
SAN FRANCISCO, CA  94104-1513

SIEGMUND SHYU
OFFICE OF THE CITY ATTORNEY
200 N. MAIN ST.
700 CITY HALL EAST
LOS ANGELES, CA  90012

Page    5 of    5    DEPT. SE-G

MINUTES ENTERED
09/20/07
COUNTY CLERK

14
184



**FILED**

LOS ANGELES SUPERIOR COURT

AUG 3 1 2007

JOHN A. CLARKE, CLERK

BY S. BARRETT, DEPUTY

1
2
3
4
5
6
7
8

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

9
10
11

HERBERT MOLANO, ALAN SMOLINISKY, and CONQUEST STUDENT HOUSING, LLC, a California limited liability company,

                            Petitioners,

        v.

CITY OF GLENDALE, CALIFORNIA, a governmental entity,

                            Respondent.

DOES 1 through 50, inclusive,

                Real Party in Interest.

) Case No. BS106394
)
) **STATEMENT OF DECISION**
)
)
)
) Department 85
) Honorable Dzintra Janavs
)
) Petition Filed:  December 8, 2006
)
)
)
)
)
)
) Trial Date:  August 27, 2007
)
)
)
)

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**15**
**185**

STATEMENT OF DECISION

# I.  INTRODUCTION

Having taken the matter under submission on August 27, 2007, having considered all of the briefing and oral argument of the parties, and having admitted into evidence Parties stipulation of Facts and the Administrative Record for this case and made evidentiary rulings as reflected in the Minute Order of 8/27/07 re Requests for Judicial Notice, the Court rules as follows:

## A.   PRELIMINARY/PROCEDURAL ISSUES

Petitioner's motion to supplement the administrative record by uncertified volumes 69-83 is denied.   As contended by Respondents, these documents are not properly part of the Administrative Record.  Relevant information concerning the pipe-line projects is contained in the certified Administrative Record.  CEQA does not require the inclusion of 14 additional volumes (2 cardboard boxes) dealing with the review and/or approvals of various applications of the individual pipeline projects.  In any case, the court has reviewed the pages in the uncertified record cited by petitioner and various uncited portions of said records and finds that they add no significant weight to Petitioner's arguments.

As regards Petitioner Molano's standing to bring this CEQA Petition for Writ of Mandamus, the Petition's allegations regarding standing are meager.  However, sufficient evidence has been presented by Declaration filed 8/24/07, that he does have standing.

The allegations are insufficient and there is no evidentiary showing, that Petitioners Conquest student Housing ("Conquest") and Alan Smolinsky have standing.  In fact, evidence has been proferred including a Stipulation of Facts by the parties that Conquest and Petitioner Smolinsky brought this action for economic reasons, to foster their commercial or competitive interest.  Such interests "cannot serve as a beneficial interest" for purposes of CEQA's standing requirements.  (*Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1235; *Regency Outdoor Advertising, Inc. v. City of West Hollywood* (July 25, 2007, B186011__ Cal.App.4th __[pp. 4-5]).  These petitioners have not established, as required by *Waste Management,* a direct and substantial beneficial interest (that they will obtain some benefit from the writ or suffer some detriment from its denial, other than economic) nor that they have any interest over and above the interest held in common by public at large.  Similarly, they

1

STATEMENT OF DECISION

**15**
**186**

1    have not shown standing for a citizen action.  Balancing the interests of petitioners as citizens and

2    the "public duty" and "public need" as required by *Waste Management*, does not weigh in

3    petitioner's favor.  These petitioners lack any connection with the City of Glendale.  Petitioner

4    Conquest is not Sierra Club.

5         Neither Conquest, nor Smolinsky have shown they have standing to challenge Glendale

6    land use decisions.

7         No opposition having been filed, Respondent's motion for judgment  on the pleadings was

8    granted on 8/27/07, as to 4th and 5th causes of action.

9    **B.    SUBSTANTIVE ISSUES**

10        Petitioners seek a writ of mandate commanding Respondent, City of Glendale ("City" or

11   "Respondent") to set aside its decision certifying the Final Environmental Impact Report ("EIR")

12   and approving the Project known as the Downtown Specific Plan ("Plan").  As will be explained

13   below, the writ of mandate, including all causes of action stated therein, is denied.

14        Glendale began preparation of the Downtown Specific Plan in 2003. (AR 13:3035.) These

15   efforts included extensive public involvement, and formation of a Downtown Specific Plan

16   Advisory Group. (AR 13:3038-3040.) In August 2006, the City circulated the Plan's draft EIR for

17   public comment. (AR 1:142-6:1441.) The draft EIR projected a reasonably foreseeable amount of

18   build-out under the Plan, recognizing that certain downtown areas were still viable and not likely

19   to be redeveloped. (AR 6:1294-1299.) The 45-day public comment period closed in October 2006.

20   (AR 9:2016.) Glendale received a total of eight comment letters, each of which generally

21   supported the Plan or offered additional recommendations or guidance, with the exception of

22   comments from Petitioners. (AR 9:2040-2068; 13:3043-3044.)

23        In late October 2006, Glendale issued a final EIR and a separate supplemental response to

24   late comments made by Petitioners. (AR 7:1442-12:2891.) The Planning Commission held a

25   public hearing and recommended certification of the Final Program EIR and approval of the Plan

26   and other associated approvals. (AR 16:3922-3926.) The City Council certified the EIR on October

27   31, 2006 (AR 1:1-3), and approved the Plan on November 7, 2006. (AR 1:4-141; 18:4205-4327.)

28        On December 8, 2006, Petitioners filed a Petition for Writ of Mandate, alleging non-

2

STATEMENT OF DECISION

**15**

1  compliance with the California Environmental Quality Act ("CEQA").

2      On March 2, 2007, Respondent submitted a motion for judgment on the pleadings as to

3  Petitioners' fourth and fifth causes of action.  Petitioners have not opposed the motion.

4  **II.  STANDARD OF REVIEW**

5      As Respondent outlines in its brief, and Petitioners do not dispute, the standard of review in

6  a CEQA case is substantial evidence.

7      Adoption of the Downtown Specific Plan is a legislative action. (*Sierra Club v. Gilroy City*

8  *Council* (1990) 222 Cal.App.3d 30, 39, disapproved on another ground in *Western States*

9  *Petroleum Assn. v. Super. Ct.* (1995) 9 Cal.4th 559, 576.) In a mandate proceeding to review a lead

10  agency's decision to adopt a plan, the proper standard is "whether there was a prejudicial abuse of

11  discretion. Abuse of discretion is established if the agency has not proceeded in a manner required

12  by law or if the determination or decision is not supported by substantial evidence." (Pub.

13  Resources Code, §21168.5.)

14      The California Supreme Court recently clarified this review standard in *Vineyard Area*

15  *Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427,

16  435. As explained by the Court, "while we determine de novo whether the agency has employed

17  the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements'

18  [citation], we accord greater deference to the agency's substantive factual conclusions." (*Id.* at p.

19  435.)

20      In applying the substantial evidence standard "an EIR is presumed adequate, and the

21  plaintiff in a CEQA action has the burden of proving otherwise." (*Barthelemy v. Chino Basin Mun.*

22  *Water Dist.* (1995) 38 Cal.App.4th 1609, 1617.) In applying that standard "the reviewing court

23  must resolve reasonable doubts in favor of the administrative finding and decision." (*Laurel*

24  *Heights Improvement Assn. v. Regents of Univ. of Cal.* (1988) 47 Cal.3d 376, 393, citing *Topanga*

25  *Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514.) And, it is

26  Petitioners' burden to "lay out the evidence favorable to the other side and show why it is lacking."

27  (*Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1028

28  ("*ECOS*"); *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.)

3

1   Glendale determined that a "program" or "first-tier" EIR was appropriate for the Downtown

2   Specific Plan because it is a plan intended to guide and regulate growth within Glendale's

3   downtown area, and will be followed by subsequent project-specific developments that will be

4   subject to further environmental review. (AR 7:1489, 1512; 13:3004.) On that basis, Glendale

5   prepared a program EIR for the Downtown Specific Plan, rather than a project-level EIR. CEQA

6   provides a lead agency with the flexibility to prepare different types of EIRs, including

7   programmatic EIRs in contrast to those for specific development projects. (Pub. Resources Code,

8   §§21068.5, 21093; Cal. Code Regs., tit. 14 ("CEQA Guidelines"), §§15152, 15161, 15168, 15385.)

9   A "program" or "first-tier" EIR is intended to focus environmental review on the

10  environmental issues that are relevant to the approval being considered (*e.g.*, a general/specific

11  plan or zoning approval). (Pub. Resources Code, §§21068.5, 21093; CEQA Guidelines, §§15152,

12  15168, 15385.) The record here demonstrates that Glendale made the same type of discretionary

13  timing and tiering decisions that were upheld in *Al Larson Boat Shop, Inc. v. Board of Harbor*

14  *Commissioners* (1993) 18 Cal.App.4th 729, 743, where the agency decided to first consider a plan

15  under CEQA, and later consider six specific projects pursuant to that plan. The subject EIR's

16  impact analyses determined site-specific environmental review was not "warranted" because of the

17  programmatic nature of the document, and because a plan was being adopted, *not* a project-level

18  approval. (AR 7:1538, 1540-1541.) In addition, as in *Al Larson*, when specific projects are

19  proposed pursuant to the Downtown Specific Plan, Glendale will require further CEQA review and

20  permitting requirements. (AR 1:14, 205; 7:1512; 13:3004.)

21  **II.    CEQA**

22      THE EIR's project description section (AR 7: 1494-1514) covers existing physical

23  conditions.  It describes the project and project location, districts and neighborhoods encompassed,

24  parks, existing zoning designations and objectives for each, and surrounding land uses in

25  considerable detail.  Project objectives are outlined, including providing cultural opportunities.

26  The EIR description includes the eleven different districts of the DSP area, "based on the existing

27  building patterns within each area and the intended development envisioned for the districts." (AR

28  7: 1502).  The EIR then describes each of the districts in detail.  For example, as regards the Alex

4

1   Theatre District, the EIR, among other things states "The vision for Alex Theatre District

2   encourages entertainment activities, restaurants, small scale retail businesses, and other such active

3   pedestrian-oriented activities. New development must be sensitive to landmark status of the Alex

4   Theatre and the traditional "old downtown Main Street" character of this section of Brand

5   Boulevard." (AR 7: 1502).

6       The project description also provides detailed charts, and maps including a list describing

7   Related Development Projects.

8       A. EXISTING PHYSICAL CONDITIONS

9       Petitioners contend that the EIR is inadequate because its description of the existing

10   physical conditions was "incomprehensible." CEQA Guidelines provide that a "description" of the

11   environmental setting is required, and that description "shall be no longer than is necessary" to

12   understand the project's impacts. (CEQA Guidelines, §15125, subd. (a).)

13      Here, the EIR provides an adequate description of the environmental setting, pursuant to

14   CEQA Guidelines, §15125, subdivision (a), and the record shows that the existing physical setting

15   is described, mapped, and pictured in the EIR. (AR 7:1496-1502 (text and maps); 9:2066;

16   12:2682-2688 (EIR Appendix I with lot area and location for individual parcels).) The EIR did not

17   omit any resource or other critical information that would render it insufficient. The EIR describes

18   the surrounding land uses (AR 1:194 7:1497), and the Plan also provides illustrative figures and

19   diagrams that describe the surrounding land uses. (AR 10:2091-2208.) See also Responses to

20   comments. (AR 12:2857-2858)

21      The cases cited by Petitioners are not on point, as they examine situations where an EIR

22   entirely omitted an adjacent sensitive environmental resource, or fundamentally critical

23   information about such a sensitive environmental resource affected by a specific project. (See, e.g.,

24   *Cadiz Land Co., Inc. v. Rail Cycle, L.P.* (2000) 83 Cal.App.4th 74, 91-92; *Galante Vineyards v.*

25   *Monterey Peninsula Water Management. Dist.* (1997) 60 Cal.App.4th 1109, 1122; *San Joaquin*

26   *Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 722-729.)

27   These cases did not require the level of detailed information that Petitioners claim must be

28   included, nor did they involve program EIRS.

5

1       Finally, Glendale provided a "good faith, reasoned analysis in response" to each of

2   Petitioners' comments on this issue. (AR 12:2857-2859; CEQA Guidelines, §15088, subd. (c).)

3   Therefore, the EIR's description of existing conditions is adequate.

4       The EIR's project description complies with CEQA.  It is clear, complete, and shows a

5   good-faith effort at full disclosure.  (CEQA Guidelines §15151.)

6      **B.**   **EXISTING ZONING AND PLANNING**

7       Petitioners claim that the EIR "provides only the barest information regarding the existing

8   backdrop of zoning and planning regulations now governing the area."  They assert that the lack of

9   description precludes users from being able to make basic determinations about the proposed plan

10  and the associated rezoning, thereby rendering the EIR inadequate.

11      The EIR here does describe existing zoning and planning, in both the text, maps, and in

12  responses to comments. (AR 7:1496-1501; 8:1684-1751; see also 12:2858; 54:12985-12987.)

13      Furthermore, CEQA only requires that a program EIR compare a proposed new plan to

14  existing conditions, not to an existing plan or zoning. (CEQA Guidelines, §15125; *Environmental*

15  *Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 352

16  ("*EPIC*").)  Here, the program-level EIR for the Downtown Specific Plan appropriately compared

17  the new plan to existing conditions.  Therefore, the EIR meets the legal requirements with respect

18  to its description of existing zoning and planning.

19     **C.**   **FORSEEABLE BUILD-OUT**

20      Petitioners claim that the project description was "severely curtailed" by understating the

21  full build-out that could be permitted under the Plan, and that to comply with CEQA, the EIR must

22  assume full build-out of development in downtown Glendale.

23      While CEQA does not provide direct authority on this issue, the applicable case law

24  demonstrates that CEQA does not require "worst case" analysis (*Napa Citizens for Honest*

25  *Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 373), but rather

26  requires that an EIR evaluate what is "reasonably foreseeable" based on substantial evidence.

27  (CEQA Guidelines, §15144; see also *Laurel Heights, supra*, 47 Cal.3d at p. 396.)

28      The EIR and Appendix I provide the technical analysis for the Downtown Specific Plan's

6

1    build-out projections. (AR 12:2682-2688; AR 7:1508.) This analysis provides a methodology

2    based on reasonable approximations for the foreseeable build-out of the Plan. The basis for this

3    methodology forecasts the foreseeable development of sites in the Downtown Plan area, which

4    currently contain underperforming or marginal uses, and/or sites with current development interest

5    (referred to as "opportunity sites" and "potential development"), and then "subtracts" impacts from

6    existing uses. (AR 12:2683-2687.) The methodology includes reasonable population assumptions

7    based on use and tables with data pertaining to Glendale's "comparative density analysis" for

8    proposed projects within the Plan area. (AR 12:2688.)

9         The record supports Glendale's analysis. A "worst case" theoretical full build-out was not

10   required, as it would unrealistically assume razing the entire downtown area, despite the fact that

11   many sites will not foreseeably redevelop because they are already developed and contain

12   economically viable uses. (AR 61:14816-14817; *Napa Citizens, supra,* 91 Cal.App.4th at p. 373.)

13   The Administrative Record demonstrates that Glendale has used its "best efforts to find out and

14   disclose all that it reasonably can." (CEQA Guidelines, §15144.) and its reasonable assumptions

15   are supported by substantial evidence.

16        The EIR does not allow any future development "by right" or "actually authorize" future

17   development. The Plan and related EIR make clear that the term "by right" only means the

18   maximum building height *allowable* in a particular zone, conditional on the requisite application,

19   review and approval. (See, e.g., AR 7:1455; 13:2920, 2946, 2992.) The EIR does not exempt

20   future development from obtaining additional discretionary approvals and performing the required

21   level of project-specific environmental review under CEQA. (AR 7:1490, 1512.) Here, as in

22   *ECOS,* Glendale based its assumption on a variety of reasonably foreseeable development

23   constraints, cognizant that project-specific CEQA review for future development would occur at a

24   later time. (*ECOS, supra,* 142 Cal.App.4th at pp. 1036-1038.) Under the law, this program EIR

25   cannot be later applied to limit review of development that goes beyond this EIR's scope of

26   analysis; the record confirms that both the Plan and the EIR here require CEQA review for specific

27   projects. (AR 7:1508; 13:3004.)

28        Glendale's build-out methodology and corresponding environmental review complies with

7

STATEMENT OF DECISION

**15**

1   CEQA requirements for Program EIRS.

2     **D.**    **SHADE IMPACTS**

3      Petitioners contend that shade impacts were improperly deferred to project-level review,

4 despite the fact that four projects were known to Glendale during the preparation of the program

5 EIR. The opening brief asserts that "the EIR merely declares such impacts significant, and then

6 declines to further analyze them" based on the programmatic nature of the EIR.

7      The issue here is whether a project-level analysis is required within the scope of a

8 program EIR. Case law on point holds that a building-by-building analysis is not necessary or

9 appropriate for a program EIR. (*Rio Vista Farm Bur. Center v. County of Solano* (1992) 5

10 Cal.App.4th 351, 374; *Al Larson, supra,* 18 Cal.App.4th at pp. 743, 746.) Additionally, "[t]iering

11 is properly used to defer analysis of environmental impacts and mitigation measures to later phases

12 when the impacts or mitigation measures are not determined by the first-tier approval decision but

13 are specific to the later phases. (*Vineyard, supra,* 40 Cal.4th at p. 431.) Specifically, analysis and

14 identification of mitigation for "site specific effects such as aesthetics or parking' [citation] may be

15 impractical when an entire large project is first approved; under some circumstances analysis of

16 such impacts might be deferred to a later tier EIR." (*Ibid.*)

17      Shade impacts analysis here was not improperly deferred. The EIR properly analyzed

18 shade impacts at the programmatic level, considered the "severity" and the "likelihood of their

19 occurrence", and found that implementing the Plan would create significant and unavoidable

20 impacts to shade-sensitive uses within the Plan area. (AR 7:1538-1541; *Sacramento Old City

21 Assn. v. City Council of Sacramento* (1991) 229 Cal.App.3d 1011, 1033.) The EIR's analysis and

22 Glendale's findings reflected that the shade and shadow assessments for buildings in the Plan area

23 would be evaluated at a project-level, based on the building's unique location, design, height,

24 positioning, dimensions, and surrounding shade-sensitive uses. (AR 1:14-15; 12:2857.) The EIR

25 concluded that there were no known feasible mitigation measures available to avoid or reduce such

26 impacts, and Glendale's City Council elected to find these impacts acceptable when balanced

27 against the Plan's significant public benefits, as articulated in the Statement of Overriding

28 Considerations. (AR 1:14-15, 50-51.)

1   The EIR's program-level analysis of shade impacts complies with CEQA.

2   **E.   THE PIPELINE PROJECTS**

3   Petitioners contend that the project description ignored large projects that are currently "in
4   the planning stages" and, therefore, failed to "fully evaluate them," citing four projects that they
5   claim should have been included in the project description and evaluated at a project-level in the
6   EIR.

7   A project-level analysis is not required within the scope of a program EIR, simply
8   because the projects are in the development pipeline and known to Glendale. As noted above,
9   the case law does not require a building-by-building analysis in a program EIR. (*Rio Vista, supra,*
10   5 Cal.App.4th at p. 374; *Al Larson, supra,* 18 Cal.App.4th at pp. 743, 746.)

11   *Al Larson, supra,* 18 Cal.App.4th 729, is directly on point and demonstrates that tiering
12   through the use of a program-level EIR, with subsequent project-level review, is valid even when
13   information about future projects is available. In *Al Larson,* a five-year plan amendment described
14   six anticipated port projects that would be implemented under the plan; concurrently with the
15   plan's approval, two separate project-specific EIRs were being developed and approved. (*Id.* at pp.
16   736-737, 746-747.) The EIR for the plan amendment focused on a "general overview of
17   cumulative impacts," and provided that cumulative impacts and related mitigation measures would
18   be "addressed in further detail as part of the environmental review of specific projects." (*Id.* at p.
19   746.) The court rejected petitioner's claim that the EIR had deferred analysis of alternatives and
20   cumulative impacts to future project EIRs, and held that "the 'project' in this case was the five-year
21   plan . . . , *rather than the 'approval'* of any of the 'anticipated' projects or their locations." (*Id.* at p.
22   743; italics added.) Specifically, the court held that a program EIR may "legitimately indicate that
23   more detailed information may be considered in future project EIRs." (*Id.* at p. 746; see also *Rio*
24   *Vista, supra,* 5 Cal.App.4th 351.)

25   This Petitioners' statement in reply brief that *Al Larson* "strongly implied that the
26   information in the project-level EIRs should have been incorporated into the master Plan EIR" Is
27   incorrect. None of the cited dicta creates such an implication. (*Al Larson, supra,* 18 Cal.App.4th
28   at pp. 747-748.) Instead, Al Larson sets forth common CEQA doctrines providing that a first-tier

9

STATEMENT OF DECISION

**15**

1  EIR "should focus on the secondary effects... [and] need not be as detailed as an EIR on the

2  specific construction projects that might follow," and that "[a]bsolute perfection is not required"

3  because EIR analysis "is subject to a rule of reason." (*Ibid.*)

4      Here, similarly to *Al Larson,* the Downtown Specific Plan was analyzed in a program EIR.

5  The programmatic review does not approve subsequent projects or exempt them from project-level

6  environmental review. (AR 7:1512; *Al Larson, supra,* 18 Cal.App.4th at p. 743.)   Project-level

7  analysis of specific future projects is not required in this Program EIR.   There is no improper

8  deferral of environmental review or project "segmentation."

9      Furthermore, the EIR did account for the four "pipeline projects" identified by Petitioners

10  in its related development projects list, the build-out assumption, and the cumulative impacts

11  analysis. (AR 7:1513-1514; 12:2682-2688; 17:4104-4106.)   The EIR states that specific

12  development proposals in the DSP area would  be subject to separate project-level environmental

13  review, (AR 7:1512.) and EIRs are, in fact, being prepared for "pipeline projects."   Project level

14  review in a program-level EIR was not required simply because Glendale was aware of some

15  aspects of these projects. (See, *Al Larson, supra,* 18 Cal.App.4th at pp. 743, 746-747.)

16      The Court also notes, in response to footnote 4 of Petitioners' reply brief, that *Friends of*

17  *Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, has

18  been superseded by statute, as recognized in *Citizens for Responsible Equitable Environmental*

19  *Development v. City of San Diego* (*CREED*), 134 Cal.App.4th at 607-608, for the proposition it

20  was cited for in Petitioners' Opening Brief, namely that a "program EIR was obligated to analyze

21  each project's impacts to the extent information was known or reasonably could have been

22  known."  The holding in the *Friends of Mammoth* decision in this regard is no longer good law;

23  furthermore, the *CREED* decision provides clear authority that project-specific analyses of Plan-

24  implementing projects are not required. (*CREED, supra,* 134 Cal.App.4th at p. 608.)

25      F.    CUMULATIVE IMPACTS

26      Petitioners claim that cumulative impacts were understated, focusing on the number of

27  related projects listed in the EIR, a list they claim is "far too limited to satisfy CEQA."

28      CEQA Guidelines require the EIR to discuss cumulative impacts when they are significant.

10

1   (CEQA Guidelines, §15130, subd. (a):, §15065, subd. (a)(3).) The discussion "should be guided by

2   the standards of practicality and reasonableness." (CEQA Guidelines, §15130, subd. (b).) An

3   "adequate" discussion of significant cumulative effects must be based on either a "list of past,

4   present, and probable future projects producing related or cumulative impacts, including, if

5   necessary, those projects outside the control of the agency, or a summary of projections contained

6   in an adopted general plan or related planning document . . . which described or evaluated regional

7   or area wide conditions contributing to the cumulative impact." (CEQA Guidelines, §15130, subd.

8   (b)(1)(A)-(B).) In terms of the geographic scope of the cumulative impacts analysis, "[l]ead

9   agencies should define the geographic scope of the area affected by the cumulative effect and

10  provide a reasonable explanation for the geographic limitation used." (CEQA Guidelines, §15130,

11  subd. (b)(3).) Thus, an EIR that completely ignores cumulative impacts of the project is

12  "inadequate." (*Citizens to Preserve the Ojai v. County of Ventura* (1985) 176 Cal.App.3d 421, 430-

13  431.) But a good-faith and reasonable disclosure of such impacts is sufficient. (*Id.* at pp. 431-432;

14  see also *Al Larson, supra,* 18 Cal.App.4th at p. 749; *Fairview Neighbors v. County of Ventura*

15  (1999) 70 Cal.App.4th 238, 245.)

16       Here, the EIR utilized the "list" and the "projection" methodologies authorized by the

17  CEQA Guidelines, and provided an adequate analysis of cumulative impacts. (AR 7:1513-1514.)

18  The cumulative impacts section of the EIR analyzed each environmental category, establishing a

19  reasonable geographic area for each category. (AR 7:1515-9:1918; 12:2861-62.) Where

20  appropriate, the EIR also considered the regional significance of various cumulative impacts. (AR

21  7:1513-1514; 8:1680-1681; 11:2580.)   The selection of the proper area for assessment of

22  cumulative impacts is within the lead agency's discretion, and will not be rejected unless it is

23  "arbitrary." (*Ebbetts Pass Forest Watch v. Dept. of Forestry and Fire Protection* (2004) 123

24  Cal.App.4th 1331, 1351; see also CEQA Guidelines, §15130, subd. (b)(3).)

25       The EIR properly analyzed cumulative impacts, as required under CEQA.

26  G.   LIGHTING AND GLARE

27

28  Petitioners claim that the mitigation for glare was rendered illusory because the measures

11

1  are dependent upon a determination by individual project proponents that the prescribed action is

2  "appropriate" and/or "feasible."

3      The policy set forth for CEQA mitigation measures is as follows: "the procedures required

4  by [CEQA] are intended to assist public agencies in systematically identifying both the significant

5  effects of proposed projects and the . . . feasible mitigation measures. . . ." (Pub. Resources Code,

6  §21002.) "Feasible" is defined to mean "capable of being accomplished in a successful manner

7  within a reasonable period of time, taking into account economic, environmental, social, and

8  technological factors." (Pub. Resources Code, §21061.1.) In the first instance then, mitigation

9  measures are required by law to be "feasible," and EIRs "shall describe feasible measures which

10  could minimize significant adverse impacts." (CEQA Guidelines, §15126.4 , subd. (a)(1).) In

11  addition, in applying the standards for adequacy of an EIR, CEQA makes clear that the

12  "sufficiency of an EIR is to be reviewed in light of what is reasonably feasible." (CEQA

13  Guidelines, §15151.)

14      In the setting of a program EIR, as here, where subsequent actions in the program will be

15  examined in light of the program EIR, "[a]n agency shall incorporate feasible mitigation measures

16  . . . developed in the program EIR into subsequent actions in the program." (CEQA Guidelines,

17  §15168, subd. (c)(3).) The enforcement of such measures is ensured through adoption of the

18  required mitigation monitoring program. (Pub. Resources Code, §21081.6.) Against this backdrop,

19  CEQA cases have found mitigation measures are illusory only when they "could not be effectual

20  whenever and however attempted." (*Fairview Neighbors, supra,* 70 Cal.App.4th at p. 244.)

21      Here, the EIR evaluated whether the Downtown Specific Plan would create new sources of

22  substantial light or glare. (AR 7:1536-1537.) It concluded that while new lighting impacts from

23  signage and other substantial nighttime lighting in downtown Glendale would be less-than-

24  significant, because the downtown is already developed, the addition of new sources of glare from

25  reflective building surfaces would result in a potentially significant impact. (*Ibid.*) The EIR

26  identified seven program-level mitigation measures to reduce such impacts to less-than-significant

27  levels, which include "provisions to ensure that lighting spillover onto any adjacent sensitive uses

28  . . . would be minimized and glare impacts from reflective surfaces would be reduced or eliminated

STATEMENT OF DECISION

1    to the extent feasible." (AR 7:1537.) The EIR disclosed that the mitigation reducing light/glare

2    impacts to less-than-significant "will be carried forward in the planning process and applied to

3    future project-level CEQA review for specific projects proposed under the [Plan]." (*Ibid.*) In

4    addition, the EIR stated that "project-level design plans will be evaluated to determine the extent of

5    potential lighting and glare impacts upon adjacent sensitive uses. If necessary, additional project-

6    specific design features and project-specific mitigation will be developed as part of each project to

7    minimize potential lighting and glare impacts." (AR 7:1538.)

8          In response to comments on this issue, the EIR stated that terms like "feasible" or

9    "appropriate" do not place limitations on implementing the measures (AR 61:14821); instead,

10   these statements are declaratory of existing law under CEQA. Additionally, the light/glare impacts

11   are reduced from significant to less-than-significant by those measures that do not include such

12   terms. (*Ibid.*) For example, Mitigation Measure 4.1-1(a), "requires [that] new exterior lighting to

13   be oriented and focused onto the specific on-site location intended for illumination." (*Ibid.*) "[T]his

14   measure . . . reduces the effects of night lighting on adjacent areas to less-than-significant levels.

15   This measure must be implemented in all cases . . . [A]ll other mitigation measures assist in further

16   reducing the impact, but they are not the determinants of the significance conclusion." (*Ibid.*)

17   These mitigation findings are consistent with *Laurel Heights*, which held that, "*taken as a whole,*

18   there was substantial evidence to support the . . . conclusion that the environmental effects of the

19   project . . . will be mitigated." (*Laurel Heights, supra,* 47 Cal.3d at p. 422, original italics.)

20         Glendale adopted the light/glare mitigation measures (AR 1:13-14) and the mitigation

21   monitoring program, including "corrective action" if the adopted mitigation measures are not

22   implemented. (AR 9:2070-2071.)   Contrary to Petitioners' claim, the adopted mitigation

23   monitoring program does not leave implementation and "feasibility" determinations to the project

24   proponent. Rather, the program includes monitoring provisions stating that, "[p]rior to the issuance

25   of building permits, while detailed development plans are being prepared for approval by City

26   staff, City staff will be responsible for ensuring compliance with the mitigation monitoring

27   applicable to the project design phase." (AR 9:2070.) The program also imposes reporting

28   requirements on City staff. (*Ibid*; AR 18:4430-4431.) As stated above, the mitigation measures

1   also are to be "carried forward" and "applied to future project-level CEQA review for specific

2   projects proposed under the [Plan]." (AR 7:1537.)

3       These measures are fashioned to lessen light/glare impacts, will be implemented at a

4   project-specific review level where allowed by law, and are contained in an adopted, enforceable

5   mitigation monitoring program. (AR 1:48; 9:2070-2072.) The measures comply with CEQA and

6   are enforceable under CEQA.

7       **H.**   RESPONSE TO COMMENTS REGARDING HISTORIC STRUCTURES

8       Petitioners assert the EIR "did not consider" two mitigation suggestions regarding historic

9   structures that were proposed by Petitioners in their October 9, 2006 comment letter. (AR 12:2847,

10  2865.), and the Final EIR "summarily dismissed" their mitigation proposals by a cursory response

11  and concluding that "the additional mitigations listed in this comment are not relevant." (AR

12  12:2865 [response 42].) Petitioners claim that because their proposed measures were not facially

13  infeasible, the EIR's response violated CEQA.

14      CEQA Guidelines section 15088 addresses evaluation of and response to comments on a

15  draft EIR. Specifically, the lead agency must "respond to comments received during the noticed

16  comment period . . . and may respond to late comments." (*Id.* at subd. (a).) The written responses

17  must address specific recommendations relating to major environmental issues and explain why

18  particular comments or suggestions were not accepted, all the while endeavoring to provide a

19  "good faith, reasoned analysis" in response. (*Id.* at subd. (c).) However, the lead agency "need not,

20  under CEQA, adopt every nickel and dime mitigation scheme brought to its attention." (*A Local

21  and Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1809 ; see also *id.* at pp.

22  1810-1811 ["superior court correctly determined that the City Council was not required under

23  CEQA to adopt, verbatim, all of ALARM's proposed mitigations"].)

24      First, Glendale was under *no* obligation to respond to Mr. Henning's comment, because it

25  was submitted after the close of the public review period. (AR 1:4 ["[N]otice was duly provided to

26  the public, government agencies and all other interested parties that they may submit written

27  comments on the Draft EIR to the City on or before October 2, 2006."]; AR 9:2016.) The appellate

28  court in *Browning-Ferris Industries v. City Council* (1986) 181 Cal.App.3d 852, 862, confirmed

<div align="center">14</div>

<div align="center">STATEMENT OF DECISION</div>

<div align="right">**15.**</div>

1   "there is no requirement that an agency respond in writing to comments submitted after expiration

2   of the comment period."  The fact that Petitioners notified Glendale that they would be submitting

3   late comments does not render them timely.

4        Second, the comment submitted was general in nature and, therefore, a general response

5   was sufficient.  The single sentence in Petitioners' October 9, 2006 comment letter suggested that,

6   "[a]dditional mitigation measures should include use [of] façade easements, possibly financed with

7   redevelopment funds, and use of the State Historic Building Code which eases requirements for

8   upgrades to current codes which can be prohibitively expensive." (AR 12:2847 (Comment 42).)

9   Glendale responded that CEQA Guidelines section 15126.4, subdivision (b) provides specific

10  information on what constitutes adequate mitigation for historic resources, including "that where

11  alterations to Historical Resources are conducted in a manner consistent with the Secretary of the

12  Interior's Standards for the Treatment of Historic Properties, impacts generally would be reduced

13  to less-than-significant levels."  (AR 12:2865 (Response 42).)  On that basis, the EIR stated that

14  the additional mitigations listed in Petitioners' comment were not relevant to the analysis.  "[T]he

15  determination of the sufficiency of the agency's responses to comments on the draft EIR turns

16  upon the detail required in the responses . . . [and, therefore,] [w]here a general comment is made,

17  a general response is sufficient." (*Browning-Ferris, supra,* 181 Cal.App.3d at p. 862.) The

18  response provided to Petitioners' late mitigation suggestions was substantively sufficient in that an

19  explanation was provided as to why previously proposed mitigation measures, included in the EIR,

20  were preferred and adequate.

21        Finally, the mitigation measures proposed by Petitioners were already encompassed by the

22  mitigation measures in the EIR, which rendered the suggested mitigation "not relevant," as stated

23  in the response to comment. (AR 12:2865 (Response 42); AR 12:2861 (Response 21).)  At the

24  program level, the EIR's adopted mitigation measures include the requirement that if a future

25  development project within the Plan area is proposed on or immediately surrounding a site

26  containing a known historic resource, project-level environmental review will be required to

27  consider such impacts, including preparation of an intensive-level historic resources survey. (AR

28  7:1611; and see AR 7:1612 (Mitigation Measure 4.4-4(d)).) If the specific project calls for

15